# EXHIBIT C

**OPERATING AGREEMENT**
**GREENBACK BUSINESS SERVICES LLC**

A Wyoming Limited Liability Company

**THE INTERESTS DESCRIBED AND REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR ANY APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND ARE RESTRICTED SECURITIES AS THAT TERM IS DEFINED IN RULE 144 UNDER THE ACT. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR QUALIFICATION UNDER THE ACT AND APPLICABLE STATE ACTS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE ACTS, THE AVAILABILITY OF WHICH IS TO BE ESTABLISHED TO THE SATISFACTION OF THE COMPANY.**

**THIS OPERATING AGREEMENT** (the "Operating Agreement") is effective as of May 27, 2022 (the "Effective Date"), by and among Greenback Business Services LLC, a Wyoming Limited Liability Company (the "Company") and the members of the Company identified on the attached Exhibit A (referred to individually as a "Member" and collectively as the "Members"), as the same may be amended from time to time, who agree as follows:

**ARTICLE I**
**ORGANIZATION**

1.1     Formation.  The Company has been organized as a Wyoming Limited Liability Company by the filing of Articles of Organization ("Articles") with the State of Wyoming.

1.2     Name.  The name of the Company shall be Greenback Business Services LLC, a Wyoming Limited Liability Company. The Company may also conduct its business under one or more assumed names.

1.3     Purposes.  The purposes of the Company are to engage in any activity for which Limited Liability Companies may be formed under the Wyoming Limited Liability Company Act. The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act.

1.4     Duration.  The Company shall continue in existence for the period fixed in the Articles for the duration of the Company or until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Operating Agreement.

1.5     Registered Office and Resident Agent.  The Registered Office and Resident Agent of the Company shall be as designated in the initial Articles or any amendment thereof. The Registered Office and/or Resident Agent may be changed from time to time. Any such change shall be made

1

in accordance with the Act.  If the Resident Agent shall ever resign, the Company shall promptly appoint a successor.

1.6     Intention for Company.  The Members have formed the Company as a Limited Liability Company under and pursuant to the Wyoming Limited Liability Company Act.  The Members specifically intend and agree that the Company not be a partnership (including, a limited partnership) or any other venture, but a Limited Liability Company under and pursuant to the Act and the Wyoming Limited Liability Company Act.

1.7     Contracts with Interested Members.  The Company may enter into contracts or transact business with its Members, including but not limited to agreements to provide services to the Company or with any entity in which a Member is personally interested; and in the absence of fraud, no such contract or transaction shall be invalidated or affected, nor shall the interested Member be liable to the Company or its other Members, by the fact of such common interest or involvement so long as the contract or transaction is fair and reasonable to the Company.

## ARTICLE II
## ADMINISTRATIVE PROVISIONS

2.1     Books of Account.  At all times during the continuance of the Company, the Company shall keep, or cause to be kept, full and true books of account reflecting each of the Company's transactions. These books of account, together with a list of the name and address of each Member, a copy of the Articles, copies of the Company's financial statements and federal, state, and local tax returns and reports for the three most recent fiscal years, and copies of records that would enable a Member to determine the Member's Units shall be maintained at all times at the Company's registered office. These books shall be open to reasonable inspection and examination by the Members or their duly authorized representatives at the Company's registered office, during reasonable business hours, on reasonable notice to the Company. The Company may engage certified public accountants to assist in the preparation of the Company's books and financial statements and to render any other services the Company requests.

2.2     Reports.  The Company shall endeavor to furnish to each Member within 90 days after the end of each fiscal year, or as soon as practical thereafter, an annual report of the Company's business and operations during the year, together with such information as may be necessary for the preparation of each Member's federal and state income or other tax returns. The annual report shall contain a copy of the Company's annual financial statement showing the Company's gross receipts and expenses and profit or loss and the allocations of them to each Member for the year.

2.3     Fiscal Year and Accounting Method.  The Company's fiscal year shall be the calendar year. The particular accounting methods and principals to be followed by the Company shall be selected by the Members from time to time.

2.4     Bank Accounts.  One or more Company bank accounts may be established, and checks issued on these accounts shall be signed as designated by the Managers.

2

2.5     Partnership Representative.

     2.5.1    The partnership representative of the Company within the meaning of Section 6223 of the IRC, as amended by the Bipartisan Budget Act of 2015, shall initially be **David McKeegan**, who shall be authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and other expenses reasonably incurred in connection with such examinations.

     2.5.2    Each Member shall reflect on his or her individual income tax return all items of income, gain, loss, deduction, or credit relating to the Company, its property, or its business in a manner that is consistent with the treatment of such items on the Company returns.

## ARTICLE III
## CAPITAL CONTRIBUTIONS, MEMBERSHIP INTERESTS, AND CAPITAL ACCOUNTS

3.1     Membership Interests.  Each Member owns a Membership Interest (as defined in the Section 102(2)(q) of the Act) in the Company, represented by the number of membership interest units ("Units") set forth next to each Member's name on Exhibit A).  The percentage of all Units issued and outstanding in proportion to the Units issued to any particular Member is referred to as the "Membership Interest Percentage".

3.2     Members' Capital Accounts.

     3.2.1    The Company shall maintain a separate bookkeeping account (a "Capital Account") for each Member, which shall be:

        (a)     increased (i) for the amount of cash and the fair market value of any property (net of any liabilities secured by the property that the Company assumes or takes subject to) that the Member contributes, and (ii) for the Member's share of any of the Company's income or gain; and

        (b)     decreased (i) for the amount of any cash and the fair market value of any property (net of any liabilities secured by the property that the Member assumes or takes subject to) distributed to the Member, (ii) for the Member's share of any losses and deductions of the Company, and (iii) for any expenditures under IRC 705(a)(2)(B).

     3.2.2    If a Member's Units, or any portion of them, are transferred in accordance with this Operating Agreement, the transferee shall succeed to the Capital Account of the transferring Member or to any portion that is transferred.

     3.2.3    All of the provisions above regarding the establishment and maintenance of Capital Accounts are intended to comply with Treas. Reg. 1.704-1(b)(2)(iv) and shall be interpreted and

applied to comply with this Treasury Regulation. The Members further agree to make any adjustments to the Capital Accounts that may be necessary or appropriate to comply with the Treasury Regulation.

3.2.4    Except as otherwise expressly provided in this Operating Agreement or under the Act, no Member is entitled to receive any interest or return on any contributions to the Company or on the Member's Capital Account, nor does any Member have any interest, right, or claim in or to any of the Company's assets.

3.3    Issuance of Additional Units. The Company is initially authorized to issue 100 Units. The Company may issue additional Units for such consideration as permitted by the Act, on the consent of the Managers. Any purchaser of Units from the Company shall become a Member of the Company after executing an amendment to this Operating Agreement, agreeing to be bound by all of the terms and provisions of this Operating Agreement and satisfying any other conditions of Membership as the Company may require.

3.4    Capital Contributions. No Member shall be required to make capital contributions to the Company.

## ARTICLE IV
## TAX ALLOCATIONS

4.1    Allocation of Profits and Losses. The Company's income, gain, loss, deduction, or credit ("Profits and Losses") shall be allocated among the Members first, so that their Capital Account balances are, as nearly as possible, in the same ratios as their respective Units, and then pro rata, in accordance with the Units held by each Member. Notwithstanding the above, net losses allocated to the Members shall not exceed the maximum amount of net loss that can be so allocated without causing any member to have an adjusted Capital Account deficit at the end of any fiscal year. In the event some, but not all, of the Members would have adjusted Capital Account deficits as a consequence of an allocation of net losses, the limitation on net loss allocation shall be applied on a Member by Member basis so as to allocate the maximum permissible net loss to each Member under the IRC.

4.2    Regulatory Allocations.        The following regulatory allocations apply:

4.2.1    *Minimum-Gain Chargeback*. To the extent and in the manner required by Treas. Reg. 1.704-2(f), if there is a net decrease in Company Minimum Gain for any fiscal year, each Member shall be allocated items of Company income or gain for such fiscal year (and, if necessary, succeeding fiscal years) equal to such Member's share of the net decrease in Company Minimum Gain determined under Treas. Reg. 1.704-2(g). This Section 4.2.1 shall be interpreted and applied in a manner consistent with the minimum-gain chargeback requirements of Treas. Reg. 1.704-2(f).

4.2.2    *Member Minimum-Gain Chargeback*. To the extent and in the manner required by Treas. Reg. 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain, each Member with a share of Member Minimum Gain shall be allocated items of Company income and gain for such fiscal year (and, if necessary, succeeding fiscal years) in an amount equal to the Member's share

4

of the net decrease in Member Minimum Gain. The items to be allocated shall be determined in accordance with Treas. Reg. 1.704-2(f)(6). This section 4.2.2 shall be interpreted and applied in a manner consistent with the minimum-gain chargeback requirement of Treas. Reg. 1.704-2(i)(4).

4.2.3   *Qualified Income Offset*.   Any Member who unexpectedly receives any adjustment, allocation, or distribution described in Treas. Reg. 1.704-1(b)(2)(ii)(d)(4), (5), or (6) shall be allocated items of Company income and gain (consistent with a pro rata portion of each item of income, including gross income, and gain for such fiscal year) in an amount and manner sufficient to eliminate, as quickly as possible, any deficit in the Member's Capital Account.

4.2.4   *Company Nonrecourse Deductions*.   Any Company Non Recourse Deductions shall be allocated among the Members in accordance with Treas. Reg. 1.704-2(e).

4.2.5   *Member Nonrecourse Deductions*.   Member Nonrecourse Deductions shall be allocated to the Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which Member Nonrecourse Deductions are attributable.  This Section 4.2.5 shall be interpreted and applied in a manner consistent with Treas. Reg. 1.704-2(i)(1).

4.3   Allocations Regarding Contributed Property.   Items of income, gain, loss, and deduction with respect to any property contributed to the Company by any Member shall be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value for Capital Account purposes, in accordance with IRC 704(c) and the Treasury Regulations promulgated thereunder. If the value of the property is later adjusted, subsequent allocations of income, gain, loss, and deduction with respect to the property shall be made in accordance with any method permitted by IRC 704(c) and the Treasury Regulations promulgated under it.

4.4   Definitions.   For purposes of this Operating Agreement, the following definitions shall apply:

4.4.1   "Company Nonrecourse Deductions" has the same meaning as that term in Treas. Reg. 1.704-2(b)(1).

4.4.2   "Member Nonrecourse Deductions" has the same meaning as that term in Treas. Reg. 1.704-2(i)(2).

4.4.3   "Member Nonrecourse Debt" has the same meaning as that term in Treas. Reg. 1.704-2(b)(4).

4.4.4   "Member Minimum Gain" means an amount, with respect to any Member Nonrecourse Debt, as determined in accordance with Treas. Reg. 1.704-2(i)(3).

4.4.5   "Company Minimum Gain" has the same meaning as that term in Treas. Reg. 1.704-2(b)(2), (d).

4.4.6   "IRC" means the Internal Revenue Code of 1986, as amended, and its related Treasury Regulations (collectively, the "IRC").

4.5   <u>Interpretation</u>.   The Members intend that the allocations of the Company's Profits and Losses shall be applied in a manner consistent with IRC 704 and the Treasury Regulations promulgated under it.   The provisions of this Article IV shall be interpreted in a manner consistent with IRC 704 and the Treasury Regulations promulgated under it.

**ARTICLE V**
**DISTRIBUTIONS**

5.1   <u>Distributions</u>.

5.1.1   The Managers may make distributions of Excess Cash to the Members from time to time.

The term "Excess Cash" shall mean that portion of the cash and cash equivalent assets of the Company, which in light of the Company's then, current, and foreseeable sources and needs for cash, exceeds the amount needed by the Company to (i) service debts and obligations, and (ii) conduct its business and carry out its purposes.   The Company may retain Excess Cash and reinvest the Excess Cash or reserve such Excess Cash to fund the business plan and ongoing working capital needs of the Company, and as determined by the Managers.

5.1.2   Distributions of Excess Cash shall be in cash or property or partially in both, as determined by the Members. No distribution shall be declared or made if, after giving it effect, the Company would not be able to pay its debts as they become due in the usual course of business or the Company's total assets would be less than the sum of its total liabilities plus, the amount that would be needed if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members upon dissolution that are superior to the rights of the Members receiving the distribution.

5.1.3   Distributions shall be made in proportion to the Member's Membership Interest Percentages.

**ARTICLE VI**
**DISPOSITION OF MEMBERSHIP INTERESTS**
**AND MEMBER SERVICE**

6.1   <u>Restriction on Transfer</u>.

6.1.1.   Except as hereinafter expressly provided, the Members shall not sell, assign, transfer, pledge, hypothecate, or otherwise dispose of any of their Membership Interest in the Company by operation of law or otherwise without the prior written consent of the Managers of the Company.   The term "dispose of" as used in this paragraph shall include the sale, assignment, transfer, conveyance, gift, exchange, devise, encumbrance, pledge, hypothecation, and any other

disposition of Membership Interests, whether voluntary, involuntary or otherwise, including any distribution by an administrator or personal representative or trustee.

6.1.2.   The Members may, by providing thirty (30) day advance written notice to the Company (the "Notice Period") transfer Membership Interests without consideration to an Approved Trust unless the disposition would cause a termination of the Company's election to be treated as a subchapter "S" Company for federal income tax purposes, if applicable (a "Permitted Transfer"). For purposes of this Agreement, the term "Approved Trust" means with respect to any individual, a grantor controlled revocable trust for the benefit of his or her spouse or descendants where the Member is also the sole trustee. The Company may impose reasonable conditions on the Permitted Transfer, including without limitation requiring the Member to provide a notarized copy of a certificate of the Approved Trust in form and content satisfactory to the Company and the proper joinder by the Approved Trust as a party to this Agreement.

6.2    Intentionally Omitted.

6.3    Right of First Refusal. If any Member desires to sell or assign his or her Membership Interest in the Company to a third party (the "Selling Member"), the Selling Member must present the other Members a bona fide written offer and such Selling Member shall offer the other Members the ability to purchase the Selling Member's Membership Interests on the same terms and conditions as the bona fide offer. After receipt of the bona fide offer, the other Members shall have 30 days to exercise its right to purchase the Membership Interests subject to the terms and conditions of the bona fide offer. If the other Members fail to exercise their option, the Selling Member may sell the Membership Interests on the same terms and conditions as the bona fide offer, provided such sale is completed within 60 days of providing notice of the bona fide offer to the other Members.

6.4    Purchaser's Status as Member. If a Member sells, encumbers, transfers, assigns, or otherwise disposes of all or part of his or her interest in the Company, the purchaser or assignee of such interest shall be entitled to all of the rights and privileges of a Member of the Company only on the unanimous written consent of all of the remaining Members. If all of the remaining Members do not consent to the admission of such purchaser or assignee as a Member, the purchaser or assignee shall only be entitled to the distributions from the Company to which the selling Member would have been entitled. Notwithstanding the preceding, every transferee of a Member's interest must execute an acknowledgment and consent to be bound by the terms and provisions of this Operating Agreement as a condition precedent to becoming a Member with the attendant rights, benefits, and obligations of such membership. No transfer, whether by sale, devise, or otherwise, shall be effective unless and until the purchaser executes the acknowledgment and consent and delivers it to the Company.

6.5    Termination For Cause. The Company (by a vote of the Members owning greater then fifty percent (50%) of the Units (exclusive of the Member under consideration) shall have the right and option to buy a Member's Units for Cause. The term "Cause" shall mean:  (i) any conviction of or plea of guilty or nolo contendere to any crime which has a material adverse effect upon the Company; (ii) upon violation by a Member of any first level offense; first level offenses shall mean the following:  [1] intentional misappropriation of the Company funds or any of its affiliated entities funds for personal use; or [2] flagrant dishonesty or intentional act detrimental to the

7

conduct of the Company's business or the business of any affiliated entity; or [3] a violation by a Member of the terms of this Agreement, or any of its affiliated entities Operating Agreement(s).

The purchase price shall be equal to the credit balance in the Member's Capital Account, which shall be paid within twenty-four (24) months of closing.

## ARTICLE VII
## VOTING RIGHTS OF MEMBERS

7.1     Rights of Members.  Members shall have the right to vote on the Board of Managers as provided in Article VII below.

Members shall not have any right, power or authority to take part in, vote on, participate or interfere, in any manner, with the management, conduct or control of the Company, its property or the Company's business, and shall have no right or authority whatsoever to act for or on behalf of the Company.

7.2     Required Vote.  All Members shall be entitled to vote on any matter submitted to a vote of the Members.

The affirmative vote or consent of 51% of the Membership Percentage Interest of the Members entitled to vote or consent on such matter shall be required unless otherwise specifically set forth herein.

7.3     Meetings.  An annual meeting of the Members for the election of the Board of Managers shall be held at the time, date and place that the Managers shall determine.  Special meetings of Members for the purpose of filling a vacancy on the Board of Managers may be called at any time by the Managers.  Notice of a meeting shall be given to the Members not less than ten (10) or more than sixty (60) days before the meeting date.  All meetings of Members shall be presided over by a chairperson, designated by the Managers.

7.4     Consent.  Any action required or permitted to be taken at an annual or special meeting of the Members may be taken by consent or approval without a meeting or prior notice.  The consent or approval must be in writing, set forth the action to be taken, and be signed by the Members having at least the minimum number of votes necessary to authorize or take such an action at a meeting at which all Membership Interests entitled to vote on the action are present and voting.  Every written consent or approval shall also bear the date of when each Member signed the consent.  Prompt notice of the taking of action without a meeting by less than unanimous written consent of the Members entitled to vote shall be given to all Members who did not consent to or approve the action.

7.5     Limited Liability of Members.  No Member shall be personally liable for the Company's acts, debts or obligations, unless the Wyoming Act or any other provision of this Operating Agreement expressly provides otherwise.

7.6     Access to Company Information.  On written request by a Member, the Managers shall provide such Member with a copy of the Company's most recent annual financial statement and

federal, state and local income tax returns and reports.  On reasonable written request by a Member, (i) the Managers shall provide such Member with information regarding the current state of business and financial condition of the Company; (ii) any Member, or his, her or its designated representative, may inspect and copy, at such Member's request, any records maintained, and (iii) a Member may obtain such other information regarding the Company's affairs or inspect, personally or through a representative, during ordinary business hours, such other books and records of the Company's affairs whenever circumstances render such request just and reasonable. Notwithstanding the above, the Members waive any right to receive information relative to specific ownership percentages of any or all other specific Member(s).

**ARTICLE VIII**
**MANAGEMENT**

8.1     <u>Management of Business.</u>  The Company shall be managed by no fewer than one (1) person or entity and no more than five (5) persons or entities (the "Managers" or "Board of Managers") who shall be the Managers of the Company within the meaning of the Act and this Operating Agreement.  The duties, compensation and benefits, if any, of the Managers shall be only as reasonably determined from time to time by a vote of the Manager.

8.2     <u>Election or Removal of Managers.</u>  By a vote of the Member's holding a majority of the Membership Units, the Members shall have the right to elect the Board of Managers, fill a vacancy in the Board of Managers or remove a Manager.  The initial Managers shall be: **David McKeegan and Carrie McKeegan.**

8.3     <u>General Powers of Managers.</u>  All decisions concerning the business and affairs of the Company shall be made by the Managers.  The Managers shall have the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company, including, the power to: (a) purchase, lease or otherwise acquire any real or personal property; (b) sell, convey, mortgage, grant a security interest in, pledge, lease, exchange, or otherwise dispose of or encumber any real or personal property; (c) open one or more depository accounts and make deposits into, write checks against and make withdrawals against such accounts; (d) borrow money and incur liabilities and other obligations; (e) enter into any and all agreements and execute any and all contracts, documents and instruments; (f) engage employees and agents, define their respective duties and establish their compensation or remuneration; (g) establish pension plans, trusts, profit sharing plans and other benefit and incentive plans for Members, employees and agents of the Company; (h) obtain insurance covering the business and affairs of the Company and its property, and on the lives and well being of its Members, employees and agents; (i) commence prosecute and defend any proceeding in the Company's name; (j) participate with others in partnerships, joint ventures and other associations and strategic alliances; and (k) distribute profits to the Members.

8.4     <u>Voting.</u>  Each Manager shall be entitled to one vote on any matter submitted to a vote of the Managers.  The affirmative vote or consent of a majority of the Managers shall be required to authorize Company action.

8.6     Standard of Care; Liability.  Each Manager shall discharge his or her duties as a manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the best interests of the Company.  A Manager shall not be liable for any monetary damages to the Company for any breach of said duties except for receipt of a financial benefit to which the Manager is not entitled; voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act; or a knowing violation of the law.

8.7     Term of Office.  Each Manager shall hold office until he or she resigns or is removed in accordance with Paragraph 8.8.

8.8     Resignation or Removal of a Manager.  A Manager may resign at any time by written notice to the Members.  Acceptance is not necessary.  Resignation of a Manager who is also a Member does not affect such person's rights as Member.  A Manager may be removed from office, with or without cause, by the affirmative votes of fifty one (51%) percent of the Units entitled to vote.  A vacancy in the office of Manager shall be filled as provided in Paragraph 8.2 above.

8.9     Consent.  Any action required or permitted to be taken by the Managers may be taken without a meeting, without prior notice, and without a vote, if consents in writing, setting forth the action taken, are signed by the Managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Managers entitled to vote on the action were present and noted.  Every written consent shall bear the date and signature of each Manager who signs the consent.  Prompt notice of the taking of action without a meeting by less than unanimous written consent shall be given to all Managers who have not consented in writing to such action.

**ARTICLE IX**
**PROTECTIVE COVENANT**

9.1.    The Members hereby acknowledge that they are familiar and will help develop the Company's trade secrets and other confidential information.  The Members agree that while a member of the Company and for twelve (12) months following withdrawal for any reason as a Member, he shall not, directly or indirectly, either for himself or for any other individual own any interest in, manage, control, consult with, render services for or participate in (whether as an officer, director, employee, partner, agent, representative or otherwise) or in any other manner engage anywhere in the Protected Territories in any business competitive with business of the Company or any affiliated entity (the "Protected Business"). The term "Protected Territories" shall mean the entirety of the United States of America. The Members agree that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Company's business or any affiliated entity.

9.2.    Further, so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following withdrawal for any reason as a Member, the Member shall not directly, or indirectly through another person or entity, (i) induce or attempt to induce any employee of the Company or any affiliated entity to leave the employ of the Company or any affiliated entity, or in any way interfere with the relationship between the Company and any

employee thereof; (ii) hire any person who was an employee of the Company or any affiliated entity at any time during the six (6) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the Parties so as to avoid any disputes under this Paragraph that any such hiring within such six (6) month period is in violation of clause (i) above), or (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relationship of the Company or any affiliated entity.

9.3.   Technical Development and Improvements.  The Members acknowledge and agree that the Company or any affiliated entity shall have the exclusive ownership, title and possession of any information, plans, products, data, inventions, training programs, or instructional materials discovered, devised, developed, implemented, improved, or otherwise identified or capable of identification regarding the business of the Company or any affiliated entity.  The Members shall report and promptly make available any and all technical developments and improvements. Except as expressly approved by the Company's Members, the Members shall disclose, use and release such technical developments solely in the name and on behalf of the Company or any affiliated entity.

9.4.   Confidential Information.  The Members agree to retain all information relating to the business of Company or any affiliated entity in strict confidence and shall not, at any time, except as authorized in writing by an authorized officer of Company and for the benefit of Company, directly or indirectly, divulge or disclose to any person, firm, association or corporation, or use for his own benefit, gain or otherwise, any information, plans, processes, products, client, report data, results of tests and data, client lists, price lists or any other trade secrets or confidential materials or client information or data regarding the business of Company or any affiliated entity, which is disclosed to or acquired by Member directly or indirectly in the course of Member's employment.

9.5.   Enforcement

(a)   If, at the time of enforcement of the covenants contained above ("Protective Covenants"), a court shall hold that the duration, scope or area restrictions stated are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the Protective Covenants to cover the maximum duration, scope and area permitted by law.  Member has consulted with legal counsel regarding the Protective Covenants and based on such consultation has determined and agrees that the Protective Covenants are reasonable in terms of duration, scope and area restrictions and are necessary to protect the goodwill of the Company's businesses and agrees not to challenge the validity or enforceability of the Protective Covenants.

(b)   If a Member breaches, or threatens to commit a breach of any of the Protective Covenants, the Company and its affiliates shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company or its affiliates at law or in equity:

(i)  the right and remedy to have the Protective Covenants specifically enforced by any court or competent jurisdiction, it being agreed that any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Company and its affiliates and that money damages would not provide an adequate remedy to the Company or its affiliates; and

(ii)  the right and remedy to require Employee to account for and pay over to the Company or its affiliates any profits, monies or other benefits derived or received by Employee as the result of any transactions constituting a breach of the Protective Covenants.

The invalidity or unenforceability of any provision hereby of, or parts hereof shall in no way effect the validity or enforceability of any other provision or parts hereof.  The parties agree that the part or parts of this Agreement to be held invalid or unenforceable shall be deemed to have been modified to provide the maximum protective covenant possible by law.

## ARTICLE X
## EXCULPATION OF LIABILITY; INDEMNIFICATION

10.1  <u>Exculpation of Liability</u>.  Unless otherwise provided by law or expressly assumed, a person who is a Member or Manager, or both, shall not be liable for the acts, debts or liabilities of the Company.

10.2  <u>Indemnification</u>.  Except as otherwise provided in this Article, the Company shall indemnify any Manager or Member and may indemnify any employee or agent of the Company who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Manager, Member, employee or agent of the Company, against expenses, including attorneys fees, judgment, penalties, fines and amounts paid in settlement actual and reasonably incurred by such person in connection with the action, suit or proceeding, if the person acted in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in a manner that such person reasonably believed to be in the best interests of the Company and with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such person's conduct was unlawful.  To the extent that a Manager, Member, employee or agent of the Company has been successful on the merits or otherwise in defense of an action, suit or proceeding or in defense of any claim, issue or other matter in the action, suit or proceeding, such person shall be indemnified against actual and reasonable expenses, including attorneys fees, incurred by such person in connection with the action, suit or proceeding and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein.  Any indemnification permitted under this Article, unless ordered by a court, shall be made by the Company, only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct and upon an evaluation of the reasonableness of expenses and amounts paid in settlement.  This determination and evaluation

shall be made by a vote of the Members who are not parties or threatened to be made parties to the action, suit or proceeding. Notwithstanding the foregoing to the contrary, no indemnification shall be provided to any Manager, Member, employee or agent of the Company for or in connection with the receipt of a financial benefit to which such person is not entitled, voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act, or a knowing violation of law.

## ARTICLE XI
## DISSOLUTION AND WINDING UP

11.1   <u>Dissolution</u>. The Company shall dissolve and its affairs shall be wound up by the vote of the Managers.

11.2   <u>Winding Up</u>. Upon dissolution, the Company shall carry on its business and affairs as necessary to wind up of the Company's business and affairs and shall complete the winding up as soon as practicable. Upon the winding up of the Company, the assets of the Company shall be distributed first to creditors to the extent permitted by law, in satisfaction of Company debts, liabilities and obligations and then to Members and former Members first, in satisfaction of liabilities for distributions and then, in accordance with their Membership Interest Percentages.

## ARTICLE XII
## MISCELLANEOUS

12.1   <u>Entire Agreement.</u> This Operating Agreement constitutes the entire understanding and agreement between the parties with respect to the subject matter hereof and replaces and supersedes all prior agreements between the Company and its Members. All prior negotiations and agreements between the parties hereto are superseded by this Operating Agreement, and there are no representations, warranties, understandings or agreements other than those expressly set forth herein. This Operating Agreement may not be changed orally, but only by an Agreement in writing, authorized by a vote of the Members.

12.2   <u>No Involuntary Dissolution or Termination</u>. One of the principal purposes of this Operating Agreement is to protect the Company against the usual incidents and consequences which ensue upon the death or retirement of a Member, the transfer by a Member of an interest in the Company, the admission of a new Member, or similar events. Accordingly, it is hereby agreed among the Members that the dissolution or termination of the Company can be effected only in accordance with and subject to the terms of this Operating Agreement and that neither the withdrawal nor death of a Member nor the admission of a new Member shall effect the dissolution or termination of the Company except as specifically set forth herein.

12.3   <u>Jurisdiction and Venue</u>. The parties agree to exclusive jurisdiction and venue of the courts in _____ County, Wyoming, in all disputes arising out of, or relating to, this Agreement and further agree that, in any such action, they will submit to depositions and other discovery in _____ County, Wyoming, at their own cost and expense.

12.4    Company Name.  No value shall be attributed to the name or goodwill of the Company or allowed therefore in any inventory, accounting, or statement in any adjustment or settlement with any Member or in any final accounting upon the liquidation or dissolution of the Company, or for any other purpose or in any other manner.

12.5    Governing Law.  This Operating Agreement shall be subject to, and governed by, the laws of the State of Wyoming irrespective of the fact that one or more of the parties now is, or may become, a resident of a different state.

12.6    Severability.  Each provision of this Operating Agreement must be interpreted in a way that is valid under applicable law.  If any provision is held invalid, the rest of the Operating Agreement will remain in full effect and the offending provision shall be deemed modified so as to be enforceable.

12.7    Notices.  Any notice required or permitted to be given under this Operating Agreement shall be sufficient if in writing, and if sent by registered or certified mail to the Member at their last known address with a copy sent via regular mail and facsimile to Eric W. Misterovich, Revision Legal, PLLC, 8051 Moorsbridge, Portage, MI 49024; 269-235-9900.

12.8    Gender and Number.  As the context of any provision may require, nouns and pronouns of any gender and number shall be construed as any other gender and number.

12.9    Binding.  This Agreement shall be binding upon and inure to the benefit of the parties hereto their Personal Representatives, successors and assigns.

12.10   Counterparts.  This Agreement may be signed in one or more counterparts, and each counterpart will be considered an original Agreement.  All of the counterparts will be considered one document and become a binding agreement when one or more counterparts have been signed by each of the parties and delivered to the other.

12.11   Advice of Counsel.  The Members expressly acknowledge that they have been advised and instructed by the Company that they have the right to consult an attorney and that they should review the terms of this Operating Agreement with counsel of their own selection.  The Members further confirm that they have had the opportunity to review this Operating Agreement with counsel of their own choice, that they have had ample time to study this Operating Agreement, that they have carefully read the terms of this Operating Agreement and are fully aware of the Operating Agreement's contents and legal effects, and that they knowingly execute this Operating Agreement voluntarily and of their own free will.

The parties have executed this Operating Agreement on the dates set below their names, to be effective on the date listed on the first page of this Operating Agreement.

[signatures on following page]

IN WITNESS WHEREOF, the undersigned have executed this Agreement.

**Members**

*David McKeegan*
_____                    May 26, 2022
By:  David McKeegan


*Carrie McKeegan*
_____
Carrie McKeegan (May 26, 2022 12:49 MDT)
By: Carrie McKeegan


*Crystal Stranger*
_____
Crystal Stranger (May 26, 2022 14:15 MDT)
By: Crystal Stranger

15

## EXHIBIT A
## GREENBACK BUSINESS SERVICES LLC
## MEMBERSHIP INTEREST

| MEMBERS | MEMBERSHIP INTEREST PERCENTAGE | UNITS |
|---------|-------------------------------|-------|
| David McKeegan | 47% | 47 |
| Carrie McKeegan | 47% | 47 |
| Crystal Stranger | 6% | 6 |
| Total | 100% | 100 |