## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | | |
|---|---|---|
| **CLEER LLC (F/K/A GREENBACK BUSINESS SERVICES LLC) D/B/A CLEER TAX,** | : : : : | **CASE NO.:** <br><br> **JUDGE:** |
| Plaintiff, | : : | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR** |
| v. | : : | **IMMEDIATE TEMPORARY RESTRAINING ORDER AND** |
| **CRYSTAL STRANGER, et al.,** | : : | **PRELIMINARY INJUCTIVE RELIEF** |
| Defendants. | : | **SEPTEMBER 24, 2024** |

Pursuant to Fed. R. Civ. P. 65, Plaintiff Cleer LLC (f/k/a Greenback Business Services LLC) d/b/a Cleer Tax ("Cleer") hereby submits its Memorandum of Law in Support of its Motion for Temporary Restraining Order and Preliminary Injunctive Relief. Cleer asks this Court to enjoin Defendant Crystal Stranger from violating the noncompete and nonsolicit provisions in the agreements that Stranger agreed to with Cleer, and from improperly exercising control over Cleer's Cleer.tax domain name and using it to divert business from Cleer. For the reasons explained below, Cleer respectfully requests that the Court enter a temporary restraining order and preliminary injunction.

## FACTUAL BACKGROUND

### I.    Cleer's Business.

David McKeegan founded Greenback Business Services (currently, Cleer) in 2016 to help start-ups and early stage entrepreneurs with tax preparations and filings. (Compl. ¶ 14). Cleer experienced meteoric growth and in 2022 landed on the Inc. 5000 list of fastest growing private companies in the United States. (*Id.* ¶ 15). Cleer now has over 50 employees worldwide and

provides tax preparing, bookkeeping, and consultation services to more than 5,000 domestic and international businesses seeking individualized solutions for compliance with the United States tax system.  (*Id.* ¶ 16)

## II.     Cleer's Trademark Rights And Domain Name.

Cleer owns the CLEER® (word mark) and CLEER.TAX (design mark) trademarks.  (*Id.* ¶ 17).  CLEER® is registered with the United States Patent and Trademark Office as Reg. No. 7356779 and claims a first use date of October 28, 2022.  (*Id.* ¶ 18).  Cleer has also filed a United States trademark application for CLEER.TAX (Design Mark), Ser. No. 98128324 (collectively with CLEER®, the "CLEER Trademarks").  (*Id.* ¶ 19).  The CLEER.TAX design mark is pictured below:



(*Id.*)

The CLEER Trademarks cover a variety of goods and services, including business consulting services; bookkeeping; business development services, namely, providing start-up support for businesses of others, and regulatory compliance.  Cleer has extensively used the CLEER Trademarks and promoted them at considerable expense.  (*Id.* ¶ 20).  Cleer also owns the "cleertax.com" domain name, which it registered on May 26, 2022.  (*Id.* ¶ 21).  Cleer uses the "cleertax.com" domain name as the URL of its email address (Hello@Cleertax.com) and to advertise and promote its business through its website.  (*Id.*)

## II.     Cleer, Stranger, and the MVA.

Cleer hired Stranger as Lead Accountant in January 2020.  (*Id.* ¶ 22)/  As Lead Accountant, Stranger prepared and reviewed tax returns, advised clients, and performed marketing services.

(*Id.* ¶ 23).  David and his wife Carrie McKeegan were sole and equal members of Cleer at that time.  (*Id.* ¶ 24).

In May 2022, the McKeegans promoted Stranger to International Tax Director and General Manager of Cleer.  (*Id.* ¶ 29).  In that role, Stranger oversaw the tax, bookkeeping, and CSA Team; steering tax policy and general guidance; providing tax strategy consultations for clients; giving webinars and media interviews; and coordinating the development of technology and tools.  (*Id.* ¶ 30).  At that time, the McKeegans also presented Stranger with the MVA, under which Stranger received an initial 6% membership interest in Cleer, 12% would vest after one year from the MVA's effective date, then a maximum of 20% would vest two years from the MVA's effective date.  (*Id.* ¶¶ 25, 31).

Under Section 8 of the MVA, "when Employee's employment with Company ends, **Employee will promptly return** all originals and copies of all documents, records, software programs, media, and other materials concerning Confidential Information, as well as **any and all equipment, files, software programs, and other personal property belonging to the Company**."  (*Id.* ¶ 32 (emphasis added)).  And the nonsolicit provision of the MVA under Section 12 states:

> a.   During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:
>
> i.   Directly or indirectly contact, solicit, accept business from, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to employee's

termination, for the purpose of selling or soliciting products or services of Company; and

ii.        directly or indirectly contact, solicit, recruit or hire any employees of the Company with whom Employee worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company.

(*Id.* ¶ 33).

## III.    <u>Stranger Signed Cleer's Operating Agreement.</u>

As a new Member of Cleer, the McKeegans required her to execute the Operating Agreement. (*Id.* ¶ 26). The Operating Agreement imposed additional restrictive covenants on the McKeegans and Stranger in their capacities as Members. (*Id.* ¶ 27). By signing the Operating Agreement, Stranger agreed to and is bound by the following provisions:

9.1     The Members hereby acknowledge that they are familiar and will help develop the Company's trade secrets and other confidential information. The Members agree that while a Member of the Company and for twelve (12) months following the withdrawal for any reason as a Member, he shall not, directly or indirectly, either for himself or for any other individual own any interest in, manage, control, consult with, render services for or participate in (whether as an officer, director, employee, partner, agent, representative, or otherwise) or in any other manner engage anywhere in the Protected Areas in any business competitive with business of the Company or any affiliated entity (the "Protected Business"). The term "Protected Territories" shall mean the entirety of the United States of America. The Members agree that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Company's business or any affiliated entity.

9.2     Further, so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following withdrawal for any reason as a Member, the Member shall not directly, or indirectly through another person or entity, (i) induce or attempt to induce any employee of the Company or any affiliated entity to leave the employ of the Company or any affiliated entity, or in any way interfere with the relationship between the Company and any employee thereof; (ii) hire any person who was an employee of the Company or any affiliated entity at any time during the six (6)

4

month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the Parties so as to avoid any disputes under this Paragraph that any such hiring within such six (6) month period is in violation of clause (i) above), or (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relationship of the Company or any affiliated entity.

9.3   <u>Technical Development and Improvements</u>.   The Members acknowledge and agree that the Company or any affiliated entity shall have the exclusive ownership, title and possession of any information, plans, products, data, inventions, training programs, or instructional materials discovered, devised, developed, implemented, improved, or otherwise identified or capable of identification regarding the business or any affiliated entity.  The Members shall report and promptly make available any and all technical developments and improvements.  Except as expressly approved by the Company's Members, the Members shall disclose, use and release such technical developments solely in the name and on behalf of the Company or any affiliated entity.

. . .

9.5   <u>Enforcement</u>.

(a) If, at the time of enforcement of the covenants contained above ("Protective Covenants"), a court shall hold that the duration, scope or area restrictions stated are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the Protective Covenants to cover the maximum duration, scope and area permitted by law. Member has consulted with legal counsel regarding the Protective Covenants and based on such consultation has determined and agrees that the Protective Covenants are reasonable in terms of duration, scope and area restrictions and are necessary to protect the goodwill of the Company's businesses and agrees not to challenge the validity or enforceability of the Protective Covenants.

(b) If a Member breaches, or threatens to commit a breach of any of the Protective Covenants, the Company and its affiliates shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of,

5

any other rights and remedies available to the Company or its affiliates at law or in equity:

> (i) the right and remedy to have the Protective Covenants specifically enforced by any court or competent jurisdiction, it being agreed that any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Company and its affiliates and that money damages would not provide an adequate remedy to the Company or its affiliates; and

> (ii) the right and remedy to require Employee to account for and pay over to the Company or its affiliates any profits, monies or other benefits derived or received by Employee as the result of any transactions constituting a breach of the Protective Covenants.

> The invalidity or unenforceability of any provision hereby of, or parts hereof shall in no way effect the validity or enforceability of any other provision or parts hereof. The parties agree that the part or parts of this Agreement to be held invalid or unenforceable shall be deemed to have been modified to provide the maximum protective covenant possible by law.

(*Id.* ¶ 28).

## IV.  <u>Stranger Created The Domain Cleer.tax For Cleer's Business Use.</u>

As part of its rebranding in January 2023, Greenback changed its name to Cleer. (*Id.* ¶ 34). All aspects of Greenback and Stranger's role with the company remained the same; the only change was in name. (*Id.* ¶ 35). On May 26, 2022, while employed by Cleer and as part of that rebranding, Stranger registered the Cleer.tax domain name for Cleer's future ownership and use. (*Id.* ¶ 36). That same day, Mr. McKeegan registered the "cleertax.com" domain name for use by the company in connection with email and a website. (*Id.* ¶ 37). When Stranger registered Cleer.tax, she at first did so using her personal debit or credit card. (*Id.* ¶ 39). But she renewed the Cleer.tax domain on May 26, 2023 using her Cleer credit card. (*Id.*). At all times since Stranger registered the domain, Cleer.tax has been and continues to be Cleer's property. (*Id.* ¶ 40).

**V.**   **Stranger Committed And Continues To Commit Many MVA And Operating Agreement Violations.**

On January 22, 2024, Stranger registered the domain "OpticTax.com" during her employment with Cleer.  (*Id.* ¶ 41).  She resigned from Cleer on February 1, 2024.  (*Id.* ¶ 42).  At first, Optic Tax provided services not directly competitive to Cleer, including consulting and advising services.  (*Id.* ¶ 42).  But starting September 1, 2024, Optic Tax began providing tax preparation, bookkeeping, and consulting services to startup, small, and growing domestic and international businesses seeking individualized solutions for compliance with the United States tax system—the exact services Cleer provides—making it a direct competitor of Cleer.  (*Id.* ¶ 44).  At that time, Stranger started soliciting Cleer's clients, prospective clients, and contractors.  (*Id.* ¶ 45).  Since Stranger's employment with Cleer ended, she has poached at least ten Cleer contractors to work for Optic Tax.  (*Id.* ¶ 46).

Optic Tax's employees and contractors are directly soliciting Cleer's clients at Stranger's direction:





Continuing Our Partnership at Optic Tax External Inbox ×

Evangeline Cubelo <evan@optictax.com> 11:42 AM (2 hours ago)
to bcc: me

Hello there,

I hope you have been great.

I just wanted to let you know that I have left Cleer effective immediately. I am now working for OpticTax.com with Crystal Stranger who used to run Cleer, and is one of the top international tax experts. It would be an honor to work with you again moving forward.

Optic Tax is willing to match the pricing and package. Please let me know if you are interested in continuing to work with me and making the switch. If you aren't interested in changing, I fully understand that. Either way, I am always here for you if you need any help or have any questions.

Thank you and have a great day!

Sincerely yours,

Evangeline Cubelo
Junior Bookkeeper
evan@optictax.com
Optic Tax

Instaworks Inc. Information Inbox ×

Rechel Perez <rechel@optictax.com> + Add to HubSpot Wed, Sep 4, 3:39 AM (1 day ago)
to me

Log email to HubSpot

Hi Filip,

Good day to you. I hope you are doing well.

I just wanted to let you know that I have left Cleer effective September 03, 2024.

I am now working for OpticTax.com with Crystal Stranger who used to run Cleer, and is one of the top international tax experts.

I really enjoyed working with you as a client, and I would be happy to work with you going forward. I would understand if you prefer not changing.

If you need assistance, feel free to reach out.

Thank you so much. Best Regards.

--
Sincerely Yours,
Rechel Perez
Senior Bookkeeper

OpticTax.com
rechel@optictax.com
Optic Tax

Best of luck to you as well! | It has been a pleasure working with you! | Best of luck to you too!

(*Id.* ¶ 47). Even more alarming, on September 6, 2024 (nearly 7 months following her separation from Cleer), Stranger used Cleer's "cleer.tax" domain as the email URL to solicit Cleer's clients,

while specifically mentioning the CLEER.TAX trademark and domain name as part of that solicitation:

From: "Cleer.tax" <crystal@cleer.tax>
Date: Sep 6, 2024 21:32
Subject: Important News: Changes to Bookkeeping
To: samuel@funbers.com
Cc:

Hi,

You are probably aware about the loss of the entire bookkeeping team at Cleer, and I understand this may have put you in a challenging situation. In full transparency, I want to share some background, so you can understand what happened. As a cofounder of Cleer, I brought both the clients from my prior business and the domain Cleer.tax into the partnership, and I have over 20 years of international and complex tax experience that I used to lead the company and develop the current offerings.

Due to a culture shift that prioritized profit above all else, I left in February to start Optic Tax, focusing on complex international tax consulting.  When I left, I did everything in my power to keep the team together, help the company succeed, and turned down business that would be a conflict. I even tried to buy the remainder of Cleer and had an agreement on price but was stuck on terms. In August, in bad faith, I was removed from the business partnership, with no justification or real explanation. Almost immediately, the team began messaging me about changes that were making their work untenable, and telling me the entire bookkeeping team was planning a walk-out.

The team had been ordered to install screen tracking software on their personal computers that would take a picture of their screen every three seconds. They felt this not only justified their own privacy and web safety, as it could screenshot their passwords, but it would also expose personal financial data of their clients. It was a free product, and they didn't see that it had any data safeguards in place, but they received an ultimatum that they must install this by September 1st.

Things compounded, and the team started to really panic when the former head of HR was fired, and an email was sent out to the whole team falsely stating that she quit. A week later the head of the bookkeeping team was terminated, and told to transition her work to a VA staffing company. I had been exploring legal options of regaining my value in the partnership, but hearing what the team was telling me, it seemed that there would be no company left if I waited. But I can tell you, two weeks ago I never thought I would be sending this email now, it all just deteriorated there so fast.

When the team wanted to leave, they all reached out to me with concerns about who would help the clients if they left. While they told me they felt abused and couldn't handle even a day more, they were loyal to you as being wonderful clients and were worried who would help you. Many team members had stayed in a bad situation because they didn't want to burden you, and while many team members had quit since I left, nobody new had been hired to replace them. So at their request, I expanded Optic Tax to provide tax and bookkeeping services, to give the team a safe place to do their excellent work.

Team members may have reached out to you, as we want to offer you assistance in this transition time, as seamlessly as possible, so there is no disruption to your business. We are here to help whether you choose to work with us going forward or not. I am making myself personally available if you have any questions, you can schedule a call with me here: https://calendly.com/optictax/complimentary-consultation Again, I am happy to help you in any way I can, whether you choose to work with us in the future or not, so please let me know if there is anything I can do to help. Wishing you all the best.

Sincerely,

Crystal Stranger

Founder & CEO

Optic Tax Inc.

http://optictax.com

30 N Gould St, Ste 3088

Sheridan, WY 82801

Unsubscribe Now

(*Id.* ¶ 48).

Stranger has also improperly retained and refused to relinquish control over the domain Cleer.tax, which she has used and continues to use to deliberately redirect and mislead Cleer's

clients and potential clients who click the link for Cleer.tax which redirects to OpticTax.com.  (*Id.* ¶¶ 49–50).

## VI.   <u>Cleer Terminated Stranger's Units For Cause And Repurchased Them.</u>

In August 2024, because Stranger refused to return Cleer.tax and a company laptop with client information on it to Cleer, Cleer Members voted to terminate Stranger's 12 Cleer Units for cause and repurchase them under the Operating Agreement because of her "flagrant dishonesty," "intentional acts detrimental to the conduct of the Company's business," and "multiple and continuing violations of the Company's Operating Agreement."  (*Id.* ¶ 52).  As of August 2024, Stranger had only vested a 12% membership interest in Cleer because she was employed for more than two but less than three years from when she signed the MVA when her Cleer employment ended.  (*Id.* ¶ 51).

Under the Operating Agreement, when a Member's Units are terminated for cause and repurchased, "[t]he purchase price shall be equal to the credit balance in the Member's Capital Account . . . ."  (*Id.* ¶ 54).  When Cleer terminated Stranger's 12 Units for cause and repurchased them, Stranger's Member Capital Account for Cleer was -$70,743.  (*Id.* ¶ 55).  Despite demands, Stranger has not paid Cleer the amount owed.  (*Id.* ¶ 56).

## <u>LEGAL STANDARD</u>

Cleer is entitled to a temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65.  To demonstrate that it is entitled to relief, the party seeking the injunction must prove: (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.  *3M v. Francavilla*, 191 F. Supp. 2d 270, 277 (D. Conn. 2002).  In determining whether to

grant preliminary injunctive relief, courts consider these factors: (1) the probability the plaintiff will succeed on the merits; (2) the significance of the irreparable harm in the absence of the injunction; (3) the balance between the irreparable injury and harm to the opposing party; and (4) the public interest. *Id.*; *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 26 (2d Cir. 2004).[1]

For the reasons below, Cleer satisfies these elements and is entitled to the injunctive relief it seeks.

## LEGAL ARGUMENT

### I.  Cleer Is Likely To Prevail On The Merits.

Cleer is likely to prevail on its claims.  In establishing the likelihood of success on a motion for preliminary injunctive relief, "the movant 'need not show that success is an absolute certainty. . . . There may remain considerable room for doubt.'"  H*&R Block E. Tax Servs., Inc. v. Brooks*, No. 3:00-CV-132JCH, 2000 U.S. Dist. LEXIS 19369, at *6 (D. Conn. Oct. 12, 2000) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).  Cleer more than meets that standard. The facts show a strong likelihood of success on Cleer's claims against Stranger.

#### A.     Cleer Is Likely To Prevail On Its Breach Of Contract Claims.

As an employee of Cleer, Stranger agreed to customer and employee non-solicitation provisions with Cleer in the MVA.  As an owner of Cleer, Stranger agreed to customer and employee non-solicitation covenants and a non-competition restrictive covenant in the Operating Agreement.  Stranger's breaches of the MVA and Operating Agreement are clear: during the restricted periods under both agreements, she has formed and is operating a directly competitive business and has deliberately poached Cleer's clients and contractors for and through that business.

---

[1] The "'standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction.'"  *Media Grp., Inc. v. Ontel Prods. Corp.*, No. 3:00CV2034, 2001 U.S. Dist. LEXIS 2015, at *3 (D. Conn. Jan. 12, 2001) (citation omitted).

By signing the MVA and Operating Agreement, Stranger specifically consented to the issuance of an injunction upon breach of the agreements.  (Compl. ¶¶ 23, 27).[2]

It is well-settled Michigan law that a "restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical scope, and the type of employment or line of business must be reasonable."  *Coates v Bastion Brothers, Inc.*, 276 Mich App 498, 507 (2007); *see also* M.C.L. § 445.774a.  Similarly, under Wyoming law, "[t]o be enforceable, a noncompete agreement must be (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in duration and geographical limitations; and (5) not against public policy."  *Hassler v. Circle C Res.*, 2022 WY 28, ¶ 15, 505 P.3d 169, 174 (Wyo. 2022) (*Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 540 (Wyo. 1993)).

Here, the terms of the MVA and Operating Agreement are clear, unambiguous, and reasonable to protect Cleer's competitive business interests. Indeed, preventing the anticompetitive contact with a business' clients is a legitimate business interest.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007) (finding that reasonable competitive business interests include protecting "close contact with the employer's customers or customer lists, or cost factors and pricing"); *see also Follmer, Rudzewicz & Co., P.C. v. Kosco,* 420 Mich. 394, 362 N.W.2d 676, 680–81 (1984) ("While an employee is entitled to unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable, confidential information, including information regarding customers, constitutes property of the employer and may be protected by contract."); *Brown v. Best Home Health & Hospice, LLC*, 2021 WY 83, ¶ 28, 491

---

[2] The MVA is controlled by Michigan law. (MVA, Section 16)  The Operating Agreement is controlled by Wyoming law.  (Operating Agreement, 12.5).

P.3d 1021, 1031 (Wyo. 2021) (holding that under Wyoming law "'[e]mployers are entitled to protect their business from the detrimental impact of competition by employees who, but for their employment, would not have had the ability to gain a special influence over clients or customers.'" (quoting *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 542 (Wyo. 1993), *overruled on other grounds by Hassler v. Circle C Res.*, 2022 WY 28, 505 P.3d 169 (Wyo. 2022)). Given that Optic Tax is trying to pass itself off as affiliated with Cleer, Cleer has further legitimate interests in preventing unfair competition.

The nonsolicitation provisions of the MVA and the non-solicitation and non-competition provisions of the Operating Agreement are properly limited in duration, as they apply only for a limited period of one year following Stranger's termination. *See Kelly Services Inc. v. Marzullo*, 591 F. Supp. 2d 924, 939 (E.D. Mich. 2008) ("[c]ourts, applying Michigan law, have routinely upheld non-compete agreements restricting the former employee from engaging in restrictive activities for periods of six months to three years"). The Wyoming Supreme Court has held that a one-year duration restricted period of noncompete agreement is reasonable. *Hopper*, 861 P.2d at 545. Moreover, the non-solicitation provision only applies to current customers of Cleer – of which Stranger (as a former owner of Cleer), knows them all.

At least one court applying Michigan law has found nationwide geographic limitations to be sufficiently tailored to grant injunctive relief where, as here, the business operated nationwide and, as Stranger did here, the employee assented to a contract with a clause agreeing that the geographic limitation is reasonable. *Quest Car Care Prod., Inc. v. Titus*, 708 F. Supp. 3d 1338, 1344 (W.D. Mich. 2023) ("The term 'Protected Territories' shall mean the entirety of the United States of America. **The Members agree that the geographic restrictions set forth above are**

**reasonable and necessary to protect the goodwill of the Company's business** or any affiliated entity." (emphasis added)); (Compl. ¶ 27).

As a result, Cleer is highly likely to succeed on the merits of its claims and this factor of the preliminary injunction analysis weighs strongly in its favor.

### B.    Cleer Is Likely To Prevail On Its Federal Trademark Claims.

This Court has held that "[t]o warrant a preliminary injunction, [a] [p]laintiff 'need not show that there is a likelihood of success on the merits of all of [its] claims for relief. Rather, [it] must show a likelihood of success on the merits of at least one of [its] claims.'" *Inteliclear, LLC v. Victor*, No. 3:16CV1403 (JBA), 2016 WL 5746349, at *6 (D. Conn. Oct. 3, 2016) (quoting *Westchester Legal Servs., Inc. v. Westchester Cty.*, 607 F. Supp. 1379, 1382 (S.D.N.Y. 1985)). As shown above, Cleer has established that it is likely to prevail on its breach of contract claims, which is enough to warrant issuing the equitable relief it seeks. Nonetheless, for the reasons below, Cleer is also likely to prevail on its federal trademark claims.

### 1.    Defendants' conduct violates Section 43(a)(1)(A) of the Lanham Act.

Section 43(a)(1)(A) of the Lanham Act states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof,   or   any false designation of origin, false or   misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). In other words, Section 43(a) of the Lanham Act prohibits any false designation of origin which is likely to cause confusion or mistake, or deceive as to origin of

source, sponsorship, or affiliation.  *See Forschner Group, Inc. v. Arrow Trading Co.*, 30 F.3d 348, 358 (2d Cir. 1994) (citations omitted).

Through the use of Cleer's "Cleer.tax" domain and CLEER Trademarks for unlicensed commercial use, Defendants are impermissibly "passing off" the "Cleer.tax" domain and CLEER Trademarks.  Such passing off constitutes trademark infringement and false designation of origin, an unfair practice prohibited by Section 43(a) of the Lanham Act.  15 U.S.C. §1125 (a).  "A seller who deliberately passes off his goods as those of his competitor has falsely designated the origin of the goods within the meaning of section 43(a)."  *Sutton Cosmetics (P.R.) v. Lander Co.*, 455 F.2d 285, 287 (2d Cir. 1972) (affirming preliminary injunction).  Defendants have deliberately programmed "Cleer.tax" to automatically redirect people to "OpticTax.com" to pass off their services as Cleer's services.  Defendants have also intentionally used the CLEER Trademarks in email advertising to solicit Cleer's clients and potential consumers. This has caused and will continue to cause confusion and mistake as to the origin of source of and affiliation between Cleer and Optic Tax.

Cleer is thus likely to prevail on its false designation of origin and unfair competition claim.

## 2.     <u>Defendants' conduct violates the Anti-cybersquatting Consumer Protection Act.</u>

The Anti-cybersquatting Consumer Protection Act prevents the use of a domain name, in bad faith with intent to profit, that incorporates a mark.  15 U.S.C. § 1125(d)(1)(A).  In bringing a cybersquatting claim, Cleer must establish: "(1) the [CLEER] mark is either distinctive or famous; (2) the Domain Name is identical or confusingly similar to the [CLEER] mark; and (3) Defendants had a bad faith intent to profit from use of the mark."  *Web-adviso v. Trump*, 927 F. Supp. 2d 32, 39 (E.D.N.Y. 2013), *aff'd sub nom. Yung v. Trump*, 648 F. App'x 24 (2d Cir. 2016) (citing *Sporty's Farm LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497–99 (2d Cir.2000)).

First, the CLEER Trademarks are inherently distinctive.  Distinctiveness is measured on a scale progressing from least to most distinctive by categorizing marks: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976).  "An arbitrary mark 'applies a common word in an unfamiliar way' and a fanciful mark 'is not a real word at all, but is invented for its use as a mark.'"  *Real News Project, Inc. v. Independent World TV, Inc.*, 2008 U.S. Dist. Lexis 41457, *19 (S.D.N.Y. 2008) (quoting *Lane CapitalMgm't, Inc. v. Lane CapitalMgm't, Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)). "Arbitrary and fanciful marks are inherently distinctive, '[t]heir intrinsic nature serves to identify a particular source of a product, so they will be automatically protected.'"  *Id.*  Cleer is not a real word.  Mr. McKeegan came up with Cleer to be used solely as a trademark.  *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997) (holding that fanciful marks are "words invented solely for their use as trademarks."); *see also Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 228 F. Supp. 399, 404 (S.D.N.Y. 2002) (same).  Cleer qualifies as a fanciful mark and thus is inherently distinctive.

Second, the domain Defendants are using, Cleer.tax, is identical to Cleer's CLEER.TAX design mark and incorporates Cleer's CLEER Trademark. This domain incorporates, in its entirety, Cleer's Trademarks without incorporating any additional matter.

Third, Defendants have plainly acted in bad faith for several reasons.  This is not a case in which a defendant registered a domain that is identical or confusingly similar to a plaintiff's mark. Cleer actually owns the domain at issue, after registering the domain name for the benefit of Cleer and in the course of employment with Cleer, and thus Defendants have no intellectual property rights in the domain name.  And by using Cleer's domain to autoforward to a competitive website that offers services using its brand, as well as using the Cleer.tax domain in a deceptive email

campaign, Defendants are diverting consumers away from Cleer to locations that harm the goodwill associated with Cleer's mark. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V).

Cleer is thus likely to prevail on its cybersquatting claim.

## II.     Cleer Will Be Irreparably Harmed Absent Injunctive Relief.

### A.     Stranger Stipulated To Irreparable Harm.

Under the MVA, Stranger "agree[d] that breach of this Agreement will cause irreparable injury to Company, such that monetary damages would not provide an adequate or complete remedy." (Compl. ¶ 23). And under the Operating Agreement, Stranger "agreed that any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Company and its affiliates and that money damages would not provide an adequate remedy to the Company or its affiliates . . . ." (*Id.* ¶ 27).

Stipulating to irreparable harm is enough to establish the irreparable harm element for preliminary injunctive relief under Michigan law. *See, e.g., Two Men & a Truck Int'l, Inc. v. Rupright*, No. 1:16-CV-23, 2016 WL 8808790, at *2 (W.D. Mich. Jan. 14, 2016) ("[Plaintiff] has also established irreparable harm on this record."). And under Wyoming law, courts may consider provision in noncompete agreements allowing for injunctive relief in determining whether preliminary injunction would issue against former employees. For this reason alone, Cleer has established it will suffer irreparable harm.

### B.     Stranger's Restrictive Covenant Violations Establish Irreparable Harm.

Putting aside Stranger's stipulation to irreparable harm, Cleer would suffer irreparable harm absent injunctive relief based on her many violations of the MVA and Operating Agreement. Courts applying Michigan law find that loss of customer goodwill and fair competition stemming from an employee's breach of restrictive employment covenants are likely to cause an employer

irreparable harm.  *See, e.g.*, *Mktg. Displays Int'l v. Shaw*, 646 F. Supp. 3d 897, 906 (E.D. Mich. 2022), *appeal dismissed and remanded*, 93 F.4th 967 (6th Cir. 2024); *see also Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940, 951 (E.D. Mich. 2008).  Stranger has unfairly competed with and tarnished Cleer's goodwill by soliciting and poaching Cleer's clients and employees through a domain name belonging to Cleer, among other means.  Hijacking and holding hostage Cleer.tax and using it to redirect Cleer's current and prospective clients to Optic Tax hurts the sterling reputation Cleer has built for itself.

> For these reasons also, Cleer will suffer irreparable harm absent injunctive relief.

**C.     Defendants' Federal Trademark Law Violations Establish Irreparable Harm.**

Irreparable injury is presumed "when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial, because loss of control over one's reputation is neither calculable nor precisely compensable." *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, 2018 U.S. Dist. Lexis 72349, *16 (E.D.N.Y. 2018).  Given the nature of websites, courts have concluded that a cyber squatter's operation of a website "would produce an actual injury that would not be remediable after trial." *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 527 (S.D.N.Y. 2012).  In *Bogoni*, the court held:

> [T]he mere fact that both Domain Names are spelled only with the plaintiff's name weighs quite heavily in favor of the plaintiff here; any time the plaintiff meets a new person, that person--or, for that matter, anyone the plaintiff already knows--will be just clicks away from visiting one of the sites run by the defendant.  Even if the defendant never posts damaging material, the Court agrees with the plaintiff that the use of the plaintiff's name in the Domain Names 'create[s] a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of those sites.'

*Id.* (emphasis in original).

Defendants are using Cleer's Cleer.tax domain name and the CLEER Trademarks to sell Optic Tax's services.  As a result, Cleer has lost control over its reputation and goodwill associated with its business and marks.

### III.   Sufficiently Serious Questions Go To The Merits And The Balance Of Equities Weighs In Favor Of Plaintiff.

Even if this Court were not satisfied that Cleer is likely to prevail on the merits, it has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction.  *See Fairy-Mart v. Marathon Petroleum Co., LP*, No. 3:17-cv-1195, 2017 U.S. Dist. LEXIS 183642, at *47 (D. Conn. Nov. 6, 2017) (holding that at preliminary injunction stage, novel legal issues, and evidence brought forth by Plaintiffs raised sufficiently serious questions "to make them fair ground for litigation.") (citation omitted).  The Second Circuit has ruled that, under its "serious questions" standard, a district court may "grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (affirming issuance of injunctive relief based on the serious questions standard) (citation omitted). In balancing the equities, a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).

The balance of equities here leans heavily Cleer's favor.  Cleer is seeking to hold Stranger to the bargain she struck when it made her a Member, negotiated the terms of the restrictive covenants, and entered into the MVA and Operating Agreement.  Cleer now seeks to protect its

legitimate business interests, including its goodwill, client information, and relationships, and employees.

There is no inequity in compelling Stranger to honor her contractual promises to wait before engaging in competitive work and soliciting Cleer's clients and employees. On the other hand, Cleer faces immediate and irremediable damage, including the potential loss of substantial business, should Stranger continue to reap the benefits of her unfair competition with Cleer. Any prejudice to Stranger (which is minimal given the egregious and deliberate nature of her conduct) is substantially outweighed by the prejudice Cleer would suffer absent injunctive relief.

**IV.    The Public Interest Favors An Injunction**

Considering the public interest factor where an employer sought a preliminary injunction to enforce a noncompete, the Sixth Circuit applying Michigan law explained:

> No important public policies readily appear to be implicated by the issuance of the preliminary injunction in this case other than the general public interest in the enforcement of voluntarily assumed contract obligations. As previously indicated, enforcement of this non-compete clause would not run afoul of either federal or Michigan antitrust policy because the injunction appears to be reasonable in purpose, scope, and duration.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007). This Court has similarly held that it is in the public's interest to enforce contracts. *Gartner, Inc. v. Hackett Grp., Inc.*, No. 3:23-CV-688 (SRU), 2023 WL 7350329, at *7 (D. Conn. Nov. 7, 2023).

For the same reasons, enforcing the restrictive covenants in the MVA and Operating Agreement against Stranger serves the public interest. As established above, the restrictive covenants are reasonable in all relevant respects. Thus, Cleer seeks to do no more than hold Stranger to her voluntarily assumed contractual obligations, which serves the public interest and favors issuing the injunctive relief it seeks.

## **CONCLUSION**

Based on the above, Cleer respectfully requests that this Court enter a temporary restraining order and a preliminary injunction ordering that Stranger stop violating the MVA and Operating Agreement and that she immediately cease all use associated with the Cleer.tax domain name and transfer the Cleer.tax domain name to Cleer.

Respectfully submitted,

*/s/ Michael S. O'Malley*
Michael S. O'Malley, Esq. (ct31784)
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
281 Tresser Boulevard
Stamford, CT 06901
Ph: (203) 969-3109
Fx: (203) 969-3150
Michael.o'malley@ogletree.com

PRO HAC VICE FORTHCOMING:

George B. Musekamp (0087060)
Evan H. Cohn (0100407)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202
Ph: (513) 381-2838
Fx: (513) 381-0205
gmusekamp@taftlaw.com
ecohn@taftlaw.com

*Counsel for Plaintiff Cleer LLC (f/k/a Greenback Business Services LLC) d/b/a Cleer Tax*

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2024 I filed Defendant's Plaintiff's Motion for Immediate Temporary Restraining Order and Preliminary Injunctive Relief using the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Michael S. O'Malley*