**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | DEFENDANTS' OPPOSITION TO |
| | : | INJUNCTIVE RELIEF |
| CRYSTAL STRANGER et al. | : | |
| | : | 2024-10-01 |

# Introduction

Plaintiff alleges, in the memorandum supporting their motion for a TRO and injunctive relief (ECF 12-1, "Plaintiff's motion"), legal conclusions that the Defendants have breached contracts with Plaintiff and have infringed a valid trademark that is owned by Plaintiff.

Plaintiff's legal conclusions are wrong or at the least not supported by the underlying factual allegations. Plaintiff does not show a substantial likelihood of success on the merits and does not show that the balance of hardships favors Plaintiff. Therefore, it would not be appropriate to issue a preliminary injunction that would mandate a change to the status quo. Accordingly, Defendants oppose the motion for injunctive relief.

Additionally, Plaintiff has not properly served any Defendant. Accordingly, the Court lacks jurisdiction over the Defendants. Defendants do not waive the jurisdictional defect.

# Factual Background

As of January 3, 2020, Plaintiff was known as Greenback Business Services, LLC ("GBS") — a Wyoming company, organized by two Connecticut residents (David and Carrie McKeegan), which had its principal place of business in Michigan. GBS did business as "Greenback Business Services" and focused on serving the U.S. tax needs of foreign startups creating U.S companies.

On January 3, 2020, GBS hired Crystal Stranger ("Ms. Stranger") as its Lead Accountant.[1] In that role, Ms. Stranger oversaw the Enrolled Agents and other staff who were responsible for preparing tax returns on behalf of founders of U.S. startups across the world.

Ms. Stranger had significant previous experience as an Enrolled Agent and was an NTPI Tax Fellow. Additionally, she had an entrepreneurial spirit that GBS hoped would be helpful in business development. As part of her ongoing business development efforts, since 2014 Ms. Stranger had been publishing and providing tax advice under the business name of "Clear Advantage Publishing".[2] Additionally, from December of 2014 Ms. Stranger owned a company (1st Tax Inc. or "1st Tax") that was offering business tax services and had a roster of recurring business clients. Ms. Stranger provided tax and bookkeeping services through 1st Tax until GBS asked Ms. Stranger to merge her client base with GBS Tax and Bookkeeping, as part of an oral

---

[1]Exhibit A, Employment Agreement.

[2]Exhibit B, Amazon.com, The Small Business Tax Guide book listing

2

agreement ancillary to the MVA discussed below. Ms. Stranger's entrepreneurial qualities made Ms. Stranger attractive to GBS.

On May 26, 2022, two years into her employment with GBS and thinking of her "Clear Advantage" trade name, Ms. Stranger registered the domain name "cleer.tax". The next day, David McKeegan offered Ms. Stranger a Membership Vesting Agreement ("MVA")[3] and promoted Ms. Stranger to "International Tax Director and General Manager". In July 2022, Ms. Stranger offered to allow GBS to use her "cleer.tax" domain.

Five months later, on October 28, 2022, GBS announced a name change to "Cleer, LLC" ("Cleer").

2023 was a banner year for Cleer. The company made the Inc 5000 list of fast-growing companies based on about a 40% increase of sales over 2022. However, profits increased by only 25% compared to the 30% that David McKeegan had targeted. This was in part because Ms. Stranger had brought on additional staff in expectation of sales increases in 2024 and the correspondent increased workload. Sales did not occur as quickly as had been projected by David McKeegan. There were hard feelings. David McKeegan complained persistently about inadequate profitability and "empire building". Ms. Stranger tried to protect her team, but to no avail. There were layoffs and attrition.

---

[3]ECF 1-4.

However, in August 2023, based on Ms. Stranger's permissive license of "cleer.tax", David McKeegan filed a trademark application[4] in the name of Greenback Business Services LLC for CLEER as an identification of origin for business consulting services, bookkeeping, regulatory compliance auditing, etc.

By the beginning of 2024, David McKeegan had driven out Cleer's business manager (Lindsey Anderson) and Ms. Stranger was required to take on Lindsey's work in addition to her existing more-than-full-time workload. Ms. Stranger felt that she was being set up to fail and to be fired for cause. Although she was only 12% vested for the total 20% stake offered in the ownership of Cleer, she tendered her resignation from employment in mid January. January 22, she registered "optictax.com" as the domain for a business she intended to launch.

January 31, 2024 was Ms. Stranger's last day of employment with Cleer. However, she did not withdraw as a member of the LLC. As such, she observed the terms of the LLC Operating Agreement ("OA")[5] and Membership Vesting Agreement that prohibited her competing with her own company.

April 9, 2024, Greenback Business Services LLC obtained a trademark registration[6] for CLEER. The registration was based on a statement of use that intentionally omitted GBS/Cleer's tax preparation and consulting business, and included

---

[4]ECF 1-2.

[5]ECF 1-3.

[6]ECF 1-1.

Alan Harrison – SANDOLLAR Law – Milford, CT

"regulatory compliance auditing", which was a service that Cleer did not perform at the time that the statement of use was made.

May 13, 2024, David McKeegan offered to buy out Ms. Stranger's equity in Cleer. The terms of the offer were not acceptable to Ms. Stranger. Then Ms. Stranger offered to purchase Cleer and David McKeegan accepted her offer on the price, but before a Letter of Intent could be signed McKeegan demanded unreasonable deal terms. While Ms. Stranger was considering next steps, her stepfather was diagnosed with terminal bladder cancer. Through the middle of August 2024, Ms. Stranger was full-time caregiver to her cognitively-impaired mother and terminally ill stepfather. She had no opportunity to further negotiate an acquisition or buy out.

August 8, 2024, the McKeegans informed Ms. Stranger that they had voted to expel Ms. Stranger from Cleer and to "repurchase" her 12% stake for zero dollars based on her Capital Account purportedly having a debit balance.[7]

Freed of the OA and MVA restrictions[8], Ms. Stranger launched Optic Tax. She rescinded Cleer's license to use cleer.tax (thereby voiding Cleer's specimen of use for the trademark registration) and made use of that domain, which continued to be registered to her, for her own purposes.

_____

[7]As will be explained in Defendants' Answer and Counterclaims, under clause 4.1 of the Operating Agreement it would not be possible for Ms. Stranger's Capital Account to have had a debit balance unless ALL of the Capital Accounts had debit balances. Given that GBS / Cleer had maintained profitability throughout 2020-2023, such seems improbable.

[8]Except for, allegedly, clause 12(a) of the MVA — quoted at ECF 12-1, pages 3-4.

Meanwhile, David McKeegan embarked on a somewhat overbearing quest to measure employee productivity by mandating that by September 1, 2024 all Cleer staff should install on their computers (with which the staff accessed, viewed, and entered sensitive client financial data) a time-tracking and screen-capture software called "Trackabi". Fearing professional liability for potential exposure of client data through the screen capture functionality, Cleer's staff resigned en masse effective September 1, 2024. They then, on September 4, reached out to Ms. Stranger for employment.

The status quo is that Plaintiff and Defendants each operate tax preparation and consulting businesses that serve and compete for U.S. residents, companies, and non-U.S. citizens who need to pay U.S. taxes.

Plaintiff filed the Complaint in this action and then mailed copies to Wyoming addresses supposedly for Ms. Stranger and for Optic Tax. Ms. Stranger does not reside in Wyoming and Optic Tax is not a Wyoming company. The Wyoming address used for sending documents to Optic Tax has never been a place of business of the company.

## Legal Standards

A preliminary injunction is an "extraordinary remedy." *UBS Fin. Servs. V. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011), quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (describing preliminary injunction as "extraordinary and drastic remedy").

A plaintiff seeking a preliminary injunction must show: (1) "a likelihood of success on the merits"; (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) "that the public interest would not be disserved by the issuance of [the] injunction."

*Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107 (2nd Cir. 2024) (*citing Salinger v. Colting*, 607 F.3d 68 (2nd Cir. 2010)).

However, [the Second Circuit has] required the movant to meet a higher standard [as to likelihood of success] where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2nd Cir. 1995).

Thus, the typical "likelihood of success" standard is heightened further to a "clear" or "substantial" showing of such a likelihood of ultimate success where, as here, Plaintiff seek a mandatory preliminary injunction that would "alter, rather than maintain, the status quo." *Almontaser v. New York City Dep't of Educ.*, 519 U.S. 505, 508 (2d Cir. 2008). And that heightened standard of likelihood of ultimate success becomes even higher where, as here, the preliminary injunction "(1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to

defendants on the merits at trial." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citations omitted).

Any preliminary injunction must satisfy Rule 65(d), which requires that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Sanders v. Air Line Pilots Association, International*, 473 F.2d 244 (2nd Cir. 1972).

Notwithstanding the foregoing, the decision to either grant or withhold the equitable relief of a preliminary injunction "rests in the sound discretion of the court." *Petrol. Expl., Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 218 (1938).

On the other hand, "[t]he purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers School Dist.*, 561 F.3d 97 (2nd Cir. 2009).

Wyoming law is the governing law of the OA[9] and "any ambiguity in the contract is construed against the drafter of the agreement." *Collins v. Finnell*, 2001 WY 74, 29 P.3d 93 (Wyo. 2001). Under Wyoming law,

(a) A person is dissociated as a member from a limited liability company when:

(i) The company has notice of the person's **express will to withdraw** as a

---

[9] `ECF 1-3, 12.5.`

member, but, if the person specified a withdrawal date later than the date the company had notice, on that later date;...

Wyo. Stat. 17-29-602 Events causing dissociation (Wyoming Statutes (2024 Edition)) (emphasis added).

The Federal Rules provide:

… Unless federal law provides otherwise, an individual-other than a minor, an incompetent person, or a person whose waiver has been filed-may be served in a judicial district of the United States by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

… Unless federal law provides otherwise or the defendant's waiver has been filed, a domestic or foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served:

(1) in a judicial district of the United States:

(A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or

(B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and-if the agent is one authorized by statute and the statute so requires-by **also** mailing a copy of each to the defendant...

Fed. R. Civ. P. 4 Summons (Federal Rules of Civil Procedure (2024 Edition)) (emphasis added).

Plaintiff attempted service on Defendants in the State of Wyoming. The Wyoming rules provide:

(e) Serving an Individual Within the United States. An individual other than a person under 14 years of age or an incompetent person may be served within the United States: (1) by delivering a copy of the summons and of the complaint to the individual personally,

(2) by leaving copies thereof at the individual's dwelling house or usual place of abode with some person over the age of 14 years then residing therein,

(3) at the defendant's usual place of business with an employee of the defendant then in charge of such place of business, or

(4) by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

Wyo. R. Prac. & P. 4 Summons (Wyoming Rules of Practice and Procedure, Generally (2024 Edition)).

The Wyoming rules further provide:

(2) Service upon a corporation within the United States shall be made: (A) by delivery of copies to any officer, manager, general agent, or agent for process, or

(B) If no such officer, manager or agent can be found in the county in which the action is brought such copies may be delivered to any agent or employee found in such county.

(C) If such delivery be to a person other than an officer, manager, general agent or agent for process, the clerk, at least 20 days before default is entered, shall mail copies to the corporation by registered or certified mail and marked "restricted delivery" with return receipt requested, at its last known address.

Wyo. R. Prac. & P. 4 Summons (Wyoming Rules of Practice and Procedure, Generally (2024 Edition)).

This Court sits in the State of Connecticut. Connecticut law provides:

The service of a writ of summons shall be made by the officer reading it and the complaint accompanying it in the hearing of the defendant or by leaving an attested copy thereof with him or at his usual place of abode. When service is made by leaving an attested copy at the defendant's usual place of abode, the officer making service shall note in his return the address at which such attested copy was left.

Conn. Gen. Stat. 52-54 Service of summons (General Statutes of Connecticut (2024 Edition)).

"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 61 (1940).

# Analysis

This Court has no jurisdiction over Defendants. Plaintiff fails to demonstrate a likelihood of success on the merits of the breach of contract claims or the trademark claims. Further, Plaintiff fails to demonstrate that the balance of hardships tilts in Plaintiff's favor. Additionally, at least part of Plaintiff's claim for injunctive relief lacks specificity necessary to support an injunction that complies with Rule 65(d).

## No service of process means no jurisdiction

Plaintiff has not properly served Ms. Stranger. No copy of the Complaint and summons was personally delivered to Ms. Stranger, left at her dwelling house or usual place of abode, left at her usual place of business, read aloud to her, or delivered to any agent authorized to receive service of process on her behalf.

Plaintiff has not properly served Optic Tax. No copy of the Complaint and summons was personally delivered to Optic Tax, left at its usual place of business, or delivered to any officer, manager, general agent, or agent for process.

Without proper service of process, this Court has no jurisdiction over Ms. Stranger or over Optic Tax.

## No substantial likelihood of success on breach of contract

Plaintiff's motion alleges, at page 7, that "Stranger Committed And Continues To Commit Many MVA And Operating Agreement Violations". Plaintiff's motion further alleges, at page 11, that "Stranger agreed to customer and employee non-solicitation provisions with Cleer in the MVA [and] agreed to customer and employee non-solicitation covenants and a non-competition restrictive covenant in the Operating Agreement."

More specifically, Plaintiff's motion alleges, at pages 4-5, that Ms. Stranger is bound to clauses 9.1-9.3 and 9.5 of the OA. But clause 9.1 is effective only "while a Member of the Company and for twelve (12) months following **the withdrawal** for any

reason as a Member" and clause 9.2 is effective only "so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following **withdrawal** for any reason as a Member". Clause 9.3 is limited to "information, plans, products, data, inventions, training programs, or instructional materials".

Ms. Stranger is not a Member and did not **withdraw** as a Member under Wyoming law, so she is outside the terms of OA clauses 9.1 and 9.2. Plaintiff has zero likelihood of success on the merits of a claim that Ms. Stranger is in breach of a contract that does not apply to her.

Meanwhile, the non-compete provision of the MVA would be applicable only if Ms. Stranger had been terminated from employment for cause. She was not.

Regarding the non-solicitation provisions (clause 12 of the MVA), the "clear, unambiguous" terms (emphasis added) prohibit Ms. Stranger from:

i. directly or indirectly contact[ing], solicit[ing], accept[ing] business from, or communicat[ing] the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee **had direct or indirect contact or solicited *on behalf of Company*** in the two (2) years prior to Employee's termination, for the purpose of selling or soliciting products or services that are in competition with the products or services of Company; and

Alan Harrison – SANDOLLAR Law – Milford, CT

ii. directly or indirectly contact[ing], solicit[ing], recruit[ing] or hir[ing] any employees of the Company with whom Employee worked or had contact **for the purpose of causing, inviting, or encouraging** any such employee to alter or terminate his or her employment or business relationship with Company[.]

Plaintiff's motion fails to identify any specific customer, supplier, prospective customer, or prospective supplier of Cleer "with whom Employee **had direct or indirect contact or solicited *on behalf of Company*** in the two (2) years prior to Employee's termination" in purported violation of MVA clause 12(a)(i).

In many cases, Ms. Stranger had pre-existing relationships with clients whom she brought to GBS. Indeed, those pre-existing relationships were a factor in GBS' decision to proffer the MVA. Plaintiff's motion fails to identify any specific customer or supplier with whom Ms. Stranger had contact or solicited **on behalf of Cleer**. Thus, Plaintiff's motion fails to show a "substantial" likelihood of success on the merits of the purported breach of the non-solicitation clause.

Meanwhile, with respect to MVA clause 12(a)(ii), Ms. Stranger did not solicit or hire any Cleer employee "for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company." Rather, Cleer's bookkeepers terminated their employments with Cleer and **then** reached out to Ms. Stranger. Thus, Plaintiff has zero likelihood of success on the merits of a claim for breach of the employee non-solicitation clause.

Plaintiff fails to show a substantial likelihood of success on the merits of its breach of contract claims, as would be required to justify the Court in issuing a mandatory preliminary injunction.

## No substantial likelihood of success on trademark infringement

Ms. Stranger owns the "cleer.tax" domain name[10] and has owned it at all times since she registered it in May 2022. Ms. Stranger orally offered GBS a license to use the "cleer.tax" domain name and the CLEER trade name, and based solely on that oral license, GBS changed its name to Cleer LLC. After being expelled from membership in GBS/Cleer, Ms. Stranger has revoked that license.

There is at least a genuine dispute as to whether Cleer established its use of the CLEER mark only under license from Ms. Stranger — a license that has been revoked. Where there is a dispute as to whether Plaintiff even has rights in its purported trademark, there is no substantial likelihood of success on the merits of a trademark claim.

Further regarding the possibility that Plaintiff lacks rights in the purported CLEER mark, Plaintiff's trademark registration for CLEER was obtained only by misrepresenting, in the trademark application, what services the mark was used for.

Plaintiff's principal business is tax preparation, and Plaintiff is using the CLEER mark for tax services, as evidenced by "cleertax.com" and by Plaintiff's effort to obtain

---

[10]Exhibit C, partial namesilo listing of domain names owned by Ms. Stranger Stranger.

16

Ms. Stranger's "cleer.tax" domain. But Plaintiff's pre-filing trademark search revealed other companies and registrations such as Clear Tax and Clear Start Tax. And there was Ms. Stranger's own Clear Advantage brand of tax publishing and consulting services. Therefore, in order to avoid a Section 2(d) rejection based on likelihood of confusion, Plaintiff chose to omit tax preparation from the list of services for which it claimed use of CLEER — even though tax preparation is the principal service for which Plaintiff uses CLEER.

Plaintiff's misrepresentations to the USPTO in obtaining the CLEER trademark registration present viable grounds for cancellation of the registration.[11] Where Plaintiff's purported ownership of the CLEER mark is based only on a flawed registration, there is not a substantial likelihood that Plaintiff will prevail on the merits of a trademark infringement claim.

Even if Plaintiff could demonstrate rights in the CLEER mark, the *Polaroid* factors would need to be weighed: "[T]he strength of [the plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the [plaintiff] will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Riseandshine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2nd Cir. 2022) (holding that SDNY erred in finding that "Rise" was a "strong" mark).

---

[11]Trademark Act § 2(e)(1), 2(f), 14(1), 14(3).

Alan Harrison – SANDOLLAR Law – Milford, CT

Although each *Polaroid* factor may be considered, whether a purported mark even is strong enough to be protectable is a threshold question.

"The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength." *Riseandshine*, at 120. "To describe different degrees of inherent distinctiveness, the trademark law utilizes four categories. In order of ascending strength, they are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Id*. "One rung above the unprotectable generic marks are descriptive marks. These are marks that tell something about a product, its qualities, ingredients or characteristics. Descriptive marks are **presumptively unprotectable**, but can acquire a degree of protection if they have acquired secondary meaning, i.e. an acquired public recognition as a mark identifying the source." *Id* (internal cites and quotes omitted, emphasis added).

"Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive. ... However, the statute does not state that the certificate of registration is itself evidence of how the public actually views the mark, and we conclude that the certificate does not constitute evidence of this fact as such." *Lane Capital Mgmt. v. Lane Capital Mgmt.*, 192 F.3d 337, 345 (2nd Cir. 1998).

"Clear", or its homonym "cleer", in context of any type of consulting services, is a descriptive mark. It describes the consultant's aspiration to render clarity to the client. Accordingly, there are several other uses of "clear" as a trade name specifically in the field of tax preparation or tax consulting services. Where multiple people use the same trade name in the same line of business, for the same purpose of describing a quality of their services, the mark is inherently not distinctive and does not inherently merit trademark protection. At this early stage of litigation, it is too soon for the Court to determine whether to accept the contrary presumption that is raised by the CLEER registration.

Thus, there is a substantial question as to whether CLEER is a protectable mark. This question weighs against the possibility of Cleer showing a substantial likelihood of success on the merits.

Turning to the factor of Defendants' good faith in using "cleer.tax", Ms. Stranger adopted "cleer.tax" as her own domain name and prospective trade name, then offered to license the trade name to GBS. Ms. Stranger has used CLEAR to identify tax consulting businesses since as early as 2006.[12] CLEAR is an anagram of Ms. Stranger's middle name, "Clare", and was in fact the middle name that her parents meant to give her save for a nurse's error in filling out the birth certificate.

---

[12]Crystal Clear Financial LLC, a tax and bookkeeping firm owned and operated from 2006 through 2009 by Ms. Stranger; Clear Advantage LLC, a publishing and tax consulting business owned and operated by Ms. Stranger from 2014 through the present; and Clearly Crypto LLC, a cryptocurrency specific tax firm owned and promoted by Ms. Stranger from 2018 to 2019.

Based on Ms. Stranger's revocable offer of a license, GBS changed its name to Cleer. But GBS/Cleer rendered no consideration for the license and did nothing to perpetuate or even memorialize the license. Instead, GBS proceeded to file for trademark registration of a trade name that it was using only under an oral license from Ms. Stranger. The application for registration was not done in good faith.

Turning to the quality of services, Ms. Stranger redirects her "cleer.tax" domain name to "optictax.com", where she operates the business Optic Tax. As the principal of Optic Tax, she supervises a team of more than twenty tax professionals who render competent and timely tax advice and tax preparation services to diverse clients. Ms. Stranger's more than 20 years of tax industry experience inform the high level of quality that her team delivers to her clients.

Thus, several of the *Polaroid* factors weigh against a finding of infringement, so that Cleer fails to show a substantial likelihood of success on the merits of its trademark infringement claim, as would be needed to justify the Court in issuing a mandatory preliminary injunction.

## Balance of hardships does not favor the Plaintiff

On the one hand, if injunctive relief is denied then Plaintiff will continue to compete with Defendant as just one of many competing tax consulting services. On the other hand, if injunctive relief is granted then Defendants will be put out of business and will lose valuable property, including the "cleer.tax" domain that Defendants created. Granting a preliminary injunction on these facts would provide Plaintiff with all the relief

that is sought and could not be undone by a judgment favorable to Defendants on the

merits at trial.

Thus, the balance of hardships does not favor Plaintiff.

## Lack of specificity

With reference to a purported breach of the non-solicitation clause in the MVA,

Plaintiff's motion for injunctive relief fails to state a claim with sufficient specificity so that

the Court could issue an injunction compliant with Rule 65(d). Given the uncertainty as

to which clients Ms. Stranger brought to GBS rather than soliciting on behalf of GBS,

Ms. Stranger would be left to merely guess as to whether any particular customer or

supplier was within the four corners of an injunction conforming to Plaintiff's vague

claim.

# Conclusion

Plaintiff's motion is vague, fails to show a substantial likelihood of success on the merits, and does not demonstrate that the balance of hardships favors granting injunctive relief against Defendants. Additionally, the Court lacks jurisdiction over Defendants.

Accordingly, Defendants pray the Court to DENY Plaintiff's request for mandatory injunctive relief.

Respectfully submitted,

s/Alan Harrison

Alan Harrison ct29464
SANDOLLAR Law
6 West River Street #112
Milford, CT 06460
alan@sandollar-law.net
203.212.9996