## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | | |
|---|---|---|
| **CLEER LLC (F/K/A GREENBACK BUSINESS SERVICES LLC) D/B/A CLEER TAX** | : | Case No. 3:24-cv-01496-MPS |
| | : | |
| | : | Judge Michael P. Shea |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **PLAINTIFF'S VERIFIED FIRST** |
| | : | **AMENDED COMPLAINT FOR** |
| **CRYSTAL STRANGER, ET AL.,** | : | **DAMAGES, TEMPORARY** |
| | : | **RESTRAINING ORDER, AND** |
| Defendants. | : | **PRELIMINARY AND PERMANENT** |
| | : | **INJUNCTION** |
| | : | |

Plaintiff Cleer LLC (f/k/a Greenback Business Services LLC) d/b/a Cleer Tax ("Cleer"), for its Verified First Amended Complaint against Defendants Crystal Stranger ("Stranger") and Optic Tax, Inc. ("Optic Tax") (collectively, "Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.    Cleer commenced this action because of the unlawful acts of its former employee and business partner, Stranger, who, among other things, deliberately violated various restrictive covenants by unfairly competing against Cleer, poaching Cleer's current and prospective clients and employees, and using Cleer's confidential information for the benefit of Optic Tax, hijacked Cleer's domain name for use in a deceptive and misleading email and website campaign, misappropriated Cleer's trade secret client list to solicit Cleer's clients for Defendants' use and benefit, stole Cleer's corporate identity, misused and tarnished Cleer's valuable trade name, trademark, reputation, and goodwill to deceptively target consumers, and has caused and continues to cause significant irreparable harm to Cleer.

2.     Cleer brings this suit for injunctive relief and damages to redress Defendants' flagrant violations of contractual, common law, and statutory obligations owing to Cleer, including to stop Defendants' unfair competition, stop solicitation of Cleer's customers and contractors, stop Defendants' interference with Cleer's contracts and business relationships, stop Defendants from defaming Cleer, stop Defendants' misuse of Cleer's confidential and trade secret information, stop Defendants from further damaging Cleer's goodwill, to stop Defendants' improper control over and use of the website domain name Cleer.tax that she has redirected to Stranger's own competing website, and to stop Defendants' improper control and use of the @cleer.tax domain name that Defendants are using to solicit Cleer's customers and employees.

**PARTIES, VENUE, AND JURISDICTION**

3.     Cleer is a Wyoming limited liability company.

4.     Cleer has two members who maintain United States residencies in Connecticut and who operate Cleer out of Connecticut when in the United States.

5.     Connecticut is the location of Cleer's United States headquarters.

6.     Upon information and belief, Optic Tax is a Delaware corporation with its US headquarters located in Wyoming.

7.     Upon information and belief, Stranger is a resident of New Mexico and/or owns residential real estate in Dona Ana County, New Mexico at the following addresses: (1) 5719 Mauer Road, and (2) 5077 Tierra Blanca Road.

8.     According to the publicly available Dona Ana County Real Estate Assessor website, Stranger lists her "Owner Address" for both properties above as 30 North Gould Street, Suite 3088, Sheridan, Wyoming 82801.

135495088v1

9.     According to the publicly available Dona Ana County Treasurer's Office, Stranger's address for both properties above is 30 North Gould Street, Suite 3088, Sheridan, Wyoming 82801.

10.     According to the publicly available Dona Ana County Treasurer's Office, Stranger paid her real estate taxes for 5719 Mauer Road from 30 North Gould Street, Suite 3088, Sheridan, Wyoming 82801.

11.     Upon information and belief, Stranger maintains an agent for purposes of service of process at 30 North Gould Street, Suite 3088, Sheridan, Wyoming 82801, and Stranger was served with a copy of the original Complaint and Summons at this address.

12.     Upon information and belief, Stranger is the sole shareholder, CEO, and President of Optic Tax.

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (diversity) because the parties are domiciled or residents of different states and the amount in controversy exceeds $75,000.  Cleer has lost profits that exceed $75,000 caused by Defendants' improper conduct, Cleer's profitability was impaired by Defendants' actions in an amount that exceeds $75,000, Cleer's reputation was impaired by Defendants' actions in an amount that exceeds $75,000, and Cleer is seeking equitable relief, the value of which exceeds $75,000.

14.     The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) pursuant to 28 U.S.C. § 1338(a)–(b) (original jurisdiction to adjudicate federal trademark claims) and 18 U.S.C. § 1836 (original jurisdiction to adjudicate trade secret claims under the Defend Trade Secret Act of 2016 ("DTSA")).

15.     The Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This Court has personal jurisdiction over Optic Tax because it committed torts in Connecticut by tortiously interfering with the Membership Vesting Agreement ("MVA") between Cleer and Stranger that has a Connecticut forum selection clause, its wrongful conduct inflicted damage on Cleer and its members in Connecticut, and Stranger (who agreed to jurisdiction in Connecticut) is directing the wrongful acts of Optic Tax to cause harm to Cleer in Connecticut.

17.     The Court also has personal jurisdiction over Optic Tax because, upon information and belief, Optic Tax is soliciting Cleer's clients located in Connecticut using Cleer's confidential and trade secret client list that has proprietary information pertaining to Connecticut clients.

18.     Upon information and belief, Optic Tax further conducts or attempts to conduct business in Connecticut, markets itself as conducting business throughout the United States (including Connecticut), and has filed or will file income tax returns on behalf of clients that conduct business in Connecticut.

19.     The Court has personal jurisdiction over Stranger because she agreed by contract to personal jurisdiction in Connecticut.

## BACKGROUND FACTS

20.     In 2016, David and Carrie McKeegan, husband and wife, founded Greenback Business Services ("Greenback") (which later changed its name to Cleer) with a focus on helping start-ups and early stage entrepreneurs with tax preparations and filings.

21.     In 2022 and 2023, Cleer earned a spot on the list of fastest growing private companies in the United States.

22.     Cleer is a global provider of tax preparing, bookkeeping, and provided consultation services to more than 5,000 startup, small, and growing domestic and international businesses seeking individualized solutions for compliance with the United States tax system.

23.     Prior to interference by Defendants, Cleer had over 50 contractors worldwide

**Cleer's Trademark Rights and Domain Name**

24.     Cleer is the owner of the CLEER® (word mark) and CLEER.TAX (design mark) trademarks.

25.     CLEER® is registered with the United States Patent and Trademark Office as Reg. No. 7356779. The CLEER® Trademark claims a first use date of October 28, 2022.  (Exhibit A – Registration For CLEER®).

26.     Cleer has also filed a United States trademark application for CLEER.TAX (Design Mark), Ser. No. 98128324 (collectively with CLEER®, the "CLEER Trademarks"). The CLEER.TAX design mark is pictured below.



(Exhibit B – Application For CLEER.TAX).

27.     The CLEER Trademarks cover a variety of goods and services, including business consulting services; bookkeeping; business development services, namely, providing start-up support for businesses of others, and regulatory compliance. Cleer has extensively used the CLEER Trademarks and promoted them at considerable expense.

28.     Cleer is also the owner of the "cleertax.com" domain name, which was registered on May 26, 2022. Cleer uses the "cleertax.com" domain name as the URL of its email address (Hello@Cleertax.com), and to advertise and promote its business through its website.

**Cleer Hires Stranger as an Employee**

29.     In January 2020, Cleer hired Stranger as a Lead Accountant.

30.     At that time, Mr. and Mrs. McKeegan each held 50% membership interests in Cleer.

31.     Stranger, as an employee, was tasked with preparing and reviewing tax returns, advising clients, and performing marketing services.

32.     Stranger was provided with a company laptop, client lists which included client contact information, and other confidential information

33.     Cleer maintains the secrecy of its client lists and does not share those lists with the public of any competitors.

34.     Cleer maintains a competitive advantage from its client lists and uses its client lists to create new business, drive referrals, and maintain current clients.

<u>**Stranger Becomes a Member of Cleer and**</u>
<u>**Agrees To Be Bound By Several Restrictive Covenants**</u>

35.     In May 2022, Mr. and Mrs. McKeegan awarded Stranger an initial 6% membership interest in Cleer.  (Exhibit C – Operating Agreement at Ex. A).

36.     The McKeegans required Stranger, as a new Member of Cleer, to execute the Operating Agreement.

37.     The Operating Agreement imposed restrictions on Stranger in her capacity as a member.

38.     In her capacity as a Member, Stranger agreed to the following provisions under the Operating Agreement:

> 9.1     The Members hereby acknowledge that they are familiar and will help develop the Company's trade secrets and other confidential information.  The Members agree that while a Member of the Company and for twelve (12) months following the withdrawal for any reason as a Member, he shall not, directly or indirectly, either for himself or for any other individual own any interest in, manage, control, consult with, render services for or participate in (whether as an officer, director, employee, partner, agent, representative, or otherwise) or in any other manner engage anywhere in the Protected Areas in any business competitive with business of the Company or any affiliated entity (the "Protected Business").  The term "Protected

6

Territories" shall mean the entirety of the United States of America. The Members agree that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Company's business or any affiliated entity.

9.2    Further, so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following withdrawal for any reason as a Member, the Member shall not directly, or indirectly through another person or entity, (i) induce or attempt to induce any employee of the Company or any affiliated entity to leave the employ of the Company or any affiliated entity, or in any way interfere with the relationship between the Company and any employee thereof; (ii) hire any person who was an employee of the Company or any affiliated entity at any time during the six (6) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the Parties so as to avoid any disputes under this Paragraph that any such hiring within such six (6) month period is in violation of clause (i) above), or (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relationship of the Company or any affiliated entity.

9.3    Technical Development and Improvements.    The Members acknowledge and agree that the Company or any affiliated entity shall have the exclusive ownership, title and possession of any information, plans, products, data, inventions, training programs, or instructional materials discovered, devised, developed, implemented, improved, or otherwise identified or capable of identification regarding the business or any affiliated entity.    The Members shall report and promptly make available any and all technical developments and improvements.    Except as expressly approved by the Company's Members, the Members shall disclose, use and release such technical developments solely in the name and on behalf of the Company or any affiliated entity.

9.4    Confidential Information.    The Members agree to retain all information relating to the business of the Company or any affiliated entity in strict confidence and shall not, at any time, except as authorized in writing by an authorized officer of Company and for the benefit of Company, directly or indirectly, divulge or disclose to any person, firm, association or corporation, or use for his own benefit, gain or otherwise, any information, plans, processes, products, client, report data, results of tests and data, client lists, price lists or any other trade secrets or confidential materials or client information or data regarding the business of Company or any

7

affiliated entity, which is disclosed to or acquired by Member directly or indirectly in the course of Member's employment

9.5    Enforcement.

(a) If, at the time of enforcement of the covenants contained above ("Protective Covenants"), a court shall hold that the duration, scope or area restrictions stated are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed to revise the Protective Covenants to cover the maximum duration, scope and area permitted by law. Member has consulted with legal counsel regarding the Protective Covenants and based on such consultation has determined and agrees that the Protective Covenants are reasonable in terms of duration, scope and area restrictions and are necessary to protect the goodwill of the Company's businesses and agrees not to challenge the validity or enforceability of the Protective Covenants.

(b) If a Member breaches, or threatens to commit a breach of any of the Protective Covenants, the Company and its affiliates shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to the Company or its affiliates at law or in equity:

(i) the right and remedy to have the Protective Covenants specifically enforced by any court or competent jurisdiction, it being agreed that any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Company and its affiliates and that money damages would not provide an adequate remedy to the Company or its affiliates; and

(ii) the right and remedy to require Employee to account for and pay over to the Company or its affiliates any profits, monies or other benefits derived or received by Employee as the result of any transactions constituting a breach of the Protective Covenants.

The invalidity or unenforceability of any provision hereby of, or parts hereof shall in no way effect the validity or enforceability of any other provision or parts hereof. The parties agree that the part or parts of this Agreement to be held invalid or unenforceable shall

135495088v1

> be deemed to have been modified to provide the maximum
> protective covenant possible by law.

(Exhibit C – Operating Agreement at Sections 9.1–9.5).

### **Stranger Agrees to Additional Restrictive Covenants in Her Capacity as an Employee**

39.     In conjunction with Stranger becoming a member of Cleer and execution of the Operating Agreement, Stranger was promoted to the position of International Tax Director/General Manager.

40.     In that role, Stranger was responsible for overseeing the tax, bookkeeping, and CSA Team; steering tax policy and general guidance; providing tax strategy consultations for clients; giving webinars and media interviews; and coordinating the development of technology and tools.

41.     In June 2022, Stranger executed the MVA that, assuming she remained employed with Cleer, gave Stranger her initial 6% membership interest mentioned above upon execution, vested 12% one year from the MVA's effective date, then would vest a maximum of 20% two years from the MVA's effective date.  (Exhibit D – MVA at Section 6).

42.     Section 8(a) of the MVA states:

> Employee will not reveal or otherwise disclose, without prior
> written approval, to anyone Confidential Information, which will
> include, without limitation, any of Company'[s] confidential,
> proprietary or trade secret information that is disclosed to Employee
> or Employee otherwise learns in the course of employment such as,
> but not limited to, business plans, designs, marketing interests,
> products, financial information, including cost and pricing, vendor
> lists, and sales processes and procedures.  Confidential Information
> will not include any information which: (i) is or becomes publicly
> available through no act of Employee; (ii) is rightfully received by
> Employee from a third party without restrictions; or (iii) is
> independently developed by Employee.

(*Id.* at Section 8(a)).

43.     Section 8(d) of the MVA states:

135495088v1

> Employee understands and agrees that he or she will be exposed to Company's trade secrets, including but not limited to information that derives independent economic value from its secret nature. Trade Secrets (hereinafter "Trade Secrets") will include (a) any and all proprietary software solutions used by Company; (b) technical information concerning company salaries, strengths, weaknesses, and skills; (c) information concerning Company's finances, including sales information, profits, accounting information, unpublished financial information, and marketing expenditures; (d) information concerning the company's suppliers or customers, including customer lists, customer information, supplier lists, and supplier information; (e) information concerning business strategies, including marketing plans, business plans, research projects, and product development; (f) and any other information not generally known to the public which, if disclosed, could reasonably be expected to adversely affect Company's business. Employee agrees that he will not reveal or otherwise disclose, without prior written approval, to anyone the Trade Secrets of Company.

(*Id.* at Section 8(d)).

44. "[W]hen Employee's employment with Company ends, **Employee will promptly return** all originals and copies of all documents, records, software programs, media, and other materials concerning Confidential Information, as well as **any and all equipment, files, software programs, and other personal property belonging to the Company**." (*Id.* at Section 8(f) (emphasis added)).

45. Section 8(h) of the MVA states: "Employee understands and agrees that his or her obligation to maintain Company'[s] Confidential Information and Trade Secrets will remain in effect even after his or her employment with Company ends and will continue for so long as the information remains either Confidential Information or a Trade Secret." (*Id.* at Section 8(h)).

46. Section 9(c) of the MVA states: "Employee agrees to aid in and execute any and all documents necessary to prepare any papers that Company may consider necessary or helpful to obtain or maintain any patents, copyrights, trademarks, or other proprietary rights and will do so at no charge to Company." (*Id.* at Section 9(c)).

10

47.    Section 12 of the MVA states:

    a.    During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:

        i.    Directly or indirectly contact, solicit, accept business from, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to employee's termination, for the purpose of selling or soliciting products or services of Company; and

        ii.    directly or indirectly contact, solicit, recruit or hire any employees of the Company with whom Employee worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company.

(*Id.* at Section 12).

**Stranger Created The Domain "Cleer.tax" For Cleer as a Cleer Employee**

48.    In or around January 2023, Greenback transitioned to Cleer for purposes of rebranding.

49.    All aspects of Greenback and Stranger's role with the company remained the same; the only change was in name.

50.    During Stranger's employment with Cleer, she secured the domain name "Cleer.tax" for Cleer to use for business reasons as part of the rebranding.  This is evidenced by Stranger's registration of "Cleer.tax" on May 26, 2022, prior to Cleer's claimed first use of the CLEER Trademarks of October 28, 2022.

11

51.     Mr. McKeegan obtained the email domain @cleertax.com for use by the company. Both "cleertax.com" and "cleer.tax" were registered on May 26, 2022—the same date Stranger executed the Operating Agreement.

52.     Stranger was assigned the email address crystal@cleer.tax for her employment related activities on behalf of Cleer; the remaining employees and owners of Cleer were also provided an @cleer.tax email account which they permissibly used to solicit and conduct business on Cleer's behalf.

53.     Cleer further used the website www.Cleer.tax to market its services and solicit clients.

54.     Upon information and belief, Stranger used her personal debit or credit card to secure Cleer.tax for Cleer's business use, but she renewed the domain on May 26, 2023 using her Cleer credit card.

55.     The Cleer.tax email and website domain names are and always have been Cleer's property.

**<u>Stranger's Violations of the MVA and Operating Agreement</u>**

56.     Upon information and belief, Stranger purchased the domain "OpticTax.com" on January 22, 2024, while she was still employed by Cleer.

57.     On February 1, 2024, Stranger resigned from Cleer.

58.     Stranger retained and refused to return a laptop that was issued to her by Cleer and is Cleer's property.

59.     Upon information and belief, Stranger retained a Cleer client list that she is now using to solicit clients for Optic Tax.

12

60.    At that time, upon information and belief, Optic Tax provided only non-competing services, including certain consulting and advising.

61.    However, beginning on September 1, 2024, Cleer discovered that Optic Tax expanded its business to begin competing directly against Cleer by providing services for tax preparing, bookkeeping, and consultation to startup, small, and growing domestic and international businesses seeking individualized solutions for compliance with the United States tax system.

62.    In August/September 2024, Stranger and Optic Tax began soliciting Cleer's contractors, clients, and prospective clients.

63.    Since the end of Stranger's employment with Cleer and prior to expiration of the restrictive covenants, she has solicited many of Cleer's clients and poached at least ten contractors from Cleer, who, upon information and belief, now work for Optic Tax.

64.    Optic Tax's employees are directly soliciting Cleer's clients at Stranger's direction:





65.    In fact, on September 6, 2024 (nearly 7 months following her separation from Cleer), Defendants used Cleer's "cleer.tax" domain to solicit Cleer's clients and disparage Cleer:

From: "Cleer.tax" <crystal@cleer.tax>
Date: Sep 6, 2024 21:32
Subject: Important News: Changes to Bookkeeping
To: samuel@funbers.com
Cc:

Hi,

You are probably aware about the loss of the entire bookkeeping team at Cleer, and I understand this may have put you in a challenging situation. In full transparency, I want to share some background, so you can understand what happened. As a cofounder of Cleer, I brought both the clients from my prior business and the domain Cleer.tax into the partnership, and I have over 20 years of international and complex tax experience that I used to lead the company and develop the current offerings.

Due to a culture shift that prioritized profit above all else, I left in February to start Optic Tax, focusing on complex international tax consulting.  When I left, I did everything in my power to keep the team together, help the company succeed, and turned down business that would be a conflict. I even tried to buy the remainder of Cleer and had an agreement on price but was stuck on terms. In August, in bad faith, I was removed from the business partnership, with no justification or real explanation. Almost immediately, the team began messaging me about changes that were making their work untenable, and telling me the entire bookkeeping team was planning a walk-out.

The team had been ordered to install screen tracking software on their personal computers that would take a picture of their screen every three seconds. They felt this not only justified their own privacy and web safety, as it could screenshot their passwords, but it would also expose personal financial data of their clients. It was a free account, and they didn't see that it had any data safeguards in place, but they received an ultimatum that they must install this by September 1st.

Things compounded, and the team started to really panic when the former head of HR was fired, and an email was sent out to the whole team falsely stating that she quit. A week later the head of the bookkeeping team was terminated, and told to transition her work to a VA staffing company. I had been exploring legal options of regaining my value in the partnership, but hearing what the team was telling me, it seemed that there would be no company left if I waited. But I can tell you, two weeks ago I never thought I would be sending this email now, it all just deteriorated there so fast.

When the team wanted to leave, they all reached out to me with concerns about who would help the clients if they left. While they told me they felt abused and couldn't handle even a day more, they were loyal to you as being wonderful clients and were worried who would help you. Many team members had stayed in a bad situation because they didn't want to burden you, and while many team members had quit since I left, nobody new had been hired to replace them. So at their request, I expanded Optic Tax to provide tax and bookkeeping services, to give the team a safe place to do their excellent work.

Team members may have reached out to you, as we want to offer you assistance in this transition time, as seamlessly as possible, so there is no disruption to your business. We are here to help whether you choose to work with us going forward or not. I am making myself personally available if you have any questions, you can schedule a call with me here: https://calendly.com/optictax/complimentary-consultation Again, I am happy to help you in any way I can, whether you choose to work with us in the future or not, so please let me know if there is anything I can do to help. Wishing you all the best.

Sincerely,

Crystal Stranger

Founder & CEO

---

**Optic Tax Inc.**

http://optictax.com

30 N Gould St. Ste 3088

Sheridan, WY 82801

**Unsubscribe Now**

66.     On September 9, 2024, Defendants sent another email from the Cleer.tax email domain to again solicit and interfere with Cleer's clients and further disparage Cleer:

Hi,

You may have received another email from my former business partner. I am sorry that he has sunk so low as to make this a public argument. But now I feel I must defend myself by countering these allegations, that really should be saved for the courts to decide who owns what.

As background, when I joined Greenback Business Services (GBS) it was a small company with just four team members. When I became a partner, I contributed not only my expertise in business and international tax, but also my clients from a practice, 1st Tax Inc., that I owned from 2014 and ran concurrently to GBS. My vesting agreement was for a 20% stake (not 12%), and I filed an 83(b) election paying tax on this. When we rebranded, I offered to use the Cleer.tax domain that I had purchased prior to becoming a partner (a variant on the name of a company I had from 2007 to 2010, Crystal Clear Financial LLC), and we never talked about any agreements related to this or transferring the domain. When I left due to a culture crisis, I offered to let them buy me out, or for me to buy them out, but they decided to steal my interest instead of coming to a fair agreement.

Contrary to the claim the business is thriving, the reports I've been getting over the last six months from prior clients were that there were lapses in service, and substantial attrition with no re-hiring. Clients reaching out to me said they were leaving, and this made me think there would be no business left at Cleer for me to get any value from if I simply took legal action to regain my stake for the time and financial investment I had made over many years in both companies.

Ultimately though, regaining my value was just one factor, and I still wouldn't have taken these steps except that the team reached out to me planning a walk-out, because of what they felt was an abusive situation, and was putting them and their clients at risk of a data breach. I felt an obligation to provide an option for the team and the clients, so nobody was left without services.

Please note that there has been no legal action taken against me, or Optic Tax Inc., to date. I also have not received emails directly from my former partners after the last messages I sent requesting justification for the actions they took reclaiming my interests. Their lawyer sent an email back in March asking for me to turn over the cleer.tax domain, without any real grounds for this, then never responded to my email back. That is the only legal communication I have received from them. Ultimately Cleer LLC abandoned use of the cleer.tax domain, rather than purchasing it from me, although I offered repeatedly to settle this amicably.

Again, my apologies that you are in the middle of this partner disagreement, which should be private and among us partners and our lawyers. Partnerships can be challenging, you think you can trust your partners, until they show you they had no intention of honoring the agreements made. But as clients this is not your problem, and at Optic Tax we have been trying to do everything we can to provide you uninterrupted service during this challenging period.

At the end of the day, this should be about you and what your needs are, and how we can serve you best. And with my extensive tax knowledge and the team who is ready to provide services immediately, I believe we are in the best position to help you. Please feel free to reach out to discuss this or your ongoing needs, happy to hop on a call or connect you with the right person to help out.

Wishing you all the best,

Crystal

Founder and CEO, Optic Tax

67.     Upon information and belief, the above emails went to all of Cleer's clients from the client list that Stranger took with her when she resigned from Cleer.

68.     Stranger has also improperly retained and refused to relinquish control over the website domain Cleer.tax and email domain XXX@cleer.tax.

69.     Defendants further redirected all website traffic for Cleer's current and prospective clients who visit www.Cleer.tax directly to www.OpticTax.com.

70.     Optic Tax offers the same services as Cleer and Defendants are intentionally attempting to confuse clients into using Optic Tax's services instead of Cleer's.

71.     Defendants have forwarded emails sent to XXX@cleer.tax addresses to Defendants' new email addresses with Optic Tax.  In other words, Defendants are intercepting emails from clients intended for Cleer and redirecting those communications to Optic Tax for purposes of taking business from Cleer, as this email shows:



72.     Upon information and belief, Cleer has lost several clients to Optic Tax because of Stranger's solicitation efforts.

73.     Upon information and belief, Defendants have adversely impacted Cleer's relationship with its primary referral partner because of Defendants' improper conduct.

**<u>Cleer Terminated Stranger's Cleer Shares For Cause And Repurchased Them</u>**

74.     Stranger's employment with Cleer ended on February 1, 2024, which was before the three-year anniversary of the MVA.  As such, she only vested a 12% membership interest in Cleer when she left.

75.     On August 8, 2024, because Stranger refused to return Cleer.tax and a company laptop with client information on it to Cleer, Cleer Members voted to terminate Stranger's 12 Cleer Units for cause and repurchase them under the Operating Agreement due to her "flagrant dishonesty," "intentional acts detrimental to the conduct of the Company's business," and "multiple and continuing violations of the Company's Operating Agreement."  (Exhibit E – Cleer's

18

Letter Terminating And Repurchasing Stranger's Membership Units; *see also* Exhibit C – Operating Agreement at Section 6.5).

**VOTE OF THE MEMBERS OF**

**Cleer LLC,**

a Wyoming Limited Liability Company

August 8, 2024

Pursuant to Section 6.5 of the Operating Agreement (the "**Operating Agreement**") of Cleer LLC (the "**Company**"), the undersigned, constituting Members "owning greater [than] fifty percent (50%) of the Units (exclusive of the Member under consideration)" of the Company, do hereby cause the Company to exercise its rights under Section 6.5(ii)[2] and [3] of the Operating Agreement to buy Crystal Stranger's ("**Stranger**") 12 Units "for Cause."

Specifically, the Company, through a vote of the Members hereto, exercises its right to repurchase the 12 Units due to, e.g.: (a) Stranger's flagrant dishonesty (6.5(ii)[2]); (b) Stranger's intentional acts detrimental to the conduct of the Company's business (6.5(ii)[2]); and (c) Stranger's multiple and continuing violations of the Company's Operating Agreement (6.5(ii)[3], any one of which, individually, would be sufficient grounds "for Cause" under the Operating Agreement.

Accordingly, the amount owed to Stranger for her 12 Units pursuant to Section 6.5 shall be "equal to the credit balance in the Member's Capital Account", which is approximately a deficit of $70,000 (i.e. -$70,000). Consequently, the Company owes Stranger no additional payment in exchange for her 12 Units.

The Members and Managers hereto are authorized and directed to take any action necessary to effectuate the foregoing resolutions, including any steps or documents necessary to complete the transfer of Units contemplated herein.

***

**IN WITNESS WHEREOF**, the undersigned, being the remaining Members in the Company, and holding a majority of the Units in the Company (exclusive of the Member subject to this 'for Cause' determination), have hereby voted to approve the Company's repurchase of Stranger's 12 Units "for Cause", pursuant to Section 6.5 of the Operating Agreement, and they, respectively, execute this document as of the date set forth above.

David McKeegan, Member 44 Units

Carrie McKeegan, Member, 44 Units

76.     As of August 8, 2024, Stranger was no longer a member of nor did she hold any membership interest in Cleer, and her 12-month post-withdrawal non-solicit and non-competition obligations began to run under the Operating Agreement.

77.     Under the Operating Agreement, when a Member's Units are terminated for cause and repurchased, "[t]he purchase price shall be equal to the credit balance in the Member's Capital Account . . . ."  (Exhibit C – Operating Agreement at Section 6.5).

78.     When Cleer terminated Stranger's 12 Units for cause and repurchased them, Stranger's Member Capital Account for Cleer was -$70,743.   (Exhibit E – Cleer's Letter Terminating And Repurchasing Stranger's Membership Units).

79.     Despite Cleer's demands, Stranger has not paid Cleer the amount owed.

**COUNT I**
**STRANGER: BREACH OF CONTRACT (MVA)**

80.     Cleer repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

81.     The nonsolicitation provision in the MVA is a valid, enforceable obligation necessary to protect Cleer's legitimate business interests and prevent unfair competition by its former employee, Stranger.

82.     Cleer has complied with all of its obligations under the MVA.

83.     Based on the facts stated above, Stranger has breached the MVA by violating the following provisions of the MVA:

     a.  The Confidentiality and Trade Secret provisions under Sections 8 and 9;

     b.  The Non-Disparagement Clause of Section 7;

     c.  The agreement to aid in and execute any and all documents necessary to prepare any papers that Company may consider necessary or helpful to obtain or maintain any trademarks or other proprietary rights of Section 9(c);  and

     d.  The Non-Solicitation provisions under Section 12.

135495088v1

84.     As a result of Stranger's conduct, and unless Stranger is enjoined from continuing such conduct, Cleer has suffered and will continue to suffer irreparable and incalculable harm for which it can never be compensated.  No adequate remedy at law exists for such a breach.

85.     Cleer is entitled to immediate and permanent injunctive relief against further breaches by Stranger.

86.     As a direct and proximate result of Stranger's breaches of contract, Cleer has suffered substantial monetary damages which will be established at trial.

87.     Under the MVA, and as a direct and proximate result of Stranger's breaches of contract, Cleer is entitled to recovery of its attorneys' fees and costs.

## COUNT II
## STRANGER: BREACH OF CONTRACT (OPERATING AGREEMENT)

88.     Cleer repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

89.     As a Member, Stranger was subject to additional contractual duties under the Operating Agreement, including the duty not to compete with Cleer.

90.     Cleer has complied with all of its obligations under the Operating Agreement.

91.     Based on the facts stated above, Stranger has breached the Operating Agreement by violating the following provisions:

a.   The Non-Competition provision under Section 9.1;

b.   The Non-Solicitation provision under Section 9.2;

c.   The Technical Developments and Improvements provision under Section 9.3; and

d.   The Confidential Information provision under Section 9.4.

92.    As a result of Stranger's conduct, and unless Stranger is enjoined from continuing such conduct, Cleer has suffered and will continue to suffer irreparable and incalculable harm for which it can never be compensated.  No adequate remedy at law exists for such a breach.

93.    Cleer is entitled to immediate and permanent injunctive relief against further breaches by Stranger.

94.    As a direct and proximate result of Stranger's breaches of contract, Cleer has suffered substantial monetary damages which will be established at trial.

**COUNT III**
**STRANGER AND OPTIC TAX: UNFAIR COMPETITION**

95.    Cleer repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

96.    Defendants are competing with Cleer.

97.    Defendants have made a strategic decision to try to maliciously target and take away Cleer's customers and clients to gain an unfair advantage.

98.    Defendants have made a strategic decision to try to maliciously target and hire away Cleer's contractors to gain an unfair advantage.

99.    Defendants are improperly controlling, refusing to relinquish, and using the Cleer.tax website to divert and funnel Cleer's current and prospective clients to OpticTax.com.

100.    Defendants are improperly controlling, refusing to relinquish, and using the Cleer.tax email domain to divert and funnel Cleer's current and prospective clients to OpticTax.com.

101.    Defendants are improperly defaming Cleer and informing clients, *inter alia*, that Cleer lost "its entire bookkeeping team," that "there may be no company left," that Cleer "stole"

Stranger's "interest" in Cleer, that there had been "lapses in service," that clients could be "left without services," and other remarks regarding Cleer's business – none of which is true.

102.    Defendants' conduct constitutes unfair competition.

103.    This unfair competition has been willful, deliberate, and malicious.

104.    Defendants have benefitted from their acts of unfair competition.

105.    As a direct and proximate result of Defendants' acts of unfair competition, Cleer has suffered substantial monetary damages which will be established at trial.

106.    Cleer will further be irreparably harmed unless this Court enjoins the activities of Stranger.

**COUNT IV**
**STRANGER AND OPTIC TAX: TORTIOUS INTERFERENCE**
**WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS**

107.    Cleer repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

108.    As a result of her employment with Cleer, Stranger was intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between Cleer and its customers.

109.    Upon information and belief, Stranger and Optic Tax intentionally, with malice, and without privilege or justification, have interfered with and will continue to interfere with Cleer's business relationships with certain clients and prospective clients using unfair and improper means, and/or with the intent to interfere with such relationships for their benefit.

110.    Defendants have engaged in the conduct complained of in a willful and malicious manner, with an improper motive and through improper means, entitling Cleer to an award of punitive damages.

111. Stranger and Optic Tax had and have actual notice of Stranger's post-employment contractual obligations to Cleer.

112. Cleer possesses a protectable interest in its contracts and relations with clients and prospective clients, in that it has a reasonable expectation of new or continued association with Cleer.

113. As a direct and proximate result of Defendants' acts of tortious interference with Cleer's business expectancies, Cleer has suffered substantial monetary damages which will be established at trial.

114. Defendants will continue their acts of tortious interference with Cleer's business expectancies, and Cleer will be irreparably harmed thereby unless the Court enjoins such activities.

**COUNT V**
**STRANGER AND OPTIC TAX: CIVIL CONSPIRACY**

115. Cleer repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

116. Defendants, as described above, maliciously conspired and acted with intent of depriving Cleer of its property, intending to damage Cleer's business.

117. As a direct and proximate result of the wrongful conduct of Defendants, Cleer has suffered substantial monetary damages which will be established at trial.

118. Upon information and belief, Defendants will continue to conspire to harm Cleer, such that it will be irreparably harmed unless such activities are enjoined by this Court.

**COUNT VI**
**STRANGER: BREACH OF DUTY OF LOYALTY**

119. Cleer repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

120.     Stranger, as an employee and member of Cleer, owed an undivided duty of loyalty to Cleer not to use her position at Cleer for her own personal benefit or the benefit of another, to act in good faith, to act in the best interests of Cleer, to account to the company and to hold as trustee for it any property, profit or benefit derived by the member from a use by the member of Cleer's property, to refrain from competing with the company in the conduct of the company's activities and affairs before the dissolution of the company, and not to hinder Cleer's ability to succeed in its business operations. Conn Gen. Stat. Sec. 34-255h(a)-(b).

121.     As described above, during her employment and membership with Cleer, Stranger breached her duty of loyalty by, among other things, purchasing the domain name "OpticTax.com" on January 22, 2024, refusing to relinquish control of the Cleer.tax domain to Cleer, and taking actions in favor of Optic Tax and competing against Cleer during her time as a member of Cleer.

122.     As a direct and proximate result of the wrongful conduct of Stranger, Cleer has suffered substantial monetary damages which will be established at trial.

123.     By breaching her duty of loyalty to Cleer, Stranger acted with malice, wantonness, bad faith, and with the specific intent to cause harm to Cleer, which conduct entitled Cleer to punitive damages in an amount to be determined at trial.

**COUNT VII**
**STRANGER AND OPTIC TAX: FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION**

124.     Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

125.     The CLEER Trademarks and name are a protectable mark identifying the source or origin of the Cleer.

126.     Cleer has a protectable interest in the CLEER Trademarks and name.

127.    Defendants' unauthorized use in commerce of the CLEER Trademarks as alleged above, including Defendants' use of the "cleer.tax" domain name, is likely to confuse, cause mistake, or deceive consumers as to the origin, source, sponsorship, or affiliation of its services, and is likely to cause consumers to believe, contrary to fact, that Defendants' services are sold, authorized, endorsed, or sponsored by Cleer or that Defendants are in some way affiliated with or sponsored by Cleer.

128.    Defendants' unauthorized use in commerce of the CLEER Trademarks as alleged above constitutes use of a false designation of origin and a misleading description and representation of fact in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

129.    Upon information and belief, Defendants' conduct as alleged above is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of the Defendants with Cleer.

130.    The conduct of the Defendants as alleged above constitutes unfair competition and false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

131.    Defendants' conduct as alleged herein is causing immediate and irreparable harm and injury to Cleer, and its goodwill and reputation, and will continue to both damage Cleer and confuse the public unless enjoined by this Court. Cleer has no adequate remedy at law.

132.    Cleer is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

135495088v1

**COUNT VIII**
**STRANGER AND OPTIC TAX: ANTICYBERSQUATTING**

133.    Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

134.    Defendants have registered, trafficked in, and are using a domain name, "cleer.tax," that includes and is virtually identical to Cleer's Trademarks CLEER and CLEER.TAX. Defendants' domain name encompasses the CLEER mark, name and identity in its entirety. The Domain Name is also identical to Cleer's CLEER.TAX mark.

135.    The CLEER and CLEER.TAX marks are distinctive and were known to Defendants at the time they registered and/or acquired the "cleer.tax" domain name.

136.    Defendants had and continue to have a bad faith intent to profit from use of the "cleer.tax" domain name.

137.    Defendants have no valid trademark rights in the CLEER and CLEER.TAX name and mark or any other mark incorporating or comprising the name "CLEER."

138.    Defendants have used the domain name to cause confusion and to exploit the goodwill of Cleer's CLEER and CLEER.TAX mark for Defendants' commercial gain.

139.    Defendants' acts constitute cybersquatting in violation of 15 U.S.C § 1125(d).

140.    As a result of Defendants' cybersquatting, Cleer has suffered detriment to its goodwill, business, reputation and profits – all of its damages in an amount yet to be determined, and subject to a treble damages award pursuant to 15 U.S.C. § 1117.

141.    Alternatively, upon information and belief, Cleer believes that the Defendants have derived and will continue to derive unlawful gains and profits as a result of their unlawful acts. Alternatively, Cleer is entitled to recover statutory damages.

135495088v1

142.    This case is an exceptional case and Cleer is entitled to recover its attorneys' fees pursuant to 15 U.S.C. § 1117.

143.    Cleer is entitled to a transfer of the "cleer.tax" domain name.

144.    If Defendants are permitted to continue the foregoing acts, Cleer will sustain further loss and damage and irreparable injury, for which Cleer has no adequate remedy at law. Injunctive relief against Defendants continued conduct should be granted pursuant to this Court's authority under 15 U.S.C. §§ 1116 and 1118.

## COUNT IX
### STRANGER AND OPTIC TAX: VIOLATION OF DTSA

145.    Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

146.    Cleer has developed and owns valuable trade secrets related to its services, including its client lists.

147.    The trade secrets are used in, or intended for use in, interstate or foreign commerce.

148.    Cleer's trade secrets have value because they are not generally known to the public and are not readily ascertainable.

149.    Cleer has taken reasonable measures to safeguard its trade secrets, including the issuance, enforcement, and training of confidentiality and data security policies, granting and monitoring limited access to its trade secrets, and using password protection to access its trade secrets on proprietary databases.

150.    Defendants took electronic data containing Cleer's trade secret and confidential information without a legitimate purpose.

151.    Stranger used improper means to acquire and use Cleer's trade secrets by accessing and downloading Cleer's information without a lawful purpose after she planned to leave Cleer and

28

compete against it through Optic Tax.

152.    Defendants have obtained an economic benefit from the misappropriation of Cleer's trade secrets.

153.    Defendants' misappropriation was willful and malicious.

154.    As a result of Defendants' unlawful actions, Cleer has suffered harm, including: (1) the loss of its confidential and proprietary information, including the lost value derived from Cleer's investment in a large amount of time and resources to develop the confidential information that gives Cleer an advantage over its competitors; (2) lost business from customers that are now serviced by Defendants; and (3) damage to goodwill and reputation.

155.    As a result of Defendants' willful and malicious misappropriation of Cleer's trade secrets, Cleer is entitled to recover actual damages from the harm Defendants have caused and continue to cause, exemplary damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(B).

156.    As a result of Defendants' willful and malicious misappropriation of Cleer's trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(A), Cleer is entitled to a permanent injunction enjoining Defendants from engaging in any further actual or threatened misappropriation of Cleer's trade secrets and from disclosing them to anyone other than an employee or representative of Cleer.

### COUNT X
### STRANGER AND OPTIC TAX: VIOLATION OF
### THE CONNECTICUT UNIFORM TRADE SECRET ACT

157.    Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

158.    Cleer's trade secrets constitute "trade secrets," as that term is defined under the Connecticut Uniform Trade Secrets Act, General Statutes § 35-50, et seq. ( "CUTSA").

159.    At all relevant times, Cleer has used and continues to use reasonable efforts to protect the secrecy of Cleer's trade secrets, including, but not limited to, the use of contracts and agreements, implementing policies and protocols governing confidentiality, and by implementing and requiring the use of the other protective measures described above.

160.    Cleer's trade secrets provide critical commercial and competitive advantages to Cleer, and Cleer derives significant economic value from this information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

161.    As set forth above, Defendants' conduct constitutes misappropriation of Cleer's trade secrets in violation of the CUTSA.

162.    As set forth above, Defendants' conduct in misappropriating Cleer's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive.

163.    As a direct and proximate cause of the defendants' misappropriation of Cleer's trade secrets, Cleer has suffered and will continue to suffer substantial damages and, pursuant to Conn. Gen. Stat. § 35-53(a), Cleer is entitled to an award of compensatory damages, in an amount to be determined at trial, for loss of Cleer's trade secrets and other confidential information.

164.    As a result of Defendants' willful and malicious misappropriation of Cleer's trade secrets, Cleer is entitled to punitive damages, pursuant to Conn. Gen. Stat. § 35-53(b), by the doubling of damages awarded to Cleer under Section 35-53(a).

165.    Further, Cleer is entitled, under Section 35-53(b), to an award of its attorneys' fees and costs.

166.     As a direct and proximate cause of Defendants' conduct, Cleer has suffered, and will continue to suffer, irreparable financial loss, loss of goodwill and loss of confidentiality of its proprietary and confidential information, including Cleer's trade secrets.

167.     Pursuant to Conn. Gen. Stat. § 35-52, Cleer is entitled to a permanent injunction enjoining Defendants from engaging in any further actual or threatened misappropriation of Cleer's trade secrets and from disclosing them to anyone other than an employee or representative of Cleer.

168.     Pursuant to General Statutes § 35-55, Cleer is entitled to have the secrecy of its trade secrets protected through entry of a judicial order.

## COUNT XI
## OPTIC TAX: TORTIOUS INTERFERENCE WITH CONTRACT

169.     Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

170.     The MVA and Operating Agreement are valid contracts existing between Stranger and Cleer.

171.     Optic Tax has at all relevant times had knowledge of the MVA and Operating Agreement.

172.     With knowledge of those contracts, Optic Tax has intentionally interfered with them by hiring Stranger in violation of the non-compete in the Operating Agreement, allowing and assisting her in violating restrictive covenants of the MVA and Operating Agreement, and using Cleer's information to unfairly compete in violation of the confidentiality provisions of the MVA and Operating Agreement.

173.     Optic Tax has tortiously interfered with these contracts and caused Stranger to breach the contracts with Cleer.

174.    Such interference was malicious and without justification.

175.    As a direct and proximate result of Defendants' acts of tortious interference with these contracts, Cleer has suffered and continues to suffer damages in an amount that will be established at trial.

## COUNT XII
## CRYSTAL STRANGER: STATUTORY THEFT
## UNDER CONN. GEN. STAT. § 52-564

176.    Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

177.    As part of her employment with Cleer, Cleer gave Stranger a company laptop.

178.    When Stranger ended her employment with Cleer, she was contractually required to return all Cleer property to Cleer, including her company laptop.

179.    Cleer made demands to Stranger for her to return the company laptop.

180.    Cleer obtained a Court order requiring Stranger to return the company laptop.

181.    While Stranger was ordered to return the laptop by the Court, she intentionally refused to return the company laptop for months and would not have done so absent Court intervention.

182.    In defiance of the Court's Order, Stranger returned an old, defective laptop that she was issued by Cleer in 2021 and not the working laptop she was issued by Cleer in 2023.

183.    To date, Stranger has not returned to Cleer the laptop she was issued in 2023.

184.    Stranger's theft of the company laptop has caused Cleer to suffer actual damages in an amount to be established at trial.

185.     By virtue of Stranger's theft of the company laptop, Cleer is entitled to an award for its damages, plus treble damages, under Conn. Gen. Stat. § 52-564.

## COUNT XIII
## <u>CRYSTAL STRANGER: CONVERSION</u>

186.    Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

187.    By retaining the Cleer company laptop and by failing to promptly return it to Cleer once stranger ended her employment, Stranger wrongfully and without authorization maintained possession and control over property belonging to Cleer.

188.    As a result of Stranger's actions, Cleer was excluded from exercising its right of ownership, possession, and control over the company laptop and was harmed as a result.

189.    Stranger's conversion of Cleer's company laptop has caused Cleer to suffer actual damages in an amount to be established at trial.

## COUNT XIV
## <u>CRYSTAL STRANGER AND OPTIC TAX: DEFAMATION (LIBEL)</u>

190.    Cleer realleges and incorporates each and every allegation in the paragraphs above as if they were fully set forth herein.

191.    Starting in or around August 2024, Defendants have carried out a campaign to defame Cleer.

192.    Defendants have carried out this malicious campaign to permanently harm and damage Cleer by publishing false statements of fact in mass electronic communications to third parties including Cleer's former, current, and prospective clients and employees.

193.    Defendants false statements include, but are not limited to, making the affirmative statements that Cleer lost "its entire bookkeeping team," that "there may be no company left," that Cleer "stole" Stranger's "interest" in Cleer, that there had been "lapses in service," that clients could be "left without services," and other remarks regarding Cleer's business.

33

194.    These written statements of and concerning Cleer are false and defamatory, injure Cleer's trade, profession, and business, subject Cleer to public ridicule, and caused reputational damage.

195.    Accordingly, Defendants' false statements constitute libel *per se* pursuant to Conn. Gen. Stat. Section 52-237.

196.    Defendants published these statements with the intent to, and in fact did, excite adverse, derogatory, or unpleasant feelings or opinions against Cleer and to injure Cleer's professional reputation.

197.    Defendants made these statements with actual malice in fact.

198.    As a direct result of Defendants' conduct, Cleer has suffered and will continue to suffer significant and permanent injury to its professional reputation.  The defamatory statements Defendants published have diminished the esteem, respect, goodwill, and confidence Cleer has earned and held throughout its existence.

199.    As a further result of Defendants' conduct, Cleer has suffered economic damages in that previously available business opportunities, clients, customers, and other sources of revenue generation and publicity have been withdrawn or are no longer available and are unlikely to be made available to Cleer in the future.

200.    Cleer has incurred and will continue to incur attorneys' fees and costs in pursuing this action to which it is entitled to recover.

201.    Cleer is further entitled to punitive damages.

**WHEREFORE**, Cleer respectfully prays for the following relief:

1)  Restraining and enjoining Stranger, her agents, and all other persons acting in concert with her from using the Cleer.tax email and website domains for any reason and directing her to relinquish control over the domains to Cleer;

2)  Restraining and enjoining Stranger, her agents, and all other persons acting in concert with her from soliciting any of Cleer's current or prospective clients, employees, and contractors, and from further breaching the Operating Agreement and MVA;

3)  Restraining and enjoining Stranger, her agents, and all other persons acting in concert with her from competing against Cleer in violation of the noncompetition and nonsolicitation restrictive covenants;

4)  Restraining and enjoining Defendants from using, disclosing, or sharing any of Cleer's confidential or trade secret information, and to return such information to Cleer and then permanently purge such information;

5)  Restraining and enjoining Stranger, her agents, and all other persons acting in concert with her from using the CLEER and CLEER.TAX marks in the future;

6)  Compensatory damages against Defendants in the amount of all actual damages that Cleer is determined at the trial of this action to have sustained, together with pre-judgment interest;

7)  Punitive damages;

8)  Cleer's attorneys' fees and other litigation costs and expenses;

9)  Attorneys' fees and treble damages pursuant to 15 U.S.C. § 1117;

10) Attorneys' fees and punitive damages pursuant to Conn. Gen. Stat. §§ 35-53(a) and (b);

11)    Attorneys' fees and exemplary damages pursuant to 18 U.S.C. § 1836(3)(B).

12)    Treble damages pursuant to Conn. Gen. Stat. § 52-564;

13)    An accounting of and payment to Cleer of all revenue, profits, or any other

financial gain attributable to Stranger and Optic Tax's unlawful acts as alleged

herein; and

14)    granting the injunctive relief described above and such other and further relief as

may be just and proper.

## **JURY DEMAND**

Cleer demands a trial by jury on all triable issues.

Respectfully submitted,

*/s/ George B. Musekamp*
George B. Musekamp (PHV)
Evan H. Cohn (PHV)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Tel:  (513) 381-2838
Fax: (513) 381-0205
gmuskeamp@taftlaw.com
ecohn@taftlaw.com

Michael S. O'Malley (CT31784)
Ogletree, Deakins, Nash,
Smoak & Stewart P.C.
281 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 969-3109
Fax: (203) 969-3150
Michael.O'Malley@ogletree.com

*Attorneys for Plaintiff*

36

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on November 8, 2024, the foregoing Verified First Amended Complaint for Monetary Damages, Temporary Restraining Order, and Preliminary and Permanent Injunctive Relief was electronically filed with the Court's CM/ECF system and the system will send electronic notice to all counsel of record.


*/s/ George B. Musekamp*
George B. Musekamp

## **VERIFICATION**

I, _David McKeegan__, being first duly cautioned and sworn, hereby depose and state upon personal knowledge that the factual allegations contained in the foregoing Verified First Amended Complaint for Monetary Damages, Temporary Restraining Order, and Preliminary and Permanent Injunctive Relief ("Complaint") are true and correct to the best of my knowledge, information and belief. Where the allegations in the Complaint are made upon information and belief, I am informed of the information contained in such allegations and believe such information to be true. The documents attached to the Complaint are true and correct copies of those documents as described in the Complaint.

Subscribed and sworn by _McKeegan_ before me, a Notary Public, on this __6__ day of November, 2024.

Notary

CHIP KEATING
NOTARY PUBLIC - CONNECTICUT
MY COMM. EXPIRES 12/31/2026

38