## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | Stranger Answer and Counterclaim |
| | : | |
| CRYSTAL STRANGER et al. | : | 2024-11-26 |

Defendant Crystal Stranger now answers the First Amended Complaint by Plaintiff Cleer LLC, and submits her counterclaim, as follows. All statements are made on information or belief.

# ANSWER

## NATURE OF THE ACTION

1.  Ms. Stranger denies all aspects of this allegation that impugn her character or reputation.

2.  Ms. Stranger denies all aspects of this allegation that impugn her character or reputation.

## PARTIES, VENUE, AND JURISDICTION

3.  Admitted.

4.  Cleer's principal place of business is Michigan, and Cleer is not registered as a foreign corporation in Connecticut. The McKeegans own a house in Connecticut but are not legal residents of Connecticut as they file the Foreign Earned Income

1

Exclusion to write off their US income tax, and they have often spent more than 35 days per year in the US, which implies that they use the Bonafide residence test in order to get their tax exemption. This means they have official residence outside the United States, either in Costa Rica or Bali but definitely not in Connecticut for Federal tax purposes. Otherwise admitted.

5.  Denied. Cleer's nerve center is in Texas. Cleer's current senior tax manager, Henry Shin, is the only full-time employee of Cleer and resides in Texas. He sends out mail on behalf of Cleer, and receives IRS correspondence to his address, and attends leadership meetings weekly. It is arguable that this is the true nerve center of Cleer as it is where most operations regularly occur within the US. *Hertz Corp. v. Friend* determined that the "nerve center" test be the single dominant approach. In *Hertz*, Justice Breyer explained that a corporations "nerve center" refers to the place where "a corporation's officers direct, control, and coordinate the corporation's activities." It is further explained that practically, this location should be the headquarters provided that "the headquarters is the actual center of direction, control, and coordination[, and] not simply an office where the corporation holds its board meetings." Under this rule the CT house where the McKeegans spend 1-2 months per year should not be considered a nerve center.

6.  Optic Tax is a Delaware corporation and its headquarters are in New Mexico. Otherwise admitted.

7.  Denied, except that Ms. Stranger does own residential real estate in Dona Ana County, New Mexico at 5007 Tierra Blanca Road.

8.  Admitted.

9.  Admitted.

10. Admitted.

11. Denied. Ms. Stranger does not maintain any U.S. agent for service of process. Ms. Stranger was not served.

12. Denied as to Ms Stranger being a shareholder, otherwise admitted.

13. Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

14. This paragraph states legal conclusions as to which admission or denial would be premature.

15. This paragraph states legal conclusions as to which admission or denial would be premature.

16. Denied.

17. Denied.

18. Denied.

19. Admitted.

## BACKGROUND FACTS

20.  Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

21.  Denied as to 2022 (only Regional Inc 5000 that year). Otherwise admitted.

22.  Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

23.  Denied.

### *Cleer's Trademark Rights and Domain Name*

24.  Denied.

25.  Admitted.

26.  Admitted.

27.  Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

28.  Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

### *Cleer Hires Stranger as an Employee*

29.  Admitted.

30. Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

31. Denied as to marketing services, which were not in Ms. Stranger's role. Additionally, Ms. Stranger was tasked with business development. Otherwise admitted.

32. Admitted that Cleer provided Ms. Stranger a laptop. Denied as to being provided client lists as Ms. Stranger never was in a marketing role, although she did have access to electronically stored client information. Additionally, Ms. Stranger provided Cleer with client lists and operational materials previously developed in her own business, 1st Tax Inc.

33. Denied.

34. Admitted that Cleer uses its client lists to create new business, drive referrals, and maintain current clients. Otherwise denied.

### *Stranger Becomes a Member of Cleer and Agrees To Be Bound By Several Restrictive Covenants*

35. Admitted.

36. Admitted.

37. Admitted.

38. Admitted.

### *Stranger Agrees to Additional Restrictive Covenants in Her Capacity as an Employee*

39. Denied. Ms. Stranger was made the International Tax Director and Chief Operating Officer before she was made a member of Cleer and signed the operating agreement. She accepted the ITD role October 1, 2020, had been running daily operations since about a week after she started at GBS, and accepted the Chief Operating Officer role in April 2022.

40. Admitted, except that there was no official "General Manager" role at GBS / Cleer.

41. Admitted.

42. Admitted.

43. Admitted.

44. Admitted.

45. Admitted.

46. Admitted.

47. Admitted.

### *Stranger Created The Domain "Cleer.tax" For Cleer as a Cleer Employee*

48. Denied. GBS began operating as Cleer in late October / early November 2022.

49. Admitted.

50. Admitted that Ms. Stranger secured the domain name "Cleer.tax" during her employment with Greenback Business Services, on May 26, 2022, prior to Cleer's claimed first use of the CLEER Trademarks of October 28, 2022. Otherwise denied.

51. Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

52. Admitted.

53. Admitted.

54. Ms. Stranger renewed the "cleer.tax" domain on May 26, 2023 using her personal credit card. Otherwise admitted.

55. Denied.

*Stranger's Violations of the MVA and Operating Agreement*

56. Admitted.

57. Denied. Ms. Stranger resigned on January 16, 2024.

58. Denied. Cleer never requested Ms. Stranger return the laptop and had allowed other team members to retain company laptops after resignations.

59.  Ms. Stranger denies that Cleer gave her a client list to retain, and further denies

     she is **now** using Cleer's client list to solicit clients for Optic Tax. To the extent

     that Ms. Stranger e-mailed Cleer clients on September 6, 2024 from the Cleer.tax

     e-mail domain, she did so based on a list of e-mails provided to her by former

     Cleer contractors.

60.  Denied. As early as February 2024, Cleer was aware of, permitted, and referred

     clients for Optic Tax to provide specialized business tax consulting and research

     and development tax credit preparation services.

61.  Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity

     of this paragraph. In particular, Ms. Stranger does not know what Cleer

     "discovered" or when.

62.  Denied.

63.  Denied. Cleer approved Ms. Stranger hiring former Cleer contractors and

     referred clients to Ms. Stranger, thereby waiving the non-solicit provisions.

64.  Ms. Stranger denies that Optic Tax's employees **are** directly soliciting Cleer's

     clients at Stranger's direction.

65.  Admitted.

66.  Denied. The subject e-mail was sent from optictax.com, not cleer.tax.

67.  Denied.

Alan Harrison – SANDOLLAR Law – Milford, CT

68. Ms. Stranger denies that she has "improperly" retained the website domain Cleer.tax and email domain XXX@cleer.tax.

69. Admitted.

70. Denied.

71. Admitted.

72. Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

73. Ms. Stranger lacks information sufficient to form a belief as to the truth or falsity of this paragraph.

### *Cleer Terminated Stranger's Cleer Shares For Cause And Repurchased Them*

74. Denied. Ms. Stranger's employment with Cleer ended on January 31st, 2024, and the MVA would have been fully vested in two years, not three. Otherwise admitted.

75. Ms. Stranger never was told a reason why she was removed from Cleer and therefore lacks the information sufficient to form a belief as to truth or falsity of this allegation. Otherwise admitted, including the "quotes" around the excuses for freezing out Ms. Stranger.

76. Denied, as Ms. Stranger did not "withdraw" from Cleer LLC.

77. Admitted.

78. Denied (see counterclaim, below).

79. Denied as to "Cleer's demands" and as to the amount owed.

## COUNT I STRANGER: BREACH OF CONTRACT (MVA)

80. Admitted or denied as above.

81. This paragraph states legal conclusions as to which admission or denial would be premature.

82. Denied.

83. – 87. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT II STRANGER: BREACH OF CONTRACT (OPERATING AGREEMENT)

88. Admitted or denied as above.

89. This paragraph states legal conclusions as to which admission or denial would be premature.

90. Denied.

91. – 94. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT III STRANGER AND OPTIC TAX: UNFAIR COMPETITION

95. Admitted or denied as above.

96.  Admitted.

97.  Denied

98.  Denied.

99.  Denied. Ms. Stranger owns the cleer.tax domain.

100. Denied. Ms. Stranger owns the cleer.tax domain.

101. Denied as to the legal conclusions. Ms. Stranger's statements were true or personal opinions when made.

102. – 106. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT IV STRANGER AND OPTIC TAX: TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONSHIPS

107. Admitted or denied as above.

108. Admitted.

109. Denied.

110. – 114. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT V STRANGER AND OPTIC TAX: CIVIL CONSPIRACY

115. Admitted or denied as above.

116. – 118. These paragraphs state legal conclusions as to which admission or denial would be premature. Additionally, there is no cause of action for "conspiracy" between a legal entity and its own agent or owner. *Harp v. King*, 266 Conn. 747, 777, 835 A.2d 953 (Conn. 2003).

## COUNT VI STRANGER: BREACH OF DUTY OF LOYALTY

119. Admitted or denied as above.

120. Denied. Cleer waived the duty of loyalty by written agreement. See Exhibit K.

121. – 123. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT VII STRANGER AND OPTIC TAX: FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION

124. Admitted or denied as above.

125. Denied.

126. Denied.

127. – 132. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT VIII STRANGER AND OPTIC TAX: ANTICYBERSQUATTING

133. Admitted or denied as above.

134. Denied as to registration. Otherwise admitted.

135. Denied. Ms. Stranger registered cleer.tax before GBS started doing business as Cleer.

136. Denied.

137. Denied.

138. Denied.

139. – 144. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT IX STRANGER AND OPTIC TAX: VIOLATION OF DTSA

145. Admitted or denied as above.

146. Denied. Many of the alleged Cleer "trade secrets" were developed by Ms. Stranger in connection with her prior company, 1st Tax Inc, including parts of the "Cleer" client list.

147. Ms. Stranger denies that Cleer had any trade "secrets".

148. Ms. Stranger denies that Cleer had any trade "secrets".

149. Denied. Cleer has allowed over 70 independent contractors, many in foreign countries access to their systems with minimal oversight and unrestricted access. There were no limitations of data access as that was not possible with the system built on Salesforce, and all team members had access to all general client data. Master admin passwords also were stored on a Excel spreadsheet in

a cloud folder in Box, where any leadership or development team member could access.

150. Denied.

151. Denied.

152. Denied.

153. Denied.

154. Denied.

155. – 156. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT X STRANGER AND OPTIC TAX: VIOLATION OF THE CONNECTICUT UNIFORM TRADE SECRET ACT

157. Admitted or denied as above.

158. This paragraph states legal conclusions as to which admission or denial would be premature.

159. Denied. Cleer has allowed over 70 independent contractors, many in foreign countries access to their systems with minimal oversight and unrestricted access. There were no limitations of data access as that was not possible with the system built on Salesforce, and all team members had access to all general

client data. Passwords also were stored on a Google Drive sheet where any team member could access.

160. Denied. Many of the alleged Cleer "trade secrets" were developed by Ms. Stranger in connection with her prior company, 1st Tax Inc, including parts of the "Cleer" client list.

161. Denied.

162. Denied.

163. Denied.

164. – 168. These paragraphs state legal conclusions as to which admission or denial would be premature.

## COUNT XI OPTIC TAX: TORTIOUS INTERFERENCE WITH CONTRACT

169. – 175. These paragraphs are not applicable to Ms. Stranger.

## COUNT XII CRYSTAL STRANGER: STATUTORY THEFT UNDER CONN. GEN. STAT. § 52-564

176. Admitted or denied as above.

177. Admitted that Cleer gave Ms. Stranger a laptop in 2021. Otherwise denied.

178. This paragraph states a legal conclusion as to which admission or denial would be premature.

179. Denied.

180. Admitted.

181. Denied. While Ms. Stranger was ordered to return the laptop by the Court, she did so promptly. She had not been previously asked to return the laptop.

182. Denied. Ms. Stranger returned the laptop that she was issued by Cleer in 2021, which she had had repaired in 2023. Ms. Stranger never was issued a laptop by Cleer in 2023. The laptop that Ms. Stranger shipped to Cleer's counsel was the last laptop Ms. Stranger used with Cleer's business and was in working order when she mailed it from South Africa.

183. Denied. Ms. Stranger never was issued a laptop by Cleer in 2023. Cleer issued Henry Shin a laptop in 2023.

184. Denied.

185. Denied.

## COUNT XIII CRYSTAL STRANGER: CONVERSION

186. Admitted or denied as above.

187. Denied. Cleer never requested the laptop be returned and had allowed other team members to retain company laptops after resigning. Furthermore, Ms. Stranger still was a member of Cleer LLC and as such was entitled to possess company property.

188. Denied.

Alan Harrison – SANDOLLAR Law – Milford, CT

189. Denied.

## COUNT XIV CRYSTAL STRANGER AND OPTIC TAX: DEFAMATION (LIBEL)

190. Admitted or denied as above.

191. Denied.

192. Denied.

193. The statements all were either true or opinions.

194. Denied.

195. This paragraph states legal conclusions as to which admission or denial would be premature.

196. Denied.

197. Denied.

198. – 201. These paragraphs state legal conclusions as to which admission or denial would be premature.

# AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Now comes Counterclaimant Crystal Stranger, by and through undersigned counsel, to defend the Complaint and to complain of Counterdefendants Cleer LLC, David McKeegan, and Carrie McKeegan as follows:

Alan Harrison – SANDOLLAR Law – Milford, CT

**Synopsis**

1.    The McKeegans and Cleer LLC brought on Ms. Stranger to provide the subject

matter expertise and supervisory abilities that the business sorely lacked. After

working Ms. Stranger for 60+ hours each week over the course of three years,

David McKeegan first forced Ms. Stranger to resign from employment and then

conspired with Carrie McKeegan to expel Ms. Stranger from her membership in

the LLC without fair or adequate payment for her 12% membership interest. In

doing so, Cleer LLC and/or one or more of the McKeegans breached their

fiduciary duty under Wyoming law and materially breached the Cleer LLC

Operating Agreement ("OA") and Membership Vesting Agreement ("MVA"), by

among other things committing accounting fraud in the valuation of Ms.

Stranger's Capital Account and failing to obtain a third-party valuation of Ms.

Stranger's membership interest. Ms. Stranger respectfully submits that the

McKeegans' and/or Cleer's material breaches of the OA and MVA excuse her

from performance under those agreements, and that those breaches and the

breach of fiduciary duty entitle her to money damages. Ms. Stranger seeks a fair

accounting of her Capital Account and reasonable payment for her 12%

membership interest, all according to the terms of the OA and MVA.

**The Operating Agreement and the Membership Vesting Agreement**

2.    The first agreements between Ms. Stranger and Cleer LLC were the Greenback

Business Services Employment Agreement (GBSEA) and the Justworks

Alan Harrison – SANDOLLAR Law – Milford, CT

Agreement. See Exhibit J. These were the governing agreements when Ms. Stranger purchased the cleer.tax domain.

3.  Before signing the GBSEA, Ms. Stranger requested permission to continue her side business, 1st Tax Inc, while employed at Greenback Business Services, and was expressly granted permission by David McKeegan. See Exhibit K.

4.  During Ms. Stranger's membership in Cleer LLC, the OA and MVA were effective between Ms. Stranger, Cleer LLC, and the McKeegans.

5.  Clause 12.5 of the OA provides that the OA shall be subject to, and governed by, the laws of the State of Wyoming. Clause 16 of the MVA provides that the MVA shall be governed exclusively by Michigan law.

6.  Clause 2.2 of the OA provides:

    2.2 Reports. The Company shall endeavor to furnish to each Member within 90 days after the end of each fiscal year, or as soon as practical thereafter, an annual report of the Company's business and operations during the year, together with such information as may be necessary for the preparation of each Member's federal and state income or other tax returns. The annual report shall contain a copy of the Company's annual financial statement showing the Company's gross receipts and expenses and profit or loss and the allocations of them to each Member for the year.

7.  Clause 4.1 of the OA provides:

4.1 Allocation of Profits and Losses. The Company's income, gain, loss, deduction, or credit ("Profits and Losses") shall be allocated among the Members first, so that their Capital Account balances are, as nearly as possible, in the same ratios as their respective Units, and then pro rata, in accordance with the Units held by each Member. Notwithstanding the above, net losses allocated to the Members shall not exceed the maximum amount of net loss that can be so allocated without causing any member to have an adjusted Capital Account deficit at the end of any fiscal year. In the event some, but not all, of the Members would have adjusted Capital Account deficits as a consequence of an allocation of net losses, the limitation on net loss allocation shall be applied on a Member by Member basis so as to allocate the maximum permissible net loss to each Member under the IRC.

8.    Clause 6.5 of the OA provides:

6.5 Termination For Cause. The Company (by a vote of the Members owning greater then fifty percent (50%) of the Units (exclusive of the Member under consideration) shall have the right and option to buy a Member's Units for Cause. The term "Cause" shall mean: (i) any conviction of or plea of guilty or nolo contendere to any crime which has a material adverse effect upon the Company; (ii) upon violation by a Member of any first level offense; first level offenses shall mean the following: [1] intentional misappropriation of the Company funds or any of its affiliated entities funds for personal use; or [2]

flagrant dishonesty or intentional act detrimental to the conduct of the Company's business or the business of any affiliated entity; or [3] a violation by a Member of the terms of this Agreement, or any of its affiliated entities Operating Agreement(s). The purchase price shall be equal to the credit balance in the Member's Capital Account, which shall be paid within twenty-four (24) months of closing.

9.  Clause 10(b) of the MVA provides:

b. Upon termination of Employee, Company, David McKeegan, or Carrie McKeegan shall have the right to buy back all membership interests held by Employee at the time of termination ("Repurchasing Membership Interest"). The value of Employee's membership interest at the time of Repurchasing Membership Interest shall be determined by a third-party individual or entity that specializes in valuation of company's interest, in the good faith discretion of the Company.

10. Clause 13 of the MVA provides:

Final Agreement. This Agreement supersedes any prior agreement between the Employee and Company, including, but not limited to, any other agreement relating to salary or any other form of compensation from Company to which Employee may claim an entitlement for any reason.

Alan Harrison – SANDOLLAR Law – Milford, CT

## Cleer LLC and/or the McKeegans refused Ms. Stranger access to financial records

11.  At various times during her membership in Cleer LLC, Ms. Stranger requested access to Cleer's financial records, as was her right under the OA.

12.  David McKeegan refused Ms. Stranger access to the relevant records.

13.  David McKeegan refused Ms. Stranger access to any annual report of Cleer's business and operations, as was her right under the OA.

14.  David McKeegan refused Ms. Stranger access to such information as was necessary for preparation of her federal and state income or other tax returns, as was her right under the OA.

15.  David McKeegan refused Ms. Stranger access to annual statements showing Cleer's gross receipts, expenses, profit, or loss or the allocations of those items to each Member for the year, as was her right under the OA.

16.  Such refusals were material breaches of the OA.

## Cleer LLC and/or the McKeegans did not properly allocate profits to Ms. Stranger's Capital Account

17.  Clause 4.1 of the Operating Agreement requires that "net losses allocated to the Members shall not exceed the maximum amount of net loss that can be so allocated without causing any member to have an adjusted Capital Account deficit at the end of any fiscal year".

18. In each year that Ms. Stranger was a member of Cleer LLC, David McKeegan informed her that Cleer LLC had a net profit.

19. Ms. Stranger never made a withdrawal from her Capital Account.

20. The OA was effective on August 8, 2024.

21. According to the OA, on or about August 8, 2024, Ms. Stranger's Capital Account should have had a credit balance in excess of $250,000 up to $500,000.

22. Nevertheless, Cleer and/or the McKeegans "repurchased" Ms. Stranger's membership interest based on a Capital Account deficit balance of approximately $71,000.

23. Previously on May 13th, 2024 David McKeegan offered to buy out Ms. Stranger's equity interest in Cleer for $216,559.85 which he stated as "5x the profit in 2023 plus our bonuses added back". See Exhibit L. It is a mystery how he could go from this still low offer to a negative capital balance of $71,000 after an additional seven months of the company earning profits.

24. Thus, the "repurchase" of Ms. Stranger's membership interest was based on a fraudulent accounting of Ms. Stranger's Capital Account.

25. Such fraudulent accounting was a material breach of the OA.

## Cleer LLC and/or the McKeegans did not properly value Ms. Stranger's membership interest

26. The MVA, which is the Final Agreement regarding compensation between Ms. Stranger and Cleer LLC, provides that "The value of Employee's membership interest at the time of Repurchasing Membership Interest shall be determined by a third-party individual or entity that specializes in valuation of company's interest, in the good faith discretion of the Company."

27. The MVA was effective on August 8, 2024.

28. In "repurchasing" Ms. Stranger's membership interest on August 8, 2024, Cleer LLC / the McKeegans did not retain a third-party individual or entity to value her membership interest.

29. Such failure to obtain a third-party valuation was a material breach of the MVA.

## Ms. Stranger independently developed much of the material that Cleer LLC attempts to claim as trade secrets

30. Ms. Stranger founded her prior company 1st Tax Inc in 2014. She created knowledge base and client outreach materials, price lists, and other materials for 1st Tax Inc. that she later incorporated into Cleer.

31. Ms. Stranger merged her client list from 1st Tax into Cleer's client list.

## Cleer LLC did not make reasonable efforts to keep its secrets

32. During the time that Ms. Stranger was a member and/or employee of Cleer LLC, the company had approximately 70 employees or independent contractors.

Alan Harrison – SANDOLLAR Law – Milford, CT

33.  Only about a half dozen Cleer employees or contractors, including Ms. Stranger, were issued company laptops. The remaining 60+ employees and contractors were required to use their personal laptops or computers for Cleer business.

34.  Cleer hosted "proprietary" documents and information on Salesforce and on Box (a cloud-based document management system), but many users — including the tax preparers and customer success team members — customarily downloaded material from Box for ease of use on their personal devices. The member/managers of Cleer were fully aware of this customary practice by their employees and contractors, and took no measures to mitigate or prevent the practice.

35.  Lindsay Anderson, the operations manager of Cleer during some of Ms. Stranger's time there, maintained an Excel spreadsheet of all her Cleer-related accounts and passwords, including the admin passwords for most accounts. She shared the spreadsheet with other employees in Box.

36.  Shortly after Ms. Stranger was expelled from membership in Cleer, the management instituted a third-party time tracking and productivity monitoring software that took screenshots of user devices at random intervals, without definitive guarantees of privacy or confidentiality. See Exhibit M.

Alan Harrison – SANDOLLAR Law – Milford, CT

## Cleer LLC waived solicitation of former employees

37. When Ms. Stranger left employment with Cleer LLC, David McKeegan

    encouraged her to "take" several employees with her, including her personal

    assistant Macarena Olivares. See Exhibit N.

## First affirmative defense (as to Count 1): material breach by Cleer / the McKeegans

38. Ms. Stranger's performance under the OA is excused by Cleer / the McKeegans'

    material breaches of the OA.

## Second affirmative defense (as to Count 2): material breach by Cleer / the McKeegans

39. Ms. Stranger's performance under the MVA is excused by Cleer / the

    McKeegans' material breaches of the MVA.

## Third affirmative defense (as to Counts 3–5): no wrongful act

40. Cleer's claims of unfair competition, tortious interference, and civil conspiracy all

    are predicated upon some wrongful act.

41. Specifically, Cleer bases these claims on Ms. Stranger's alleged breaches of the

    OA and MVA.

42. However, as Cleer materially breached those agreements first, Ms. Stranger's

    performance under the agreements is excused. It is not wrongful for Ms. Stranger

    to avoid compliance with agreements that Cleer materially breached.

Alan Harrison – SANDOLLAR Law – Milford, CT

43. With regard to the employee non-solicitation agreements, Cleer waived those terms. It is not wrongful for Ms. Stranger to avoid compliance with restrictions that Cleer has waived.

44. Without a predicate wrongful act, Cleer's claims for unfair competition, tortious interference, and civil conspiracy all fail.

## Fourth affirmative defense (as to Counts 9 and 10): independent development

45. Cleer's trade secret claims all depend upon the asserted subject matter being proprietary to Cleer.

46. But Ms. Stranger had independently developed client lists, training materials, etc. that she brought into Cleer when she joined the company as an employee.

47. To the extent that Cleer's trade secret claims are directed to Ms. Stranger's independently developed materials, knowledge, or relationships, the claims fail.

## Fifth affirmative defense (as to Counts 9 and 10): lack of reasonable measures to keep secrets

48. Cleer's trade secret claims all depend upon Cleer having taken reasonable precautions to protect the secrecy of the asserted subject matter.

49. But Cleer routinely had dozens of independent contractors, mostly based in the Philippines and often on short-term contracts, use their personal electronic devices to access and download materials from Cleer cloud servers, including

without limitation customer lists, customer contact information, customer financial data, Cleer's business and marketing plans.

50.  Cleer had no information security officer, no information security protocol, and no enforcement of any information security measures.

51.  To the extent that Cleer's trade secret claims presume Cleer took reasonable measures to protect the secrecy of its supposed "secrets", the claims fail.

## Sixth affirmative defense (as to Count 14): truth of statements made

52.  Cleer alleges that Ms. Stranger defamed Cleer by stating that Cleer lost "its entire bookkeeping team," that "there may be no company left," that Cleer "stole" Stranger's "interest" in Cleer, that there had been "lapses in service," that clients could be "left without services,"

53.  All of these statements were and remain true, or were matters of opinion stated as such.

54.  Defamation cannot be found in a statement of opinion.

55.  Defamation cannot be found in a true statement.

56.  Therefore, Cleer's claims for libel fail.

## Seventh affirmative defense (as to Count 5): no cause of action for intracorporate civil conspiracy

57.  Connecticut does not recognize a claim for conspiracy among a corporate entity and its employees, members, officers, or shareholders in scope of employment.

## Eighth affirmative defense (as to Count 6): no provable damages from alleged breach of loyalty

58. Cleer has not alleged and cannot prove any damages that are specifically traceable to Ms. Stranger's alleged breaches of loyalty.

## Ninth affirmative defense (as to Count 7): no damages from alleged false designation of origin

59. Cleer has not alleged and cannot prove any damages that are specifically traceable to Ms. Stranger's alleged false designation of origin.

## Tenth affirmative defense (as to Count 8): no damages from alleged cybersquatting

60. Cleer has not alleged and cannot prove any damages that are specifically traceable to Ms. Stranger's alleged cybersquatting.

## Eleventh affirmative defense (as to Count 8): prior registration

61. Ms. Stranger had registered cleer.tax in her own name, with her own funds, in good faith, before GBS started doing business as Cleer.

## Twelfth affirmative defense (as to Counts 12–13): the alleged laptop never was issued to Ms. Stranger

62. Cleer alleges that Ms. Stranger stole a laptop that Cleer had issued to her in 2023.

63. Cleer did not issue Ms. Stranger a laptop in 2023.

64. Cleer did issue a laptop to Henry Shin in 2023.

Alan Harrison – SANDOLLAR Law – Milford, CT

65. Ms. Stranger cannot be held accountable for Cleer issuing a laptop to a different person who may or may not have returned that laptop to Cleer.

## First counterclaim: breach of contract by Cleer / the McKeegans

66. The fraudulent accounting of Ms. Stranger's Capital Account was a material breach of the OA, from which Ms. Stranger has suffered economic loss in an amount exceeding $75,000 to be determined at trial.

## Second counterclaim: breach of contract by Cleer / the McKeegans

67. Failure to obtain a third-party valuation of Ms. Stranger's membership interest was a material breach of the MVA, from which Ms. Stranger has suffered economic loss in an amount exceeding $75,000 to be determined at trial.

## Third counterclaim: breach of fiduciary duty

68. As managers of Cleer LLC, under the OA and Wyoming law the McKeegans had a fiduciary duty to seek a court determination before changing the membership of the LLC, where the grounds for changing membership impugned Ms. Stranger's character and were sure to be disputed.

69. The McKeegans did not seek a court determination before forcing Ms. Stranger out of her membership interest in Cleer LLC.

70. The McKeegans' breach of their fiduciary duty caused Ms. Stranger economic loss in an amount exceeding $75,000 to be determined at trial.

71. Under Wyoming law, punitive damages including attorney fees may be awarded on a judgment for breach of fiduciary duty.

## Fourth counterclaim: misappropriation of image or likeness

72. Ms. Stranger did not assign Cleer LLC or the McKeegans any right to use her image or likeness in marketing materials.

73. Despite Ms. Stranger's resignation as an employee and the McKeegans' unlawful expulsion of Ms. Stranger from membership in Cleer, Cleer and/or the McKeegans continue to use Ms. Stranger's image and likeness in marketing materials.

74. Ms. Stranger has suffered reputational harm and economic loss from her image and likeness being used in association with Cleer LLC's failing business.

## Fifth counterclaim: libel per se

75. Despite Ms. Stranger no longer being employed by Cleer LLC or reviewing work done by Cleer LLC, Cleer LLC and/or the McKeegans continue to hold out to Cleer's clients that Cleer has the benefit of Ms. Stranger's expertise.

76. By continuing to host articles written by Ms. Stranger and display her photograph in association with those articles, thereby tying Ms. Stranger to the sub-standard and defective accounting practices of current Cleer LLC employees, Cleer LLC and/or the McKeegans "injure [Ms. Stranger] in [her] profession and calling..."

Alan Harrison – SANDOLLAR Law – Milford, CT

*Lega Siciliana Social Club, Inc. v. St. Germaine*, 77 Conn. App. 846, 825 A.2d 827 (Conn. App. 2003).

77. Holding out Ms. Stranger as continuing to associate with Cleer LLC and its defective work is libel per se.

## Sixth counterclaim: libel or slander per se

78. David and/or Carrie McKeegan contacted the administrators of Dynamite Circle, an exclusive social club of which both the McKeegans and Ms. Stranger were members, and made oral and/or written statements that caused Ms. Stranger to be expelled from Dynamite Circle.

79. On belief, the McKeegans' oral and/or written statements defamed Ms. Stranger in her profession and calling.

80. On belief, the McKeegans' oral and/or written statements impugned Ms. Stranger's moral character.

81. The McKeegans' oral and/or written statements were slander and/or libel per se.

## Prayer for Relief

**WHEREFORE,** Ms. Stranger prays the Court to grant:

• an accounting of her Capital Account in Cleer LLC, as of August 8, 2024.

• a third-party valuation of Cleer LLC.

- joint and separate compensatory damages for the breaches of contract by Cleer LLC and/or the McKeegans, in an amount to be determined at trial.

- joint and separate compensatory damages for the McKeegans' breach of fiduciary duty.

- joint and separate punitive damages, including attorney fees, for the McKeegans' breach of their fiduciary duty, pursuant to *Prancing Antelope I, LLC v. Saratoga Inn Overlook Homeowners Ass'n, Inc.*, 478 P.3d 1171 (Wyo. 2021), in an amount to be determined by the Court.

- joint and separate compensatory damages for Cleer LLC and/or the McKeegans misappropriating Ms. Stranger's image and likeness.

- joint and separate general damages for the McKeegans' libels per se.


Respectfully submitted,
s/Alan Harrison
Alan Harrison ct29464
SANDOLLAR Law
6 West River Street #112
Milford, CT 06460
alan@sandollar-law.net
203.212.9996

Alan Harrison – SANDOLLAR Law – Milford, CT

VERIFICATION

I, ............Crystal Stranger................, being first duly cautioned and sworn, hereby
depose and state upon personal knowledge that the factual allegations contained in the
foregoing Answer and Counterclaims document are true and correct to the best of my
knowledge, information and belief. Any exhibits attached to the document are true and
correct copies of the materials described in the document.

Signed: ...................................................…


Here appeared before me, via Google Meet, the person named above, whose identity is
personally known to me or proven on the basis of satisfactory evidence, and they made,
in my presence, voluntary signatures and an oath or affirmation vouching for the
truthfulness and completeness of the foregoing.


..................................................    Date...........................................................
Alan Harrison                                              2024-11-26
Commissioner of Conn. Superior Court
431816                                               Place..........................................................
                                                          Greenwich, CT

Alan Harrison – SANDOLLAR Law – Milford, CT