UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| CLEER LLC (F/K/A GREENBACK BUSINESS SERVICES LLC) D/B/A CLEER TAX, | : : : : | Case No. 3:24-cv-01496-MPS  Judge Michael P. Shea |
| Plaintiff, | : : : | **PLAINTIFF CLEER LLC'S MOTION FOR FINDING DEFENDANTS IN CONTEMPT OF COURT'S TEMPORARY RESTRAINING ORDER [DOC. 34]** |
| v. | : : | |
| CRYSTAL STRANGER, et al., | : : | |
| Defendants. | : | |

**I.    INTRODUCTION**

Defendants Crystal Stranger and Optic Tax knowingly and repeatedly violated this Court's October 22, 2024 Temporary Restraining Order ("TRO"). Defendants admit that they created a list of 226 clients belonging to Plaintiff Cleer LLC ("Cleer") and merged it into a roughly 14,000 person mailing list for soliciting clients. Ms. Stranger has further admitted that she signed two contracts that prohibited her from soliciting or accepting business from Cleer's clients, and that she has in fact solicited Cleer's clients for the benefit of Optic Tax.

This Court ordered Defendants to not contact or solicit Cleer's clients and to confer with counsel for Cleer if there was any confusion as to the identity of any current or prospective Cleer client. (TRO, Doc. 34 at 4). The Court also specifically warned Defendants of the risks of contempt if they continued to send "blast" emails from Optic Tax's client list. (Ex. A – Transcript of TRO Hearing ("Hearing Tr.") at 25:7-13). Defendants ignored the Court's TRO and warnings.

1

Over a month **after** the Court entered its unambiguous TRO (giving Defendants plenty of time to remove Cleer's contacts from Defendants' mailing list and/or to confer with Cleer's counsel), Optic Tax sent yet another "blast" solicitation email to its 14,000 person mailing list – 5,448 of which overlap with Cleer's mailing list – including the 226 clients Defendants *knew* belong to Cleer. In fact, Ms. Stranger testified that she sent at least three such "blast" emails after the Court's TRO was entered but has refused to produce them despite repeated requests from Cleer.

Defendants did nothing to comply with the Court's TRO regarding client solicitation – perhaps the most important remedy to Cleer in that Order. Instead, Defendants have carried on with business as usual and continued to solicit Cleer's clients through "blast" emails just as they had done before the TRO. Sanctions are thus appropriate and Cleer respectfully requests reimbursement of its fees incurred in pursuing and obtaining the TRO and through the date of Defendants' most recent breach of the TRO, along with the fees associated with this Motion.

## II.    BACKGROUND FACTS

On September 24, 2024, Cleer filed a Motion for a TRO requesting the solicitation and contacting of its clients to stop. In its Reply, Cleer provided the Court with evidence that Optic Tax was sending out "blast" solicitation emails to Cleer's clients in an effort to get those clients to switch to Optic Tax. (David McKeegan Declaration, Ex. H of Ex. 1 of Reply, Doc. 31-1 at 30–36). Defendants did not deny (and have in fact admitted) that they were soliciting Cleer's clients.

On October 22, 2024, the Court held a Telephonic Motion Hearing in which counsel for all parties participated. Specifically, counsel for Cleer informed the Court that Optic Tax, via Ms. Stranger, was "sending out blast e-mails" using "some sort of [a] mailing list that she took from [Cleer]" to solicit Cleer's current and potential clients. (Ex. A – Hearing Tr.at 7:8-9). Counsel for

Defendants admitted that Optic Tax had a client list belonging to Cleer: "Your Honor, it's a little more nuanced than that. At some point she had a list. She doesn't know if [its] the full list, and it got merged into her larger list of potential customers. So she's trying to back it out." (*Id.* at 23:8-11).

The Court addressed that point and stated:

And so it seems to me the burden is on her to say 'Well, wait a minute. Wait a minute. This is one that I really didn't have any contact with and I think I should be allowed to contact them.' And then if Cleer disagrees, you can bring it to the Court's attention and we'll figure it out. . . . **But in the meantime it seems to me fair to say 'Okay, just stop it. Stop. Let's figure this out. Stop reaching out to anybody who might have been a customer of the company until the Court has a chance to hear this matter because, otherwise, there's a serious risk that you're violating this agreement.'**

(*Id.* at 21:2-6 (emphasis added)).

When counsel for Ms. Stranger questioned Defendants' ability to know who is a Cleer current or prospective client, counsel for Cleer offered a solution: "if there's a question, counsel and I can work amicably and he can ask 'Is this one of your clients?' And I'll let him know." (*Id.* at 24:10-12). The Court asked Defendants' counsel if that was a workable solution "to sort out **individual situations** where she wants to contact somebody" and counsel for Ms. Stranger stated that "I think Ms. Stranger would be amenable in principle to that." (*Id.* at 24:20-25) (emphasis added).

However, the Court made clear that the "blast" out emails should stop:

Okay. I mean, because at the end of the day, Mr. Harrison, I hate to say it, **but it sounds to me like the difficulty here was kind of created by her; right? She took their list. She merged it with her own. And now she's having trouble remembering what she merged**. You know, with all due respect, why should that be their problem? So -- so, you know, I'm thinking that the way to deal with this is, as Mr. Musekamp suggested, see if counsel can work things out with regard to -- **but she's going to have to be very careful here. I think the days of blast e-**

3

**mails are over because -- unless, you know, she's willing to take a risk of a contempt order. Because once I issue an order, it becomes an order of the Court.**

(*Id.* at 25:1-13) (emphasis added).

The same day, the Court entered a TRO stating in relevant part:

It is HEREBY ORDERED that Stranger, and all of her agents, servants, employees, attorneys, and any other persons who are in active concert or participation with her are hereby RESTRAINED and ENJOINED from:

\*\*\*

2. **soliciting or otherwise contacting for purposes of developing business**, entering into an agreement, or proposing or making any sale any person **who is or was a customer, supplier, or prospective customer or supplier of Cleer LLC**.

The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination. **Absent conferral and agreement, Stranger may not contact any customers or suppliers or prospective customers or suppliers of Cleer LLC or its predecessors**.

(TRO, Doc. 34 at p. 4) (emphasis added).

On January 13, 2025, Ms. Stranger was deposed. Ms. Stranger testified that Optic Tax had indeed created a list of 226 Cleer clients that were provided to her from the bookkeeping team she had hired away from Cleer. (Ex. B – Deposition Transcript of Crystal Stranger ("Stranger Tr.") at 44:15-20, 142:2-16, 153:5-12).[1] She also testified that she merged that 226 Cleer client list into a larger 14,000 person mailing list that she used for sending "blast emails." (*Id.* at 154:6-10). Counsel for Cleer has compared Optic Tax's 14,000 AEO mailing list with Cleer's 9,933 AEO mailing list, and **there is an overlap of 5,448 email addresses – over half of Cleer's current**

---

[1] Cited testimony and exhibits from the Deposition of Crystal Stranger are attached as Exhibit B.

4

**and prospective clients and business partners are curiously contained on Optic Tax's mailing list**.[2]

During her deposition, Ms. Stranger was shown an October 8, 2024 "blast" email that was sent from hello@optictax.com before the Court entered the TRO. (*Id.* at 214:2-23[3]). That "blast" email was never produced in discovery but instead was obtained by Cleer because it was sent to a "dummy" email account Cleer uses for testing. (*Id.* at 222:9-22). Ms. Stranger could not explain how Cleer's dummy email ended up on Optic Tax's mailing list. (*Id.*). She also testified that she added Cleer's client list into her larger 14,000 person mailing list:

> Q. Okay. So, at the end here it says, you've received this e-mail because you signed up on our website or made a purchase from us. Was that accurate for the 14,000 people that you sent this to?
>
> A. Probably not. I didn't -- I didn't set the e-mail structure up.
>
> Q. This would also go to the 226 Cleer clients, as well. Right?
>
> A. I believe so, yes.

(*Id.* at 215:23-25, 216:1-8).

Ms. Stranger was then questioned about Exhibit 48 – a similar "blast" email that Optic Tax sent on **December 5, 2024** – more than a month **after** the Court's TRO. Again, Ms. Stranger **did not produce this email in discovery and was instead obtained by Cleer because it was sent to the same dummy email account**. Like Exhibit 46, Exhibit 48 was also sent from

---

[2] If necessary, Counsel for Cleer can produce both lists for the Court to conduct an *in camera* comparison of both Optic Tax's and Cleer's AEO mailing lists to confirm the overlap.

[3] The Transcript states Optic Tax sent the Exhibit 46 email on October 28, 2024, which would have been after the Court entered the TRO, but that is inaccurate. Optic Tax sent the Exhibit 46 email on October 8.

hello@optictax.com to the same Optic Tax 14,000 person mailing list including the 226 Cleer list that was created by Cleer's former bookkeepers:

> Q. I'll show you what's marked as Exhibit 48. This is another, what I'll call a blast e-mail from Hello at Optic Tax dot com. Do you see that?
>
> A. Yes.
>
> Q. Did this go out to all 14,000 people on the mailing list, as well?
>
> A. Yes.
>
> . . .
>
> Q. Got it. So, this e-mail, the Optic Tax hello Optic Tax dot com also went out to the 226 Cleer clients?
>
> A. Yes. This is informational only.

(*Id.* at 222:1-7, 224:8-11).

Exhibit 48 is a blatant solicitation. It reminds clients of "fast approaching" deadlines, provides tax advice, includes branding from Optic Tax, includes a link to Optic Tax's website, is signed by Ms. Stranger, and invites any recipient to "reach out to us for help." (*Id.* at Ex. 48). Ms. Stranger also admitted that she did nothing to change her "blast" email solicitations after the Court's TRO was entered:

> Q. What did you do after the TRO went on to make sure that you weren't sending these types of blast e-mails to Cleer clients?
>
> A. The blast e-mails are not a solicitation. This is only an informative e-mail.
>
> . . .
>
> Q. Okay. So, you didn't do anything to stop these blast e-mails from going out to Cleer's clients?
>
> A. It's informational.

> Q. Right. So, the answer to my question is you didn't do anything to stop these blast e-mails from going out to Cleer clients. Right?
>
> A. I don't know. I have to look back if I -- I don't think so, because I didn't remove that list, because I was told not to remove anything, also. So, it's in a middle ground where I can't do anything right, apparently, which is, you know, what's so frustrating about this.

(*Id.* at 224:2-25, 225:1).

Ms. Stranger further testified that she did this more than once:

> Q. How many of these type of, quote, informational e-mails that you're calling them have you sent out after this Court's order went on?
>
> A. A few.
>
> Q. Five? Ten? Fifteen?
>
> A. I don't know. Three.

(*Id.* at 227:4-10).

Ms. Stranger also admitted that she never conferred with Cleer before sending out the "blast" emails as instructed by the Court. (*Id.* at 225:2-7, 226:8-25, 227:22-25, 228:1-25). Cleer has repeatedly asked for the production of the other "blast" emails sent by Ms. Stranger following the Court's TRO but she will not produce the emails.

### III.  LEGAL ARGUMENT

#### A.  Legal Standard.

The Court has "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). A party may be held in civil contempt for failure to comply with a court order if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King v. Allied*

*Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). As to the first element, an order is clear and unambiguous if it is "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *In re Baldwin–United Corp.*, 770 F.2d 328, 339 (2d Cir.1985). As to the second element, the burden of establishing contemptuous conduct is borne by the moving party, *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009), and "[i]n the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred," *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002). But the party seeking the contempt order need not establish that the violation was willful. *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984).

      **B.**    **Ms. Stranger Failed to Comply with a Clear and Unambiguous Order and is Therefore in Contempt.**

The Court's TRO is clear: Ms. Stranger and Optic Tax must not solicit or contact Cleer's current or prospective clients. The Court's TRO was also clear that if Defendants had any question about whether a solicitation or contact would violate the TRO, they should confer with Cleer.

Defendants have not complied with the Court's TRO. After the Court's TRO was entered, they sent "blast" solicitation emails to 226 known Cleer clients and 5,448 contacts that Cleer uses to solicit business. Defendants' only defense is that the alleged "blast" emails were "informational" and not "solicitations." (Ex. B – Stranger Tr. at 224:1-25). Defendants are missing the point – an informational email directing clients to Optic Tax and Ms. Stranger for tax assistance **is a solicitation**. In addition, the Court's TRO is unambiguous that they should not "contact" Cleer's current or potential clients, so her argument is meritless. And if there was any question,

8

Defendants should have conferred with Cleer as instructed by the Court, but they did not, apparently willing to risk a finding of contempt.

Finally, Defendants never attempted to diligently comply with the TRO in a reasonable manner. Defendants never attempted to comply at all. Defendants had over a month to clean up their mailing list and confer with Cleer's counsel before attempting to solicit clients, yet they took no action. Better yet, Defendants could have refrained from sending "blast" emails as warned by the Court.

### C. Sanctions are Appropriate for Defendants' Contempt of Court

"Unlike sentences for criminal contempt, which are punitive in nature and intended to vindicate the authority of the court, the sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996). The Second Circuit "has commented that, '[s]o far as the first of these functions is concerned, the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy.'" *Id.* (quoting *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979)). On the other hand, "[t]he compensatory goal . . . can only be met by awarding to the plaintiff any proven damages. The district court in either case may award appropriate attorney fees and costs to a victim of contempt." *Id.* (internal citation omitted). Moreover, "th[e] inherent power to enforce a consent judgment extends beyond the remedial contractual terms agreed upon by the parties." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101 (2d Cir. 2016) (internal quotation marks omitted).

Defendants actions "demonstrate[] a flagrant disregard for the terms" of the TRO which warrant sanctions. *Allstate Ins. Co. v. Nair*, No. 3:10CV88 SRU, 2011 WL 1832774, at *4 (D.

9

Conn. May 13, 2011). This is not a question of an accidental or trivial breach of the Court's TRO. Defendants did exactly what the Court told them not to do as to the most important remedy to Cleer – not soliciting its current and prospective clients just before tax season. Cleer expended significant attorneys' fees in obtaining the TRO and now pursuing a preliminary injunction to protect its business and stop Defendants from soliciting Cleer's clients. Yet, Cleer did not get the benefit of the injunctive relief ordered by the Court and still has not as of the date of the last "blast" email sent by Defendants.

Accordingly, in order to coerce future compliance and remedy the harm to Cleer, the appropriate remedy is to award Cleer its attorneys' fees expended in obtaining the TRO, its attorneys' fees in pursuing the preliminary injunction as of the date of the last "blast" email sent to Cleer's clients (*i.e.*, the last date of Defendants' contempt), its attorneys' fees associated with the instant Motion, and any other relief the Court deems just and proper.

Respectfully submitted,

*/s/ George B. Musekamp*
George B. Musekamp (PHV)
Evan H. Cohn (PHV)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Tel: (513) 381-2838
Fax: (513) 381-0205
gmusekamp@taftlaw.com
ecohn@taftlaw.com

Michael S. O'Malley, Esq. (CT31784)
Ogletree, Deakins, Nash,
Smoak & Stewart P.C.
281 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 969-3109

                                          Fax: (203) 969-3150
                                        Michael.O'Malley@ogletree.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

    The undersigned certifies that on January 17, 2025 the foregoing was filed using the Court's electronic filing system which will provide notice to all counsel of record.

    Alan Harrison
    SANDOLLAR Law
    6 West River Street #112
    Milford, CT 06460
    alan@sandollar-law.com
    202-212-9996

    */s/ George B. Musekamp*
    George B. Musekamp