FEB 5 2025 PM12:25
FILED-USDC-CT-N    EN

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | PRO SE MOTION FOR CONTEMPT |
| | : | |
| CRYSTAL STRANGER et al. | : | |
| | : | |
| | : | |

COMES NOW, Crystal Stranger, the Defendant in the above-captioned matter, proceeding pro se, and respectfully moves this court to hold the Plaintiff, Cleer LLC, in contempt for engaging in a pattern of misconduct that has subverted the integrity of these proceedings. The Plaintiff knowingly made false representations to this court regarding their residency and business operations in Connecticut, provided materially inaccurate financial disclosures, and obstructed justice by instructing a subpoenaed witness to withhold critical information. In support of this motion, I state as follows:

### I.  INTRODUCTION

The Plaintiff, Cleer LLC, has made material misrepresentations to this Court regarding their residency and business operations in Connecticut, and the calculation of the capital accounts of Cleer. Specifically, the Plaintiff falsely claimed that the McKeegans were both Connecticut residents and that Cleer was a Connecticut headquartered company, and that Cleer terminated my interest for cause wherein I

1

owed Cleer an amount of $70,743 related to a negative capital account balance that they have since admitted to having incorrectly calculated wherein this should have been admittedly a positive amount, in a still indeterminate value, as they have yet to provide all relevant financials.

Contradictory to the residency statements, in the Preliminary Injunction hearing, Cleer's CEO and managing member, David McKeegan admitted he does not live anywhere in the United States. These false statements were made to establish jurisdiction in order to gain an unfair advantage in this case by forcing ahead discovery of not just myself but also the other party in this matter, Optic Tax Inc., which has no Connecticut connection and no contractual agreement with Cleer LLC to create jurisdiction.

The miscalculation of the capital account was even more egregious, wherin, during his deposition, the CEO and managing member of Cleer LLC, David McKeegan, admitted that he did not review the Operating Agreement (OA) terms related to the calculation of capital balance, and further that he did not share the OA document at all with the accountant, Nicole Wiseman, whom he hired to calculate this amount.

Furthermore, not only did David McKeegan give his CPA the wrong dates from which to calculate this, but Ms. Wiseman told my former attorney, Alan Harrison, in an email that David McKeegan had told her to withhold evidence related to the subpoena issued to her in this case. This intentional attempt at evidentiary subterfuge points that there are discrepancies to be found in the books, which from a cursory look appear to

be dividends which were paid to the McKeegans but never received in an equal share by all owners of the business, thus materially breaching the OA, and by reference rendering the MVA unenforceable against the Plaintiff.

These blatant lies and subterfuge have undermined the integrity of these proceedings, led to significant cost outlays, and have wasted the time of the Court.

## II. FACTUAL BACKGROUND

### 1. Plaintiff's False Representations

The Plaintiff claimed in the *PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY AND PERMANENT INJUNCTION ("Amended Complaint")* Document 55) filed on November 8th, 2024, that "Cleer has two members who maintain United States residencies in Connecticut and who operate Cleer out of Connecticut when in the United States." (*Id.* Pg 2:4) This statement is false wherein that while the members may own a house in Connecticut, David McKeegan has later admitted they do not reside at that home or file taxes as residents of Connecticut.

Furthermore they claimed that "Connecticut is the location of Cleer's United States headquarters." (Id. Pg 2:5) However, Cleer is not registered with the Secretary of State of Connecticut as a Connecticut business, as I verified when on November 9th, 2024 I personally searched Connecticut's State Website's official search function for any

3

registrations under the names of either Cleer or Greenback Business Services (*Exhibit A- CT Online Business Search*) and came up with zero similarly registered business names. In all of the Plaintiff's production, the only piece of mail produced on Cleer's behalf using the Connecticut address of the McKeegans was the Trademark application filed. Using an address once or twice on a certain government filing does not create a headquarters, and Cleer had employees actively working full-time in leadership roles in other states, which would create a nerve center there.

Later in the Amended Complaint they stated that "When Cleer terminated Stranger's 12 Units for cause and repurchased them, Stranger's Member Capital Account for Cleer was -$70,743." And they  went on to say that "Despite Cleer's demands, Stranger has not paid Cleer the amount owed." (*Amended Complaint* Pg 20:78-79) Yet these amounts were not correctly calculated as the company had always made a profit and a negative capital balance would be impossible under the terms of the OA section 4.1 which states, "net losses allocated to the Members shall not exceed the maximum amount of net loss that can be so allocated without causing any member to have an adjusted Capital Account deficit at the end of any fiscal year." Thus any prior net losses cannot be allocated to members, and the company always was profitable during the time of membership, meaning this was, per the OA document, an impossibility.

Not only were these accounts incorrectly calculated, but in communications to his CPA, Nicole Wiseman, Mr. McKeegan tried to prevent the discovery of this material,

4

seemingly to hide how incorrect the company financial calculations and payments were. Nicole Wiseman emailed my former attorney Alan Harrison that, "At the request of David McKeegan, I can only provide the tax returns and suggested adjusted journal entries for them as I am not their accountant." (*Exhibit B- Wiseman Subpoena Emails*, Page 3 - On 1/21/25 21:48) This shows their blatant attempt to prevent the discovery of subpoena'd documents.

The residency representations were material to the Court's determination of jurisdiction to allow an evidentiary hearing on the Motion to Dismiss for Personal Jurisdiction, and to allow expedited discovery while the Motion to Dismiss was pending, and these assertions have increased litigant cost and wasted court time in holding the evidentiary hearing. Furthermore the accusation that I had a negative capital balance paints me in the eyes of the court as a debtor to Cleer and obscures the fact that Cleer breached the OA, and by reference the MVA, by maintaining the books and likely issuing member dividends in a fraudulent manner.


### 2. Plaintiff's Admissions

On January 15th, 2025 during the deposition of David McKeegan the Plaintiff stated he does not spend 183 days per year in Connecticut in order to be a resident of Connecticut and that he files the Foreign Earned Income Exclusion to exclude his income tax earned by claiming to not be a resident of the United States. From this line of questioning:

Q.    Okay.  So you are a Connecticut resident for tax purposes?

ATTORNEY MUSEKAMP:  I object to the question. Go ahead, Mr. McKeegan.

THE WITNESS:· I don't know if I count as a resident because I don't spend a full year, you know, 183 days or whatever it is, in Connecticut.

BY ATTORNEY HARRISON:

Q.    Okay.  You file the form Earned Income Exclusion to exclude U.S. income by claiming you're a nonresident?

A.    I have done, yes.

Q.    Did you do that last tax year?

A.    I believe so.

(*Exhibit C- David McKeegan Deposition Transcript Excerpt 1* at 6:19-7:9).

Then also related to residency, on January 29th, 2025 in the Preliminary Injunction Hearing David McKeegan went on to testify:

Q. Okay. Mr. McKeegan, are you a resident of Connecticut?

A. I own a home here. I have a mortgage and a car. But I don't live here full-time. But I don't live anywhere in the United States full-time.

Q. Okay. Have you said at different times that you are a resident of Connecticut?

A. No, I don't believe so.

6

Q. For example, did you say in the verified complaint that you maintain United States residency in Connecticut?

A. No. I said I have a residence in Connecticut, meaning I own a home.

(*Exhibit D- PI Hearing Excerpt* at 145:21-146:6).

Saying in testimony that David McKeegan has a residence in Connecticut, not that he is a resident, is obviously a slip-up of Plaintiff's attorney's plan of trying to claim that the term "residencies" as used in the Amended Complaint filed in response to Optic Tax's Motion to Dismiss for lack of Personal Jurisdiction was merely a mis-spelling of "residences" with intentionally crafty wording to allow them wiggle room out of their lie once the court finally calls them out on this, rather than claiming in the pleading proper residency in Connecticut by using more definitive terms, despite this being exactly what they were alluding to in that pleading.

Again in the January 15th deposition of David McKeegan the Plaintiff stated "We were sort of loosey-goosey with a lot of that. We didn't really manage that directly, as per the operating agreement." (*Exhibit E- David McKeegan Deposition Transcript Excerpt 2* at 63:17) He was so cavalier about not following fiduciary duties for the company, that he even admitted in the same deposition that during the time I was a member in the LLC he had only once calculated the capital accounts (at the time of my forced removal from the LLC):

Q.   As the CEO of the business, do you understand how the capital accounts were supposed to be calculated?

A.   No.  That's why I hired a CPA to do it.

Q.   Did you show your CPA this section of the operating agreement before you had her calculate the capital account balances?

A.   I don't recall.

Q.   Did she tell you how she calculated the capital account balances?

A.   We didn't have a phone conversation or anything like that about it, but it's easy enough to see, based on the spreadsheet, that she sent that we just walked through.

Q.   Does the spreadsheet way of calculating capital account balances match Section 4.1 here?

A.   I don't know.

Q.   As the CEO of the business, isn't it your responsibility to know?

A.   I don't know.

Q.   So you don't know what you're responsible for as CEO of your own business?

A.    I would say as CEO of a business, this would be probably one of the more minor things that I would spend any time looking at or doing.

Q.    So you think the allocation of profits and losses among members is a minor part of the CEO's responsibilities?

A.    Well, again, as I said earlier, for a C Corp, this isn't really all that relative. So it was really only in calculating the value at the end of Ms. Stranger's membership.

Q.    So the value of the members' membership interest is only a minor part of the CEO's responsibilities?

A.    Yes.

Q.    So who's responsible for the valuation of the members' membership interest?

A.    Well, let's look at it this way.  In the seven or eight years that I've been running this business, I only had to look at that once.

(*Id.* at 81:24-83:17)


David McKeegan also discussed in the deposition how he directed his CPA to use the date of January 31st, 2024 to calculate the capital account ending date unto, rather than the correct date of August 8th, 2024. He admitted the calculation was completely incorrect, and he then agreed in testimony that it should have been a positive balance to pay out:

9

Q.    Okay.  So it looks like you and Nicole agreed that even though Ms. Stranger was a member until August 8th, you should calculate her capital account as of January 31st?

A.    Yeah.  Again, I didn't see any date in the operating agreement as to when that should be, like what date we should use, so we went with her last day of employment.

Q.    So why did you send information through August 8th?

A.    I don't recall.

——————

Q.    Okay.  So August 8, 2024, if we go to the net income, that's 773,000, roughly, positive; right?

A.    Yes.

Q.    Okay.  But if we go to this capital account analysis spreadsheet, as of January 31, 2024 -- this is B75 on the P&L through January 2024 -- there was a net loss of 717,000, roughly; correct?

A.    Yes.

Q.    So between January 31st and August 8th, there was a swing of about 1.4 million positive; right?

A.    Yeah.  Tax season will do that for our business.

Q.   Right.  It seems like if you had used the August 8th number instead of
the January 31st number, Ms. Stranger's capital account balance would have been
quite different; correct?

A.   I would have to calculate it to know exactly how different, but it looks like
it would be a different number.

Q.   For example, it would be a positive number; correct?

A.   Most likely, yes.

(*Id.* at 91:17-93:14)

In the court testimony David McKeegan went on to discuss the capital account in
more detail, and admitted the date period he used to calculate the capital account was
incorrect, "I believe I made a mistake in calculating that. Because when I calculated it or
I asked the CPA to calculate it, it was to the end of January, so her final day of working.
It wasn't until her membership was revoked." (*Exhibit F PI Hearing Transcript Excerpt 2.*
at 116:21) He then went on to admit that prior to trial he had still not yet made a
calculation of the correct capital account amount. *(Id.* at 117:11-17)

At the Preliminary Injunction hearing, on cross examination, David McKeegan
was questioned about the Interrogatory he answered related to questions about
calculating and allocating Cleer's net profit in question 6 in *Exhibit G - Responses to
Stranger's First Discovery Requests*:

Q. That's about calculating and allocating Cleer's net profit, right?

A. That says, "Describe the process related to the calculation and allocation of Cleer's net profit among capital accounts in each year that Ms. Stranger was a member of Cleer, including how Cleer arrived at its valuation."

Q. Okay. And in response to that interrogatory, did you say or write "Cleer's officers reviewed the Operating Agreement and complied with its terms"?

A. I reviewed the operating agreement. I saw that we had to get a capital account calculation. And then I asked our CPA to do that calculation.

Q. So in your deposition did you testify that you didn't make any effort to comply with the Operating Agreement?

A. I never would have thought of calculating a capital account had I not read the Operating Agreement and seeing that there was a capital account valuation required.

(*Exhibit D PI Hearing Excerpt* at 145:3-20)

However, this response was directly contradictory to the deposition testimony:

Q.    Did you calculate her capital account balance the same way this operating agreement says to do it?

A.    I don't see the operating agreement saying how to calculate a capital account balance. I believe that's just an accounting protocol.

12

_____

Q.    Okay.  So this talks about allocating the company's profits and losses among the members' capital accounts; correct?

A.    Yep.

Q.    Okay.  So this is a -- kind of customized.  Is this a different way of doing it than you might find by Googling for it?

A.    I don't know.

(*Exhibit E- David McKeegan Deposition Transcript Excerpt 2* at 80:25-81:23)

And at another point in the same deposition, David McKeegan admitted to not making any effort to comply with the Section 4.1 in the Operating Agreement related to the valuation of the Capital Accounts whatsoever:

Q.    As the CEO of Cleer, did you make any effort to comply with Section 4.1 of the operating agreement?

A.    We did not make any effort or I did not make any effort to comply because it wasn't necessary because of the tax status of the entity.

(*Id.* at 72:2-8)

To further confirm this miscalculation, in the email thread from Ms. Wiseman she wrote, "it appears that you all believe that Ms. Stranger has an ownership in a partnership but Cleer is a corporation as noted in my responses. I will forward you the

one email I have on the capital account but as I mentioned in the email, I refer to any owner as a shareholder and we were not made aware during the tax filings that Ms. Stranger was a shareholder in Cleer LLC." (*Exhibit B- Wiseman Subpoena Emails, Page 2 On 1/22/25 14:13*) She later stated, "we have done nothing on their behalf with the exception of the back of the envelope calculation on the capital account." Thus she never gave an official capital account valuation which was reasonable for Cleer LLC to rely on, directly contrary to the testimony given in the deposition and at trial. *(Id. Page 2 On 1/22/25 14:13)*

These admissions directly contradict the Plaintiff's earlier representations to the Court, conflict between what was stated in the deposition and testimony at trial, and show an intentional disregard for the truth by attempting to interfere with a Subpoena and prevent evidence from being discovered in the case.

### 3. Impact on the Case

The Plaintiff's false statements were intended to mislead the court and give an unfair advantage in this litigation. Furthermore, the Plaintiff's attempt to influence a subpoenaed witness obstructed the discovery process and may have deprived both Defendants of critical evidence. I have still never been provided a tax return for Cleer LLC or the preceding companies while I was a member, or as part of this litigation, and the financials provided by Nicole Wiseman which were given to her by Cleer show difference in end of year accumulated paid dividends.

If you look at *Exhibit H - Balance Sheets for 2021 through 2023* there are substantial differences in the "Dividends" Equity Account from the financials given to Nicole Wiseman for preparation of the 2021 taxes (page 1) and the financials presented for 2022 taxes (page 2). Both of these have a column for December 31st 2021 and when you look at the "Dividends" line on each representation of the same time period one reports dividends paid in the amount of $74,832.22 (and clearly there was a mistake made to show in GBP rather than dollars in the currency marker) whereas for the same period on the 2022 financials this amount was showing $337,412.66. This points to the fact that sometime during 2022 dividends were paid out to the members. As I became a member during 2022 it is likely that I was intentionally not paid my actual share of the dividends, which appear to have been paid out during this year in which I became a member.

In each subsequent year this dividend payment account continues to increase on the financials, yet I never received a single dividend payment during the time of my membership. This points to fraud by the managing members which would have amounted to a material breach of the OA, which is a dependent covenant of the Master Vesting Agreement (MVA).

The fact that David McKeegan would try to hide this evidence from the Court points to this evidence being likely to influence the outcome by showing that the MVA would also not be enforceable in that case against the Plaintiff, as the MVA is reliant on the OA being valid. Beyond obstructing evidence, the Plaintiff's misrepresentations have

caused unnecessary delay, increased litigation costs, and undermined the integrity of these proceedings.

## II. LEGAL ARGUMENT

### 1. Contempt of Court

The Plaintiff's conduct constitutes contempt of court under the Court's inherent authority and Federal law. Courts have broad authority to sanction parties who engage in misconduct that undermines the integrity of judicial proceedings.

First, the Plaintiff falsely claimed to "maintain United States residencies in Connecticut" and operate their company, Cleer, out of Connecticut. These statements were material to the Court's determination of jurisdiction and venue under 28 U.S.C. §1391. The Plaintiff's subsequent admission that they do not live anywhere in the United States demonstrates that these representations were knowingly false.

In *Chambers v. Nasco, Inc.,* 501 U.S. 32 (1991) the Supreme Court held that courts have inherent power to sanction misconduct, including false statements, to preserve the integrity of the judicial process. The Federal Rules of Civil Procedure rule 11(b) also require that all representations to the Court be truthful and not presented for an improper purpose, such as misleading the court to establish jurisdiction.

Second, the Plaintiff provided inaccurate financial information regarding capital accounts, which are material to the counterclaims and defenses in this case. This

misrepresentation prejudiced the Defendant's ability to prepare a defense and violated the Plaintiff's duty of candor to the Court.

By providing falsified accounting statements to the court, Cleer LLC showed their utter disregard for the importance of their fiduciary duties. "The most basic fiduciary duty imposed in a financial trust relationship must surely be the duty to render an accurate accounting. " *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 47 (D.D.C. 1999).

Finally, the Plaintiff's attempt to influence a subpoenaed witness obstructed the discovery process and attempted to deprive the Defendant of critical evidence. This conduct is a direct affront to the Court's authority, and should make the court question what other materials have been withheld in the discovery process.

"Many courts have held that witness tampering is a particularly egregious fraud on the court and an abuse of the judicial process." *Tomasini v. United States Postal Serv.,* CIVIL 17-1552 (MEL), 24-25 (D.P.R. May. 2, 2024)*; "*The alleged misconduct at issue here-witness tampering-is, if true, truly egregious and strikes at the heart of the integrity of this proceeding." *SurfCast, Inc. v. Microsoft Corp.,* 2014 WL 12726543, (D. Me. Sept. 5, 2014);

The courts also have repeatedly determined that actual tampering of the witness is not required, merely that they engaged in contact which could have had "a reasonable tendency to influence" a witness. *Torres v. Wells Fargo Bank,* 2019 WL 8012686, at 5 (CD. Cal. Dec. 17, 2019) (citing *Ramirez,* 845 F.3d at 782)

Furthermore, "Merely attempting to tamper with a witness is sanctionable and it is not necessary that the offending party's effort was successful or had its intended effect." *Tomasini* citing *Torres,* 2019 WL 8012686, at 4 ("Trying improperly to influence a witness is fraud on the court... .") (citing *Ty Inc. v. Softbelly's. Inc.* 517 F.3d 494, 498 (7th Cir. 2008) (emphasis in original).

### 2. Materiality of the Misrepresentations

The Plaintiff's false statements and misconduct were material to the proceedings and prejudiced the Defendant's ability to defend against the claims.

The Plaintiff's false representations regarding residency and business operations were intended to establish jurisdictions in this district improperly and to delay the Motion to Dismiss for Personal Jurisdiction on behalf of Optic Tax in order obtain a breadth of discovery materials over myself that they otherwise would not have been entitled to. They furthermore were calculated to harass and cause undue burden to Optic Tax so that the company could not operate its business successfully, preventing me from receiving wages during these proceedings. In *Steel Co. v. Citizens For Better Environment* (96-643) 90 F.3d 1237 the Court discussed how jurisdictional issues are fundamental to the Court's authority. As such, false statements on this point are particularly egregious.

The Plaintiff's inaccurate financial disclosures directly impacted the Defendant's ability to assess the claims and prepare a defense, including evidence for grounds for

dismissal based on breach of the OA by the McKeegans. Financial misrepresentations in litigation are a serious violation of the duty of candor.

Courts have regularly applied sanctions when financial obligations have not been handled properly before the court. "Awarding such relief is particularly appropriate in this case considering the severity of the defendants' transgressions and the fact that the conduct has undeniably exacerbated the already considerable harm that the plaintiffs have suffered as a result of the defendants' failure to discharge their fiduciary obligations properly." Cobell v. Norton, 226 F. Supp. 2d 1, 153 (D.D.C. 2002)

The Court is clearly granted sanction powers related to subpoenas under the Federal Rule of Civil Procedure 45(g). Interfering with a subpoenaed witness or obstructing the discovery process is a clear basis for granting sanctions, as stated in *Ramirez v. T&H Lemont, Inc.* "But witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction.", 845 F.3d 772, 782 (7th Cir. 2016); These sanctions have been upheld and liberally granted throughout the history of the United States judicial system, as this type of conduct is a direct affront to the Court's authority.

### 3. Prejudice to the Defendant

The Plaintiff's misconduct has caused significant prejudice to the Defendant, including: 1. Unnecessary litigation expenses; 2 Delay in resolving the case causing business and wage losses; and 3. Deprivation of critical evidence and information necessary to defend against the claims.

These actions taken by the Plaintiff show a clear disregard for the truth and a blatant attempt to influence the court even by fraudulent means. "Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear. " *Aoude v. Mobil Oil supra.*

In *H.K. Porter Co. v. Goodyear Tire Rubber* 906 F. Supp. 2d 938, 975 the court dismissed the case due to the Plaintiff's fraudulent financial disclosures. The court opined "in the usual case, sanctions ordered pursuant to a court's inherent power to sanction litigation misconduct must be limited to the amount of legal fees caused by that misconduct. But it determined that in cases of particularly egregious behavior, a court can award a party all of the attorney's fees incurred in a case, without any need to find a "causal link between [the expenses and] the sanctionable conduct."

"The relief ordered based upon a finding of fraud on the court has consistently been both swift and severe. In cases where the fraud is unearthed prior to the entry of final judgment, courts almost always dismiss the case (if the plaintiff was the party that perpetrated the fraud) or enter a default judgment (if the defendant committed the fraud)." *Cobell v. Norton,* 226 F. Supp. 2d 1, 24 (D.D.C. 2002)

Here as in in the cases above and confirmed by *Young v. Office of United States Senate Sergeant at Arms,* 217 F.R.D. 61, 71 (D.D.C. 2003) "civil contempt would be as ineffective a sanction for plaintiff's misconduct as would a monetary sanction. Ms. Young has abused the litigation process so substantially that she has lost the privilege of maintaining this lawsuit. Coercing or seeking to obtain or manufacture false testimony

'strikes at the heart of the judicial system. Lying cannot be condoned in any formal proceeding.... Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.'*Quela v. Payco-General Am. Credits, Inc.,* 82 Fair Empl. Prac. Cas. (BNA) 1878, 2000 WL 799750 (N.D.III.2000)"

The Plaintiff's deceit has prejudiced the Defendant, misled the Court on jurisdictional and substantive issues, and warrants immediate sanctions to deter further abuse of the judicial system.

### III. RELIEF REQUESTED

WHEREFORE, I respectfully request that this Honorable Court:

1. Hold the Plaintiff, Cleer LLC, in contempt for their false statements, financial misrepresentations, and interference with a subpoenaed witness;

2. Impose appropriate sanctions, including but not limited to:

   • Dismissal of the Plaintiff's claims, with prejudice.

   • An award of attorney's fees and costs incurred as a result of the Plaintiff's misconduct;

   • Ordering the Plaintiff to conduct a forensic accounting of my capital account balance in Cleer LLC, and calculate any dividends, deemed dividends, and dividend equivalent payments which should be paid.

3. Grant any other relief the Court deems just and proper.

Respectfully submitted,

Crystal Stranger

Pro Se Litigant

Date: February 5th, 2025

**Pro Se Motion for Contempt**

**Exhibit A**

**CT Online Business Search**



ALERT
Connecticut remains at an elevated level of fire risk due to extremely dry conditions. Use extra caution to prevent fires. An emergency burn ban is in effect for all state parks, forests, and wildlife management areas, prohibiting the use of all outdoor grills, firepits, campfires, etc.

Notice:
Business owners – Go here if you received a **Notice of Intent to Dissolve or Revoke**. Go here if you received a **Certificate of Dissolution or Revocation**. Not sure? **Search your business**, the letter you received is the most recent filing under filing history.

CT.GOV   State of Connecticut                          🔍 Search   🌐 Language   👤 Sign In

# Business.CT.gov

Home   Start Your Business ⌄   Services ⌄   Taxes ⌄   Licenses & Permits ⌄   My Industry ⌄   Resources ⌄



Enter business name, business ALEI or filing number

```
Cleer
```
🔍

Looking for something specific? Try **advanced search**

Need to keep a copy of this search? You can share this link or export the information in a comma-separated value (CSV) format.

[ SHARE LINK ]

[ EXPORT CSV RESULTS ]

BR INQUIRY   ›   RESULTS FOR "CLEER"

## Filters

**0 results found**

📅 **Date**

Business Start Date

MM/DD/YYYY 📅

Business End Date

MM/DD/YYYY 📅

## Businesses

Sort by:  Business Name ⌄

No results were found. Please try a new search or filter.

📊 **Business status**

Active
Cancelled
Dissolved
Forfeited
Merged
Revoked
Withdrawn

🏢 **Business type**

Domestic
Foreign

☰ **Entity Type**

LLC
LLP
Stock Corp
Non Stock Corp
Benefit Corp.

Show more (12)

Business.CT.gov





Need to keep a copy of this search? You can share this link or export the information in a comma-separated value (CSV) format.

SHARE LINK

EXPORT CSV RESULTS

BR INQUIRY  >  RESULTS FOR "GREENBACK BUSINESS SERVICES"

### Filters

**0 results found**

📅 **Date**

Business Start Date

MM/DD/YYYY

Business End Date

MM/DD/YYYY

### Businesses

Sort by:  Business Name ⌄



**No results were found. Please try a new search or filter.**

**Business status**

Active

Cancelled

Dissolved

Forfeited

Merged

Revoked

Withdrawn

**Business type**

Domestic

Foreign

**Entity Type**

LLC

LLP

Stock Corp

Non Stock Corp

Benefit Corp.

Show more (12)

Business.CT.gov

**Pro Se Motion for Contempt**

**Exhibit B**

**Wiseman Subpoena Emails**

 Gmail

# Fwd: Notice of Subpoena (Cleer v Stranger)

5 messages

**Alan Harrison** <alan@sandollar-law.net>                                    Wed, Jan 22, 2025 at 3:40 PM
To: Crystal Stranger <crystalstranger@gmail.com>

Hi, Crystal.


Please review and let me know your thoughts.


Thank you.


Yours faithfully,

Alan Harrison
SANDOLLAR Law
Milford, CT
203.212.9996


-------- Forwarded Message --------
**Subject:** Re: Notice of Subpoena (Cleer v Stranger)
   **Date:** Wed, 22 Jan 2025 20:01:11 +0000
   **From:** Nicole Wiseman <nicole@legacycpaservices.com>
      **To:** Alan Harrison <alan@sandollar-law.net>


---

**From:** Alan Harrison <alan@sandollar-law.net>
**Sent:** Wednesday, January 22, 2025 2:27 PM
**To:** Nicole Wiseman <nicole@legacycpaservices.com>
**Subject:** Re: Notice of Subpoena (Cleer v Stranger)

Hi, Nicole.


Please send the documents referenced in your initial response.


Thank you.


Respectfully,

Alan Harrison
SANDOLLAR Law
Milford, CT
203.212.9996

On 1/22/25 14:13, Nicole Wiseman wrote:

Hi,

I actually just tried to call you as it appears that you all believe that Ms. Stranger has an ownership in a partnership but Cleer is a corporation as noted in my responses. I will forward you the one email I have on the capital account but as I mentioned in the email, I refer to any owner as a shareholder and we were not made aware during the tax filings that Ms. Stranger was a shareholder in Cleer LLC.

I need to know if you would like me to provide the financials that were sent to me by the company. As I mention, we are not engaged to serve the company in 2019 and 2024 so we have done nothing on their behalf with the exception of the back of the envelope calculation on the capital account.

Nicole

---

**From:** Alan Harrison <alan@sandollar-law.net>
**Sent:** Wednesday, January 22, 2025 10:49 AM
**To:** Nicole Wiseman <nicole@legacycpaservices.com>
**Subject:** Re: Notice of Subpoena (Cleer v Stranger)

Hi, Nicole.


Please do not rely on Mr. McKeegan for legal advice about your compliance with a subpoena, when you could be held in contempt of Federal Court for failure to comply.


If you do not want to fully comply with the subpoena, please retain your own counsel (not Mr. McKeegan's) to advise you how to proceed.


I look forward to receiving your complete responses.


Thank you.


Respectfully,

Alan Harrison
SANDOLLAR Law

Milford, CT
203.212.9996

On 1/21/25 21:48, Nicole Wiseman wrote:

> Hi Mr. Harrison,
>
> I do not work on the financials of either of these entities, I only prepared their tax returns and am not responsible for the the condition of the financials. At the request of David McKeegan, I can only provide the tax returns and suggested adjusted journal entries for them as I am not their accountant. Anything I prepared for them was for the tax return and based off information supplied to me for the tax return.
>
> Nicole

**From:** Alan Harrison <alan@sandollar-law.net>
**Sent:** Thursday, January 16, 2025 5:30 PM
**To:** Nicole Wiseman <nicole@legacycpaservices.com>
**Subject:** Notice of Subpoena (Cleer v Stranger)

Ms. Wiseman:

You may accept service of this subpoena by e-mail, or I can have a person go to your house and place of work to serve you. Please let me know. Thank you.

Respectfully,

Alan Harrison
SANDOLLAR
6 W River St #112
Milford CT 06460
203.212.9996

**4 attachments**

📄 **Greenback Business Services LLC - 2021 Tax Return.xls**
43K

📄 **Cleer LLC - Tax Return Financials 2023 2022.xlsx**
16K

📄 **GBS Tax Return Financials 2020.xlsx**
16K

📄 **2022 Cleer Financials for tax return.xlsx**
16K

---

**Crystal Stranger** <crystalstranger@gmail.com>                    Wed, Jan 22, 2025 at 3:50 PM
To: Alan Harrison <alan@sandollar-law.net>

Dave told her she can provide the tax returns and journal entries, did she provide that?

Crystal Stranger, JD, EA

CEO
OpticTax.com

On Jan 22, 2025, at 10:40 PM, Alan Harrison <alan@sandollar-law.net> wrote:

&lt;Greenback Business Services LLC - 2021 Tax Return.xls&gt;
&lt;Cleer LLC - Tax Return Financials 2023 2022.xlsx&gt;
&lt;GBS Tax Return Financials 2020.xlsx&gt;
&lt;2022 Cleer Financials for tax return.xlsx&gt;

---

**Crystal Stranger** <crystalstranger@gmail.com>                    Thu, Jan 23, 2025 at 2:28 AM
To: Alan Harrison <alan@sandollar-law.net>

In addition to the question about providing the tax returns and journal entries she discussed, here are a few things that jump out to me from the financials:

1. 2023 Financials show Dividends paid out showing a total of $339338.65 running balance for 2023. This number jumped between when the 2021 financials were prepared and the 2022 financials, making it look like Dave paid a dividend and was hiding it? I was an owner in 2022, so I should have received a portion of that dividend. Since I was an owner why wasn't I paid a dividend? From what I can see that would be on top of the Owner and Management salaries which were the pay to me and Dave.
2. Prior year financials don't match up to current year on what was provided, for example 2022 Dec 31st Balance Sheet shown on 2023 documents does not match up with the 2022 Dec 31st balance sheet on the 2022 financials. This is a huge red flag for fraud (this is something we don't tolerate on financials provided to us for preparing tax returns, these discrepancies always have to be explained, and amended returns filed to correct or other adjustments and disclosures made). This is true for EVERY year of financials, with the biggest discrepancies for 2021 from one year to another.
3. Depreciation amounts are not consistent from year to year, the capital assets as listed don't make sense, and don't show any value in the trademark they are fighting so hard for.

Sincerely Yours,

Crystal Stranger, JD, EA, NTPI Tax Fellow

**What is an enrolled agent?**
Enrolled agents (EAs) are America's tax experts. EAs are the <u>only</u> federally-licensed tax practitioners who specialize in taxation and also have <u>unlimited</u> rights to represent taxpayers before the Internal Revenue Service.

---

**Alan Harrison** <alan@sandollar-law.net>                    Thu, Jan 23, 2025 at 6:23 AM
To: Crystal Stranger <crystalstranger@gmail.com>

This is information that goes toward a trial, not the preliminary injunction hearing. I should prepare amended counterclaims based on this new information. Fraud, breach of fiduciary duty.

---

**Crystal Stranger** <crystalstranger@gmail.com>                    Thu, Jan 23, 2025 at 6:53 AM
To: Alan Harrison <alan@sandollar-law.net>

OK and maybe add the workplace harassment now as the new judge might be more likely to be amenable to that?

Sincerely Yours,

Crystal Stranger, JD, EA, NTPI Tax Fellow


**What is an enrolled agent?**
Enrolled agents (EAs) are America's tax experts. EAs are the **only** federally-licensed tax practitioners who specialize in taxation and also have **unlimited** rights to represent taxpayers before the Internal Revenue Service.

**Pro Se Motion for Contempt**

**Exhibit C**

**David McKeegan Deposition Transcript, Excerpt 1**

1       Q.    Good morning, Mr. McKeegan.   How are

2   you this morning?

3       A.    Good.   How are you?

4       Q.    Good.   Where are you this morning?

5       A.    I am in Costa Rica in my office.

6       Q.    Okay.   Do you spend a lot of time in

7   Costa Rica?

8       A.    We spend some time down here, yeah.

9       Q.    About how much time do you spend in

10  Costa Rica?

11      A.    It depends a little bit from year to

12  year, but this year we're planning on being

13  here until the beginning of April.

14      Q.    For tax purposes, is Costa Rica your

15  residence?

16      A.    Not sure if that's relevant to the

17  matter at hand today.

18      Q.    Your attorney can object, but you

19  have to answer the questions.

20      A.    Can you explain what you mean by

21  "for tax purposes"?

22      Q.    For the purposes of U.S. federal

23  income tax and the U.S. state income tax, do

24  you declare Costa Rica as your residence?

25      A.    For the purpose of U.S. taxes, the

1    address on my 1040 is not my Costa Rica

2    address.

3            Q.    Where do you declare as your

4    residence for federal tax purposes?

5            A.    I have a mailing address in Michigan

6    that I put on my tax return so that if I

7    receive any notices from the IRS, I receive it.

8            Q.    Do you pay Michigan state taxes?

9            A.    I've only been to Michigan once, so,

10    no.

11            Q.    Do you pay --

12            A.    It's just a mailing address.

13            Q.    Do you pay Connecticut state taxes?

14            A.    I have, yes.

15            Q.    Do you currently pay Connecticut

16    state taxes?

17            A.    For the last tax year, I did pay

18    taxes in Connecticut.

19            Q.    Okay.  So you are a Connecticut

20    resident for tax purposes?

21                    ATTORNEY MUSEKAMP:  I object

22    to the question.

23                    Go ahead, Mr. McKeegan.

24                    THE WITNESS:  I don't know if

25    I count as a resident because I don't spend a

**Pro Se Motion for Contempt**

**Exhibit D**

**PI Hearing Transcript Excerpt**

1    him a question, and if it then disagrees with the

2    deposition transcript, you can go ahead and impeach him.

3    At this point there's no basis for impeachment.

4            MR. HARRISON:  Okay, Your Honor.  I was going to

5    general questions about inconsistencies between different

6    statements he made.

7            THE COURT:  You have to establish a foundation

8    for that.  You can start by saying you testified this on

9    your direct examination, but there needs to be a

10    foundation for the impeachment.

11            MR. HARRISON:  Okay, Your Honor.

12    BY MR. HARRISON:

13    Q.    So Mr. McKeegan, you testified on direct that you

14    gave to your CPA instructions to calculate Ms. Stranger's

15    capital account balance, right?

16    A.    Yes.

17    Q.    Okay.  Were those instructions consistent with the

18    Operating Agreement?

19    A.    I don't recall giving her a copy of the Operating

20    Agreement.  I assumed that a capital account was just an

21    accounting thing.  So that it would be standard and a CPA

22    would know how to do it.

23    Q.    Okay.  Did you make any special effort to have her

24    comply with the Operating Agreement in valuing the capital

25    account?

1   A.   I just asked our tax preparer to calculate the

2   capital account.

3   Q.   Okay.

4        MR. HARRISON:  Now, Your Honor, I have

5   foundation to impeach.

6   Q.   Would you look at 516.  That's your interrogatory

7   responses.  Can you go to Interrogatory 6, please.  It's

8   about calculating and allocating.

9        (Court reporter asks for clarification.)

10       THE COURT:  There's not a microphone at the

11  podium.  If you want to go back and do your examination

12  from your area, you can, because you have a microphone.

13  Otherwise, I'm going to ask you to speak up so we can hear

14  you, all right?  Thank you.

15       MR. HARRISON:  I'll do my best, Your Honor.  I'm

16  getting over the flu.

17       THE COURT:  Can you tell us again where you want

18  us to go?

19       MR. HARRISON:  Exhibit 516, Interrogatory

20  Response 6.

21  BY MR. HARRISON:

22  Q.   Are you there, Mr. McKeegan?

23  A.   Page 6, yes.

24  Q.   Interrogatory Response 6.

25  A.   But on page 6.

1   Q.   It's got a numeral 6 at the start of the paragraph.

2   A.   Okay.

3   Q.   That's about calculating and allocating Cleer's net

4   profit, right?

5   A.   That says, "Describe the process related to the

6   calculation and allocation of Cleer's net profit among

7   capital accounts in each year that Ms. Stranger was a

8   member of Cleer, including how Cleer arrived at its

9   valuation."

10  Q.   Okay.  And in response to that interrogatory, did you

11  say or write "Cleer's officers reviewed the Operating

12  Agreement and complied with its terms"?

13  A.   I reviewed the operating agreement.  I saw that we

14  had to get a capital account calculation.  And then I

15  asked our CPA to do that calculation.

16  Q.   So in your deposition did you testify that you didn't

17  make any effort to comply with the Operating Agreement?

18  A.   I never would have thought of calculating a capital

19  account had I not read the Operating Agreement and seeing

20  that there was a capital account valuation required.

21  Q.   Okay.  Mr. McKeegan, are you a resident of

22  Connecticut?

23  A.   I own a home here.  I have a mortgage and a car.  But

24  I don't live here full-time.  But I don't live anywhere in

25  the United States full-time.

146

1   Q.   Okay.  Have you said at different times that you are

2   a resident of Connecticut?

3   A.   No, I don't believe so.

4   Q.   For example, did you say in the verified complaint

5   that you maintain United States residency in Connecticut?

6   A.   No.  I said I have a residence in Connecticut,

7   meaning I own a home.

8   Q.   Okay.  Does Cleer use Salesforce?

9   A.   We do, yes.

10  Q.   Does it work right?

11  A.   It's getting better.

12  Q.   Can you tell me more about that, please?

13  A.   In what way?

14  Q.   Well, you say it's getting better.  It was worse

15  before.  How was it worse?

16  A.   Previously it was quite a shambles.  And there was a

17  lot of information that was going into it incorrectly,

18  things were breaking all the time, we couldn't get

19  accurate reporting out of it.

20  Q.   Okay.  When did you implement Salesforce?

21  A.   I don't know.  I would guess -- you know, it was a

22  couple years ago.  It was 2021, 2022, I would guess.  That

23  was a project that Ms. Stranger was working on.

24  Q.   Okay.  And what is the point of having Salesforce or

25  using Salesforce as a company?

**Pro Se Motion for Contempt**

**Exhibit E**

**David McKeegan Deposition Transcript, Excerpt 2**

1    credit services?

2        A.    I believe that Deon sent her one or

3    two clients, and when I found out about that, I

4    advised him not to refer clients to her anymore

5    because she was not what I would categorize as

6    a good leaver.

7        Q.    What does a "good leaver" mean?

8        A.    Somebody that leaves the company on

9    good terms.

10       Q.    Okay.  In what respect was

11   Ms. Stranger not a good leaver?

12       A.    Well, when she left, she took

13   company property with her.

14       Q.    And what did you regard as company

15   property?

16       A.    Well, she stole the company domain

17   name, and she also stole a company computer.

18                  ATTORNEY HARRISON:  Crystal,

19   can you go on mute, please?  Thanks.

20   BY ATTORNEY HARRISON:

21       Q.    Now, Mr. McKeegan, in Cleer's

22   employee agreement, doesn't it say that

23   employees can retain company equipment when

24   they finish employment in exchange for part of

25   their severance package?

CLEER, LLC vs CRYSTAL STRANGER, et al                                    Job 38345
David Mckeegan January 15, 2025                                            Page 63

```
 1        A.     I don't know.  Where does it say

 2   that?

 3        Q.     Okay.  Let me pull that up.

 4                    ATTORNEY MUSEKAMP:  Sorry,

 5   Alan.  What exhibit are you on?

 6                    ATTORNEY HARRISON:  I'm just

 7   looking for something that I thought I

 8   remembered seeing.

 9                    ATTORNEY MUSEKAMP:  Okay.

10   I'll sit tight.

11                    ATTORNEY HARRISON:  Yeah.

12   Sorry.

13   BY ATTORNEY HARRISON:

14        Q.     Okay.  Moving on, who was

15   responsible for determining the balances and

16   capital accounts for members of Cleer?

17        A.     We were sort of loosey-goosey with a

18   lot of that.  We didn't really manage that

19   directly, as per the operating agreement.

20               When Crystal started receiving

21   equity, we had a conversation about how we

22   wanted to do it and we decided that we would

23   just pay out the excess cash flow at the end of

24   each year as opposed to having separate

25   operating accounts and capital accounts and all
```

1   that kind of stuff.

2       Q.    Okay.  So Article 12 of the

3   operating agreement, Section 12.1, the "entire

4   agreement," can you read the last sentence of

5   that section, please?  This is Exhibit 1.

6       A.    You said Article 12.  Which one?

7       Q.    Section 12.1 starts "entire

8   agreement."  Can you read the last sentence,

9   please?

10      A.    "This operating agreement may not be

11  changed orally, but only by an agreement in

12  writing, authorized by a vote of the members."

13      Q.    Okay.  Did you ever have an

14  agreement in writing that was authorized by a

15  vote of the members to change how you allocated

16  profits among capital accounts?

17      A.    We did not.

18      Q.    Okay.  Can we go up to Section 4.1

19  of the operating agreement, "allocation of

20  profits and losses."

21            Looking at the first sentence here,

22  let me know when you get there.

23      A.    Yep.  I got it.

24      Q.    Would you agree that the first

25  sentence of Section 4.1 describes a two-step

1    process for allocating income gained, loss,

2    deduction or credit?

3         A.    Let's see.  It says, "The company's

4    income gained, loss, deduction or credit shall

5    be allocated among the members first so that

6    their capital account balances are, as nearly

7    as possible, in the same ratios as their

8    respective units and then pro rata in

9    accordance with the units held by each member."

10        Q.    So are there two steps, sir?

11        A.    Yeah, it looks like shall be

12   allocated to the member first, and then pro

13   rata in accordance to the units held.

14        Q.    Okay.  So are you an accountant?

15        A.    Not by training, no.  I passed the

16   Enrolled Agent exam, but I am -- I am not an

17   accountant.  I'm a business owner.

18        Q.    Okay.  But you run a business;

19   correct?

20        A.    I do, yes.

21        Q.    So you understand money, generally

22   speaking; correct?

23        A.    I understand money.  I wouldn't

24   necessarily say I understand legal documents.

25        Q.    Okay.  But this is a sentence about

1    money; right?

2         A.    This reads rather legalese to me.

3         Q.    Are income gained, loss, deduction

4    or credit money?

5         A.    Yes.

6              ATTORNEY MUSEKAMP:    Object to

7    the question, as well.

8    BY ATTORNEY HARRISON:

9         Q.    As a business owner, are you

10   familiar with how to handle money?

11        A.    As a business owner, I am familiar

12   with how to handle money in my business.

13        Q.    As a business owner, are you

14   responsible for correctly handling money

15   according to the operating agreement of the

16   business?

17        A.    As a -- as one of the two business

18   -- or one of the three business owners, I

19   suppose, I was partly responsible, yes.

20        Q.    Were you the CEO of Cleer at this

21   time in August of 2024?

22        A.    August 20 -- yes.

23        Q.    Were you the CEO of Cleer in 2023?

24        A.    Yes.

25        Q.    Were you the CEO of Cleer in 2022?

```
 1        A.     Yes.

 2        Q.     In 2022, 2023, or 2024, was anyone

 3   else more responsible than you for how to

 4   handle the business' money?

 5        A.     No.  I was probably the one cutting

 6   checks and things like that.

 7        Q.     So as the CEO, you were responsible

 8   for implementing this Section 4.1 of the

 9   operating agreement?

10        A.     Yeah, but we did agree, Crystal and

11   I, that we weren't going to bother with all the

12   capital account jargon that was in the

13   document.  We didn't put it in writing, but

14   that's what we had verbally agreed.

15        Q.     So you understand that oral

16   agreements -- this operating agreement says

17   that oral agreements to modify aren't

18   effective.

19               Do you understand that?

20        A.     I do, yes.

21        Q.     So did your talk with Crystal remove

22   your obligation to comply with Section 4.1?

23               ATTORNEY MUSEKAMP:  Object to

24   the question to the extent it calls for a legal

25   conclusion.
```

CLEER, LLC vs CRYSTAL STRANGER, et al                    Job 38345
David Mckeegan January 15, 2025                          Page 68

1   BY ATTORNEY HARRISON:

2       Q.    Okay.  Moving on, what was the

3   balance in Ms. Stranger's capital account when

4   she joined Cleer as a member?

5       A.    I imagine it was zero.

6       Q.    What was the balance in your capital

7   account when Ms. Stranger joined Cleer as a

8   member?

9       A.    I don't know.

10      Q.    What was the balance in

11  Mrs. McKeegan's capital account when

12  Ms. Stranger joined Cleer as a member?

13      A.    I don't know.

14      Q.    As the CEO, when did you review

15  the --

16      A.    Sorry.  We didn't have capital

17  accounts before Ms. Stranger joined.

18      Q.    Okay.  So you all started with zero?

19      A.    I don't know.  I'm not sure how

20  that -- I'm not sure how that would have

21  initiated, but...

22      Q.    As the CEO, you were the primary

23  person responsible for handling the business'

24  money; correct?

25      A.    Yep.

```
1        Q.    But you don't know how you would

2   have handled the business' money for the

3   capital accounts?

4        A.    Well, the capital accounts are

5   really just an imaginary thing.  It's not a

6   separate bank account.  It's not -- it's just

7   an accounting practice.

8        Q.    As the CEO, weren't you responsible

9   for compliance with accounting practices?

10       A.    For things like tax and stuff like

11  that, yes.

12       Q.    Don't capital accounts --

13       A.    We have a CPA that did that work for

14  us.

15       Q.    Okay.  Don't capital accounts affect

16  tax statements?

17       A.    No, because Cleer is an LLC, but

18  it's taxed as a C Corp.

19       Q.    Okay.  Was your accountant Nicole

20  Wiseman?

21       A.    Yes.

22       Q.    Okay.  So she was your CPA?

23       A.    Yes.

24       Q.    During Ms. Stranger's time as a

25  member of Cleer -- let me show you Exhibit 4
```

```
 1   and Exhibit 5.  Here's Exhibit 4.
 2                   (Deposition Exhibit Nos. 4 and
 3   5 were marked for identification.)
 4   BY ATTORNEY HARRISON:
 5       Q.    Does this look familiar?
 6       A.    Yes.
 7       Q.    What is this?
 8       A.    It says, "Income statement profit
 9   and loss, Cleer, LLC, for the year ending
10   December 31, 2023."
11       Q.    There's three columns.  The first
12   column says "account" at the top.  The second
13   says "2023."  And the third says "2022."
14   Correct?
15       A.    Yes.
16       Q.    Okay.  And then below that, there's
17   income, cost of goods sold, gross profit,
18   operating expenses; correct?
19       A.    Yep.
20       Q.    Okay.  And the next page, you've got
21   total operating expenses, operating income,
22   other income expense, and net income; correct?
23       A.    Correct.
24       Q.    If you were following Clause 4.1 of
25   the operating agreement, which of these numbers
```

1  would have been allocated among the capital

2  accounts?

3      A.    If I was following Clause 4.1, 4.1

4  says "income gained, loss, deduction or

5  credit."

6                  ATTORNEY MUSEKAMP:  Alyssa,

7  just give me a continuing objection to the

8  relevancy of these questions for purposes of

9  the PI, but I don't want to object to each one

10 and interrupt Mr. Harrison's questioning.

11                 ATTORNEY HARRISON:  All right.

12 Just to explain, these all go to material

13 breach of the operating agreement which would

14 alleviate Ms. Stranger's obligations under it.

15                 ATTORNEY MUSEKAMP:  Same

16 objection.  Disagree, but that's all right.

17 BY ATTORNEY HARRISON:

18     Q.    Mr. McKeegan, did you make any

19 effort to comply with Section 4.1 of the

20 operating agreement?

21     A.    Because we're a C -- taxed as a C

22 Corp, we didn't need to set up the capital

23 accounts.  That's my understanding.

24     Q.    That's not what I asked.

25                 Can you answer the question, please?

```
 1        A.    Can you repeat the question?

 2        Q.    As the CEO of Cleer, did you make

 3   any effort to comply with Section 4.1 of the

 4   operating agreement?

 5        A.    We did not make any effort or I did

 6   not make any effort to comply because it wasn't

 7   necessary because of the tax status of the

 8   entity.

 9        Q.    Now, if we take a look at the

10   Membership Vesting Agreement, I think that's

11   Exhibit 2.  Let me pull that up for you.  I

12   hope I'm looking at the right exhibit.  Give me

13   a second here.

14              Okay.  So Section 10 is termination

15   in the membership agreement -- Membership

16   Vesting Agreement; right?

17        A.    Let me get there.  Section 10,

18   termination.  Yes.

19        Q.    Okay.  And it says in Section 10B,

20   upon termination of employee, the company or

21   you or your wife can buy back membership

22   interest at a third-party valuation.

23              Is that the gist of Section 10B?

24        A.    Yes.

25        Q.    How would the third party value
```

1    Ms. Stranger's membership interest?

2         A.    Well, we had Ms. Weisman look at the

3    value of the capital account.

4         Q.    Okay.  So the capital account turned

5    out to be important; right?

6         A.    Not in an ongoing way.

7         Q.    But it did turn out to be important;

8    right?

9         A.    Only insofar as Section 10B here,

10   yes.

11        Q.    But Section 10B turned out to be a

12   pretty important part of the Membership Vesting

13   Agreement; right?

14        A.    Well, not really, because we chose

15   not to buy back Ms. Stranger's shares.

16        Q.    When you say you chose not to buy

17   them back, didn't you send Ms. Stranger a

18   letter saying that you were buying back those

19   shares?

20        A.    My understanding of this agreement,

21   and, again, I'm not an attorney, but if you

22   look at 10A, one, two, three, four, fifth line

23   down --

24        Q.    You're not really answering the

25   question.  Did you send Ms. Stranger a letter

 1    saying you were buying back her membership

 2    interest?

 3         A.    No.  We sent Ms. Stranger a letter

 4    saying that we were removing her from the

 5    entity and that her shares didn't have any

 6    value or something to that effect.

 7              I don't have the letter in front of

 8    me.

 9         Q.    Okay.  Who wrote that letter?

10         A.    We hired an attorney to write the

11    letter.

12         Q.    Did you review that letter before

13    you sent it?

14         A.    I did.

15         Q.    Did you understand that letter

16    before you sent it?

17         A.    Yeah.  I believe so.

18         Q.    All right.  Just give me a second.

19    I want to see if I can pull it.

20         A.    Just for the point I was trying to

21    make, Mr. Harrison, my understanding is that

22    this -- the MVA terminated on Crystal's last

23    day.

24              She and I had a phone conversation

25    where I said I had serious concerns about Cleer

1    continuing as a going concern, so we were

2    choosing not to buy back her shares, as per 10B

3    in this document.

4         Q.    Okay.  So on August 8, 2024, what

5    did you do with Ms. Stranger's membership

6    interest?

7         A.    We canceled it for cause.

8         Q.    Okay.  And when you canceled it for

9    cause, under the operating agreement, did you

10   have any obligations?

11        A.    I don't know.  We'd have to look at

12   the operating agreement.

13        Q.    Okay.  That's fair.  Was the letter

14   your attorney sent related to the operating

15   agreement?

16        A.    I -- again, I don't remember, off

17   the top of my head, but I would imagine it

18   probably referenced the operating agreement.

19        Q.    Okay.  So when you say "terminated

20   for cause," are you looking -- this is Exhibit

21   1, document 1.3 from the court docket, Section

22   6.5, termination for cause, does this look at

23   all familiar?

24        A.    Hold on.  Let me get there.

25   Terminate for cause.  Yes.

1      Q.    Okay.  Yes, that looks familiar?

2      A.    Yes.

3      Q.    Okay.  And that says, next page,

4  "The purchase price shall be equal to the

5  credit balance in the member's capital account

6  which shall be paid within 24 months of

7  closing."

8            Correct?

9      A.    Correct.

10     Q.    Okay.  So, again, under the

11  operating agreement, which was in effect on

12  August 8, 2024, the capital account balance was

13  important; correct?

14     A.    Yes.

15     Q.    Okay.  And how did it --

16     A.    So the capital account balance is

17  calculated using historical information so you

18  can always calculate it.  You don't have to

19  keep it as an ongoing -- I don't have to spend

20  an hour a month calculating it.

21            I can do it when required.

22     Q.    Understood.  So who calculated

23  Ms. Stranger's capital account balance when you

24  terminated her, supposedly, for cause?

25     A.    Well, when we terminated her for

```
 1   cause, Ms. Wiseman calculated it for us.

 2       Q.    How did Ms. Wiseman calculate that

 3   balance?

 4       A.    She's a CPA so, yeah.  I can -- if

 5   you want, I can open up the document and look

 6   at the Excel formulas, but it was, I believe,

 7   based off of the P&L.

 8       Q.    Okay.  I mean, Mr. Musekamp sent me

 9   what's called a capital account analysis.

10           Do you want me to show that to you?

11       A.    Sure.

12       Q.    Okay.  Let me see if I can find

13   that.  Here it is.

14                   ATTORNEY HARRISON:

15   Mr. Musekamp, do you want me to mark this as an

16   exhibit?

17                   ATTORNEY MUSEKAMP:  That's up

18   to you.  I don't -- your depo, Alan.  I don't

19   care whether you mark it or not.

20                   ATTORNEY HARRISON:  Okay.  I

21   mean, you already have it so I don't think I

22   need to send it to you again.

23                   ATTORNEY MUSEKAMP:  As long as

24   you just show it to us and we can see it,

25   that's fine with me.
```

1              ATTORNEY HARRISON:  Yeah.

2    Okay.

3    BY ATTORNEY HARRISON:

4         Q.    Here is the capital account analysis

5    that Mr. Musekamp represented Ms. Weisman did.

6         A.    Okay.  So you can see there in --

7    can you make that a little bigger, please?

8         Q.    Sure.  Yeah.

9         A.    Sorry.  I'm getting old, Alan.  My

10   eyes aren't what they used to be.

11        Q.    I sympathize.  Go easy on me.  I

12   sympathize.

13        A.    All right.  So what that says --

14   sorry.  Move your mouse down a tiny bit.

15        Q.    Yeah.  Sure.

16        A.    Okay.  So it says C3 equals the tab

17   P&L June 23.  Is that B77 times .06, so .06 was

18   Ms. Stranger's equity in the business at that

19   point in time.  So if you click on that tab,

20   B77 was the total net income.

21              So what that is saying is that she

22   got 6 percent of that net income.

23        Q.    And then --

24        A.    As of January 31, 2024, which was

25   her last day of employment, the P&L through

1    that time was B75, I think.  Yeah.  So that's

2    in a negative for that period.

3              So she got 12 percent of that

4    negative balance.

5        Q.    Okay.  Now, the capital account, was

6    that related to her employment or her

7    membership?

8        A.    It was related to her -- I suppose

9    it's related to her membership.

10       Q.    Okay.  So if it was related to her

11   membership and she was a member until August

12   8th, why would you cut off the capital

13   accounting January 31st?

14       A.    I don't know.  It says 6.5.  It

15   doesn't reference as of when.  Yeah.  It could

16   have been a confusion that we had around what

17   the proper date should have been for that

18   calculation.  Yeah.  I guess maybe there was an

19   assumption that it was her last day of

20   employment as of -- as opposed to when her

21   membership was terminated.

22             But I don't think we're in violation

23   of anything because we have 24 months to pay

24   out whatever that balance is.  So I suppose

25   Ms. Stranger could have come to us and said,

1    "Hey, you're calculating this wrong.  It should

2    have been as of this date, not that date," and

3    that probably would have saved us all probably

4    a whole lot of money in legal fees and

5    everything like that, if that's what --

6        Q.    Did you --

7        A.    -- is the issue.

8        Q.    Sorry.  I talked over you.  Go

9    ahead.

10       A.    That was it.  I just said if that

11   was her main issue.

12       Q.    Okay.  Did you inform Ms. Stranger

13   of how you calculated her capital account

14   balance?

15       A.    You can Google how to calculate a

16   capital account balance.

17       Q.    Well, can you Google this operating

18   agreement?

19       A.    She should have a copy of it.  She

20   signed the document.

21       Q.    Okay.  But did you disclose to

22   Ms. Stranger how you actually calculated the

23   capital account balance?

24       A.    I don't recall.

25       Q.    Did you calculate her capital

1    account balance the same way this operating

2    agreement says to do it?

3        A.    I don't see the operating agreement

4    saying how to calculate a capital account

5    balance.  I believe that's just an accounting

6    protocol.

7        Q.    Okay.  So Section 4.1, allocation of

8    profits and losses, are we looking at that

9    right now or are we looking at the Excel

10   spreadsheet?

11       A.    The Excel spreadsheet at the moment.

12       Q.    Sorry.  Let me get that back.

13             Allocation of profits and losses, do

14   you see that now?

15       A.    Yep.  I got it.

16       Q.    Okay.  So this talks about

17   allocating the company's profits and losses

18   among the members' capital accounts; correct?

19       A.    Yep.

20       Q.    Okay.  So this is a -- kind of

21   customized.  Is this a different way of doing

22   it than you might find by Googling for it?

23       A.    I don't know.

24       Q.    As the CEO of the business, do you

25   understand how the capital accounts were

1    supposed to be calculated?

2         A.    No.   That's why I hired a CPA to do

3    it.

4         Q.    Did you show your CPA this section

5    of the operating agreement before you had her

6    calculate the capital account balances?

7         A.    I don't recall.

8         Q.    Did she tell you how she calculated

9    the capital account balances?

10        A.    We didn't have a phone conversation

11   or anything like that about it, but it's easy

12   enough to see, based on the spreadsheet, that

13   she sent that we just walked through.

14        Q.    Does the spreadsheet way of

15   calculating capital account balances match

16   Section 4.1 here?

17        A.    I don't know.

18        Q.    As the CEO of the business, isn't it

19   your responsibility to know?

20        A.    I don't know.

21        Q.    So you don't know what you're

22   responsible for as CEO of your own business?

23        A.    I would say as CEO of a business,

24   this would be probably one of the more minor

25   things that I would spend any time looking at

1    or doing.

2         Q.    So you think the allocation of

3    profits and losses among members is a minor

4    part of the CEO's responsibilities?

5         A.    Well, again, as I said earlier, for

6    a C Corp, this isn't really all that relative.

7    So it was really only in calculating the value

8    at the end of Ms. Stranger's membership.

9         Q.    So the value of the members'

10   membership interest is only a minor part of the

11   CEO's responsibilities?

12        A.    Yes.

13        Q.    So who's responsible for the

14   valuation of the members' membership interest?

15        A.    Well, let's look at it this way.  In

16   the seven or eight years that I've been running

17   this business, I only had to look at that once.

18        Q.    So if you looked at that capital

19   account analysis and you looked at Section 4.1

20   here, would you be able to follow the steps in

21   Section 4.1 to calculate the capital account

22   balances?

23        A.    Probably what I would do is ask

24   somebody who is a CPA to do that for me.

25        Q.    Okay.  Why didn't you ask a CPA to

1   do that for you?

2       A.    I did ask a CPA to calculate the

3   capital account balance.

4       Q.    I'm sorry.  I didn't -- it glitched.

5   I missed your answer.

6       A.    I said I did ask a CPA to calculate

7   the capital account balance.

8       Q.    According to Section 4.1?

9       A.    Again, I don't recall if I sent her

10  Section 4.1 or not.  Are you saying it's not

11  calculated that way?

12      Q.    I'm asking whether you know it's

13  calculated that way.

14      A.    I don't know.

15      Q.    As a majority member of the LLC,

16  were you aware that you had any kind of duty

17  toward the minority member?

18      A.    I don't know.

19      Q.    Okay.  Did you instruct Lindsey

20  Anderson in 2023 to record $400,000 in bonuses

21  for you and your wife?

22      A.    I don't know.

23      Q.    You don't remember whether you

24  recorded $400,000 in bonuses for yourself and

25  your wife?

```
 1        A.    I don't know why I would instruct
 2   Lindsey to do that.
 3        Q.    Why not?
 4        A.    Well, Lindsey didn't have anything
 5   really to do with the finances.
 6        Q.    What was Justworks?
 7        A.    Justworks is a PEO, which is how we
 8   run our benefits and payroll for Cleer.
 9        Q.    Did Lindsey Anderson have access to
10   Justworks?
11        A.    Yeah.  I believe she did.
12        Q.    Did Lindsey Anderson have the
13   ability to cut checks via Justworks?
14        A.    I think she could add employees, add
15   and remove employees, but I don't think she can
16   cut checks.
17        Q.    Okay.  So your testimony is that you
18   didn't instruct Lindsey Anderson in 2023 to
19   record $400,000 in bonuses to you and your wife
20   in Justworks?
21        A.    I don't recall doing that or not
22   doing that.
23        Q.    I feel like if I was dealing with an
24   amount of $400,000, I would remember whether or
25   not I had made instructions about that amount.
```

```
 1              Are you sure you don't recall?
 2      A.    Well, this is probably...  2023,
 3  that would have been December 2023, so you're
 4  talking over a year ago.  Yeah.  Like, if I --
 5  just to be frank, we had sold our other
 6  business.
 7              We were in the middle of a diligence
 8  process.  Was that -- no, maybe that was a
 9  little bit before.  I don't remember.
10              But, you know, $400,000 is and is
11  not a lot of money.
12      Q.    Okay.  That makes sense to me.
13              Let me pull up Exhibit 6.
14              (Deposition Exhibit No. 6 was
15  marked for identification.)
16  BY ATTORNEY HARRISON:
17      Q.    All right.  So there's three columns
18  here.  There's account, there's June 2nd to
19  December 31, 2023, and there's January 1st to
20  August 8, 2024.
21      A.    Sorry.  That's not what I have in
22  the folder as Exhibit 6.
23      Q.    Are you sure?
24      A.    Yes.  I have an E-mail.
25                  ATTORNEY MUSEKAMP:  Same here.
```

1              THE WITNESS:  I'm sorry.

2              ATTORNEY HARRISON:  Maybe it's

3    not the same folder that I sent you or that --

4              THE WITNESS:  It's the folder

5    that the court reporter uploaded.  So I believe

6    it's the same.

7              ATTORNEY HARRISON:  Oh.  Wait.

8    Let's go back a few pages.  I see what the

9    problem was.  I was at the end of the thing.

10   Yeah.

11             THE WITNESS:  Okay, yeah.

12   BY ATTORNEY HARRISON:

13        Q.    Yes.  Now we're on the same page,

14   literally.

15             So it looks like at this first page

16   you were instructing your CPA how to value the

17   capital account; right?

18        A.    Yes.

19        Q.    Okay.  So if you were instructing

20   your CPA how to do it, didn't you earlier

21   testify that you didn't know how to do it and

22   she was doing it all for you?

23        A.    Well, if you go down to the first

24   E-mail in that thread, I say "Hi, Nicole.  If

25   we need a 'capital account' for Cleer, how

1   would we put that together?"

2           And then the rest of it is back and

3   forth between Nicole and myself about how to do

4   it.

5       Q.    Okay.  So is this --

6       A.    Mainly her asking the questions.

7       Q.    Is this the only communication you

8   had with Nicole about how to value the capital

9   account?

10      A.    Yeah.  This was the E-mail chain,

11  yes.

12      Q.    Okay.  In this E-mail chain, did you

13  reference the operating agreement procedure for

14  valuing the capital account?

15      A.    Let's see.  I don't see a reference

16  to the operating account.

17      Q.    So did you give your CPA accurate

18  instructions for how to do her job?

19      A.    The way I see or read this is I

20  asked her a question and then we just had a bit

21  of a back-and-forth.

22      Q.    Did you give her --

23      A.    I don't see --

24      Q.    Did you give her the information she

25  needed to answer the question?

CLEER, LLC vs CRYSTAL STRANGER, et al                                    Job 38345
David Mckeegan January 15, 2025                                          Page 89

1        A.      Did I give her -- well, I gave her

2    the information she needed to calculate the

3    capital account.

4        Q.      Did you give her the operating

5    agreement?

6        A.      I did not give her the operating

7    agreement, but you don't need an operating

8    agreement to calculate a capital account.

9        Q.      Didn't the operating agreement --

10       A.      Are you saying -- sorry.  Is the

11   issue that -- are you saying that we calculated

12   the capital account incorrectly?

13               Is that the issue?

14       Q.      I'm going to ask you whether the

15   operating agreement had a specific procedure

16   for calculating the capital account, Section

17   4.1.

18       A.      So I don't know because obviously,

19   they -- we have what we have in 4.1.

20               I don't know if that's a different

21   method than the normal method for calculating a

22   capital account.

23       Q.      Did you ask your CPA whether that

24   was a standard method or a different method?

25       A.      I told her we needed a capital

1    account for Cleer; how would we put that

2    together?

3         Q.    But you didn't show her the

4    operating agreement; right?

5         A.    I did not show her the operating

6    agreement.

7         Q.    Okay.  So do you think that she had

8    all the information she needed to calculate a

9    capital account balance for Cleer?

10        A.    I don't understand if the way she

11   calculated it was different than what it's

12   saying to calculate it in the operating

13   agreement.

14               I think that's a standard accounting

15   thing.

16        Q.    Okay.  So you see here that you sent

17   her -- we're looking at the income statement

18   profit and loss, June 2, 2023 to August 8,

19   2024; correct?

20        A.    Yes.

21        Q.    Okay.  So you sent her information

22   through August 8, 2024; correct?

23        A.    Looks like it.

24        Q.    But for some reason, she only used

25   information through January 31, 2024; is that

```
 1    correct?

 2         A.    I believe so.

 3         Q.    So why did you send her the

 4    information through August 8th?

 5         A.    Looking at the E-mail chain here, we

 6    said that --

 7         Q.    Let me get back to that.

 8         A.    -- so -- let's see.  I said, "We had

 9    Crystal as a partner, as well.  She had 12

10    percent equity when she resigned in January.

11    Would I determine the value of the capital

12    account at January 31, 2024?"

13               And she said, "Yes.  We would need

14    to know what she contributed to become a

15    partner and when she became a partner to figure

16    out what the split would be."

17         Q.    Okay.  So it looks like you and

18    Nicole agreed that even though Ms. Stranger was

19    a member until August 8th, you should calculate

20    her capital account as of January 31st?

21         A.    Yeah.  Again, I didn't see any date

22    in the operating agreement as to when that

23    should be, like what date we should use, so we

24    went with her last day of employment.

25         Q.    So why did you send information
```

**Pro Se Motion for Contempt**

**Exhibit F**

**PI Hearing Excerpt 2**

116

1  was and I would get the 80 percent.

2  Q.    Each person's capital account basically starts at

3  zero?

4  A.    Yeah, basically.

5  Q.    We see here (a)(i), increased for the amount of cash

6  and the fair market value of any property that the member

7  contributes?

8  A.    Right.

9  Q.    How much property did Ms. Stranger contribute?

10  A.    None.

11  Q.    So a member's share of the company's income or gain,

12  is that going to change on a monthly basis?

13  A.    It will do, because when you run a P and L on a

14  monthly basis, it's going to go up and down.  Tax

15  businesses are very lumpy.  As you would imagine,

16  February, March, April we have a lot of income.  July,

17  August you don't have a lot of income but you still have

18  staff, so you still have all the expenses.

19  Q.    I believe the calculation put in Ms. Stranger's

20  capital account was a negative $70,000?

21  A.    It did.  And I believe I made a mistake in

22  calculating that.  Because when I calculated it or I asked

23  the CPA to calculate it, it was to the end of January, so

24  her final day of working.  It wasn't until her membership

25  was revoked.

1   Q.   That would be in August?

2   A.   Yes.

3   Q.   Do you have any objection in August 2026 to paying

4   out her capital account based on the valuation as of

5   August 2024?

6   A.   No, I don't.

7            THE COURT:  Are you going to ask what the

8   capital account calculation was for August of 2024?  Is

9   that in the record?

10  BY MR. MUSEKAMP:

11  Q.   Have you made the calculation of what it should be as

12  of August 2024?

13  A.   I don't have the numbers for 2024 finalized yet, so I

14  don't know the exact number.  But it's going to be

15  somewhere around $35,000.

16           THE COURT:  Positive?

17           THE WITNESS:  Positive.

18  BY MR. MUSEKAMP:

19  Q.   Once you figure out whatever that amount is and that

20  changes the capital account calculation, would you pay

21  that over to Ms. Stranger?

22  A.   Yes, that's fine.

23  Q.   Within two years, correct?

24  A.   Yeah, by August 2026.

25  Q.   And then after you sent this letter around August of

**Pro Se Motion for Contempt**

**Exhibit G**

**Responses to Stranger's First Discovery Requests**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | | |
|---|---|---|
| CLEER LLC (F/K/A GREENBACK BUSINESS SERVICES LLC) D/B/A CLEER TAX, | : : : : | Case No. 3:24-cv-01496-MPS |
| | | Judge Michael P. Shea |
| Plaintiff, | : : | **PLAINTIFF CLEER LLC'S ANSWERS, RESPONSES, AND OBJECTIONS TO** |
| v. | : : | **DEFENDANT CRYSTAL STRANGER'S FIRST SET OF EXPEDITED DISCOVERY** |
| CRYSTAL STRANGER, et al. | : : : | **REQUESTS** |
| Defendants. | : : | |

As to All Objections:

*/s/ George B Musekamp*
George B. Musekamp, Esq.

      Pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure and the Court's Temporary Restraining Order [Doc. 34], Plaintiff Cleer LLC (f/k/a Greenback Business Services) d/b/a Cleer Tax ("Cleer") provides the following answers, responses, and objections to Defendant Crystal Stranger's ("Stranger") First Set of Expedited Discovery Requests.

## GENERAL RESERVATIONS AND OBJECTIONS

      1.    Plaintiff Cleer objects to these discovery requests to the extent that they seek information neither relevant to the issues raised in these proceedings nor reasonably calculated to lead to the discovery of admissible evidence.

2.      Cleer objects to these discovery requests to the extent that they seek discovery or production of information or material protected from discovery by the attorney work product doctrine or attorney-client privilege.

3.      Cleer objects to these discovery requests to the extent that they purport to impose upon Cleer obligations that are greater than, or inconsistent with, those imposed by the Federal Rules of Civil Procedure.

4.      Cleer objects to these discovery requests to the extent that they seek to impose upon Cleer responsibility for identifying information and documents within Defendant's possession or that are not within Cleer's possession, custody, or control.

5.      Cleer affirmatively states that the responses to the discovery requests shall not constitute an admission by it regarding the admissibility or relevance of any information.

6.      Cleer expressly reserves any and all objections to the introduction or use at trial of any information or documentation disclosed herein, including, but not limited to, objection upon the grounds of relevancy or materiality.

7.      The word usage and sentence structure of the objections and responses may be that of the attorneys assisting in their preparation, and does not necessarily purport to be the precise language of Cleer.

8.      Cleer reserves the right to amend, modify, or supplement the responses made herein upon receipt of new or different information obtained as a result of discovery and any investigation process being undertaken on its behalf.  Upon receipt of information that supplements, corrects, or

modifies the information provided in these responses, supplemental responses will be prepared and served by or on behalf of Cleer.

9.      All responses and documents produced are without waiver of any objection on the admissibility of the discovered evidence or documents, or of any provision or privilege provided by the Federal Rules of Civil Procedure or other applicable law.

10.     Cleer objects to each of Defendant's requests to the extent they seek the disclosure of Cleer's attorneys', or any other of their representatives', impressions, conclusions, opinions, computations, calculations, projections, legal theories, or other information protected from discovery by the attorney-client privilege, work-product doctrine, or other applicable privilege, protection, or immunity on the ground that said requests exceed the scope of permissible discovery under the Federal Rules of Civil Procedure. The inadvertent production of such documents will not constitute a waiver of any privilege, protection, or immunity.

11.     Cleer reserves the right to object to the use of any of the information provided or documents produced under these requests in any subsequent proceeding or in the trial of this or any other action on any grounds.

12.     Cleer reserves the right to object on any ground at any time to a demand for further responses to these requests or to further requests.

13.     Cleer reserves the right at any time to revise, correct, add to, or clarify any of the responses or objections here. However, Cleer objects to each of the requests to the extent they seek to impose a duty to supplement that exceeds the duty to supplement imposed by the Federal Rules of Civil Procedure.

14.    All of the foregoing general objections, reservation of rights, and statements are fully incorporated in the following general and specific responses to the interrogatories whether or not any specific or general objection is referenced therein.

## INTERROGATORIES

1.    Identify all persons that have knowledge about the allegations in the Complaint and Counterclaims. Provide a brief description of the knowledge You believe they have. For each person, state their email address, phone number, and mailing address.

**RESPONSE:** Objection. This Interrogatory seeks information that is subject to work product protection, seeks information beyond the scope of the preliminary injunction hearing, and requires speculation. Subject to the General Reservations and Objections above, and without waiving them, other than counsel, David McKeegan, Carrie McKeegan, Crystal Stranger, Lindsey Anderson, Alexandra Limn, Jamaica Lasac, Maria Bernardita Dimal, Alyssa Gonzalez, Leonor DaCosta, Bea Talinio, Princess Payumo, Donovan Chester Coral, Edita Mae Bosco, Wiaan Prinsloo, Kat Magpayo, Antonieta Tungcab, Nica Agapito, Angelene Dayrit, Jessica Dimatatac, Angel Resma, Judelyn Abanag, Catherine Meniosa, Enricka, Evan Cagud, and Daniel Pamintuan. In addition, all Cleer clients solicited by Optic Tax and/or Stranger.


2.    Identify all current or former clients of Cleer who you believe have been solicited by Ms. Stranger, or that you think she has performed any services for, history of prior sales to that client, and what you estimate as a potential monetary loss.

**RESPONSE:** Objection. Cleer's "potential monetary loss" is irrelevant to the issues at the preliminary injunction hearing. Subject to the General Reservations and Objections above, and

without waiving them, all clients that received blast emails from Stranger, and those clients identified or referred to in Stranger's Responses to Cleer's Interrogatory Nos. 4 and 5. Discovery is ongoing in this case, and Cleer will supplement this response if necessary as it learns of additional information.

3.      Describe all steps You took to ensure compliance with all of the fiduciary duties (profit distributions in each year, provision of company financial statements, notification for holding meetings) as outlined in the Operating Agreement.

**RESPONSE:** Objection.  This interrogatory improperly assumes that Cleer owes fiduciary duties.  Further objecting, "ensure compliance with all of the fiduciary duties" is vague, overbroad, and irrelevant to the issues at the preliminary injunction hearing. Subject to the General Reservations and Objections above, and without waiving them, Cleer's officers reviewed the Operating Agreement and complied with its terms.

4.      Identify adjustments made to each member's capital account for every year since founding, including details about any adjustments such as for capital contributions or expense items (owner salaries, owner bonuses, reimbursements, etc...) added back in.

**RESPONSE:**   Objection.   This Interrogatory is overbroad and unduly burdensome. Objecting further, this Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

Subject to the General Reservations and Objections above, and without waiving them, *see* documents Cleer produced.

5.    Describe the process utilized for calculating the salaries and bonuses of each member over the course of Ms. Stranger's membership.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Objecting further, this Interrogatory is vague as to the meaning of "process." Subject to the General Reservations and Objections above, and without waiving them, Cleer does not rely on any particular process for calculating members' salaries and bonuses. Cleer in its discretion and with input and agreement from each member, establishes salaries and bonuses for the members.


6.    Describe the process related to the calculation and allocation of Cleer's net profit among capital accounts in each year that Ms. Stranger was a member of Cleer, including how Cleer arrived at its valuation of Ms. Stranger's capital account for the forced buy out in August 2024.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Objecting further, this Interrogatory is vague as to the meaning of "process." Subject to the General Reservations and Objections above, and without waiving them, *see* documents Cleer produced. Further responding, Cleer's officers reviewed the Operating Agreement and complied with its terms. While employed, Stranger assisted in those calculations and agreed to the net profit calculations and allocations of Cleer.

7.    Identify the member(s) who authorized the special member meeting for the buy out, including which members were responsible for notifying other members, and what steps they took to notify Ms. Stranger.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. This Interrogatory is also vague as to the meaning of "special member meeting for the buy out." Subject to the General Reservations and Objections above, and without waiving them, the Operating Agreement did not require the members to hold a meeting, nor would such a meeting have changed the ultimate outcome, because David and Carrie McKeegan held a combined membership interest exceeding 50% and voted for Cleer to terminate Stranger's units for cause and repurchase them.

8.    Identify any persons in the chain of command related to authorization and approval of financials and tax filing (such as bookkeepers, who provided Cleer with tax preparation services, or who authorized tax filings) during each year that Ms. Stranger was a member.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. It is further vague as to the meaning of "chain of command related to authorization and approval." Subject to the General Reservations and Objections above, and without waiving them, David McKeegan, Nicole Wiseman, Mari Moronia, and Crystal Stranger.

9.      Identify all parties who expressed an interest in acquiring Cleer during the time Ms. Stranger was a member, financial amounts of sale discussed, and the results of each discussion.

**RESPONSE:** Objection. This Interrogatory is overbroad, harassing, and unduly burdensome.  Objecting further, this Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

10.      Identify all Cleer employees and independent contractors who had access to Cleer data during Ms. Stranger's time of employment and the specific measures taken with each team member to prevent them making copies of Cleer data.

**RESPONSE:**  Objection. This Interrogatory is overbroad, unduly burdensome, disproportionate to the needs of this case, and vague as to the types of "data" referred to.  Objecting further, this Interrogatory is impermissibly compound and better suited for deposition testimony. Subject to the General Reservations and Objections above, and without waiving them, all Cleer employees and independent contractors required access to different categories of Cleer's client data in order to complete their work for Cleer.  Cleer employees and independent contractors are required to sign agreements containing nondisclosure, nonsolicit, and noncompetition provisions. Cleer also expects, and as a condition of employment requires, all employees, independent contractors, and members to comply with state and federal laws establishing duties of loyalty and protecting trade secret information.  Most Cleer data is accessible only through Box and Salesforce, which requires each user to have a unique login and password.  Additionally, Cleer maintains an employee handbook cautioning and requiring employees to protect Cleer's sensitive,

confidential, and trade secret information. Employees who violate Cleer's policies are subject to discipline, up to and including termination.

11.    Describe what actions were taken to secure each of Cleer's cloud maintained data storage systems (CRM systems, file storage systems, portal systems, databases, etc.) to ensure that employees and independent contractors could not retain Cleer's data after employment or disclose Cleer's data to third parties.

**RESPONSE:** This Interrogatory is overbroad as it is not limited in time or scope. Subject to the General Reservations and Objections above, and without waiving them, *see* Cleer's response to Interrogatory No. 10.

12.    Identify all Cleer contractors or employees who were issued Cleer computers during Ms. Stranger's tenure, explaining company procedures around issuance, tracking, retention, such as if they returned said computers at the end of engagement.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Subject to the General Reservations and Objections above, and without waiving them, *see* Cleer's response to Interrogatory No. 10.  Further responding, David McKeegan, Crystal Stranger, Lindsey Anderson, and Henry Shin.

13.    During Ms. Stranger's time as a Cleer employee and/or member, identify each instance where a data recovery procedure was utilized to ensure that proprietary data was returned to Cleer or deleted when off-boarding independent contractors or employees.

**RESPONSE:** Objection. This Interrogatory is overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. This Interrogatory is further vague and ambiguous as to what is meant by "data recovery procedure." Subject to the General Reservations and Objections above, and without waiving them, *see* Cleer's response to Interrogatory No. 10. Further answering, to Cleer's current knowledge, Stranger is the first employee and/or member to engage in theft of proprietary company information.


14.    Describe how Cleer's email list was developed, who had access to the list, and what steps were taken to safeguard the access to this list.

**RESPONSE:** Objection. This Interrogatory is overbroad as it is not limited in time or scope, and better suited for deposition testimony. Subject to the General Reservations and Objections above, and without waiving them, *see* Cleer's response to Interrogatory No. 10. Further responding, Cleer compiled its email list over many years through referral sources, client registrations, clients emailing Cleer's customer service team, and by performing work for clients. Cleer made the email list available and accessible to employees and independent contractors on a need-to-know basis and does not make the list available to competitors.

15.    Describe how Cleer defines who a prospective client is.

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer defines a prospective client to include any person or entity who or that has (1) contacted Cleer for any service it provides; (2) directly or indirectly provided contact information to Cleer; or (3) been solicited or contacted by Cleer but for whom or which Cleer has not yet performed services.

16.    Identify how Cleer acquired each team member alleged to have been solicited by Ms. Stranger and the cost of hiring for each team member.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Further objecting, the term "acquired" is vague and overbroad as used in this Interrogatory. Subject to the General Reservations and Objections above, and without waiving them, Cleer acquired all of its team members (including those solicited by Stranger) by each team member applying to work for Cleer, Cleer offering each team member certain terms to work for Cleer, that team member agreeing to the offered terms, and that team member then beginning work for Cleer pursuant to the accepted terms.

17.    Identify all Cleer employees and contractors who have resigned or been terminated from employment since the time of Ms. Stranger's Resignation including their date of resignation or termination and the facts leading to their departure.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Subject to the General Reservations and Objections above, and without waiving them, *see* Cleer's response to Interrogatory No. 16 and documents produced.

## REQUESTS FOR PRODUCTION

1.      All documents related to, or identified while developing, your answers to interrogatories.

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

2.      All financial records including profit and loss, balance sheet, Salesforce sales records, Stripe reports, and any other agreements related to income received by Cleer during Ms. Stranger's time as a member of Cleer.

**RESPONSE:** Objection. This Interrogatory seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Further objecting, this Interrogatory is overbroad, unduly burdensome, and disproportionate to the needs of this case. Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide relevant profit and loss statements, Salesforce records, and Stripe reports.

3.      All internal process documents in use a [sic] the time of Ms. Stranger's resignation that show the workflow by contractors and employees such as Scope of Work, Scope of Process, Training Materials, Training Videos, etc.

**RESPONSE:** Objection.  This Request is overbroad, unduly burdensome, and vague as to the meaning of "internal process documents" and "workflow" in this context.  Objecting further, this Request is disproportionate to the needs of the case.

4.      All internal discussions (including emails, Skype Chats, Grain calls, and Podio notes) related to process where employees and contractors would download Typeform Questionnaires and other materials to their personal computers.

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

5.      Cleer's tax returns for all years that Ms. Stranger was a member of Cleer and prior to that time period that were used to calculate the capital value of Cleer membership.

**RESPONSE:** Objection.  This Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

6.      All records of any third party valuation that was made for the "buy out".

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

7.     All communications with any third party evaluator of Cleer.

**RESPONSE:** Objection.  This Request is overbroad and unduly burdensome.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing. Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

8.     All communications related to Cleer capital accounts during Ms. Stranger's time as a member of Cleer.

**RESPONSE:**  Objection.  This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

9.     All communications related to Cleer's profits and finances during Ms. Stranger's time as an employee and/or member of Cleer.

**RESPONSE:** Objection.    This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

10.    All communications between Cleer and its accountant(s) during Ms. Stranger's time as a member of Cleer.

**RESPONSE:** Objection.    This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.  Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

11.    All data protection policies and procedures that were in effect during Ms. Stranger's time as an employee and/or member of Cleer.

**RESPONSE:** Objection.  This Request is vague and ambiguous as to what is meant by "data protection policies and procedures."  Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

12.    All data recovery policies and procedures that were in effect during Ms. Stranger's time as an employee and/or member of Cleer.

**RESPONSE:** Objection.  This Request is vague and ambiguous as to what is meant by "data recovery policies and procedures."   Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

13.    All employee or independent contractor off-boarding policies and procedures that were in effect during Ms. Stranger's time as an employee and/or member of Cleer.

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

14.    All internal team grain call recordings and transcripts of them during Ms. Stranger's term of employment.

**RESPONSE:** Objection.  This  Request  is  overbroad,  unduly  burdensome,  and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.  Subject to the General Reservations and Objections above, and

without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

15.    All internal team communications (grain calls, emails, Skype Chats, Podio notes) after resignation of Ms. Stranger where Ms. Stranger was discussed.

**RESPONSE:** Objection.   This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.  Objecting further, this Request seeks information that is subject to attorney-client privilege and attorney work product protection.   Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

16.    All email communications made by any member, employee, or contractor of Cleer with Cleer's Clients or Partners subsequent to Ms. Stranger's resignation where Ms. Stranger was named or alluded to.

**RESPONSE:** Objection.   This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.  Objecting further, this Request seeks information protected by the

attorney client privilege. Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: *see* Cleer's response to Request No. 15.

17.     All documents related to hiring Cleer team members who were allegedly solicited by Ms. Stranger including any hiring bonuses or commission payments to recruiters or outsourcing agencies.

**RESPONSE:** Objection.    This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

18.     All documents and communications related to any buyout offers or attempts to sell Cleer.

**RESPONSE:** Objection.  This Request is overbroad, harassing, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

19.     Any communications or agreements You have had with third-party domain brokers, resellers, or auction platforms related to the sale or transfer of domain names.

**RESPONSE:** Objection. This Request is overbroad and unduly burdensome. Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

20.    Cleer's email marketing list and full client list.

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.

21.    Documents and communications related to revenue growth percentages of Cleer for all the years and partial years while Ms. Stranger was an employee and member.

**RESPONSE:** Objection.  This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case. Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.

22.    Documents and communications related to termination and resignation of team members since Ms. Stranger resigned as an employee.

**RESPONSE:** Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: Cleer will provide responsive documents, if any exist.


23.     Documents and communications related to the Trackabi screen capture software.

**RESPONSE:** Objection.   This Request is overbroad, unduly burdensome, and disproportionate to the needs of this case.  Objecting further, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.


24.     Your communications with members and administrators of Dynamite Circle regarding Ms. Stranger.

**RESPONSE:** Objection.  This Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence at the preliminary injunction hearing.


25.     All documents and communications supporting your request for a Preliminary Injunction against Ms. Stranger.

**RESPONSE:** Objection.  This "catch-all" Request is overbroad, vague, and unduly burdensome.  Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without

undue burden: Cleer will designate exhibits for the preliminary injunction hearing in accordance with the Court's orders and instructions.

26.    All documents and communications rebutting your request for a Preliminary Injunction against Ms. Stranger.

**RESPONSE:** Objection.  This "catch-all" Request is overbroad and unduly burdensome. Subject to the General Reservations and Objections above, and without waiving them, Cleer responds with responsive, non-privileged information that can be provided without undue burden: *see* Cleer's response to Request No. 25.

## REQUESTS FOR ADMISSION

1.    Cleer made a net profit in each year Ms. Stranger was a member.

**RESPONSE:** Admit.

2.    Cleer's Operating Agreement clause 4.1 states

4.1 Allocation of Profits and Losses. The Company's income, gain, loss, deduction, or credit ("Profits and Losses") shall be allocated among the Members first, so that their Capital Account balances are, as nearly as possible, in the same ratios as their respective Units, and then pro rata, in accordance with the Units held by each Member. Notwithstanding the above, net losses allocated to the Members shall not exceed the maximum amount of net loss that can be so allocated without causing any member to have an adjusted Capital Account deficit at the end of any fiscal year. In the event some, but not all, of the Members would have adjusted Capital Account deficits as a consequence of an allocation of net losses, the limitation on net loss allocation shall be applied on a Member by Member basis so as to allocate the maximum permissible net loss to each Member under the IRC.

**RESPONSE:** Cleer admits to the authenticity of the Operating Agreement. The Operating Agreement speaks for itself and contains the language stated at clause 4.1.

3.      Clause 4.1 of the Operating Agreement means that in years when Cleer made a net profit, the profit should have been allocated to each Member's Capital Account balance first so that the Capital Accounts were proportionate to the Members' Units, and then among the Capital Accounts according to the Members' Units.

**RESPONSE:** Objection.  This Request calls for Cleer to make a legal conclusion and/or expert opinion, and Clause 4.1 of the Operating Agreement speaks for itself.  This request is further vague, compound, and confusing as written.  Without waiving said objections, deny.

4.      In allocating net profits among Members' Capital Accounts according to the Operating Agreement, every Capital Account should have had a credit balance.

**RESPONSE:** Deny.

5.      Cleer never distributed money to Ms. Stranger from her Capital Account.

**RESPONSE:** Deny.

6.      In order to arrive at a negative balance in Ms. Stranger's Capital Account, Cleer had to allocate net profits differently than prescribed by the Operating Agreement.

**RESPONSE:** Deny.

7.      The Membership Vesting Agreement requires Cleer to obtain a third party valuation of a Member's interest in Cleer before buying that Member out.

**RESPONSE:** Objection. This Request calls for Cleer to make a legal conclusion. Without waiving said objection, the MVA speaks for itself, and Cleer admits to the authenticity of the MVA.

8.      Cleer did not obtain a third party valuation of Ms. Stranger's interest in Cleer before buying her out.

**RESPONSE:** Deny.

9.      It was a routine practice for Cleer's independent contractors to make local copies of data from Cleer's cloud servers.

**RESPONSE:** Deny.

10.     Cleer management encouraged Cleer's independent contractors to make local copies of data.

**RESPONSE:** Deny to the extent currently known by Cleer, unless Stranger improperly encouraged Cleer's independent contractors to make local copies of data during and after her employment with Cleer.

11.     Cleer management did not take effective measures to prevent Cleer's independent contractors making local copies of data.

**RESPONSE:** Deny.

12.    Cleer management did not take measures to prevent Cleer's independent contractors making local copies of data.

**RESPONSE:** Deny.

13.    Cleer's cloud servers were configured so that Cleer's independent contractors were not able to edit, update, or modify Cleer's data through the cloud servers.

**RESPONSE:** Objection.  This Request for Admission is vague and ambiguous as to what is meant by "cloud servers" or "data."  It is further unlimited in temporal scope.  Without waiving said objection, deny for lack of information or belief.

14.    Cleer's book-keeping staff resigned in response to David McKeegan's mandate for installation of Trackabi software.

**RESPONSE:** Deny for lack of information or belief.

Respectfully submitted,
*/s/ George B. Musekamp*
George B. Musekamp (PHV)
Evan H. Cohn (PHV)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Tel:  (513) 381-2838
Fax: (513) 381-0205
gmuskeamp@taftlaw.com

ecohn@taftlaw.com

Michael S. O'Malley, Esq. (CT31784)
Ogletree, Deakins, Nash,
Smoak & Stewart P.C.
281 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 969-3109
Fax: (203) 969-3150
Michael.O'Malley@ogletree.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 3, 2024, it caused to be served a copy of Plaintiff Cleer LLC's Answers, Responses, And Objections To Defendant Crystal Stranger's First Set Of Expedited Discovery Requests and this Certificate of Service upon the following:

Alan Harrison
SANDOLLAR Law
6 West River Street #112
Milford, CT 06460
alan@sandollar-law.com
202-212-9996

_/s/ George B. Musekamp_
George B. Musekamp

**Pro Se Motion for Contempt**

**Exhibit H**

**Balance Sheets for 2021 through 2023**

## Balance Sheet
**Greenback Business Services LLC**
**As at 31 December 2021**

|  | 31 Dec 2021 | 31 Dec 2020 |
|---|---|---|
| **Assets** | | |
|  | | |
| **Cash and Cash Equivalents** | | |
| GBS - Radius Bank | £0.00 | £60,817.29 |
| GBS - Radius Bank - Commercial | £0.00 | £106.60 |
| Greenback Business Services.co | £2,150.00 | £0.00 |
| Lending Club Checking | £263,619.95 | £0.00 |
| TD Bank - GBS | £0.00 | £871.66 |
| USD PayPal | £1,924.78 | £0.00 |
| **Total Cash and Cash Equivalen** | **£267,694.73** | **£61,795.55** |
|  | | |
| **Current Assets** | | |
| Accounts Receivable | £25,438.00 | £15,700.00 |
| Stripe Clearing | £6,654.59 | £3,826.75 |
| TD Ameritrade | £260,160.48 | £261,985.34 |
| **Total Current Assets** | **£292,253.07** | **£281,512.09** |
|  | | |
| **Property, Plant and Equipment** | | |
| Accumulated Amortization | -£19.00 | -£19.00 |
| Computers & Laptops | £6,257.29 | £4,151.63 |
| Trademark | £1,778.75 | £1,778.75 |
| **Total Property, Plant and Equip** | **£8,017.04** | **£5,911.38** |
|  | | |
| **Total Assets** | **£567,964.84** | **£349,219.02** |
|  | | |
| **Liabilities and Equity** | | |
|  | | |
| **Liabilities** | | |
|  | | |
| **Current Liabilities** | | |
| Accounts Payable | £0.00 | £177.46 |
| Amex Plat - DM | £0.00 | -£477.50 |
| Barclay Card - Jet Blue | £0.00 | £14,416.00 |
| Historical Adjustment | £8,371.63 | £8,371.63 |
| JetBlue | £30.30 | £0.00 |
| Loan from David | £283,898.13 | £0.00 |
| Unearned Income | £28,625.00 | £0.00 |
| **Total Current Liabilities** | **£320,925.06** | **£22,487.59** |
|  | | |
| **Non-Current Liabilities** | | |
| Loan from SBA | £24,615.00 | £24,615.00 |
| **Total Non-Current Liabilities** | **£24,615.00** | **£24,615.00** |
|  | | |
| **Total Liabilities** | **£345,540.06** | **£47,102.59** |
|  | | |
| **Equity** | | |
| Current Year Earnings | -£27,992.21 | £289,930.63 |
| Dividends | -£74,832.22 | -£23,132.78 |
| Owner's Capital Contribution | £12,448.81 | £12,448.81 |
| Retained Earnings | £312,800.40 | £22,869.77 |
| **Total Equity** | **£222,424.78** | **£302,116.43** |
|  | | |
| **Total Liabilities and Equity** | **£567,964.84** | **£349,219.02** |

1

# Balance Sheet

Cleer LLC

As of December 31, 2022

| Account | Dec 31, 2022 | Dec 31, 2021 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| **Cash and Cash Equivalents** | | |
| Greenback Business Services.co | 2,150.00 | 2,150.00 |
| Lending Club Checking | 61,144.71 | 0.00 |
| USD PayPal | 0.00 | 1,924.78 |
| **Total Cash and Cash Equivalents** | **63,294.71** | **4,074.78** |
| Accounts Receivable | 25,773.00 | 26,338.00 |
| Stripe Clearing | 28,158.56 | 6,654.59 |
| **Total Current Assets** | **117,226.27** | **37,067.37** |
| **Fixed Assets** | | |
| Accumulated Depreciation | (5,587.66) | (6,487.66) |
| Accumulated Amortization | | (6,487.66) |
| Computers & Laptops | 6,982.55 | 6,257.29 |
| Office Equipment | 987.99 | 0.00 |
| Trademark | 1,778.75 | 1,778.75 |
| **Total Fixed Assets** | **4,161.63** | **(4,939.28)** |
| **Total Assets** | **121,387.90** | **32,128.09** |
| | | |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Amex Plat - DM | 870.26 | 0.00 |
| GBS - Radius Bank - Commercial | 0.00 | 106.60 |
| Historical Adjustment | 8,371.63 | 8,371.63 |
| JetBlue | 11,471.32 | 30.30 |
| Loan from David | 0.00 | 20,278.18 |
| Unearned Income | 78,915.00 | 28,625.00 |
| **Total Current Liabilities** | **99,628.21** | **57,411.71** |
| **Long Term Liabilities** | | |
| Loan from SBA | 24,615.00 | 24,615.00 |
| **Total Long Term Liabilities** | **24,615.00** | **24,615.00** |
| **Total Liabilities** | **124,243.21** | **82,026.71** |
| **Equity** | | |
| Current Year Earnings | 48,624.46 | (27,796.91) |
| Dividends | (338,448.07) | (337,412.66) |
| Owner's Capital Contribution | 12,448.81 | 12,448.81 |
| Retained Earnings | 274,519.49 | 309,349.80 |
| **Total Equity** | **(2,855.31)** | **(43,410.96)** |
| **Total Liabilities and Equity** | **121,387.90** | **38,615.75** |

1

# Balance Sheet
Cleer LLC
As of December 31, 2023

| Account | Dec 31, 2023 | Dec 31, 2022 |
|---|---:|---:|
| **Assets** | | |
| **Current Assets** | | |
| **Cash and Cash Equivalents** | | |
| Chase - D. MCKEEGAN | 59,756.80 | 0.00 |
| Citi Prestige | 3.34 | 0.00 |
| GBS Mercury Bank | 254,762.00 | 0.00 |
| Greenback Business Services.co | 2,150.00 | 2,150.00 |
| Lending Club Checking | 22.55 | 61,144.71 |
| **Total Cash and Cash Equivalents** | **316,694.69** | **63,294.71** |
| Accounts Receivable | 14,053.00 | 25,773.00 |
| Due from Owner | 37.00 | 0.00 |
| Lending Club Clearing | (5,481.04) | 0.00 |
| Stripe Clearing | 10,357.17 | 28,158.56 |
| **Total Current Assets** | **335,660.82** | **117,226.27** |
| **Fixed Assets** | | |
| Accumulated Amortization | (468.00) | (349.00) |
| Accumulated Depreciation | (6,257.29) | (6,257.29) |
| Computers & Laptops | 6,257.29 | 6,257.29 |
| Trademark | 1,778.75 | 1,778.75 |
| **Total Fixed Assets** | **1,310.75** | **1,429.75** |
| **Total Assets** | **336,971.57** | **118,656.02** |
| | | |
| **Liabilities and Equity** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Amex Plat - DM | 164.80 | 870.26 |
| Chase - L. ANDERSON | 64,926.79 | 0.00 |
| Historical Adjustment | 8,371.63 | 8,371.63 |
| JetBlue | 17,990.27 | 11,471.32 |
| Treasury | 14,739.21 | 0.00 |
| Unearned Income | 128,274.81 | 78,915.00 |
| **Total Current Liabilities** | **234,467.51** | **99,628.21** |
| **Long Term Liabilities** | | |
| Loan from SBA | 0.00 | 24,615.00 |
| **Total Long Term Liabilities** | **0.00** | **24,615.00** |
| **Total Liabilities** | **234,467.51** | **124,243.21** |
| **Equity** | | |
| Current Year Earnings | 108,981.83 | 46,792.21 |
| Dividends | (339,338.65) | (338,448.07) |
| Owner's Capital Contribution | 12,448.81 | 12,448.81 |
| Retained Earnings | 320,412.07 | 273,619.86 |
| **Total Equity** | **102,504.06** | **(5,587.19)** |
| **Total Liabilities and Equity** | **336,971.57** | **118,656.02** |

1