# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLEER LLC (F/K/A GREENBACK BUSINESS SERVICES LLC) D/B/A CLEER TAX, | : : : | Case No. 3:24-cv-01496-MPS |
| | : | Judge Michael P. Shea |
| | : | Magistrate Judge Maria E. Garcia |
| Plaintiff, | : : | |
| v. | : : | **[PROPOSED] FINDINGS OF FACT,** |
| | | **CONCLUSIONS OF LAW, AND ORDER** |
| CRYSTAL STRANGER, et al., | : | **GRANTING PLAINTIFF CLEER LLC'S** |
| | : | **MOTION FOR PRELIMINARY** |
| Defendants. | : | **INJUNCTION** |

On January 29, 2025, the above-captioned matter came before the Court for an evidentiary hearing on the Motion for Preliminary Injunction ("Motion") filed by Plaintiff Cleer LLC (f/k/a Greenback Business Services LLC) d/b/a Cleer Tax ("Cleer") against Defendants Crystal Stranger ("Ms. Stranger") and Optic Tax Inc. ("Optic Tax") (collectively, "Defendants").

The hearing continued to January 30, 2025, but Ms. Stranger did not appear and refused to testify further while still under cross-examination. Nor did she provide any testimony or authenticate any evidence during her case-in-chief, and the Court will not entertain "facts" not in the record. Cleer was deprived of the opportunity to challenge Defendants' alleged defenses and the Court will draw adverse inferences against Defendants on their alleged defenses. *C.f. LiButti v. United States,* 107 F.3d 110, 121 (2d Cir. 1997) (recognizing that "the Fifth Amendment . . . does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'"). Having considered the arguments of counsel as well as all the evidence, files, records, submissions, and proceedings, the Court makes the following Findings of Fact and Conclusions of Law, and enters the following Order:

## FINDINGS OF FACT

I. **Ms. Stranger's Employment By, Membership Interest In, And Restrictive Covenants With Cleer**

1.      In 2016, David and Carrie McKeegan, husband and wife, founded Greenback Business Services ("GBS"), which they later rebranded to Cleer.  (Tr. 26–28).

2.      Cleer provides tax preparation and bookkeeping services for foreign-owned companies formed in the United States.  (*Id.* at 27).

3.      Cleer engages foreign-based accountants and bookkeepers as independent contractors who are considered "suppliers" and/or non-W-2 employees of the company.  (*Id.* at 50).

4.      Cleer hired Ms. Stranger as the International Tax Director in January 2020.  (*Id.* at 29).  At that time, David and Carrie McKeegan controlled equal ownership of Cleer, with Ms. Stranger holding no equity in the company.  (*Id.* at 29–30).

5.       Ms. Stranger was the top-level reviewer for all of Cleer's tax work; responsible for overseeing and signing off on the work of Cleer's team of Philippines-based accountants for all of Cleer's clients.  (*Id.* at 30).

6.      In that role, Ms. Stranger had direct or indirect contact with all of Cleer's clients, suppliers, and referral partners.  (*Id.* at 43–44).  Ms. Stranger provided no contrary testimony of evidence as to her direct or indirect contact with all of Cleer's, suppliers, and referral partners.

7.      Around the time Cleer hired Stranger, Mr. McKeegan wanted to step back from the day-to-day operation of the business.  (*Id.* at 30–31).  In early 2022, Mr. McKeegan and Ms. Stranger began talking in earnest about giving her equity in Cleer and Ms. Stranger taking over the operations.  (*Id.* at 30–31, 179–80).

8.      On May 26, 2022, Mr. McKeegan officially promoted Ms. Stranger to Chief Operating Officer ("COO") of Cleer, the same day she signed the Operating Agreement.  (*Id.* at

2

30–31, 46).  In that role, Ms. Stranger became the "face" of Cleer and continued having direct and indirect contact with all of Cleer's clients, suppliers, and referral partners. (*Id.* at 43–44).

9.     Ms. Stranger was never made a "Manager" of the LLC under the Operating Agreement.  (*Id.* at 99–100).

10.     The Operating Agreement contains a set of restrictive covenants applicable to Ms. Stranger in her capacity as a member of Cleer.  (*Id.* at 46–47; Preliminary Injunction ("PI") Hearing Ex. 102 at 9–10, §§ 9.1–9.5).

11.     The Operating Agreement includes non-disclosure, non-compete, and customer/employee/supplier non-solicit restrictive covenants which run from the day that Ms. Stranger ceases to have a membership interest in Cleer:

> 9.1     The Members hereby acknowledge that they are familiar and will help develop the Company's trade secrets and other confidential information.  The Members agree that while a Member of the Company and for twelve (12) months following the withdrawal for any reason as a Member, he shall not, directly or indirectly, either for himself or for any other individual own any interest in, manage, control, consult with, render services for or participate in (whether as an officer, director, employee, partner, agent, representative, or otherwise) or in any other manner engage anywhere in the Protected Areas in any business competitive with business of the Company or any affiliated entity (the "Protected Business").  The term "Protected Territories" shall mean the entirety of the United States of America.  The Members agree that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Company's business or any affiliated entity.
>
> 9.2     Further, so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following withdrawal for any reason as a Member, the Member shall not directly, or indirectly through another person or entity, (i) induce or attempt to induce any employee of the Company or any affiliated entity to leave the employ of the Company or any affiliated entity, or in any way interfere with the relationship between the Company and any employee thereof; (ii) hire any person who was an employee of the Company or any affiliated entity at any time during the six (6) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the Parties so as to avoid any disputes under this Paragraph that any such hiring within

3

such six (6) month period is in violation of clause (i) above), or (iii) **call on, solicit, or service any customer, supplier, licensee, licensor or other business relationship of the Company or any affiliated entity**.

. . .

9.4.    Confidential Information. The Members agree to retain all information relating to the business of Company or any affiliated entity in strict confidence and shall not, at any time, except as authorized in writing by an authorized officer of Company and for the benefit of Company, directly or indirectly, divulge or disclose to any person, firm, association or corporation, or use for his own benefit, gain or otherwise, any information, plans, processes, products, client, report data, results of tests and data, client lists, price lists or any other trade secrets or confidential materials or client information or data regarding the business of Company or any affiliated entity, which is disclosed to or acquired by Member directly or indirectly in the course of Member's employment.

(PI Hearing Ex. 102 at 10, §§ 9.1–9.2, 9.4 (emphasis added)).

12.    A week later, Ms. Stranger entered into a Membership Vesting Agreement ("MVA") with Cleer which defined her duties as an employee of Cleer.  (PI Hearing Ex. 101). The MVA also awarded Ms. Stranger 6% equity in Cleer upon execution, which would vest to 12% on the MVA's first anniversary and 20% on the second anniversary, subject to Ms. Stranger's continued employment with Cleer.  (Tr. 33; PI Hearing Ex. 101).

13.    The MVA contains a separate set of restrictive covenants applicable to Ms. Stranger in her capacity as a Cleer employee.  (Tr. 33–34; PI Hearing Ex. 101 at 4–10, §§ 8, 11, 12).  The MVA contains non-disclosure and client/supplier non-solicit provisions, both of which run by contract from Ms. Stranger's last day of employment with Cleer.  (PI Hearing Ex. 101 at 7–10, §§ 11–12).  The nonsolicit provision provides:

12.    Non-Solicit.

a.    During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:

171137215v1

      i.     Directly or indirectly **contact, solicit, accept business from**, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of **Company's customers or suppliers, or prospective customers or suppliers**, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to employee's termination, for the purpose of selling or soliciting products or services of Company; and

      ii.    directly or indirectly contact, solicit, recruit or hire any employees of the Company with whom Employee worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company.

(*Id.* (emphasis added)).  Her confidentiality and nondisclosure obligations are under Section 8 of the MVA.  (*Id.* at 4–5, § 8).

14.    Paragraph 11(h) of the MVA states that: "The period of time during which Employee is subject to the Agreement shall be extended for that amount of time Employee is in breach of the Agreement."

15.    The Operating Agreement further states that Ms. Stranger, as a member of Cleer, shall not have any ownership rights in any of the assets of the company.  (PI Hearing Ex. 102 at 4, § 3.2.4.).  The MVA required Ms. Stranger to return all company property to Cleer upon separation from employment for any reason.  (PI Hearing Ex. 101 at 4, § 8.c.).

16.    The MVA and Operating Agreement also have provisions concerning the assignment of intellectual property rights Ms. Stranger developed during her employment and membership with Cleer:

MVA:

9.    Ownership of Intellectual Property.

a.    Employee understands and agrees that he may be asked to create or contribute to the creation of copyrightable works. Employee understands and agrees that copyrightable works that are made within the scope of Employee's employment with Company will be considered "works made for hire" under the Copyright Act and Company will own all copyright rights in such works. Employee warrants and agrees that Employee will not seek and has not sought moral rights in any of the works Employee has created or will create within the scope of Employee's employment. IF ANY OF THE WORKS CREATED WITHIN THE SCOPE OF EMPLOYEE'S EMPLOYMENT CANNOT CONSTITUTE A WORK MADE FOR HIRE UNDER THE COPYRIGHT ACT, EMPLOYEE EXPRESSLY ASSIGNS ALL COPYRIGHT RIGHTS IN THOSE WORKS TO COMPANY.

b.    Employee understands and agrees that Employee will promptly inform Company of the full conception of and details of any and all inventions, discoveries, improvements, innovations, and ideas, whether or not patentable or protectable, that Employee conceives of, completes, or reduces to practice that (a) relate to the Company's present or prospective business; (b) result from work done by Employee using Company's equipment, facilities, materials, trade secrets, or personnel; or (c) result from or are suggested by any work that Employee has or may do for Company Employee hereby agrees to assign to Company his entire right, title, and interest in and to all developments, patent applications, or issued patents, including those applied for or issued in foreign countries, to Company that are made or conceived of, whether alone or with others, while Employee is employed by Company.

c.    Employee agrees to aid in and execute any and all documents necessary to prepare any papers that Company may consider necessary or helpful to obtain or maintain any patents, copyrights, trademarks, or other proprietary rights and will do so at no charge to Company.

Operating Agreement:

9.3.    Technical Development and Improvements.  The Members acknowledge and agree that the Company or any affiliated entity shall have the exclusive ownership, title and possession of any information, plans, products, data, inventions, training programs, or instructional materials discovered, devised, developed, implemented, improved, or otherwise identified or capable of identification regarding the business of the Company or any affiliated entity. The Members shall report and promptly make available any and all technical developments and improvements. Except as expressly approved by the Company's Members, the Members shall disclose, use and release such technical developments solely in the name and on behalf of the Company or any affiliated entity.

(PI Hearing Exs. 101 at 6, § 9, 102 at 11, § 9.3).

## II.    Ms. Stranger's Involvement In Rebranding From GBS To Cleer

17.    In early 2022, a Florida company called Global Business Service challenged GBS' trademark.  (Tr. 28, 32).

18.    In March 2022, while still weighing whether to oppose the trademark challenge or rebrand, Mr. McKeegan created a digital collaboration page for Ms. Stranger and other employees to brainstorm new names for the company.  (Tr. 52–54; PI Hearing Ex. 103).

19.    After much consideration, and with assistance from Ms. Stranger, the company committed to rebranding away from GBS rather than entrenching itself in a trademark dispute. (Tr. 28–29, 32).

20.    Ms. Stranger was materially involved in the rebranding.  (*Id.* at 183–92).  On May 26, 2022—the same day on which Mr. McKeegan promoted her to COO, gave her equity, and she executed the Operating Agreement—Ms. Stranger emailed Mr. McKeegan: "You know my opinion that this seems like a good time to rebrand.  What would you think of Cleer as a name?" (Tr. 32, 61; PI Hearing Ex. 105 at 3).

21.    Mr. McKeegan agreed to proceed with Cleer.  (*Id.*).  Later that day, to ensure the company secured Internet domains with "Cleer" in the name, Ms. Stranger registered Cleer.tax for the company while Mr. McKeegan did the same with Cleertax.com.  (Tr. 68–69; PI Hearing Ex. 105 at 1–3).

22.    Ms. Stranger testified that she registered Cleer.tax "for the company."  (Tr. 203). In a May 26, 2022 email, Ms. Stranger wrote to Mr. McKeegan:

> **We** could try to buy Cleer.com also, it isn't listed for sale, but **we** could use a broker service to try to contact the owner and buy it.  The .com domain is dormant right now and isn't being used by any other company, it is just sitting.  **We** could use the .tax to rebrand in the interim, or as a backup if **we** can't use the other domain.  I

7

bought it, just to make sure **we** don't get sniped when googling and looking at the name.

(PI Hearing Ex. 105 at 2 (emphasis added)).

23.     In a June 20, 2022 email to Mr. McKeegan, Ms. Stranger similarly wrote: "Yeah I agree.  Nobody can circumvent **us** with the name once **we** have a valid trademark, the domain becomes pretty useless to them, at least in the tax space.  I bought Cleer.tax as I thought that was the best one to build on, it seems the most obvious choice."  (PI Hearing Ex. 108 at 1 (emphasis added)).

24.     The "we" and "us" she referred to above meant the company—Cleer.  (Tr. 201–06).

25.     During a June 1, 2022 video call, Ms. Stranger, Mr. McKeegan, and Lindsey Anderson discussed trademarking Cleer and engaging a domain broker to acquire the inactive domain "Cleer.com" from its owner, who Mr. McKeegan later learned was willing to sell it for $250,000—beyond the company's budget.  (Tr. 70–71; PI Hearing Exs. 100, 108).

26.     Despite being unable to obtain the Cleer.com domain, Mr. McKeegan and Ms. Stranger were committed to the name Cleer for the rebrand and decided to proceed with Cleer.tax after confirming the .tax would not hurt the company's search engine optimization ("SEO").  (Tr. 55).

27.     With a company name selected and the Cleer.tax domain acquired, the next steps were to generate branding, design a logo, create a new website, and apply for trademarks—the typical hallmarks of a company undergoing a rebranding.  (PI Hearing Ex. 109).

28.     Ms. Stranger and Mr. McKeegan started the trademark application process in July 2022, which involved identifying companies that could contest the "Cleer" trademark.  (Tr. 78; PI Hearing Exs. 110–12).

29.     Mr. McKeegan and Ms. Stranger weighed the risks of a trademark challenge, prompting Ms. Stranger to register 13 domains with variations of "Cleer" (*e.g.*, cleer.accountant, cleer.accountants, cleer.business, etc.) for the company as a contingency plan on July 19, 2022. (Tr. 82–83; PI Hearing Ex. 111).

30.     Ms. Stranger does not claim to own any of those other Cleer-based domains even though she registered them in her personal NameSilo account just as she did for Cleer.tax. (Tr. 204–05).

31.     But later that day, Ms. Stranger and Mr. McKeegan decided to fully commit to the name Cleer and domain Cleer.tax; Ms. Stranger thus told trademark counsel to proceed with applying for the "CLEER" trademark.  (Tr. 85; PI Hearing Exs. 113–14).

32.     On August 1, 2022, the application for the CLEER trademark was filed.  (Tr. 85; PI Hearing Exs. 115, 117).

33.     In August 2023, Cleer finalized its Cleer.tax logo design, which Ms. Stranger played a central role in developing.  (Tr. 89; PI Hearing Exs. 118–19, 155).

34.     On August 11, 2023, Cleer filed a trademark application for the Cleer.tax logo.  (Tr. 91–92; PI Hearing Ex. 117).

35.     Ms. Stranger was aware that Cleer was trademarking the logo, Cleer.tax. (PI Hearing Ex. 155).

36.     During the logo development and trademarking process, Ms. Stranger never objected or claimed to own the domain Cleer.tax.  (Tr. 183).

**III.    Stranger's Resignation And Claim To Own Cleer.tax**

37.     Cleer grew rapidly and enjoyed great success from 2020 to 2022.   (Tr. 95).

9

38.     In 2023, the business was still experiencing growth, but Ms. Stranger paid no attention to the company's spending or keeping down its costs.  (*Id.*).  Simply put, Cleer was not doing well financially under Ms. Stranger's control, forcing Mr. McKeegan to step back into a more day-to-day role in late 2023.  (*Id.*).  That did not sit well with Ms. Stranger, and there was friction between the two during this time.  (*Id.*).

39.     In early 2024, things continued to sour between Ms. Stranger and Mr. McKeegan, and she eventually told Mr. McKeegan she intended to resign at the end of January.  (Tr. 96).

40.     For months before Ms. Stranger expressed any intent to resign, Mr. McKeegan insisted that she transfer the Cleer.tax domain from her personal account to the company's digital wallet.  (PI Hearing Ex. 152).

41.     Mr. McKeegan's insistence on Ms. Stranger transferring the domain intensified when she gave notice of her resignation, as Cleer could not allow a non-employee to maintain control over the primary asset through which it conducts business.  (Tr. 98; PI Hearing Ex. 152).

42.     Recognizing that she did not own the Cleer.tax domain, Ms. Stranger was initially agreeable to transferring the domain but nevertheless attempted to use her control over Cleer.tax as leverage as she departed Cleer.  She greeted each of Mr. McKeegan's requests to transfer the domain with a new excuse as to why she should or could not, despite having no right to withhold Cleer's property from it.  (Tr. 100; PI Hearing Exs. 120, 152).

43.     For example, she initially told Mr. McKeegan she would transfer the domain as part of a proposal that she be allowed to continue to work for the company as an independent contractor.  (Tr. 102).  On January 22, 2024, Ms. Stranger emailed Mr. Mckeegan demanding $200,000 in salary equivalent to work for Cleer as an independent contractor through April 2024, at which point she would transfer the Cleer.tax domain to Cleer.  (Tr. 107; PI Hearing Ex. 151).

44.     The next day, Ms. Stranger emailed Mr. McKeegan asking if he had considered this proposal. (Tr. 102; PI Hearing Ex. 120). He replied that he was "waiting for the domains before progressing with anything else." (PI Hearing Ex. 120). The domains to which Mr. McKeegan referred were Cleer.tax and all other Cleer-related domains Ms. Stranger registered for the company. (Tr. 102).

45.     Ms. Stranger wrote back:

> And I am waiting on my data before doing anything further, as I told you I don't trust you after that. So we are clearly at an impass [sic]. I am going to cancel the team lead for this today, as this is rediculous [sic] and I cant keep being calls with you and watching all these problems being created from this and acting like nothing is wrong when you are destroying this company.

(PI Hearing Ex. 120).

46.     The data Ms. Stranger wanted was Cleer data (emails to and from clients, Google docs, Google sheets) she tried to improperly download and take with her post-employment, prompting Mr. McKeegan to take away her administrator privileges on Cleer's systems. (Tr. 103).

47.     Again recognizing that the domain was company property, Ms. Stranger finally agreed to transfer possession of the Cleer.tax domain to Cleer by giving it to "a professional IP person or a domain escrow agency to make the transfer," so Mr. McKeegan sent her a meeting invite for January 26, 2024 to facilitate that handoff. (Tr. 105; PI Hearing Ex. 120).

48.     Before that could happen, Ms. Stranger's behavior suggested to Mr. McKeegan that she was unwilling to transfer the domain, prompting Mr. McKeegan to bluntly ask Ms. Stranger: "Crystal, [a]re you refusing to turn the domains over to the company?" (PI Hearing Ex. 121).

49.     After some back and forth, Ms. Stranger replied to Mr. McKeegan: "Since you have been pressuring me so hard, I have done some research into it, and as I actually purchased the domain, and I hold it in my account, technically I own it." (*Id.*). This was the first time Ms.

11

Stranger had ever told Mr. McKeegan or anyone else that she thought she owned the Cleer.tax domain.

50.    Ms. Stranger cancelled the January 26, 2024 domain transfer call with Mr. McKeegan. (PI Hearing Ex. 122).

51.    Ms. Stranger's last day of employment with Cleer was on January 31, 2024. (Tr. 99).

52.    At that point, Ms. Stranger had no authority over Cleer's management or operations; she was no longer an employee and was not a "manager" under the Operating Agreement:

> Members shall not have any right, power or authority to take part in, vote on, participate or interfere, in any manner, with the management, conduct or control of the Company, its property or the Company's business, and shall have no right or authority whatsoever to act for or on behalf of the Company.

(PI Hearing Ex. 102 at 8, § 7.1).

53.    Rather, "[a]ll decisions concerning the business and affairs of the Company shall be made by the Managers." (*Id.* at 9, § 8.3). As noted above, Ms. Stranger was never the Manager of Cleer. (Tr. 99–100).

54.    Ms. Stranger never transferred the domain to Cleer. (Tr. 109).

55.    In Defendants' Opposition to Injunctive Relief, Ms. Stranger claimed that she "orally offered GBS a license to use the 'cleer.tax' domain name and the CLEER trade name, and based solely on that oral license, GBS changed its name to Cleer LLC." (Stranger Opposition to Motion for TRO, Doc. 20 at 16). But at the preliminary injunction hearing, Ms. Stranger admitted that she fabricated her position about giving an oral license to Cleer. (Tr. 199–203). In fact, Ms. Stranger admitted that everything she did to rebrand from GBS to Cleer—obtaining Cleer.tax,

other domains involving the name "Cleer," and the Cleer trademarks—was for Cleer and in her

capacity as a Cleer employee and member.  (Tr. 204).

### IV.    Ms. Stranger's Formation Of Optic Tax, And Cleer's For-Cause Termination Of Ms. Stranger's Membership Interest.

56.    Over the months following Ms. Stranger's resignation, Mr. McKeegan immersed

himself back into the business to ensure tax season was not a failure, asked Ms. Stranger to return

her company laptop, and continued trying to get Ms. Stranger to turn the domain over to Cleer.

(Tr. 111).

57.    Meanwhile, Ms. Stranger had launched Optic Tax, a Delaware corporation, of

which she is an owner and the President, CEO, and founder.  (Tr. 176).

58.    Ms. Stranger, however, remained a minority owner in Cleer and knew she owed it

certain fiduciary duties, including the duty of loyalty and the duty to act in the best interests of the

company.  (Tr. 178).

59.    From February 1, 2024 to around September 1, 2024, Optic Tax and Ms. Stranger

appeared to comply with the restrictive covenants of the MVA.  (Tr. 118–19, 208).

60.    She also remained bound by the restrictive covenants of the Operating Agreement,

although the one-year clock had not yet begun to run while she remained a member of Cleer.  (PI

Hearing Ex. 102 at 10, §§ 9.1–9.2).

61.    Ms. Stranger continued refusing to transfer the Cleer.tax domain, citing that the

timing of the transfer would be bad for the company despite having no managerial authority in

Cleer.  (PI Hearing Exs. 100, 120–21).

62.    On August 8, 2024, the McKeegans, who collectively owned 88% of the company,

voted to terminate Ms. Stranger's membership for cause and repurchase her 12 shares for the credit

13

balance of her Capital Account in accordance with Section 6.5 of the Operating Agreement. (*Id.*; PI Hearing Exs. 102, 124).

63. Specifically, the McKeegans terminated Ms. Stranger's membership interest "for cause" under Operating Agreement Section 6.5 for her "continued insistence on acting in bad faith, stealing/withholding company property, and continuing to impermissibly hold the Company's domain name/website in an attempt to force the company into selling to a third-party have prevented any mutually beneficial outcome." (PI Hearing Ex. 124).

64. During discovery, Ms. Stranger voluntarily waived attorney-client privilege as to her communications with attorneys about the Cleer.tax domain and her restrictive covenants with Cleer, and advice counsel Geoffrey Amend warned Ms. Stranger that this is precisely what would happen if she did not, among other things, transfer the domain to Cleer. (Tr. 192–95, 197–99).

65. Ms. Stranger did not provide any evidence or testimony that her termination was not "for cause." By doing so, Ms. Stranger conceded that her interest was properly terminated for cause and that Cleer properly followed the Operating Agreement in terminating her interest.

66. The balance of Ms. Stranger's Capital Account, whatever it may be, is not due for payment until August 9, 2026. (Tr. 114).

## V. Ms. Stranger Weaponized The Cleer.tax Domain, Poached Cleer's Bookkeeping Team and Accountants, And Used Optic Tax To Unfairly Compete Against Cleer.

67. Around the time the McKeegans terminated Ms. Stranger's membership for cause, Mr. McKeegan hosted a retreat in the Philippines for Cleer's Philippines-based workers. (Tr. 118). During the retreat, he never talked to the team about layoffs or shutting down—he was only focused on pushing ahead and keeping the business running with everyone on board, especially with the October 15 extended filing deadline around the corner. (*Id.*). The retreat was highly collegial, and Mr. McKeegan had no sense that anything was amiss. (*Id.*).

14

68.     However, Ms. Stranger set a plan in place to retaliate against the McKeegans and Cleer for terminating her membership interests in Cleer.

69.     On or about September 1, 2024, Ms. Stranger, without warning, redirected the Cleer.tax website and emails to Optic Tax.  (*Id.*).

70.     Ms. Stranger did not stop at redirecting; she began intercepting and soliciting Cleer's clients that were intending to contact Cleer through the Cleer.tax domain, offering to provide them competing services through Optic Tax.  (Tr. 121; PI Hearing Ex. 136, 153–54).

71.     By September 1, 2024—less than a month after the one-year non-compete and non-solicitation covenants in the Operating Agreement started running and approximately seven months after the non-solicitation restrictive covenants of the MVA began running—Ms. Stranger was actively competing against Cleer.  (Tr. 208).

72.     Ms. Stranger was contacting and soliciting all of Cleer's suppliers while they were still working for Cleer, including its bookkeepers and many of its tax preparers and accountants. (PI Hearing Exs. 160–89).  In the solicitation emails, Ms. Stranger made it seem as though these workers were at risk of losing their jobs with Cleer, which was not true, and should therefore come work for Optic Tax.  (*Id.*).

73.     All of these suppliers were bound by covenants not to compete with, solicit from, and/or disclose confidential information of Cleer.  (Tr. 125–26; PI Hearing Ex. 157).

74.     Ms. Stranger was well aware of the contractual obligations these workers had to Cleer, as she actually countersigned on behalf of Cleer some of the agreements with the workers she later poached to Optic Tax.  (Tr. 129; PI Hearing Ex. 128).

75.     Ms. Stranger successfully poached Cleer's entire bookkeeping team, which was about 20 people.  (Tr. 211–12).

15

76.     Every single person employed by Optic Tax previously worked for Cleer in some capacity.  (Tr. 212).

77.     Ms. Stranger never made any job posts or advertisements to hire workers—her plan from the outset was to recreate Cleer under Optic Tax using the same clients, suppliers, and contractors.  (Tr. 218–19).

78.     Ms. Stranger never instructed any of the contractors she hired away from Cleer to abide by their restrictive covenant agreements with Cleer.  (Tr. 229–30).

79.     To the contrary, Ms. Stranger knew that these workers were soliciting the clients they previously serviced at Cleer in an attempt to move them to Optic Tax by relying on Cleer's client list, and Ms. Stranger encouraged them to do so.  (Tr. 235; PI Hearing Ex. 133).

80.     The suppliers Ms. Stranger poached from Cleer created a specific 226-person Cleer bookkeeping client list and provided that information to Ms. Stranger for purposes of soliciting those clients.  (Tr. 209-210, 227–29; PI Hearing Ex. 133).

81.     On September 6, 2024, Ms. Stranger sent out a blast email from her crystal@cleer.tax account (the same domain she took from Cleer.tax) to those 226 Cleer clients. That email told Cleer's clients that Cleer had lost its entire bookkeeping team (leaving out that she was the reason for that occurrence), so they could get services through Optic Tax moving forward. (Tr. 131; PI Hearing Ex.139).

82.     Three days later, Ms. Stranger sent another email—this time from crystal@optictax.com—to the same recipients, further disparaging Cleer and advising its clients to move their business to Optic Tax.  (PI Hearing Ex. 141).

16

83.    When leaving Cleer, Ms. Stranger also took with her a portion of Cleer's mailing list containing current, former, and prospective clients, suppliers, and contacts, which she merged into Optic Tax's email list.

84.    Ms. Stranger provided no evidence to explain how 5,448 of Cleer's contacts ended up on Optic Tax's mailing list.  (Tr. 138; PI Hearing Exs. 123, 159).

## VI.    Ms. Stranger Continued Soliciting Cleer's Clients Through Optic Tax Despite The Court's TRO.

85.    On October 8, 2024, using the mailing list she had created for Optic Tax—which contained an inexplicable 5,448 person overlap with Cleer's list—Ms. Stranger began sending out blast solicitation emails to Cleer's clients. (PI Hearing Ex. 123).

86.    On October 22, 2024, the Court entered a TRO restraining and enjoining Ms. Stranger from:

> 1.    soliciting or otherwise contacting for purposes of discussing employment opportunities any person who is or was employed by Cleer LLC or any of its predecessors;
>
> 2.    soliciting or otherwise contacting for purposes of developing business, entering into an agreement, or proposing or making any sale any person who is or was a customer, supplier, or prospective customer or supplier of Cleer LLC.
>
> The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination.  Absent conferral and agreement, Stranger may not contact any customers or suppliers or prospective customers or suppliers of Cleer LLC or its predecessors.

(Doc. 34 at 4).

87.    Ms. Stranger ignored the clear mandates of the TRO.

88.    On December 5, 2024—44 days after the Court entered the TRO—Defendants sent a blast solicitation email to Optic Tax's entire email list while the TRO was in place, meaning Ms.

17

Stranger sent a mass solicitation email to at least 5,448 current, former, and prospective Cleer clients and suppliers.  (PI Hearing Ex. 127).

89.    Defendants sent another blast solicitation email in December 2024 and another in January 2025 (PI Hearing Exs. 146–47), both of which contained hyperlinks to Optic Tax's website offering pricing and enabling visitors to purchase services.  (PI Hearing Exs. 125, 138, 143).

## CONCLUSIONS OF LAW

90.    To demonstrate that it is entitled to preliminary injunctive relief, the party seeking the injunction must prove: (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor.  *3M v. Francavilla*, 191 F. Supp. 2d 270, 277 (D. Conn. 2002).[1]  For the reasons below, Cleer meets these requirements and is entitled to preliminary injunctive relief.

## I.    Irreparable Harm

91.    By executing the Operating Agreement and MVA, Ms. Stranger acknowledged that breaching those agreements would cause Cleer irreparable harm.  (PI Hearing Exs. 101 at 9, § 11.g., 102 at 11–12, § 9.5).

92.    Under Connecticut law,[2] the damage to goodwill and unfair competition stemming from an employee's breach of restrictive employment covenants are likely to cause an employer irreparable harm.  *See*, *e.g.*, *Westport Res. Mgmt., Inc. v. Delaura*, No. 3:16-CV-00873 (VAB),

---

[1] Nothing in the record shows that the public interest would be harmed by imposing injunctive relief ordered here, nor did Ms. Stranger provide any evidence of how the entry of an injunction would impose any undue hardship on her.

[2] The same is true under Wyoming and Michigan law. *See*, *e.g.*, *Mktg. Displays Int'l v. Shaw*, 646 F. Supp. 3d 897, 906 (E.D. Mich. 2022) and *Glob. Bio Res., Inc. v. Cantrell*, No. 2:22-CV-68-SWS, 2022 WL 20444747, at *12 (D. Wyo. June 10, 2022).

2016 WL 3546218, at *4 (D. Conn. June 23, 2016) (citing *POP Radio, LP v. News Am. Mktg. In-Store, Inc.*, 49 Conn. Supp. 566, 576 (2005)).

93.     In the context of Cleer's domain, irreparable injury is presumed "when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial, because loss of control over one's reputation is neither calculable nor precisely compensable." *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, No. CV18814SJFSIL, 2018 WL 2012875, at *6 (E.D.N.Y. Apr. 30, 2018). Given the nature of websites, courts have concluded that a cyber squatter's operation of a website "would produce an actual injury that would not be remediable after trial." *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 527 (S.D.N.Y. 2012). In *Bogoni*, the court held:

> [T]he mere fact that both Domain Names are spelled *only* with the plaintiff's name weighs quite heavily in favor of the plaintiff here; any time the plaintiff meets a new person, that person--or, for that matter, anyone the plaintiff already knows--will be just clicks away from visiting one of the sites run by the defendant. Even if the defendant never posts damaging material, the Court agrees with the plaintiff that the use of the plaintiff's name in the Domain Names 'create[s] a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of those sites.'

*Id.* (emphasis in original).

94.     When asked what irreparable harm Ms. Stranger has caused and continues to cause Cleer, Mr. McKeegan testified:

> So, you know, there were a number of emails and conversations Ms. Stranger's had with clients of ours. I don't know if she's reached out to partners as well. But most of what was in the emails that I saw is either incorrect, untrue, or basically just trying to drag Cleer and me personally through the mud. And this is causing problems with clients. This kills a lot of the goodwill that we, as a company, have built up in the industry over a number of years. It's very damaging to the brand. Having to switch domain names is very, very damaging to the brand because, as I was alluding to earlier, we're not getting any of those links into the company now. And Google is putting more emphasis on that. It kind of limits how much SEO traffic you're going to get on an ongoing basis. Because we don't have those links, they're aged links, meaning Google is saying you're not just some start-up that

19

bought a bunch of links all over the place.  They were good, solid links coming in from partners and other places.

There's reputation damage with our partners.  Clients are going back to the partners saying this is going on there.  And that's causing a lot of harm with those relationships.  Which hopefully it doesn't destroy them.  But it's causing a lot of harm with those relationships and has done so far.

. . .

There's been a lot of confusion among clients as to why other people are contacting them.  Who has access to their data?  Where is their tax information, did that get hacked as well?  Questions like that coming in to us, which again degrades us as a brand if people think it's not secure.

(Tr. 139–40).

95.    Mr. McKeegan further testified at the preliminary injunction hearing that he would not have rebranded to Cleer.tax if he had any doubt that Cleer did not own the domain.  (Tr. 110). As he explained, a domain is "where your customers find you, it's part of your brand, it's part of your logo.  You have continuing what they call SEO juice from links from different places that come into your domain.  So we put a lot of time, energy, money into getting that domain set up." (*Id.*).

96.    David McKeegan also testified that Cleer's clients use Cleer.tax to communicate with Cleer to get tax advice and request assistance from Cleer, and that Cleer's business partners still use Cleer.tax to refer business to Cleer.

97.    Ms. Stranger provided no contrary evidence or testimony.

98.    Thus, the undisputed evidence in the record establishes that, absent injunctive relief, Ms. Stranger will continue to unfairly compete with Cleer and tarnish its goodwill with its customers, suppliers, employees, and independent contractors by operating a competing company, Optic Tax, and soliciting and poaching Cleer's clients and employees through a domain name belonging to Cleer, all in violation of her restrictive covenants.

99.     In addition, Defendants' breach of trademark law, including the unlawful retention of the domain Cleer.tax, will cause continued irreparable harm to Cleer's goodwill.

## II.     Likelihood of Success on the Merits

### A.     Breach of the Operating Agreement

100.     Cleer is likely to succeed on the merits of its claims for breach of the non-disclosure, non-competition, and non-solicitation of the Operating Agreement.

101.     The Operating Agreement is controlled by Wyoming law.  (*See* PI Hearing Ex. 102 at 10–12, §§ 9.1–9.5).

102.     Under Wyoming law, "[t]o be enforceable, a non-compete agreement must be (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in duration and geographical limitations; and (5) not against public policy." *Hassler v. Circle C Res.*, 2022 WY 28, ¶ 15, 505 P.3d 169, 174 (Wyo. 2022) (*Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 540 (Wyo. 1993)).

103.     The non-compete in the Operating Agreement is enforceable under Wyoming law. It is in writing (*See* Ex. 102 at 10, § 9.1), and the Wyoming Supreme Court has acknowledged the validity of non-competition clauses in an operating agreement. *Thorkildsen v. Belden*, 2011 WY 26, ¶ 21, 247 P.3d 60, 65 (Wyo. 2011).  The consideration for the non-compete clause in the Operating Agreement—equity in Cleer—was reasonable and sufficient. *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 13, 215 P.3d 1054, 1059 (Wyo. 2009) ("[A] covenant not to compete entered into contemporaneously with the employment itself is enforceable and is supported by sufficient consideration.").  The one-year restricted period is reasonable in terms of duration, and the nationwide geographical scope is reasonable because Cleer's provides tax services to a niche group of foreign-owned businesses filing taxes in the United States; the

21

Wyoming Supreme Court has held that a one-year duration restricted period of non-compete agreement is reasonable, and "[a] broad geographic restriction may be reasonable when it is coupled with a specific activity restriction within an industry or business which has an inherently limited client base." *Hopper*, 861 P.2d at 544–45. And the non-competition clause in the Operating Agreement is not against public policy because under Wyoming law "'[e]mployers are entitled to protect their business from the detrimental impact of competition by employees who, but for their employment, would not have had the ability to gain a special influence over clients or customers.'" *Brown v. Best Home Health & Hospice, LLC*, 2021 WY 83, ¶ 28, 491 P.3d 1021, 1031 (Wyo. 2021) (quoting *Hopper,* 861 P.2d at 542).

104.     The Court further finds that the non-compete covenant of the Operating Agreement is not unenforceable because of a merger clause contained in the MVA. "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement." *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997). Cleer is not attempting to alter either agreement. To the contrary, it is attempting to enforce both agreements exactly as written.

105.     Moreover, the MVA cannot supersede the Operating Agreement as the two contracts deal with different subject matters; the Operating Agreement details the duties as between the owners of Cleer and the MVA details the responsibilities of Ms. Stranger in her capacity as an employee of Cleer. Indeed, as was the case here, Ms. Stranger ceased her employment with Cleer, but remained an owner—she was therefore subject to a different set of restrictive covenants in a completely different capacity. Ms. Stranger has also asserted claims under the Operating Agreement and therefore cannot claim it is unenforceable because of a merger clause. (*See* Third-Party Complaint of Crystal Stranger, Doc. 65, ¶ 66).

171137215v1

106.    The non-solicitation provision in the Operating Agreement is enforceable under Wyoming law for the same reasons: it is in writing, part of the Operating Agreement, based on a grant of equity (which is reasonable and sufficient consideration), and it applies for one year to current customers of Cleer, all of whom Ms. Stranger knows as the former COO of Cleer.  (PI Hearing Ex. 102 at 10–11, § 9.2).  And because the non-solicit is reasonable in geographical scope and duration, it is not against public policy.  *Hassler*, 505 P.3d at 178 ("[A] noncompete agreement which includes unreasonable restrictions on trade violates public policy and is invalid.").

107.    The evidence in the record establishes that, on August 9, 2024, the McKeegans repurchased Ms. Stranger's equity under the Operating Agreement "for cause" pursuant to Section 6.5 because, among other things, she refused to return the company domain, Cleer.tax, to Cleer. (Tr. 118; PI Hearing Exs. 102 at 7–8, § 6.5, 124).

108.    Cleer's repurchase of Ms. Stranger's equity, which is not due until August 9, 2026, constitutes Ms. Stranger's "withdrawal for any reason" from Cleer under the Operating Agreement, starting the clock on the restrictive covenants in Article IX as of August 9, 2024.  (*See* PI Hearing Ex. 102 at 10–12, §§ 9.1–9.5).

109.    Cleer has fully performed its obligations under the Operating Agreement, and Defendants introduced no evidence to the Court that Cleer committed a prior material breach.  All evidence presented at the hearing proves that Ms. Stranger was in violation of her contracts as early as May 26, 2022—the date Ms. Stranger registered the Cleer.tax domain and then attempted to retain that company asset as her own.

110.    The one-year non-compete and non-solicitation clauses did not begin to run until August 9, 2024, when the McKeegans repurchased Ms. Stranger's equity for cause.

111.    Ms. Stranger was thus required by contract to comply with the non-compete and non-solicitation clauses of the Operating Agreement until August 9, 2025.

112.    There is no dispute that Ms. Stranger is in breach of the non-compete.  In fact, she admitted she started using Optic Tax to compete directly with Cleer on September 1, 2024.  (Tr. 208).

113.    There is also no dispute that Ms. Stranger is in breach of the non-solicitation provisions.  Under the Operating Agreement and MVA, Cleer's independent contractors are suppliers, as they supplied services to Cleer, and Ms. Stranger presented no evidence to the contrary.  She admitted that she solicited Cleer's clients, suppliers, employees, and independent contractors prior to one year expiration under the Operating Agreement, and the record reflects that she poached over 20 workers from Cleer and sent countless blast emails through Optic Tax to at least 5,448 Cleer clients.  (Tr. 228, 235; PI Hearing Exs. 123, 126–27, 132, 136–39, 143–44, 146–47, 160–89).

114.    And there is no dispute that Ms. Stranger is in breach of the non-disclosure provisions.  Optic Tax has a mailing list with 5,448 Cleer current, former, and prospective clients— over half of Cleer's mailing list.  (PI Hearing Ex. 123).  Ms. Stranger has admitted to having a separate list of 226 Cleer clients.  (Tr. 227–29).  And Ms. Stranger has possession of a confidential spreadsheet containing a staffing roster and business partner pricing information belonging to Cleer.  (PI Hearing Exs. 190, 515).  She also had and was using Cleer's pricing information to develop Optic Tax's pricing to deliberately undercut Cleer.  (PI Hearing Ex. 142).

115.    The Court recognizes that, when issuing the TRO, the Court did not enforce the non-compete provision in the Operating Agreement against Ms. Stranger at that time.  (*See generally* Doc. 34).  However, Ms. Stranger, through Optic Tax, continues to contact and solicit

Cleer's clients even when ordered by the Court not to do so. Accordingly, given the overwhelming evidence establishing Ms. Stranger's blatant breaches of her contracts and utter disregard for the Court's TRO, equity compels the Court to now fully enforce the non-compete provision against Ms. Stranger as the only remedy that will protect Cleer's legitimate business interests.

116. Accordingly, the non-compete and non-solicitation restrictive covenants of the Operating Agreement will be enforced against Ms. Stranger until August 9, 2025, and she will remain bound by the non-disclosure provisions as provided for in the Operating Agreement.

**B.     Breach of the Membership Vesting Agreement**

117. Ms. Stranger is in breach of the restrictive covenants of the MVA, which is controlled by Michigan law.

118. The MVA is an enforceable contract under which Cleer has fully performed its obligations.

119. As an employee of Cleer, Stranger agreed to not "contact, solicit, accept business from, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers . . . ." (PI Hearing Ex. 101 at 10, § 12.a.i.).

120. Under Michigan law, a "restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical scope, and the type of employment or line of business must be reasonable." *Coates v Bastion Brothers, Inc.*, 276 Mich App 498, 507 (2007); *see also* M.C.L. § 445.774a.

121. For the same reasons provided above for the Operating Agreement restrictive covenants, the restrictive covenants of the MVA are enforceable under Michigan law and designed to protect Cleer's reasonable business interests. "To be reasonable in relation to an employer's

171137215v1

competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 919 (2006). "Under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest." *Whirlpool Corp. v. Burns*, 457 F.Supp.2d 806, 812 (W.D.Mich., 2006). And preventing the anticompetitive contact with a business' clients is a legitimate business interest. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007) (finding that reasonable competitive business interests include protecting "close contact with the employer's customers or customer lists, or cost factors and pricing"); *see also Follmer, Rudzewicz & Co., P.C. v. Kosco,* 420 Mich. 394, 362 N.W.2d 676, 680–81 (1984) ("While an employee is entitled to unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable, confidential information, including information regarding customers, constitutes property of the employer and may be protected by contract.").

122.     The one-year restrictive covenant provisions of the MVA are properly limited in duration, as they apply only for a limited period of one year following Stranger's resignation. *See Kelly Services Inc. v. Marzullo*, 591 F. Supp. 2d 924, 939 (E.D. Mich. 2008) ("[c]ourts, applying Michigan law, have routinely upheld non-compete agreements restricting the former employee from engaging in restrictive activities for periods of six months to three years").

123.     At least one court applying Michigan law has found nationwide geographic limitations to be sufficiently tailored to grant injunctive relief where, as here, the business operated nationwide and, as Stranger did here, the employee assented to a contract with a clause agreeing that the geographic limitation is reasonable. *Quest Car Care Prod., Inc. v. Titus*, 708 F. Supp. 3d

26

1338, 1344 (W.D. Mich. 2023).  (PI Hearing Ex. 101 at 8, § 11.e. ("By signing this Agreement, Employee acknowledges that the Company's business is done throughout the United States and that the geographic and temporal limitations set forth above are therefore reasonable.")).

124.   Based on the same facts, Ms. Stranger has contacted, solicited and accepted business from Cleer's customers and suppliers, and therefore is in breach of the MVA.

### C.   Tolling of the Restrictive Covenants Contained in the MVA.

125.   Under the MVA, "[t]he period of time during which Employee is subject to the Agreement shall be extended for that amount of time Employee is in breach of the Agreement." (PI Hearing Ex. 101 at 9, § 11.h.).

126.   Connecticut law governs the availability of equitable remedies despite the choice of law provisions in the Operating Agreement and MVA applying, respectively, the substantive laws of Wyoming and Michigan.  *See Reclaimant Corp. v. Deutsch*, 332 Conn. 590, 613, 211 A.3d 976, 990 (2019); *see also Custard Ins. Adjusters, Inc. v. Nardi*, No. CV980061967S, 2000 WL 562318, at *51 (Conn. Super. Ct. Apr. 20, 2000), *opinion clarified*, No. CV980061967S, 2000 WL 966766 (Conn. Super. Ct. May 5, 2000).

127.   This Court and Connecticut state courts consistently enforce tolling provisions in restrictive covenant agreements.  *Gartner, Inc. v. Hackett Grp., Inc.*, No. 3:23-CV-688 (SRU), 2023 WL 7350329, at *3 (D. Conn. Nov. 7, 2023), *appeal withdrawn*, No. 23-7832, 2024 WL 4866897 (2d Cir. Feb. 15, 2024); *Beacon Ins. & Inv. Grp., LLC v. Panzo*, No. CV146044992S, 2016 WL 4507389, at *20 (Conn. Super. Ct. July 25, 2016); *Roth Staffing Companies, L.P. v. Thomas Brown & OEM ProStaffing, Inc.*, No. 3:13 CV 216 (JBA), 2013 WL 12122072, at *10 (D. Conn. Oct. 16, 2013), *supplemented sub nom. Roth Staffing Companies, L.P. v. Brown*, No.

27

3:13 CV 216 (JBA), 2014 WL 12573683 (D. Conn. Feb. 25, 2014), *report and recommendation adopted*, No. 3:13CV216 (JBA), 2014 WL 12576629 (D. Conn. Mar. 14, 2014).

128.    Cleer has recommended that, consistent with Section 11.h., the Court toll the non-solicit in the MVA for 12 months from the date it enters the preliminary injunction order. Defendants did not contest that this was the appropriate period for the injunction, and the evidence at the hearing shows that Ms. Stranger has not complied with this provision since September 1, 2024, all the while gaining a windfall by breaching the Court's Temporary Restraining Order on multiple occasions as Optic Tax prepares for the April tax season.

129.    The Court agrees with Cleer's proposed tolling timeframe for the of the MVA.

130.    It would be inequitable for the Court to reward Ms. Stranger's blatant and repeated disregard of this Court's TRO with "time served" on the restrictive covenants, especially given the cyclical nature of tax season.  This Court sees no reason why, under the blue pencil rule, it cannot amend the durational scope of a restrictive covenant.  *See*, *e.g.*, *Grayling Assocs., Inc. v. Albert Villota*, No. CV040833521, 2004 WL 1784388, at *1 n.2 (Conn. Super. Ct. July 12, 2004) (recognizing a court's ability to modify a restrictive covenant to make it more reasonable under the blue pencil rule).

131.    Therefore, as a matter of equity and consistent with the tolling provision of the MVA, the restrictive covenants of the MVA will be tolled for a period of one year from the Court's Order.

### D.    Defendants' Misappropriation of Trade Secrets

132.    Cleer brings claims against Defendants under the Connecticut Uniform Trade Secrets Act ("CUTSA") and the Defend Trade Secrets Act ("DTSA"), and "[t]he elements necessary to prove a violation of each of these statutes are largely the same, with both laws

requiring plaintiffs to demonstrate the existence of a trade secret that the defendant misappropriated." *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 330 n.2 (D. Conn. 2021). The key difference between the statutes is that the DTSA requires a plaintiff to show that "the trade secret is related to a product or service used in, or intended for use in, interstate and foreign commerce." 18 U.S.C. § 1836(b)(1). Because there is no question that the trade secrets at issue here are related to products and services used in interstate and foreign commerce, the Court analyzes Cleer's CUTSA and DTSA claims together.

133. "To state a claim for trade secret misappropriation under the DTSA, 'a plaintiff must prove that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret.'" *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 491 (S.D.N.Y. 2024) (quoting *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023)).

134. "To qualify as a trade secret, information cannot be '[m]atters of public knowledge or of general knowledge in an industry' and 'a substantial element of secrecy must exist, to the extent that there would be difficulty in acquiring the information except by the use of improper means.'" *Garden Catering-Hamilton Ave., LLC v. Wally's Chicken Coop, LLC*, 30 F. Supp. 3d 117, 138 (D. Conn. 2014) (quoting *Town & Country House & Homes Serv., Inc., v. Evans*, 189 A.2d 390, 393 (Conn. 1963)). Under Connecticut law,

> Some of the factors to be considered in determining whether given information is a trade secret are (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Town & Country*, 189 A.2d at 393.

135.    Mr. McKeegan testified that Cleer considers its client list and business partner list and pricing information to be trade secrets.  (Tr. 39).  This information is not generally available to the public.  (*Id.*).  To protect this information from unauthorized disclosure, Cleer maintains different levels of password protection for its systems, including two-factor authentication.  (*Id.* at 39–40).  For each product Cleer uses to store this kind of trade secret information (*e.g.*, Box, Salesforce, Podio, etc.), workers have their own usernames and passwords.  (*Id.* at 40).  Cleer generally has every worker having access to these systems sign a non-disclosure agreement and an independent contractor agreement containing restrictive covenants.  (*Id.*).  The value of this information to Cleer is immeasurable—it collectively amounts to the backbone of its business.  Defendants' reproduction of a list of 5,448 Cleer client email addresses would be virtually impossible without access to Cleer's list.  It would also be virtually impossible to recreate Cleer's business partner list and pricing without unauthorized access to those materials.  None of this information is publicly known to, or readily discovered by, Cleer's competitors.  These factors thus demonstrate that Cleer's client list and business partner list and pricing information are trade secrets under Connecticut law.

136.    Having found this to be trade secret information under Connecticut law, the question becomes whether Defendants misappropriated these trade secrets.  A defendant misappropriates a trade secret under the DTSA "'(1) when it acquires a trade secret by improper means, or (2) discloses or uses the trade secret without consent.'" *Sunbelt*, 552 F. Supp. 3d at 330 (quoting *Medidata Sols., Inc. v. Veeva Sys., Inc.*, 17 Civ. 589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018)).

137.    Under the DTSA, "'[i]mproper means' includes 'theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy,' but excludes 'reverse

engineering, independent derivation, or any lawful means of acquisition.'" *Town & Country*, 556 F. Supp. 3d at 255 (quoting 18 U.S.C. § 1839(6)). The statute therefore "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Better Holdco, Inc.*, 666 F. Supp. 3d at 389 (quoting *AUA Priv. Equity Partners, LLC. v. Soto*, No. 17 Civ. 8035 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)).

138.    Defendants acquired Cleer's trade secrets by improper means and used them without Cleer's consent.

139.    As explained above, Ms. Stranger has breached her duty to maintain the confidentiality of Cleer's trade secret information. She also induced and encouraged the workers she poached from Cleer to breach the confidentiality provisions to which they were bound. (Tr. 235, PI Hearing Ex. 133). For instance, by pulling client information that belonged to Cleer, these workers created a list of 226 clients, which they sent to Ms. Stranger. (Tr. 209-210, 227–29; PI Hearing Ex. 133). And she apparently encouraged and induced former Cleer employee Lindsey Anderson to breach her contractual duty not to disclose Cleer's trade secrets by having Ms. Anderson send her Cleer's business partner pricing information in November 2024, well after the start of this litigation and the Court's entry of the TRO. (Tr. 213–14). The record also reflects that Ms. Stranger actually sent blast emails to the 226 and overlapping 5,448 client lists she obtained by improper means from Cleer. (Tr. 228, 235; PI Hearing Exs. 123, 126–27, 132, 136–39, 143–44, 146–47, 160–89).

140.    The Court thus finds that Cleer is likely to prevail on its DTSA and CUTSA trade secret misappropriation claims under the improper acquisition and use theories of liability.

**E.      Cleer Owns the Domain Cleer.Tax**

141.    Ms. Stranger claims she "owns" Cleer.tax because she registered it in her name. (PI Hearing Ex. 121). That fact alone is insufficient to establish ownership of a domain, and Ms. Stranger provided no evidence to support her claim of ownership. As noted above, all of the evidence in the record establishes—and Ms. Stranger admits—that she registered the Cleer.tax domain while employed by Cleer, as part of the company rebranding, and for the benefit of Cleer. (Tr. 32, 61, 183–92, 203).

142.    As an employee of the company, Ms. Stranger owed a duty of loyalty to Cleer to act in its best interests. As one Connecticut court has explained,

> [t]he relationship of principal and agent implies trust or confidence by the principal in the agent, and the agent is obligated to exercise the utmost good faith, loyalty and honesty toward his principal or employer. . . . The general principle for the agent's duty of loyalty according to the Restatement is that the agent must act solely for the benefit of the principal in matters connected with the agency.

*News America Marketing In-Store, Inc. v. Marquis*, 862 A.2d 837 (2004), *aff'd*, 276 Conn. 310, 885 A.2d 758 (2005); *see also* 2 Restatement (Third), Agency § 8.01, comment (b), p. 250 (2006) ("the general fiduciary principle requires that the agent subordinate the agent's interests to those of the principal and place the principal's interests first as to matters connected with the agency relationship."). Ms. Stranger breached this duty by refusing to transfer the domain to Cleer despite Mr. McKeegan's countless demands while she worked for Cleer. (PI Hearing Exs. 120–21, 152).

143.    Even if Ms. Stranger at any point had intellectual property rights in Cleer.tax (she did not), Sections 9.3 of the Operating Agreement and 9 of the MVA assigned those rights to Cleer. (PI Hearing Exs. 101 at 6, § 9, 102 at 11, § 9.3). Ms. Stranger was  instrumental in rebranding the company from GBS to Cleer: she suggested the name Cleer and the domain Cleer.tax, registered the domain Cleer.tax, assisted with obtaining the trademark for "Cleer" and the logo "Cleer.tax",

and helped develop the website and company logo. (Tr. 183–92; PI Hearing Exs. 103, 105, 109, 111, 113–15, 117–19). By her own admission, she did all of this for the company.

144.    The record shows Ms. Stranger never believed she owned Cleer.tax until an opportunity to use it for leverage presented itself as she resigned from employment with the Company. (PI Hearing Ex. 121). Ms. Stranger never legally owned the domain Cleer.tax despite registering it her name and holding it in her personal account, and her claim to the contrary is frivolous.[3]

145.    Finally, Ms. Stranger is equitably estopped from now asserting ownership of the domain Cleer.tax or otherwise waived her claim of ownership. Connecticut courts have long "recognized that estoppel always requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." *Boyce v. Allstate Ins. Co.*, 673 A.2d 77, 82 (1996) (citing cases). "Waiver is the intentional relinquishment or abandonment of a known right or privilege." *City of New Haven v. Loc. 884, Council 4, AFSCME, AFL-CIO*, 677 A.2d 1350, 1354 (1996) (internal quotation marks omitted).

146.    Not once did Ms. Stranger tell Cleer she purportedly owned Cleer.tax during the company's rebranding. Much the opposite, she helped the company obtain Cleer trademarks, create the Cleer.tax email domain, launch the Cleer.tax website, design the cleer.tax logo, generate Cleer.tax marketing materials, and establish client goodwill and branding around the name

---

[3] Cleer respectfully requests that the Court invoke its inherent authority and issue sanctions against Ms. Stranger for taking a frivolous position on her ownership of Cleer.tax, including misrepresenting that she provided an "oral license" to use Cleer.tax. (Tr. 199–200 (Ms. Stranger admitting that "ownership of Cleer.tax was never discussed with Cleer" and "never even an agreement that [she was] providing a license for Cleer.tax to use this domain."); Stranger Opposition to Motion for TRO, Doc. 20 at 16 (Ms. Stranger representing to the Court that she gave Cleer an oral license.)).

Cleer.tax. (Tr. 183–92). All of Ms. Stranger's conduct was intended to lead Cleer to believe it owned the Cleer.tax domain. And based on this belief, the company changed its entire image and identity to Cleer.tax. Ms. Stranger not only acquiesced to but spearheaded the company's use of Cleer.tax for its rebrand, so any right or privilege she may have once had in Cleer.tax ceased to exist. Thus, Ms. Stranger is equitably estopped from now claiming ownership of the domain Cleer.tax or has waived that right.

147.     Paragraph 3.2.4 of the Operating Agreement states that Ms. Stranger does not own any assets of the company. Moreover, Paragraph 8.c. of the MVA requires Ms. Stranger to return company property to Cleer. Accordingly, she will be required to return the domain to Cleer.tax within 24 hours of the Court's Order.

**F.    Because Ms. Stranger Does Not Own Cleer.tax, Cleer Is Likely To Prevail On Its Claims Of False Designation of Origin And Unfair Competition Under Section 43(a)(1)(A) Of The Lanham Act**

148.     Having found that Ms. Stranger does not own the domain Cleer.tax, Defendants' conduct violates Section 43(a)(1)(A) of the Lanham Act.

149.     Section 43(a)(1)(A) of the Lanham Act states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). In other words, Section 43(a) of the Lanham Act prohibits any false designation of origin which is likely to cause confusion or mistake, or deceive as to origin of

source, sponsorship, or affiliation.  *See Forschner Group, Inc. v. Arrow Trading Co.*, 30 F.3d 348, 358 (2d Cir. 1994) (citations omitted).

150.    Through the use and redirection of Cleer's "Cleer.tax" domain and CLEER Trademarks for unlicensed commercial use, Defendants are impermissibly "passing off" the "Cleer.tax" domain and CLEER Trademarks.  Such passing off constitutes trademark infringement and false designation of origin, an unfair practice prohibited by Section 43(a) of the Lanham Act. 15 U.S.C. §1125 (a).  "A seller who deliberately passes off his goods as those of his competitor has falsely designated the origin of the goods within the meaning of section 43(a)."  *Sutton Cosmetics (P.R.) v. Lander Co.*, 455 F.2d 285, 287 (2d Cir. 1972) (affirming preliminary injunction).  Defendants deliberately programmed "Cleer.tax" to automatically redirect people to "OpticTax.com" to pass off their services as Cleer's services.  (Tr. 119).  Defendants even sent a blast email from "crystal@cleer.tax" telling Cleer's clients that Cleer's whole bookkeeping team had left and joined Optic Tax (omitting that she unlawfully catalyzed the bookkeeping team's exodus), signing off at the bottom as Optic Tax.  (PI Hearing Ex. 139).

151.    Mr. McKeegan testified as to the confusion clients have experienced as a result of Defendants' conduct:

> Q. Is there ongoing confusion due to the website and email domain transfer?
>
> A. Yeah. There's been a lot of confusion among clients as to why other people are contacting them.  Who has access to their data?  Where is their tax information, did that get hacked as well?  Questions like that coming in to us, which again degrades us as a brand if people think it's not secure.

(Tr. 140).  Cleer's clients' responses to this and other blast emails from Defendants confirms the confusion Defendants' conduct created.  (PI Hearing Exs. 129, 136, 139–41).

152.    There is considerable evidence in the record that Defendants' actions have caused and will continue to cause confusion and mistake as to the origin of source of and affiliation

between Cleer and Optic Tax.  Cleer is thus likely to prevail on its Section 43(a)(1)(A) Lanham

Act false designation of origin and unfair competition claims.

> **G.    Cleer Is Likely To Prevail On Its Claim That Defendants Violated The Anti-Cybersquatting Consumer Protection Act.**

153.    The Anti-cybersquatting Consumer Protection Act ("ACPA") prevents the use of a

domain name, in bad faith with intent to profit, that incorporates a mark. 15 U.S.C.

§ 1125(d)(1)(A).  In bringing a cybersquatting claim, Cleer must establish: "(1) the [CLEER] mark

is either distinctive or famous; (2) the Domain Name is identical or confusingly similar to the

[CLEER] mark; and (3) Defendants had a bad faith intent to profit from use of the mark." *Web-*

*adviso v. Trump*, 927 F. Supp. 2d 32, 39 (E.D.N.Y. 2013), *aff'd sub nom. Yung v. Trump*, 648 F.

App'x 24 (2d Cir. 2016) (citing *Sporty's Farm LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497–

99 (2d Cir.2000)).

154.    First, the CLEER Trademarks are inherently distinctive.  Distinctiveness is

measured on a scale progressing from least to most distinctive by categorizing marks: (1) generic;

(2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting*

*World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976).  "An arbitrary mark 'applies a common word in an

unfamiliar way' and a fanciful mark 'is not a real word at all, but is invented for its use as a mark.'"

*Real News Project, Inc. v. Independent World TV, Inc.*, 2008 U.S. Dist. Lexis 41457, *19

(S.D.N.Y. 2008) (quoting *Lane CapitalMgm't, Inc. v. Lane CapitalMgm't, Inc.*, 192 F.3d 337, 344

(2d Cir. 1999)).  "Arbitrary and fanciful marks are inherently distinctive, '[t]heir intrinsic nature

serves to identify a particular source of a product, so they will be automatically protected.'" *Id.*

Cleer is not a real word.  Ms. Stranger and Mr. McKeegan came up with Cleer and Cleer.tax to be

used as trademarks. *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir.

1997) (holding that fanciful marks are "words invented solely for their use as trademarks."); *see*

*also Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 228 F. Supp. 399, 404 (S.D.N.Y. 2002) (same).  Cleer qualifies as a fanciful mark and is thus inherently distinctive.

155.    Second, the domain Defendants used to send blast emails, Cleer.tax, is identical to Cleer's CLEER.TAX design mark and incorporates Cleer's CLEER Trademark.  This domain incorporates, in its entirety, Cleer's trademarks without incorporating any additional matter.

156.    Third, Defendants had a bad faith intent to profit for many reasons.  While the ACPA enumerates nine factors courts may examine in assessing bad faith intent to profit, the statute and the Second Circuit confirm that these factors are discretionary, non-exhaustive, and not binding.  *Am. Lecithin Co. v. Rebmann*, No. 12-CV-929 (VSB), 2020 WL 4260989, at *8 (S.D.N.Y. July 24, 2020) (citing 15 U.S.C. 1125(d)(1)(B)(i)).  Indeed, courts "'need not need not . . . march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive.'"  *Gioconda L. Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 432 (S.D.N.Y. 2013) (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001)).  That said, the factors are "expressly described as indicia that 'may' be considered along with other facts."  *Sporty's*, 202 F.3d at 498 (citing 15 U.S.C. § 1125(d)(1)(B)(i)).

157.    The first factor, "the trademark or other intellectual property rights of the person, if any, in the domain name," weighs heavily in favor of finding Defendants' bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i)(I).  This is not a case in which a defendant registered a domain that is identical or confusingly similar to a plaintiff's mark.  Cleer actually owns the domain at issue, which Ms. Stranger registered for the benefit of and in the course of her employment with and membership in Cleer.  Defendants thus have no intellectual property rights in the domain name.

158.    So, too, does the third factor, "the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services," favor finding Defendants' bad

faith intent to profit.  15 U.S.C. § 1125(d)(1)(B)(i)(III).  Ever since Ms. Stranger registered Cleer.tax for Cleer, only Cleer had used it to offer goods and services before Ms. Stranger hijacked and started using it for Optic Tax.  In other words, Defendants have never used Cleer.tax for any bona fide offering of goods or services.

159.    By autoforwarding Cleer.tax to OpticTax.com and using the Cleer.tax domain in a deceptive email campaign, Defendants diverted consumers away from Cleer to locations that harm the goodwill associated with Cleer's mark, greatly tipping the fifth factor in favor of finding Defendants' bad faith intent to profit.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V) ("the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site . . . .").

160.    And Ms. Stranger's use of the Cleer.tax domain as leverage to force Mr. McKeegan to pay her $200,000 in salary equivalents and give her confidential data belonging to Cleer tips the sixth factor in favor of finding bad faith intent to profit.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VI) ("the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct . . . .").  The Ninth Circuit has noted that "[a]s for whether use to get leverage in a business dispute can establish a violation, the statutory factors for 'bad faith intent' establish that it can."  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1221 (9th Cir. 2010).  And "Factor VI may fairly be read to mean that it is bad faith to hold a domain name for ransom, where the holder uses it to get money from the owner of the trademark rather than to sell goods."  *Id.* (footnote omitted).

Courts in the Second Circuit have reached similar conclusions.  *See Rebmann*, 2020 WL 4260989, at \*12 (finding the defendant unlawfully held domain names from his former employer as ransom as leverage to get severance or reimbursement); *see also Vogster Ent., L.L.C. v. Mostovoy*, No. 09-CV-1036 RRM/RER, 2009 WL 691215, at \*4 (E.D.N.Y. Mar. 16, 2009) (holding the former co-owner of company acted with bad faith intent to profit by refusing to return domain to the company despite repeated demands to do so).  "Indeed, holding domains hostage to extract ransoms from lawful mark owners was one of the evils targeted by the ACPA," *Mintz v. Mktg. Cohorts, LLC*, No. 18CV4159ERKSIL, 2019 WL 3337896, at \*5 (E.D.N.Y. July 25, 2019) (citing *Sporty's*, 202 F.3d at 493), which is precisely what Ms. Stranger did to Cleer using Cleer.tax as leverage in January 2024.  (Tr. 98, 102, 105, 107; PI Hearing Exs. 100, 120–22, 151–152).

161.    Cleer is thus likely to prevail on its claim that Defendants violated the ACPA.

## III.    Bond Requirement

162.    Based on the circumstances, the Court exercises its discretion to waive the bond requirement.  In this case, Cleer has established: (i) the substantial strength of its claims, and (ii) that no damage will come to Defendants as a result of being forced only to comply with Ms. Stranger's contractual obligations and returning to Cleer its company property.

163.    For each of these reasons, no bond is required to enjoin Defendants' conduct, as requested.

## ORDER

Based on the pleadings, the evidence presented, the Court records, the files, and the arguments presented, and based on the above Findings of Fact and Conclusions of Law, this Court find that Cleer has met its burden to obtain a preliminary injunction on the bases of each its claims, and the elements required for issuance of an Order have been satisfied as to each claim.

**WHEREFORE, IT IS HEREBY ORDERED THAT**:

1.      That Plaintiff Cleer LLC's Motion for Preliminary Injunction is GRANTED.

2.      Ms. Stranger and her employees, contractors, agents, companies (including but not limited to Optic Tax) and all persons in active concert or participation with, through, or under her, are enjoined and restrained from:

    a.      Pursuant to the Operating Agreement, competing against Cleer until August 9, 2025, including without limitation by offering tax preparation and bookkeeping services;

    b.      Pursuant to the Operating Agreement and MVA, for a period of one year from this Order, soliciting, hiring, or otherwise contacting for purposes of discussing employment or contractor opportunities any person who is or was working for Cleer LLC or any of its predecessors in any capacity;

    c.      Pursuant to the Operating Agreement and MVA, for a period of one year from this Order: (i) soliciting, (ii) accepting business from, (iii) continuing to provide services for, or (iv) otherwise contacting for purposes of developing business, entering into an agreement, or proposing or making any sale any person who is or was a customer, supplier, or prospective customer or supplier of Cleer LLC. The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination. Absent conferral and agreement, Stranger may not contact any customers or suppliers or prospective customers or suppliers of Cleer LLC or its predecessors.

    d.      Using, disclosing, or sharing any Confidential Information or trade secret information of Cleer. Defendants are further instructed to confer with counsel for Cleer to ensure the permanent deletion of Cleer's confidential and trade secret information within 14 days of this Order;

    e.      Using the symbol, mark, or designation Cleer.tax; and

    f.      Within 24 hours of this Order, take all actions required to return to Cleer the domain Cleer.tax.

3.      It is further ordered that no bond shall be required.

**SO ORDERED.**


Date:_____          _____

                                    U.S. District Judge




                              Respectfully submitted,

                              */s/ George B. Musekamp*
                              George B. Musekamp (PHV)
                              Evan H. Cohn (PHV)
                              Taft Stettinius & Hollister LLP
                              425 Walnut Street, Suite 1800
                              Cincinnati, Ohio 45202
                              Tel:  (513) 381-2838
                              Fax: (513) 381-0205
                              gmusekamp@taftlaw.com
                              ecohn@taftlaw.com

                              Michael S. O'Malley, Esq. (CT31784)
                              Ogletree, Deakins, Nash,
                              Smoak & Stewart P.C.
                              281 Tresser Boulevard
                              Stamford, CT 06901
                              Tel: (203) 969-3109
                              Fax: (203) 969-3150
                              Michael.O'Malley@ogletree.com

                              *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on February 12, 2025 the foregoing was filed using the Court's electronic filing system which will provide notice to all counsel of record.

*/s/ George B. Musekamp*

42