# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | DEFENDANT CRYSTAL STRANGER'S |
| | : | PRO SE SUR REPLY IN OPPOSITION |
| CRYSTAL STRANGER et al. | : | FOR FINDING DEFENDANTS IN |
| | : | CONTEMPT OF COURT'S CRYSTAL |
| | : | STRANGER, et al., TEMPORARY |
| | : | RESTRAINING ORDER [DOC. 34] |

COMES NOW, Crystal Stranger, the individual Defendant in the above-captioned matter, proceeding pro se, and respectfully asks the court to please consider the following Sur Reply in response to the Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Contempt of Court. In support of this, I state as follows:

**I. INTRODUCTION**

Plaintiff's continued assertions regarding the nature and purpose of the emails sent fundamentally misrepresent both the content and the context in which they were disseminated. The allegations that these communications constituted solicitations in violation of the Temporary Restraining Order ("TRO") fail to acknowledge the well-established professional expectation to provide timely, factual, and educational updates on critical tax matters. These emails were not targeted solicitations, but rather widely distributed informational updates on tax deadlines- topics of significant public concern.

Furthermore, Plaintiff has not provided substantive evidence that my email list was improperly obtained. Instead, the Plaintiff has sought to leverage vague allegations and speculation while refusing to provide critical data- such as a definitive list of clients with whom I had prior contact. This omission underscores the fundamental weakness of Plaintiff's arguments. Additionally, Plaintiff's claim that I "fled the jurisdiction" to avoid testifying is both baseless and misleading.

Given the overbreadth of the TRO and its infringement on my First Amendment rights, it is necessary to correct the record and highlight the Plaintiff's failure to establish any credible basis for its claims. The following arguments will demonstrate that (1) the emails in question were purely educational and not solicitations; (2) there is substantial overlap between my mailing list and Cleer's marketing list due to publicly available webinar registrations, not misappropriation; (3) Cleer has deliberately refused to produce relevant evidence that would clarify the scope of its claims; and (4) the TRO imposed an unconstitutional prior restraint on protected speech.

## II. **FACTUAL BACKGROUND**

### 1. The Emails Sent Were Not Solicitations

As a well-known tax educator, who regularly has thousands of tax professionals, business leaders, and treasury employees attend the webinars I give, there is an expectation that I will provide informational updates to the public. Webinar attendees

make up a large portion of my mailing list, and likely this is where much of the crossover of email recipients to the Cleer list comes from, as the organizations for which I give these webinars publicize them far and wide.

These emails were all essential based on misinformation seen online and questions I had been receiving related to misunderstandings of tax deadlines. The first email sent was because a contact had raised the issue that there were many websites showing incorrectly that the 4th Quarter Estimated Tax Payment for corporations being due on January 15th, 2025. With the advent of ChatGPT false information often fills the top spaces on search engine queries, and I was surprised to see this incorrect information broadly disseminated. Thus I wrote the December 5th email about year-end deadlines, as evidenced by the first main header in that document, "December 16th, 2024: 4th Quarter Estimated Tax Payments Due." (PI Hearing Exhibit 127) This was urgent information to get out on December 5th, as the deadline was just 11 days out, and if companies do not pay their estimated taxes, penalties and interest accrue.

The second email was a correction about the FinCEN Beneficial Ownership Information (BOI) filing, as I had mentioned the end of year deadline in the first email, and then the court in the *Texas Top Cop Shop Inc. v. Garland* case issued a preliminary injunction enjoining FinCEN from enforcing the BOI. (Civil Action No. 4:24-CV-478 (December 3rd, 2024)) As this injunction actually was issued prior to the date that I wrote the prior email, but I had not seen it until after sending the deadline email, I issued an email which was a correction of this deadline and that the BOI report now was a

voluntary filing, as soon as FinCEN confirmed this information on their website. This is evidenced by the main header here stating, "FinCEN agrees to stay BOI enforcement because of the Texas Case!" (PI Hearing Exhibit 146) This email also was necessary to send due to a webinar I had given the same day of sending the other email where I did not mention the BOI change.

Over the following month there were numerous whiplash-like changes to the FinCEN BOI filing requirement. First the appeals court changed their mind and rescinded the injunction, then they reinstated the injunction, then ultimately the Supreme Court of the United States overturned the injunction. However, another injunction restraining enforcement of the BOI had subsequently been issued on different facts in *Smith et al v. United States Department of The Treasury* et al, No. 6:2024cv00336. Due to this this legal ping-pong, I was inundated with messages about whether or not the FinCEN BOI was still relevant, or if it was indeed voluntary. People who have attended my webinars rely on me to help them understand this type of filing requirement, and how as tax professionals we should comply. Thus I sent the third informational email (PI Hearing Exhibit 147), with an infographic affirmatively stating the current business tax deadlines, and another explanation about the FinCEN BOI filing remaining voluntary.

These emails I sent out were purely educational in nature and related to urgent tax deadline information that my former webinar attendees need to know. It is understandable that David McKeegan does not appreciate the value of providing correct

deadlines to clients though, as the incident that originally led me to resign from Cleer back in January of 2024 was related to his sending a blast email with an incorrect tax deadline to our client list, and I was concerned of the negative effect this would have on my reputation as a tax expert. The Plaintiff is well aware of how important I believe providing correct deadlines to taxpayers is, important enough to walk away from the company I built, and this pressure by the Plaintiff to have the court restrict my ability to send information blast emails is thus a well-aimed attack with the intention to harm my reputation as a tax expert by preventing me from sharing the types of informational updates which my followers expect me to provide.

### 2. Cleer's Email List Likely Includes Many of My Webinar Attendees

Cleer has provided zero proof that I obtained any list from them. In David McKeegan's testimony at the Preliminary Injunction hearing he claimed that I stole a list of 5,448 clients from Cleer, but didn't state where that list came from, or how he determined that. Cleer's list from their email marketing allegedly shows 9,934 recipients (*PI Transcript,* 136:23), and David McKeegan estimated that in Salesforce Cleer has around 5,000 actual clients in total. However, he never provided me or my former attorney a list from Salesforce to show the total number of actual clients on that list, or had the attorneys compare and stipulate that list in comparison with my 14,000 marketing list, to determine how many of those are actual clients and not just email

contacts, as the email marketing list admittedly contains a substantially higher number of contacts than clients.

It is possible that a portion of Cleer's email list was copied from my email lists from webinars, from information shared while I was employed at Cleer. I used to share some of the lists I received from the webinar organizations with Lindsey Anderson, to add to the Cleer marketing list. I don't have access to those lists, as they are in my old gmail account of crystal@cleer.tax which I was not provided the data from when I left Cleer, so I have no record of this. If the Plaintiff decides to actually make an attempt to determine the source of their own lists, they could determine how much of their list is from my webinars, but they have not provided information on this. And as discussed infra they have made no effort to determine who I was in contact with while at Cleer, as it benefits them to leave this ambiguous.

However, it is only logical that if attendee's emails were added to the Cleer list back then, it is likely some of the same individuals have attended the many webinars I have given in 2024, and there is crossover based on this. Since their 9,934 person email marketing list exceeds their roughly 5,000 person Salesforce list by 4,934 email addresses, which is 90% of the amount of the crossover between our lists, it is possible that there may be very little crossover between their Salesforce list of actual clients, and my email marketing list, and that a good number of the shared contact information is due to multiple webinar signups of the same individuals.

This is not a stretch to imagine, considering that over 2700 people signed up just for the webinar I gave yesterday for CPA Academy titled, *2025 TAX LAW OUTLOOK: PREPARING FOR CHANGES UNDER THE NEW ADMINISTRATION*. My webinars are highly attended, and for 2024 I was voted one of the top ten presenters on the CPA Academy platform, due to my professional focus on tax education in 2024. I have had a total of 26,245 registrations for my CPA Academy webinars alone, and many of those were repeat attendees. Since leaving Cleer I have focused largely on these speaking engagements, which is part of what has enabled me to build such a substantial mailing list in a short time frame, far exceeding the result of Cleer/GBS/Greenback Business Service's efforts in all of its years in business, which may explain why they are so agitated about the mailing lists.

**3. Cleer has Refused to Provide a List of Clients Showing Direct or Indirect Contact in the Two Years Prior to Ending Employment**

As stated in the TRO, "The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination." (TRO, Doc 34 at 4)

Yet Cleer has not been bothered to create this list. In the Preliminary Injunction hearing David McKeegan testified that he has not created a list of this information yet, even though he has the capabilities to do so:

8

THE WITNESS:

A. Yes. So before she resigned, she was an admin on the Google account. And she went in and tried to download all of her information. And so I stopped that.

Q. Okay. Now, with Salesforce are you able to see which clients Ms. Stranger actually contacted while she worked for Cleer?

A. Well, the Match My Email function is one of the ones that wasn't working properly while Ms. Stranger was the COO of the business. We've since fixed it. It now works. So I don't know if I can go back in time to find that or not.

THE COURT: What was the name of the function, Match My Email?

THE WITNESS: Yeah. It's a company. I believe it's MatchMyEmail.com. They basically plug into Salesforce and they take emails from your gmail account and import them into Salesforce so that you don't have to have your email in one screen and the CRM in the other, you can see it all from one.

BY MR. HARRISON:

Q. But without that Match My Email functionality, Salesforce doesn't tell you which clients any particular person contacted?

A. Without being able to see the emails, I wouldn't be able to accurately tell you. Somebody could have left a note in there, but it's more rare for somebody to go in and type in "I sent an email on X date."

Q. Okay. Now, if Ms. Stranger had her Google account data or if you had her Google account data, would that tell you which clients she actually contacted?

A. If I went into her Google account, I could probably figure it out. It would be a very manual exercise, though.

Q. Have you done that?

A. I have not.

(*PI Transcript,* 148:9-149:18)

Therefore, even though David McKeegan admits he has been able all along to create a list from my Google Data of the clients I was in direct and indirect contact with in the two years prior to leaving my employment at Cleer, and the court ordering production of this list, he has not done so.

This whole case could be solved and could have been prevented in the first place by granting me access to my Google Data. It was when I was restricted from obtaining this in order to create a list to comply with the provisions in the Master Vesting Agreement (MVA) that communications broke down related to my leaving the company and coming to a reasonable agreement to resolve our partnership amicably. Without that data I do not have any record of who I worked with at Cleer, and I could not possibly have complied with either the restrictions in the MVA, or the TRO.

**4. Plaintiff Claims I Fled the Jurisdiction in Order to Not Testify**

As stated in the Motion for Mistrial (Motion, 139) and Opposition to Sanctions (Opposition, 148) I did not flee the Jurisdiction, I did not leave Connecticut prior to the trial ending, and the fact that I was not available to testify was due to poor communication on the part of my former attorney who was ill with Covid-19 and incapable of clearly advising me about my obligations related to the Preliminary Injunction trial that day.

Sending an email to someone who one should expect to be driving, is not a reasonable form of communicating an important change of events. And when I did receive a text message, it was not clear what the context of the message was, and I assumed it was about meeting with my attorney the next day to discuss the continuance, as planned that morning. Due to having my phone replaced I was only aware that court had continued without me at 11:36 AM, half an hour after the proceedings had concluded. At that time I did offer to turn around and immediately return to the courthouse, but as the matter had concluded it would have been futile.

Furthermore, the fact that I was not at the second date of the hearing prejudiced the Defendants more than the Plaintiff due to the fact that I was not able to testify in my defense on cross examination, and the Plaintiff was able to introduce all of their evidence without any contra-argument. (*Id.*, 246:20-25)  And yet the Plaintiff's attorney continues to waste the court's time by repeatedly bringing motions claiming that they were the ones burdened, when in fact they benefitted from this course of events.

### III. LEGAL ARGUMENT

**1. Emails Sent to a Broad Audience are Not a Solicitation**

The word "solicit" means "to make petition to" or "to approach with a request or plea." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2012); see also *Black's Law Dictionary* (10th Ed. 2014) which defines "solicitation" as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition". The emails sent in December and January were not a request, they did not seek to obtain anything, they were solely sent in order to disseminate urgent information about changes to relevant tax deadlines.

Under Connecticut law, it appears that "solicit" is limited to a plea or entreaty directed to an individual. An unpublished Superior Court opinion concurs with that definition: "The determination that 'solicit' is limited to a plea or entreaty directed to the individual is compelled not only by the customary definition of the term 'solicit,' it is compelled by practicalities. A business or entity bound by a non-solicitation provision would encounter substantial difficulty filling vacant job positions if the provision were read to cover general job postings or advertising. Those difficulties would be insurmountable for any governmental entity required by law or contract to publicly post or advertise vacant positions before filling them. These practical problems are further evidence that the parties intended to limit the term 'solicit' to its commonly understood

definition. *Pediatric Occupational Therapy Services, Inc. v. Town of Wilton*, No. X06-CV 02- 0174833 S (Conn. Super. 4/7/2004) (Conn. Super. 2004).

Furthermore, it is hard to understand why a blast email would be considered a solicitation, when internet communications have typically been determined to be less invasive than other forms of advertisements. "Moreover, the Internet is not as "invasive" as radio or television. The District Court specifically found that "[c]ommunications over the Internet do not 'invade' an individual's home or appear on one's computer screen unbidden. Users seldom encounter content 'by accident.' " 929 F. Supp., at 844 (finding 88)." *Reno v. ACLU*, 521 U.S. 844 (1997) The informational emails I sent were not solicitations, they were not even advertisements, as the purpose was urgent informational updates. And being communications over the internet case law has long held that if the information is not something that the recipient wants to receive they can either not open it, delete it, and/or unsubscribe.

**2. The TRO Restricted Speech Protected Under the First Amendment and Was an Unconstitutional Prior Restraint**

Prohibition of publishing factual information on a matter of public interest is a classic example of a prior restraint presumptively violative of the First Amendment. *Alexander v. United States*, 509 U.S. 544, 550 (1993) (permanent injunction is a "true restraint on future speech").

The First Amendment protects the freedom of expression from government interference, including interference by the judicial branch. "Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used" *Citizens United v. FEC*, 558 U.S. 310 (2010) Here the TRO's blanket prohibition of contact of any of Cleer's clients, without any means for me to remove Cleer's clients as I do not know who they are without being a provided a list, became an unreasonable prior restraint on my First Amendment rights.

As a tax educator and content creator much of the materials I produce and share with recipients of my newsletters are similar to the type of information which in the past would be gained from a newspaper. "Freedom of speech and of the press embraces, at the least, the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88 (1940). The TRO has left me terrified that any communication I make to my followers will be held against me in a Motion, such as this one the Plaintiff has brought, but this is making it impossible for me to provide the urgent information that I need to be sharing, such as the material I covered in the webinar yesterday related to the many executive orders released in the last few weeks and how the tax professionals and business leaders who rely on me for information can navigate these changes.

The informational emails that the Plaintiff claims were a violation of the TRO were substantially factual matter of public interest. Changes to tax deadlines are of the utmost importance to the attendees of my webinars, and I frequently receive questions

in response to these types of events. However, not everyone is aware of every change, which is why they rely on information from content producers like me to keep them aware of important updates.

These emails were sent solely in response to these types of misunderstanding and tax deadline changes, largely related to FinCEN BOI filing. These emails as a whole could be viewed similar to those in *Bigelow v. Virginia*: "Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience -- not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia." (421 U.S. 809 (1975))

While the Plaintiff rightly claims that there were headers which linked to pages on Optic Tax's website, not all commercial speech is devoid of First Amendment protections. As stated in *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U. S. 748, "If there is a kind of commercial speech that lacks all First Amendment protection, therefore, it must be distinguished by its content. Yet the speech whose content deprives it of protection cannot simply be speech on a commercial subject." Consequently, the emails sent are not solely lacking in protections due to the few small links to Optic Tax's website. Overall these communications which were urgent deadline related communications should more fairly be viewed as protected speech under the First Amendment.

Furthermore, there were less burdensome ways in which the TRO could have been written to not be a restraint on protected speech. It could have set a date by which Cleer needed to provide the list, it could have banned only solicitations, or it could have required removal of Cleer's 226 known clients from the list. "A regulation need not be 'absolutely the least severe that will achieve the desired end,' Fox, 492 U. S., at 480, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the "fit" between ends and means is reasonable." *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993)

### 3. The No-Contact Provision of the TRO was Overbroad and Prejudicial

The Provision in the TRO quoted by the Plaintiff in their Reply, "Absent conferral and agreement, Stranger may not contact any customers or suppliers or prospective customers or suppliers of Cleer LLC or its predecessors." (TRO, Doc 34 at 4) was an overbroad restraint on my First Amendment rights because the sentence prior to this, "The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination;" was reliant on Cleer cooperating and providing the list of clients that I had direct or indirect contact or solicitation in the two years prior to leaving (and I must add to correct the record, that I was not terminated, but left voluntarily).

Here there was an easy way that the overbreadth of the TRO could be prevented, by Cleer providing a list of the clients that I had direct and indirect contact with over the prior two years, making the TRO constitutionally valid. However, Cleer has refused repeatedly to produce this list, and as stated in the Preliminary Injunction hearing as quoted supra that while it was possible to create this list, Cleer has not made an effort to do so. It is facially obvious that it was in Cleer's self-interest to not produce this list, because the TRO statement that prevented all contact absent Cleer providing this list gave them a vested interest in not producing the information that I would be able to use to comply with the court order.

Cleer's refusal to prepare this list led to an overbroad restraint on protected speech. "The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted." *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ruling that the flow of information may not be restrained.

Just by my speech being restricted in this manner, there is substantial precedent that I have suffered irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Time Square Books, Inc. v. City of Rochester*, 645 N.Y.S.2d 951, 958 (N.Y. App Div. 1996) (same); see also *New York Times Co. v. United States*, 403 U.S. 713, 715 (1971) (the "Pentagon Papers" case) (Black, J., concurring) ("[E]very moment's continuance of the injunctions against these newspapers amounts to

a flagrant, indefensible, and continuing violation of the First Amendment."); *Nebraska Press Assoc.*, 423 U.S. at 1329 ("any First Amendment infringement that occurs with each passing day is irreparable").

The broad no-contact provision here, unless the Plaintiff meets a condition fully within their control, was an overbroad and prejudicial ruling in that there was no way I could comply with this court order, short of refraining entirely from sending emails to my mailing list. By not providing this list, Cleer has conjured a situation wherein there was a blanket suppression of my First Amendment rights of sending informational emails.

## IV. **CONCLUSION**

Plaintiff's motion seeks to weaponize contempt for routine professional conduct. The emails were lawful, non-solicitous, and served the public interest. Defendant respectfully requests that the Court deny the Plaintiff's Motion for Contempt and award costs and fees incurred in defending this meritless action.

Respectfully submitted,

Crystal Stranger

Pro Se Litigant

Date: February 18th, 2025