**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | DEFENDANT CRYSTAL STRANGER'S |
| | : | MOTION FOR BOND PURSUANT TO |
| CRYSTAL STRANGER et al. | : | FED. R. CIV. P. 65(c) |
| | : | |
| | : | |

Defendant, Crystal Stranger, appearing pro se, respectfully moves this Court for an order requiring Plaintiff to post a bond pursuant to Federal Rule of Civil Procedure 65(c) in connection with its Motion for Temporary Restraining Order (TRO) and Preliminary Injunction (PI). Defendant asserts that Plaintiff's requested relief, as granted, has and will continue to expose Defendant to significant financial harms and risks, necessitating a bond sufficient to safeguard Defendant's interests.

## I. <u>INTRODUCTION</u>

Plaintiff has sought and obtained injunctive relief through a TRO, and now seeks a Preliminary Injunction, restricting Defendant's ability to conduct her professional activities. While the length of a TRO is up to the discretion of the court, under FRCP 65 this should not exceed 14 days, unless there is good cause, and here the TRO has

already stretched for four months. These restrictions have caused and will continue to cause severe financial harm, including lost income and professional liability exposure. To mitigate these harms, Defendant requests the Court set a bond in the amount of $798,196.33, or such higher amount as the Court deems proper, to secure Defendant against financial losses resulting from the TRO and PI.

Plaintiff in their proposal regarding security stated that "there is no proof Defendants will suffer any harm." But this is not true. Due to Plaintiff's actions in not providing a reasonable list limiting the TRO restriction, Defendants have suffered substantial financial harm, and will continue to suffer substantial harm as long as the TRO or an injunction stands as currently stated.

## II. **FACTUAL BACKGROUND**

### A. Plaintiff Did Not Meet Their End of The Bargain From the TRO

The TRO specified that "The plaintiff shall file a proposal regarding security under Fed. R. Civ. P. 65(c) by Friday, October 25, 2024 by 5 pm." (TRO, Doc 34 at 5) This deadline was not met, and the Plaintiff did not file their proposal until October 28th, 2024, three days late, setting the tone for the Plaintiff's disregard of the legal process throughout these proceedings, and undermining the importance courts have tied to security related to injunctive relief.

After failing to timely file the security proposal, the Plaintiff then refused to comply with the TRO terms regarding conferring "in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination." (TRO, Doc 34 at 4) Four months have passed, and despite Plaintiff clearly admitting to having the capabilities to create this list (PI Transcript, 148:9-149:18), the list has not been produced, prejudicing Defendant.

Plaintiff claims that they have provided a list, but the only list provided (PI Hearing Exhibit 159) was an email list produced from an email marketing software, Active Campaign, as of December 18th, 2024- nearly a year after I resigned from Cleer. This was clearly stated in the direct trial testimony of David McKeegan:

BY MR. MUSEKAMP:

Q. Do you recognize this to be Cleer's mailing list?

A. I would have to see how many people are on there.

MR. COHN: You said 159. Do you mean 158?

MR. MUSEKAMP: It looks like the same. That looks more like it. Sorry. Is this still Exhibit 159?

MR. COHN: 159.

MR. MUSEKAMP: Let me start the questions over.

BY MR. MUSEKAMP:

Q. David, do you recognize this document?

A. Yes.

Q. What is this?

A. It looks like our email list from ActiveCampaign as of December 18.

Q. And how many -- Evan, if you could scroll down. How many contacts do you have on this list here?

A. It looks like there's 9,934.

Q. Would it be fair to characterize this as a current or prospective client list?

A. Yes. **This would be everybody we have on our email list to reach out to about anything tax related. So this is built up over the life of the company to capture email addresses and market to people.**

Q. Which you were testifying to previously with your business referrals and referral partners?

A. Yes.

Q. And your current clients?

A. Yes.

Q. And your prospective clients?

4

A. Yes.

THE COURT: What's the date of that list?

THE WITNESS: December 18, I believe.

THE COURT: Of '24?

THE WITNESS: '24.

(PI Transcript 136:6-137:15)

David McKeegan stated here without any ambiguity that the list provided by Plaintiff was everybody on their email list for the lifetime of the company through December 18th of 2024. Plaintiff states they formed their company in 2016 (First Amended Complaint, Doc 55, at 4), four years prior to my joining the company.

The Master Vesting Agreement (MVA) Section 12(a)(i) states:

a.       During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:

i.                Directly or indirectly contact, solicit, accept business from or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to employee's termination, for the purpose of selling or soliciting products or services of Company;

This contractual provision clearly states that the restriction is limited to clients I was in direct or indirect contact with for two years prior to leaving the company. Yet Plaintiff repeatedly asserts that somehow the restriction should include all clients who have ever signed up for an email mailing list with Cleer, including those for four years prior to me even being employed at the company. Even more dubious, the list they affirm should be used also includes names added to a mailing list for nearly a year after my resignation. How they can state this with a straight face is baffling.

Furthermore, the assertion that I had direct or indirect contact with all of Cleer's clients, is absurd. I estimate I only directly worked with around 1,000 clients over the four year time period I worked at Cleer, and I only indirectly supervised a small number of clients over the last two years of my tenure because there were two other supervisors, and I predominately did just a handful of secondary reviews. Me being the spokesperson "face" of the company is not indirect contact with all 9,934 persons on Cleer's email list, including people added for a year after I left the company, and six years prior to the term restricted under the MVA. This is an absurdity.

The no-contact default is a total bar on me sending informational emails to my followers at this point, as there has been no way for me to remove a reasonable amount of crossover contacts from my webinars. In the Plaintiff's Proposal Regarding Security Under Rule 65 (Notice, Doc 39) the Plaintiff claimed that the justification not to post a bond was based "on the abundance of undisputed, verified facts and evidence of Defendants' malfeasance Cleer has submitted to the Court." However, this is disputed,

and even if it wasn't it would make light of the fact that an overbroad injunction not only can cause financial harm well exceeding the amount in controversy but also infringes upon the Defendant's First Amendment rights. While I have admitted to contacting 226 people who I knew were prior clients of Cleer, these were not necessarily even clients that I had direct or indirect contact with over the two years prior, as that list has not bee created. Furthermore, even if they were, it makes no sense to block me from communicating with nearly 14,000 other followers to protect these couple hundred Cleer clients. Talk about using a sledgehammer to do the job of a pushpin.

Without a more accurate list the injunction renders a blanket no contact provision over my mailing list, that I spent the year developing through hard work and many webinars given, and this has caused and will continue to cause me significant financial harm and risk.

### B. The Interpretation of the Injunction Preventing Blast Emails Opens Me to Substantial Professional Liability Exposure:

After leaving Cleer in January of 2024, I focused my efforts on building a new business based on webinars and advisory work.  I have presented webinars in this time period to more than 25,000 attendees, just via CPAacademy.org, one of the many organizations I speak for. (Exhibit A) This was the platform I used to build much of my 14,000 mailing list base, and on the FinCEN Beneficial Ownership Information (BOI) specific webinars just at CPAacademy I have had a total of 11,162 attendees, (for an

example of attendance numbers please see Exhibit B) and I also give webinars on this subject for other platforms.

On February 18th, 2025 the BOI requirement was reinstated, with the new deadline now being March 21st, 2025, (Exhibit C) creating substantial liability for me if I cannot promptly inform those who are reliant on me for information about this critical tax change. The penalties related to failure to file BOI reports have recently been increased to $606 per day of late filing (Exhibit D, at 5), up to a maximum of $10,000 under Title 31 §5336(h)(3)(A)(ii).

Accountants and tax professionals who provide guidance to a broad client base assume a significant professional liability risk when they fail to follow up with clients regarding critical law changes. Clients often rely on their trusted advisors for ongoing compliance, and when a major regulatory shift occurs- such as changes to the deadlines for the BOI reporting requirements- which carries up to a $10,000 penalty if missed- failure to notify affected clients can lead to severe financial consequences.

In cases where a practitioner has historically provided compliance-related updates or filing reminders, recipients of this advice may reasonably assume that the same level of service will continue. After giving over a dozen webinars on the BOI subject this year, and issuing three informational emails on the subject since December, it is reasonable for recipients of my emails to expect me to notify them if the law subsequently changed again, as it has this week. If an accountant is prevented from communicating essential updates due to external restrictions, such as a court-ordered

injunction, clients who miss deadlines or incur penalties may attribute their non-compliance to the accountant's lack of notification and seek damages.

Given that penalties for BOI non-compliance are up to $10,000 per violation, even a small percentage of affected clients pursuing reimbursement could result in substantial professional liability exposure. Historically, professional liability claims in accounting and tax services often stem from this type of failure to inform clients of critical filing obligations, misinterpretation of new tax laws, or lapses in compliance updates, situations that become even more prevalent when practitioners advise thousands of persons as I do.

As I had been giving webinars previously under the Cleer name, it is likely that a large portion of the 5,448 individuals on Cleer's email marketing lists list are not even Cleer clients but were webinar viewers of mine instead, and as such not even prospective clients or suppliers of Cleer. Plaintiff has not produced a client list, just a mailing list, so the apposite list is not even possible to define. And Plaintiff has refused to even allow me to "clean" my list by providing the crossover list of 5,448 persons allegedly on both lists, by marking this "Attorney Eyes Only" and refusing to grant me access as a Pro Se litigant.

While I reserve the right to ask for an increased bond in the future if other sudden law changes create substantial professional liability for me, I have calculated my risk here related to the current inability to inform clients of the BOI as follows:

1.  According to a Journal of Accountancy article released in early December, just prior to the first blanket FinCEN injunction, 37% of businesses had still not filed BOI reports. (Exhibit E)

2.  I personally maintain an email list of over 14,000 tax professionals and businesses, of which approximately 5,180 had not filed prior to the injunction, based on the percentage outlined in the Journal of Accountancy article above.

3.  Due to the TRO preventing me from sending necessary client communications, at least 1% (51) may fail to file BOI reports by the March 21, 2025, deadline.

4. Given that penalties for non-compliance are $10,000 each, my estimated professional liability exposure from this  is at least $518,000.

Thus I humbly ask the court to please set at least a bond which includes the amount of $518,000 to cover the estimated risk I have from this liability related to the inability to notify my followers about this urgent BOI change which carries substantial penalty risk to pass onto me.


**C. The Cleer.tax Domain I Own Will Lose Value as Enjoined Under the TRO**

Domains lose value when they are removed from indexing, and this is why I had initially forwarded the domain to OpticTax.com, so that it would not lose value. Building the value of a domain includes activities such as being quoted as an expert in articles,

which was an activity that I did outside my work duties at Cleer, often writing about subjects completely unrelated to the business at Cleer in order to obtain high-ranking backlinks to the domain, to build its value. For example, I was interviewed about personal taxes by an article for Pure Wow, a women's lifestyle content magazine with over 100 million viewers and an extremely high Domain Ranking of 82. (Exhibit F)

This and other similar content-related backlinks were developed by me on evenings and weekends, often regarding tax subjects completely unrelated to the type of business done at Cleer. Take for example the Pure Wow article, which was about individual taxes related to marriage, but linked to the Cleer.tax website (Exhibit F, at 3). These individual efforts of mine were what had built the domain value of Cleer.tax, as we had not utilized an SEO service prior to me leaving Cleer.

The Plaintiff may have subsequently put money into SEO for this domain, and may claim some of the domain value is related to this, but he understood full well that he did not own the domain and I owned this personally, in the same way that he had owned the domain personally for GBStax.com while Cleer LLC (then Greenback Business Services LLC) used this domain name to run the business. David McKeegan admitted to this much in his testimony:

BY MR. HARRISON:

Q. Okay. When GBS was using the domain name GBStax.com, who owned that domain name?

A. I think I did.

(PI Transcript, 169:21-24)

As the TRO enjoined both parties from using the domain Cleer.tax, (TRO, Doc 34 at 5) the value that I have built in Cleer.tax, which the Plaintiff admits is owned personally, is being lost every day. According to Silver Servers, "Once your website is no longer accessible, your SEO rankings will begin to decline. Search engines like Google will attempt to access your site's pages, but when they find nothing there, they'll eventually remove your site from their index. If your pages aren't accessible for an extended period, you'll lose the ranking positions you once held for various search terms." (Exhibit G, at 2)

A more reasonable solution would be to build a web page explaining the situation with redirects to both companies, but this is not allowable under the TRO as sought by the Plaintiff, which clearly was aimed at causing me the greatest financial harm possible. But without a solution such as this, if the TRO and possible continuing PI restricts the cleer.tax website to not be redirected anywhere, my value in this asset will dissipate.

I ran an online valuation at Humbly.com, and the current Brokered Sale Valuation is listed as a range of $3,230 to $34,900 (Exhibit H), and this value has likely already dropped over the four months of the TRO. Thus I would ask that the court please award the maximum amount in this range- $34,900 as the bond amount, to cover the greatest

risk in accordance with case law leaning towards preventing the highest risk to the Defendant.

### D. Lost Avanjo LLC Revenue Related to the TRO

While the Plaintiff's aim has been to stop my tax business from operating, so as to remove their only competition (Exhibit I, 125:16-18), they also have affected the other businesses I run as the blanket prohibition on email solicitations stretches beyond my tax advisory activities. The TRO restricted any solicitations to be made with my email list until Cleer provided the clients that are restricted to me under the MVA, and I could remove them (which of course they haven't as it is in their self-interest not to). Thus I am also restricted for sending emails out for another company I own with my spouse, Avanjo, LLC. At Avanjo we had an agreement with another AI company called Infinite Goose to send emails marketing their AI products to our mailing list as well. In our prior contract with them in May of 2024 they paid us $4,000 to send email marketing promotions to their list. (Exhibit J)

During the time of the TRO they have reached out to me twice to ask us to start another promotion, but as the TRO prevented me from sending email solicitations I had turned this business down. It is likely that they would have continued to ask us to run a couple more promotions into the future as well. Thus I am humbly asking the court to approve $16,000 of a bond related to the lost business from the Infinite Goose

promotions run by Avanjo LLC, which I am personally losing out on due to this unreasonably restrictive TRO without the list of Cleer clients pursuant to the MVA.

### E. I Have Lost a Substantial Amount of Wages Related to the TRO:

When a company becomes involved in litigation that results in a TRO against a key executive, it is often considered a prudent financial and legal decision to withhold wages from that individual, particularly if the TRO directly impacts their ability to perform their duties.

Courts have recognized that businesses must act cautiously in these situations, particularly if the legal dispute could lead to long-term financial liabilities or reputational harm. Here, I had intended to start taking payroll in November and Optic Tax had been in the process of setting this up through Gusto (Exhibit K, at 2) but then I made an oral agreement with the owner of Optic Tax, Inc., Simeon Stern, that I would refrain from taking our agreed upon $15,000 per month salary, until the company could reasonably market its services to the general public again, and be certain to cover all other overhead costs. Therefore:

a)  I have been unable to collect my $15,000 per month paycheck from Optic Tax Inc. due to restrictions imposed by the TRO.

b)  I am barred from finding other gainful employment due to the TRO.

c)  Since October, I have personally lost at least $45,000 in salary.

d)  If a Preliminary Injunction remains in place for up to one year, I will continue to lose $15,000 per month, totaling $180,000 in lost wages for the potential timeline of another year to resolve the TRO and PI in later court decisions or appeals judgements before I could seek gainful employment.

Thus I humbly request that the court order security from the plaintiff in the amount of $225,000 to cover my lost wages from the time period related to the TRO and the possibility of an enduring Preliminary Injunction while this case is resolved.

## F.  Expenses Related to Enforcement of the TRO

I have incurred substantial personal expenses complying with the TRO. Plaintiff requested that I return their computer, which I complied with, but I was not reimbursed for this cost. They had never previously asked me to return this computer, or I would have done so earlier, and expected reimbursement then. Shipping this computer cost R2598, which at the Mid-market exchange rate at 24 Oct 2024 of R1.000 ZAR = $0.05621 USD, equates to $146.03. (Exhibit L)

Under the TRO I also was told to stop using my personal computer, and I had to purchase the least expensive reasonable replacement computer to use in order to continue working. I purchased a computer that cost R45,499, which at the Mid-market exchange rate at 24 Oct 2024 of R1.000 ZAR = $0.05621 USD, equates to $2,557.47 (Exhibit M)

Then a later court order (Order, 74) required me to send my personal computer in to the Plaintiff's attorneys, by stating "defendant Stranger shall ship and file on the docket proof of expedited shipping to plaintiff's counsel of the 2023 laptop (currently in a closet) with tracking information." This specifically required expedited shipping, which I complied with. As this computer was larger it would not fit in a standard box, so the cost of shipping was nearly double- R5066. At the Mid-market exchange rate at 10 Dec 2024 of R1.000 ZAR = $0.05622 USD, equates to $284.83. (Exhibit N)

While the TRO stands I cannot use my email marketing software, but I am still required to cover the cost of this expense, $109 per month. If this continues for a year under the current prohibition of sending emails but I am required to maintain this account, I will be out another $1,308.

While all of these expenses are relatively small on their own, these types of costs continue to add up during the term of litigation, and all are unnecessary but for the games the Plaintiff has played in trying to bankrupt me personally and destroy my businesses. I request that the court issue a bond for requiring the Plaintiff to cover these miscellaneous costs in the amount of $4,296.33 in total.

**G. Cleer is in a Precarious Financial Situation and I May Not be Able to Recover Damages if a Bond is Not Posted**

When I had looked at acquiring Cleer in May of 2024 the financials provided to me showed zero growth, in fact they had a slight drop in sales over the same period in the prior year, thus the company was no longer experiencing growth. From what I know, they have yet to hire replacement staff for filling critical marketing or tax advisory roles, both which are critical to maintaining a successful business in the accounting space. Additionally, they have chosen one of the most expensive law firms in the country to bring this case, and the legal fees alone are likely to exceed any company profit.

We are not talking about major corporations with deep pockets here, Cleer is a small business with gross sales in the range of $3 Million and overall profits in the mid six figures. The financial concerns are compounded because Plaintiff has a history of siphoning profits out of the company, taking substantial bonuses in each year. In 2023 he even scheduled a bonus for his wife who had not performed any work in the company that year. In the deposition testimony of David McKeegan he couldn't recall even if he had taken $400,000 in bonuses for himself and his wife in December of 2023, stating, "But, you know, $400,000 is and is not a lot of money." (Exhibit O, 86:10-11) Thus Plaintiff seems to be a bit "happy go lucky" with their funds, and while they are still sitting on substantial funds from selling their prior company, they could easily create a mismanagement situation at Cleer that would prevent Defendants from recovering.

As this lawsuit is likely to stretch on for a year or longer, I have reasonable concerns that at the time in the future when all evidence has been produced, and I will prevail, that Cleer will not have sufficient assets in order to cover the judgement against

them. Especially as the instant TRO give me extensive possible liability risk, I am concerned that I would not be able to make myself whole again after covering all the penalties that could be assessed against me from complying with the TRO and failing to advise businesses on the urgent tax law changes they rely on me to advise upon. Thus I humbly ask the court to please issue a bond in this case, in the amount deemed reasonable under the discretion granted to it.

### III.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Plaintiff argues that there should be no bond in this case, but until recently there had always been bonds posted in order to obtain a TRO or PI. "The language of Rule 65(c) was even more emphatic before changed in 2007; it read: "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The committee notes to the 2007 revision make clear that no substantive change was intended— only clarification, and consistency in style and terminology."

*Habitat Education Center, Inc. v. U.S. Forest Service*, Case No. 09-2785 (7th Cir. May 27, 2010)

Courts routinely require plaintiffs seeking injunctive relief to post a bond sufficient to compensate the defendant if the injunction is later determined to be unwarranted. In *W\.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 770 n.14 (1983), the Supreme Court emphasized that an injunction bond is necessary to ensure defendants can recover losses incurred due to a wrongful injunction.

Plaintiff quoted *Doctor's Associates, Inc. v. Distajo*, and *Westport Res. Mgmt., Inc. v. Delaura*, but neither case is on point here as there has been and will continue to be substantial financial harm caused, as discussed in *System Operations, Inc. v. Scientific Games Development Corp* ("*Continental Oil* holds that the requirement for a bond may be waived by the district court where the grant of the injunction carries no risk of monetary loss to the defendant. In the case *sub judice*, the injunction restricts the defendants in their efforts to win new instant lottery ticket contracts and the potential for monetary loss is indeed substantial.") 555 F.2d 1131, 1145 (3d Cir. 1977) (Emphasis in Original).

Furthermore, from the court waiving the bond requirement I could be enjoined from later recovering against Plaintiff for my damages related to the TRO and PI. "Courts that have waived the bond requirement have apparently assumed that, should the plaintiff later lose on the merits, the defendant may recover the damages inflicted by

the injunction. That assumption was rendered doubtful, however, by the Supreme Court's declaration in *W.R. Grace Co. v. Local Union* 759 that '[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond.'" *Continuum Co., Inc. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989)

Given the significant financial impact and risks caused by the TRO and potential Preliminary Injunction, a bond in the amount of $798,196.33 is warranted here to safeguard my financial interests. Courts have held that an injunction bond must be set at an amount sufficient to cover all reasonably foreseeable damages. See *Smith v. SEC*, 129 F.3d 356, 362 (6th Cir. 1997) (holding that bond must be "commensurate with the potential financial harm suffered by the enjoined party").

The bond should cover the total amount of the risk that the defendant runs, as clearly stated in *Mead Johnson & Co. v. Abbott Laboratories* ("when setting the amount of security, district courts should err on the high side. If the district judge had set the bond at $50 million, as Abbott requested, this would not have entitled Abbott to that sum; Abbott still would have had to prove its loss, converting the 'soft' numbers to hard ones. An error in setting the bond too high thus is not serious.)" 201 F.3d 883, 888. Assuming Cleer is solvent now, but has a risk of not being solvent in the future, this is ever more reason why the court should order a substantial bond in order to reduce the risk that the TRO and PI will cause me continuing financial harm that I will not later be able to recover for.

IV. **<u>CONCLUSION</u>**

For the foregoing reasons, I respectfully request that the Court order Plaintiff to post a bond in the amount of $798,196.33, or such higher amount as the Court deems proper, to secure Defendant against damages resulting from the TRO and any subsequent PI.

Respectfully submitted,

Crystal Stranger

Pro Se Litigant

Date: February 21st, 2025