UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| Cleer LLC,<br><br>               Plaintiff,<br><br>v.<br><br>Crystal Stranger and Optic Tax Inc.,<br><br>               Defendant. | Civil No. 3:24-CV-01496 (MPS)<br><br><br><br>March 20, 2025 |

## RECOMMENDED RULING ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Cleer LLC ("Cleer") brings this fourteen count complaint for injunctive relief and damages against Defendants Crystal Stranger and Optic Tax Inc., alleging, among other things, unlawful acts of its former employee and business partner, Stranger, for breach of non-solicitation and noncompete covenants contained in the Operating Agreement ("OA") and Membership Vesting Agreement ("MVA"), poaching Cleer's current and prospective clients and employees, and using Cleer's confidential information for the benefit of Optic Tax.[1]

---

[1]     Specifically, Plaintiff alleges: (1) breach of contract against Stranger (MVA); (2) breach of contract against Stranger (OA); (3) unfair competition against Stranger; (4) tortious interference with existing and prospective business relationships against Stranger and Optic Tax; (5) civil conspiracy against Stranger and Optic Tax; (6) breach of duty of loyalty against Stranger; (7) false designation of origin and unfair competition in violation of the Lanham Act against Stranger and Optic Tax; (8) anticybersquatting in violation of the Lanham Act against Stranger and Optic Tax; (9) violation of the Defend Trade Secrets Act against Stranger and Optic Tax; (10) violation of the Connecticut Uniform Trade Secret Act; (11) Tortious Interference with Contract against Optic Tax; (12) statutory theft against Stranger; (13) conversion against Stranger; and (14) defamation (libel) against Stranger and Optic Tax. Amend. Compl. ECF No. 55.

## I.    BACKGROUND

On October 22, 2024, Chief Judge Michael P. Shea issued a Temporary Restraining Order ("TRO") restraining and enjoining Defendant "Stranger, and all her agents, servants, employees, attorneys, and any other persons who are in active concert or participation with her" from:

> 1. soliciting or otherwise contacting for purposes of discussing employment opportunities any person who is or was employed by Cleer LLC or any of its predecessors; 2. soliciting or otherwise contacting for purposes of developing business, entering into an agreement, or proposing or making any sale to any person who is or was a customer, supplier, or prospective customer or supplier of Cleer LLC. ECF No. 34 at 4.

Thereafter, the Parties engaged in expedited discovery. *Id.* at 6. On January 21, 2025, Chief Judge Shea referred the matter for me to hold a preliminary injunction hearing and issue a recommended ruling. ECF No. 102.

A hearing on Plaintiff's Motion for Preliminary Injunction ("PI") was held on January 29 and 30, 2025. The Court considered the parties' submissions to the PI Motion, ECF Nos. 12, 20, 31, the parties' exhibits and the witness testimony.[2]

### Greenback Business Services now Clear LLC hires Crystal Stranger

In 2016, David and Carrie McKeegan, husband and wife, founded Greenback Business Services ("GBS"). ECF No. 126, Hrg. Tr. 26:6-29:15. GBS provided tax preparation and bookkeeping services for foreign-owned companies formed in the United States. Hrg. Tr. 26:17-

---

[2]    David McKeegan testified in Plaintiff's case on January 29, 2025 and was subject to cross-examination by Defendants. Plaintiff also called Crystal Stranger to testify. At the conclusion of the day, counsel indicated that examination of Stranger would continue to the following day for another thirty minutes and Cleer would rest its presentation of evidence. Hrg. Tr. 237:3. Defendants' counsel indicated he would call both McKeegan and Stranger in their case. Hrg. Tr. 237:4-238:17. On January 30, 2025, Defendants' counsel informed the Court that he tested positive for Covid overnight. Hrg. Tr. 243:22-244:3. To accommodate Defendants' counsel, and without objection from Plaintiff, the Court resumed the hearing with Defendants' counsel appearing on Zoom. Stranger did not appear at the hearing in person or on Zoom. In light of Stranger's absence, Plaintiff rested its presentation of evidence. Hrg. Tr. 247:13; 251:4-6. Defendants' counsel called McKeegan on direct examination and then rested.

27:16. GBS engaged foreign-based accountants and bookkeepers as independent contractors who are considered "suppliers" and/or non-W-2 employees of the company. Hrg. Tr. 43:10-16; 50:6-8; Pl. Hrg. Ex. 102 (OA § 9.2(iii)). In January 2020, GBS hired Stranger as International Tax Director. Hrg. Tr. 29:16-32. At that time, David and his wife Carrie McKeegan, were sole and equal members of GBS *id.* 30:11-16, with Stranger holding no equity in the company. *Id.* at 29:24-30:1. As an employee, Stranger was the "top-level reviewer for all the tax work". She reviewed the tax returns prepared by GBS's team of accountants in the Philippines, advising clients, and performing marketing services. *Id.* at 30:4-10; ECF No. 55 Amend. Compl. ¶ 31. In that role, Stranger had direct and indirect contact with all of GBS's clients, suppliers, and referral partners. Hrg. Tr. 43:21-44:4.

Stranger was provided with a company laptop, client lists which included client contact information, and other confidential information. ECF No. 55 ¶ 32.

### GBS Gets Rebranded to Cleer

In early 2022, a Florida company called Global Business Service challenged GBS's trademark. Hrg. Tr. 28:5-12, 32. On March 15, 2022, while still weighing whether to oppose the trademark challenge or rebrand, McKeegan created a Podio project, a web-based collaboration platform, entitled "Explore Rebranding — away from GBS towards the 'verb' for the industry." *Id.* at 52-54; Pl. Hrg Ex. 103 (Podio Rebranding Project). He created this Podio project to develop a new name for GBS. *Id.* Stranger was made a participant on the Podio rebranding project and he requested her collaboration on the name change. *Id.*

Stranger was materially involved in the rebranding. Hrg. Tr. 32:14-15; 183:23-194:15. On May 26, 2022, the same day on which McKeegan promoted Stranger to COO, gave her equity in Cleer, and she executed the OA, Stranger emailed McKeegan: "You know my opinion that this

seems like a good time to rebrand. What would you think of Cleer as a name?" Hrg. Tr. 61:4-65:5.; Pl. Hrg. Ex. 105 at 3. McKeegan agreed to proceed with Cleer. Pl. Hrg. Ex. 105. Later that day, to ensure the company secured Internet domains with "Cleer" in the name, Stranger registered Cleer.tax for the company while McKeegan registered Cleertax.com. Hrg. Tr. 66:6-67:15; 68:5-69:10; Pl. Exs. 105 at 1-3; 106, 107.

Stranger testified that she registered Cleer.tax "for the company." Hrg. Tr. 203:2-6. In a May 26, 2022 email from Stranger to McKeegan, she wrote,

> *We* could try to buy Cleer.com also, it isn't listed for sale, but *we* could use a broker service to try to contact the owner and buy it. The .com domain is dormant right now and isn't being used by any other company, it is just siting. *We* could use the .tax to rebrand in the interim, or as a backup if we can't use the other domain. I bought it, just to make sure *we* don't get sniped when googling and looking at the name. But doesn't seem like much shows up on google searches for that with the .com being dormant, so I think *we* could have a pretty easy SEO [search engine optimization] path with the name with either extension.

Pl. Hrg. Ex. 105 at 2 (emphasis added). Stranger testified that "we" in this email is referring to the company, Cleer. Hrg. Tr. 202:2-203:5.

During a June 1, 2022, video call, Stranger, McKeegan, and Lindsay Anderson discussed trademarking Cleer and engaging a domain broker to acquire the inactive domain "Cleer.com" from its owner, who McKeegan later learned was willing to sell it for $250,000. Hrg. Tr. 70:5-71:7; Pl. Hrg. Exs. 100, 108. He also informed them that he consulted with a search engine optimization expert who said that there was no SEO penalty or issue with the Cleer.tax domain name and noted, "[n]eed to get Trademark for Cleer, CleerPath and CleerTax." Hrg. Tr. 55:12-57:4-25; Pl. Exs. 103, 104 at 2. By June 2022, McKeegan and Stranger were committed to the name Cleer for the rebrand and decided to proceed with Cleer.tax after confirming that .tax would not hurt the company's search engine optimization. Hrg. Tr. 56:15; Pl. Hrg. Ex. 103 at 2.

On June 20, 2022, McKeegan informed Stranger that the Cleer.com domain was "a bit outside our price range" and asked her to confirm what domains she bought stating that they should organize and trademark them and then "circle the wagons." Pl. Ex. 108. Stranger responded, "Yeah I agree. Nobody can circumvent *us* with the name once *we* have a valid trademark, the domain becomes pretty useless to them, at least in the tax space. I bought Cleer.tax as I thought that was the best one to build on, it seems the most obvious choice." Pl. Ex. 108 (emphasis added). McKeegan testified that he understood that "us" referred to the company. Hrg. Tr. at 71:23-25. Stranger testified that "we" and "us" in this email is referring to the company, Cleer. Hrg. Tr. 204:1-9; Pl. Ex. 108.

With a company name selected and the Cleer.tax domain acquired, McKeegan, Stranger and Anderson addressed the next steps to rebrand the company including, design a logo, create and launch a new website, and apply for trademarks. Pl. Hrg. Ex. 109. In July 2022, Stranger and McKeegan started the trademark process, which involved identifying companies that could contest the "Cleer" trademark. Hrg. Tr. 78:15-81:7; Pl. Ex. 110. On July 19, 2022, they weighed the risks of a trademark challenge, prompting Stranger to register thirteen domains with variations of "Cleer" (e.g., cleer.accountant, cleer.accountants, cleer.business, etc.) for the company as a contingency plan. Hrg. Tr. 81:14-83:10; Pl. Hrg. Ex. 111. Stranger testified that she does not claim to own any of the other Cleer-based domains even though she registered them on her personal NameSilo account just as she did for Cleer.tax. Hrg. Tr. 204:10-207:9. Later that day, McKeegan and Stranger decided to fully commit to the name Cleer and the domain Cleer.tax; Stranger instructed trademark counsel to proceed with applying for the "CLEER" trademark. Pl. Hrg. Exs. 113-114.

The trademark application for CLEER was filed on August 1, 2022. Hrg. Tr. 85; Pl. Exs. 115, 117. In August 2023, Cleer finalized its Cleer.tax logo design, with Stranger's input. Hrg. Tr. at 88:16-90:19; 183:4-6; Pl. Hrg. Exs. 118, 119, 155. On August 11, 2023, Cleer filed a trademark application for the Cleer.tax logo. Hrg. Tr. 91:4-92:18; Pl. Hrg. Ex. 117. Stranger was aware that Cleer was trademarking the logo, Cleer.tax. Hrg. Tr. 92:25-94:19; Pl. Hrg. Ex. 155. During the logo development and trademarking process, Stranger never objected or claimed to own the domain Cleer.tax. Hrg. Tr. 94:20-23; 188:22-25.

### Operating Agreement

On May 26, 2022, the McKeegans promoted Stranger to Chief Operating Officer ("COO") of Cleer, the same day she signed the OA. Hrg. Tr. 31:16-18. As set forth in the OA ,the McKeegans awarded Stranger an initial 6% membership interest in Cleer. Pl. Hrg. Ex. 102 (OA). The OA sets out the terms by which GBS and its members interact and includes protective covenants such as a non-compete (section 9.1) and non-solicitation (section 9.2). The non-compete and non-solicitation covenants run from the day that Stranger became a Member and for a period of "twelve (12) months following her withdrawal for any reason as a Member." Ex. 102 (section 9.1[3] and 9.2[4]). The OA requires Members to retain all information relating to the business of the company

---

[3] 9.1 The Members hereby acknowledge that they are familiar and will help develop the Company's trade secrets and other confidential information. The Members agree that while a Member of the Company and for twelve (12) months following the withdrawal for any reason as a Member, he shall not, directly or indirectly, either for himself or for any other individual own any interest in, manage, control, consult with, render services for or participate in (whether as an officer, director, employee, partner, agent, representative, or otherwise) or in any other manner engage anywhere in the Protected Areas in any business competitive with business of the Company or any affiliated entity (the "Protected Business"). The term "Protected Territories" shall mean the entirety of the United States of America. The Members agree that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Company's business or any affiliated entity.

[4] 9.2 Further, so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following withdrawal for any reason as a Member, the Member

in strict confidence (section 9.4) and provides for the Company's exclusive ownership of its technical developments and improvements (section 9.3).

***Membership Vesting Agreement ("MVA")***

In addition, on June 2, 2022, Stranger executed the MVA. The MVA set forth terms for Stranger's role as an employee of the Company. Assuming she remained employed with the Company, Stranger would receive membership interests in the Company on a schedule; an initial 6% membership interest upon execution, an additional 6% one year from the MVA's effective date, an additional 8% two years from the MVA's effective date, for a total of 20% interest. Pl. Ex. 101 (MVA at § 6). By signing the MVA, Stranger agreed to additional restrictive covenants as an

---

shall not directly, or indirectly through another person or entity, (i) induce or attempt to induce any employee of the Company or any affiliated entity to leave the employ of the Company or any affiliated entity, or in any way interfere with the relationship between the Company and any employee thereof; (ii) hire any person who was an employee of the Company or any affiliated entity at any time during the six (6) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the Parties so as to avoid any disputes under this Paragraph that any such hiring within such six (6) month period is in violation of clause (i) above), or (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relationship of the Company or any affiliated entity.

employee, including confidentiality and trade secret restrictions[5] (section 8), non-compete (section 11) and non-solicitation[6] (section 12).

---

[5] Section 8(a) of the MVA states:

Employee will not reveal or otherwise disclose, without prior written approval, to anyone Confidential Information, which will include, without limitation, any of Company'[s] confidential, proprietary or trade secret information that is disclosed to Employee or Employee otherwise learns in the course of employment such as, but not limited to, business plans, designs, marketing interests, products, financial information, including cost and pricing, vendor lists, and sales processes and procedures. Confidential Information will not include any information which: (i) is or becomes publicly available through no act of Employee; (ii) is rightfully received by Employee from a third party without restrictions; or (iii) is independently developed by Employee.

Section 8(d) of the MVA states:

Employee understands and agrees that he or she will be exposed to Company's trade secrets, including but not limited to information that derives independent economic value from its secret nature. Trade Secrets (hereinafter "Trade Secrets") will include (a) any and all proprietary software solutions used by Company; (b) technical information concerning company salaries, strengths, weaknesses, and skills; (c) information concerning Company's finances, including sales information, profits, accounting information, unpublished financial information, and marketing expenditures; (d) information concerning the company's suppliers or customers, including customer lists, customer information, supplier lists, and supplier information; (e) information concerning business strategies, including marketing plans, business plans, research projects, and product development; (f) and any other information not generally known to the public which, if disclosed, could reasonably be expected to adversely affect Company's business. Employee agrees that he will not reveal or otherwise disclose, without prior written approval, to anyone the Trade Secrets of Company.

Section 8(f) of the MVA states,

when Employee's employment with Company ends, Employee will promptly return all originals and copies of all documents, records, software programs, media, and other materials concerning Confidential Information, as well as any and all equipment, files, software programs, and other personal property belonging to the Company.

Section 8(h) of the MVA states:

In Section 11(g) of the MVA Stranger agreed "that breach of this Agreement will cause irreparable injury to Company, such that monetary damages would not provide an adequate or complete remedy." *Id.*

### *Stranger's Resignation and Ownership Claim to Domain Cleer.tax*

McKeegan testified that the Company grew rapidly from 2020 through 2022. Hrg. Tr. 95:8-9. In 2023, Cleer was growing but McKeegan said "there was literally no focus on spending or

---

Employee understands and agrees that his or her obligation to maintain Company'[s] Confidential Information and Trade Secrets will remain in effect even after his or her employment with Company ends and will continue for so long as the information remains either Confidential Information or a Trade Secret.

Section 9(c) of the MVA states:

Employee agrees to aid in and execute any and all documents necessary to prepare any papers that Company may consider necessary or helpful to obtain or maintain any patents, copyrights, trademarks, or other proprietary rights and will do so at no charge to Company.

[6] a. During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:

 i. Directly or indirectly contact, solicit, accept business from, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to employee's termination, for the purpose of selling or soliciting products or services of Company; and

 ii. directly or indirectly contact, solicit, recruit or hire any employees of the Company with whom Employee worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company.

cost control" and the company was not doing well financially. Hrg. Tr. 95:9-12. He decided to step back into a day-to-day role in late 2023 to try to get the company back on track. Hrg. Tr. 95:12-14. He testified that Stranger did not welcome his return to Cleer, did not like him being involved in the business again, and this caused friction between them. Hrg. Tr. 95:17-96:3.

On or about January 17, 2024, Stranger gave notice that she intended to resign from Cleer effective January 31, 2024. Hrg. Tr. 95:5; 99:8; Pl. Ex. 151 at 3. After notice of her resignation, but before her last date of employment, McKeegan requested that Stranger transfer the Cleer.tax domain from her personal account to the company's digital wallet. Pl. Ex. 151 at 3.

Stranger was initially agreeable to transferring the domain but attempted to use her control over Cleer.tax as leverage as she departed Cleer. She responded to each of McKeegan's requests to transfer the domain with a new excuse as to why she should or could not, comply with his request, despite having no right to withhold Cleer's property. Hrg. Tr. 100; Pl. Hrg. Exs. 120, 151, 152. For example she initially told McKeegan she would transfer the domain as part of a proposal that she be allowed to continue to work for the company as an independent contractor. Hrg. Tr. 102:4-21; Pl. Hrg. Ex. 120, 151. On January 22, 2024, Stranger emailed McKeegan demanding $200,000 in salary equivalent to work for Cleer as an independent contractor through April 2024, at which point she would transfer the Cleer.tax domain to Cleer. Hrg. Tr. 102:2-103:2; 107; Pl. Hrg. Exs. 129 (Jan. 23, 2024); 151 at 2 (Jan. 22, 2024). The following day, Stranger emailed McKeegan asking if had considered this proposal. Hrg. Tr. 102; Pl. Hrg. Ex. 120. He replied that he was "waiting for the domains before progressing with anything else." Hr. Tr. 102:24-25; Pl. Hrg. Ex. 120. He testified, "[b]asically she wanted to get paid out as an exit or for the domain. You know, that wasn't something we were in a position to do. And we were continuing to push to ask for the domain back." Hrg. Tr. 104:6-9. The domains to which McKeegan referred were Cleer.tax

and all other Cleer-related domains Stranger registered for the company during her employment. Hrg. Tr. 102:11. Stranger responded,

> And I am waiting on **my data** before doing anything further, as I told you I don't trust you after that. So we are clearly at an impass [sic]. I am going to cancel the team lead for today, as this is rediculous [sic] and I can't keep being in calls with you and watching all these problems being created from this and acting like nothing is wrong when you are destroying this company.

Pl. Hrg. Ex. 120 (emphasis added). The data Stranger was seeking was Cleer data. Hrg. Tr. 103:10-13. McKeegan testified that "she was trying to download all of the Google data, all of her emails, emails to clients, anything in Google Docs, Google Sheets." *Id.* He took away her administrative privileges on Cleer's systems. Hrg. Tr. 103:14-21.

Before the planned transfer happened, McKeegan emailed Stranger and said "Crystal, [a]re you refusing to turn the domains over to the company?" Hrg. Tr. 107:21-108:6; Pl. Ex. 121. After some back and forth, Stranger replied, "Since you have been pressuring me so hard, I have done some research into it, and as I actually purchased the domain, and I hold it in my account, technically I own it." *Id.* McKeegan testified that this was the first time Stranger asserted ownership of Cleer.tax domain. Hrg. Tr. 108:16-22, Pl. Hrg. Ex. 121. Thereafter, on January 23, 2024, Stranger declined the invitation for the January 26, 2024, "Transfer Domains" call with McKeegan. Hrg. Tr. 109:6-11; Pl. Hrg. Ex. 122.

Stranger never transferred Cleer.tax domain to Cleer. Hrg. Tr. 109:18:20. Stranger initially represented that she "orally offered GBS a license to use the 'cleer.tax' domain name and the CLEER trade name, and based solely on that oral license, GBS changed its name to Cleer LLC." ECF No. 20 at 16 (Defendants' Opposition to Injunctive Relief). However, at the preliminary injunction hearing Stranger admitted that everything she did to rebrand from GBS to Cleer-obtaining Cleer.tax and other domains with the name Cleer and the Cleer trademarks, was for Cleer and in her capacity as a Cleer employee and member. Hrg. Tr. 196:13-207:9; 204:4-9.

***Optic Tax and Termination of Stranger's Membership Interest***

Following Stranger's resignation, McKeegan continued to ask Stranger to return her company laptop and transfer the Cleer.tax domain to Cleer.. Hrg. Tr. 111:17-22. Stranger launched Optic Tax Inc., a Delaware corporation, of which she is an owner and the President, CEO, founder and member of the "Board of Directors". Hrg. Tr. 176:8-177:15. Stranger, however, remained a minority owner in Cleer and knew she owed it certain fiduciary duties, including the duty of loyalty and the duty to act in the best interests of the company. Hrg. Tr. 178:11-12.

From February 1, 2024 through September 1, 2024, Optic Tax and Stranger appeared to comply with the restrictive covenants contained in the MVA. Hrg. Tr. 118-119. Stranger also remained bound by the restrictive covenants in the OA, although the one-year clock did not begin to run as long as she remained a member of Cleer. Pl. Hrg. Ex. 102 §§ 9.1 (bound by agreement for "12 months following withdraw for any reason as a member"), 9.2 (same). Stranger refused to transfer the Cleer.tax domain, asserting that the timing of the transfer would be bad for the company despite having no managerial authority in Cleer. Pl. Hrg. Exs. 120, 121.

On August 8, 2024, the McKeegans, who owned 88% of the company, voted to terminate Stranger's membership for cause and repurchase her twelve shares for the credit balance of her Capital Account in accordance with the OA ¶ 6.5(ii)[2][3]. Pl. Hrg. Exs. 102 (Section 6.5(ii)[2]) The McKeegans terminated Stranger's membership interest, "for cause" stating,

> since you resigned from the Company earlier this year, we have tried to solve this situation with you amicably on multiple occasions, but your continued insistence on acting in bad faith, stealing/withholding company property, and continuing to impermissibly hold the Company's domain name/website in an attempt to force the company into selling to a third party have prevented any mutually beneficial outcome.

Pl. Hrg. Ex. 124.

Stranger did not present any evidence or testimony to rebut Cleer's assertion that her membership interest was not "for cause." The balance of Stranger's Capital Account, is not due for payment until August 9, 2026. Pl. Ex. 102 § 6.5 ("The purchase price shall be equal to the credit balance in the Member's Capital Account, which shall be paid within twenty-four (24) months of closing). Hrg. Tr. 114:8-20.

**_Stranger's Use of Cleer.tax Domain and Violation of Non-Compete Non-Solicitation Provisions_**

After the termination of Stranger's membership in Cleer, McKeegan testified that he realized that Stranger would not give back the domain. So, he switched Cleer.tax to Cleertax.com. Hrg. Tr. 119:1-3. He set it up so all emails to Cleer.tax would be forwarded to the new email Cleertax.com and the Cleer.tax website would point to Cleertax.com. Hrg. Tr. 119:4-7. On or about September 1, 2024, the Cleer.tax website went down and emails stopped forwarding. Hrg. Tr. 119:7-10. He later learned that Stranger redirected the Cleer.tax website and emails to Optic Tax. Pl. Hrg. Tr. 119:12-19.

Stranger did not stop redirecting email and website traffic to Optic Tax. She also began intercepting and soliciting Cleer's clients who were intending to contact Cleer through the Cleer.tax domain, offering to provide them competing services through Optic Tax. Hrg. Tr. 121; Pl. Hrg. Ex. 136 (9/19/24 email "I initially emailed Seth on his cleer tax email address and received an email back from Crystal Stranger who said she owned the domain and no longer works with you."); Pl. Ex. 153 (9/19/24 email "I am Cath, one of the Customer Success Accountants here at Optic Tax. Thank you for reaching out to us. You've contacted the cleer.tax domain, which is owned by a co-founder and former partner of Cleer, who is now the founder and CEO of Optic Tax, Crystal Stranger. Due to professional differences, Crystal established Optic Tax, along with much of the original team, to offer enhanced services to clients."); Pl. Ex. 154.

By September 1, 2024, less than one month after the one year non-solicitation covenants in the OA started running and approximately seven months after the non-solicitation restrictive covenants in the MVA began to run, Stranger was actively competing against Cleer. Hrg. Tr. 208:17-24.

Stranger testified that she competed against Cleer as of September 1, 2024, within three weeks of being removed as a member from Cleer, in violation of the OA § 9.1. Hrg. Tr. 208:3-209:6. She admitted that: (1) she accepted business from Cleer's clients before the expiration of twelve months from her resignation, Hrg. Tr. 209:7-9; (2) she accepted business from forty-nine of Cleer's clients, Hrg. Tr. 209:12-14; (3) former Cleer bookkeepers provided her with a list of 226 Cleer clients, she uploaded the list into Optic Tax's mailing list and contacted all 226 of those Cleer clients, Hrg. Tr. 209:15- 210:25; and (4) twenty-three of the people she hired at Optic Tax were either former employees of Cleer or left Cleer to work at Optic. Hrg. Tr. 212:16-23. Indeed, between August 29 and September 7, 2024, Stranger sent twenty-eight solicitation emails and/or FaceBook messages to Cleer's employees/independent contractors/suppliers while they were still working at Cleer, including its bookkeepers and many of its tax preparers and accountants inquiring if they would like to explore another opportunity. Pl. Hrg. Exs. 169-188. All of these suppliers were bound by covenants not to compete with, solicit from, and/or disclose confidential information belonging to Cleer. Hrg. Tr. 125; 126:18-127:1; Pl. Exs. 157 (Non-Disclosure Agreement); 131 (Independent Contractor Agreement). Stranger testified that she never instructed any of Cleer's suppliers to abide by their restrictive covenant agreements with Cleer. Hrg. Tr. 229:20-230:2. The evidence shows that Stranger knew that these suppliers were soliciting the clients they previously serviced at Cleer in an attempt to move them to Optic Tax by relying on Cleer's client list, and Stanger encouraged them to do so. Hrg. Tr. 234:9-236:14, Pl. Ex. 132.

14

Every single person providing services to Optic Tax previously serviced Cleer in some capacity. Hrg. Tr. 211:13-23; 212:16-18. Stranger testified that she never posted job openings or advertised positions for Optic Tax. Hrg. Tr. 218:14-219:5. Rather, the only people Stranger reached out to about a job opportunity with Optic Tax, were people who worked for Cleer. Hrg. Tr. 219:2-5; Pl. Hrg. Ex. 160-188. The suppliers Stranger solicited and hired from Cleer created a specific 226-person Cleer bookkeeping client list and provided that information to Stranger for purposes of soliciting these clients. Hrg. Tr .209:15-210:8; 229:19; Pl. Hrg. Ex. 133. On September 6, 2024, Stranger sent out a blast email from her crystal@cleer.tax account, the same domain she took from Cleer.tax, to those 226 Cleer clients. Hrg. Tr. 210:23-25; Pl. Hrg. Ex. 139. Stranger informed Cleer's clients that Cleer "los[t] the entire bookkeeping team" and stated that "at the [team's] request, I expanded Optic Tax to provide tax and bookkeeping services, to give the team a safe place to do their excellent work." Pl. Ex. 139. She continued, "Team members may have reached out to you, as we want to offer you assistance in this transition time, as seamlessly as possible, so there is no disruption to your business." *Id.*

McKeegan testified that he was forwarded this email from several of Cleer's clients. Hrg. Tr. 131:2-9; 132:8-25; Pl. Ex. 141. He stated that Stranger was "very clearly trying to use our domain soliciting our clients to bring them over to her new company." Hrg. Tr. 131:15-17. Three days later, Stranger sent another email, this time from crystal@optictax.com, to the same 226 Cleer bookkeeping clients, further referencing Cleer and advising its clients to move their business to Optic Tax. Pl. Hrg. Ex. 141. McKeegan testified that several of Cleer's clients forwarded this email to him. Hrg. Tr. 132:8-25.

When leaving Cleer, Stranger took Cleer's laptop and also took with her a portion of Cleer's mailing list containing current, former, and prospective clients, suppliers, and contacts, which she

merged into Optic Tax's email list. The parties stipulated that there is an overlap between Optic

Tax's list and Cleer's list of 5,448 clients. Hrg. Tr. 138:2-13; Pl. Ex. 123, 159. Stranger provided

no explanation or evidence how 5,448 of Cleer's clients ended up on Optic Tax's email list. *Id.*

***Temporary Restraining Order October 22, 2024***

On October 22, 2024, Chief Judge Shea issued a Temporary Restraining Order ("TRO"),

*supra* at 2. Despite this order, the record shows that Stranger violated the TRO on several

occasions. On October 28, 2024, Optic Tax sent a blast email from hello@optictax.com to its

14,000 contacts, of which 5,448 overlap with Cleer's contact list. ECF No. 99-2 at 7 (Stranger

Depo. Tr. 214:8-215:5). On December 5, 2024, forty-four days after the Court entered the TRO,

Defendants sent a blast solicitation email to Optic Tax's entire email list, which included 5,448

current, former and prospective Cleer clients and suppliers. Pl. Hrg. Ex. 127. Defendants sent

another blast email solicitation in December 2024, January 2025, both of which contained

hyperlinks to Optic Tax's website offering pricing and enabling visitors to purchase services. Pl.

Hrg. Exs. 125, 138, 143, 146, 147.

On February 10, 2025, Plaintiff filed a Second Motion for Contempt of Court's Temporary

Restraining Order to notify the Court that on February 8, 2025, one of Cleer's clients, Marcos

Sanchez owner of Siux Studio LLC ("Siux"), notified a Cleer employee that he was contacted by

Optic Tax offering their services at a "significantly different price" and it "has created some

confusion on my end, and [he'd] like to clarify how things stand before moving forward." ECF

No. 135 at 1 (Feb. 8, 2025 email from Marcos Sanchez a Cleer client); ECF No. 162 Exs. A and

B. Indeed, this email exchange reveals that Optic Tax's Senior Customer Success Accountant

Yancy Gonzalez solicited Mr. Sanchez and sought to persuade him to allow Optic Tax to provide

tax services for Siux in violation of the TRO. ECF No. 162-1 at 6 (2/13/2025 email from Marcos

Sanchez to Yancy Gonzales discussing Optic Tax's pricing and stating "it would be really very helpful to get an estimated cost for the entire process. This will help us make an informed decision on whether to continue with Cleer Tax or move forward with your services."). Stranger was aware of Optic Tax's employees' efforts to secure business from Siux, but apparently did not direct her employees to stop communicating in compliance with the TRO. ECF No. 162-1 at 7 (2/13/2025 email forwarding pricing email sent to Siux from Gonzalez to Stranger stating "[f]or your reference on this.").

## II.    PRELIMINARY INJUNCTION

A party seeking a preliminary injunction must establish "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *Vidal v. Advanced Care Staffing, LLC*, No. 23-303-CV, 2024 WL 980634, at *1 (2d Cir. Mar. 7, 2024) (summary order).

### A.  *Irreparable Harm*

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and plaintiffs must show that "absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

Plaintiff has shown irreparable harm. As an initial matter, the Court notes, as Chief Judge Shea did in his TRO Order, that "[a]ccording to the MVA, Stranger agreed that breach of the agreement would result in irreparable harm to the Plaintiff, such that "monetary damages would

not provide an adequate or complete remedy." ECF No. 34 at 3; MVA § 11 (g). "While not dispositive, courts may view [such terms] as evidence of an admission that irreparable harm has occurred." ECF No. 34 at 3 (quoting *Hercules Pharms., Inc. v. Cherne*, No. 24-CV-5659 (JS)(AYS), 2024 WL 4406899, at *2 (E.D.N.Y. Sept. 18, 2024) (collecting cases)); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (where an "employment contract sought to be enforced concedes that in the event of [a former employee's] breach of the post-employment competition provision, [Plaintiff] shall be entitled to injunctive relief, because it would cause irreparable injury. Such, we think, might arguably be viewed as an admission by [the former employee] that plaintiff will suffer irreparable harm were [she] to breach the contract's non-compete provision."). In addition, loss from a party's breach of a restrictive covenant can constitute irreparable harm. *Ticor Title Ins, Co*., 173 F.3d at 69 (noting that under New York law, in the "covenant-not-to-compete context apparently assume an irreparable injury to plaintiff.").

### Stranger's Violations of the Restrictive Covenants Establish Irreparable Harm

#### Solicitation of Cleer's Employees and Customers

In addition to Stranger's concession that irreparable harm exists in this case, the record establishes that Stranger improperly solicited Plaintiff's employees and customers violating the OA and MVA since her resignation from Cleer and since the termination of her membership.

Courts "frequently find that damage to customer relationships stemming from disregard of non-compete or non-solicit covenants will cause irreparable harm." *Hercules Pharms., Inc.* 2024 WL 4406899, at *3 (quoting *BakeMark LLC v. Negron*, No. 23-CV-2360, 2024 WL 1075280, at *21 (S.D.N.Y. Jan. 12, 2024)); *Singas Famous Pizza Brands Corp.*, 468 F. App'x 43, 46 (2d Cir. 2012) (summary order) ("[T]he resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm for purposes of imposing a preliminary injunction")

(quotation marks and citation omitted). "Courts in the Second Circuit consistently have held that when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Westport Res. Mgmt., Inc. v. Delaura*, No. 3:16-CV-00873 (VAB), 2016 WL 3546218, at *4 (D. Conn. June 23, 2016) (internal quotation marks and citation omitted) (citing cases). *See Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 423 (D. Conn. 2004) (finding irreparable harm where former employee already serviced the same customers she served at former employer, disclosed customer lists to new employer); *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 444–45 (2d Cir.1977) (party's "ample evidence" of threatened loss of goodwill and customers supported finding of irreparable harm that could not be rectified by money damages).

The same is true under Wyoming and Michigan law. *See Mktg. Displays Int'l v. Shaw,* 646 F. Supp. 3d 897, 906 (E.D. Mich. 2022)*, appeal dismissed and remanded,* 93 F.4th 967 (6th Cir. 2024) ("[T]he Sixth Circuit has held that '[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer.'") (quoting *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992)); *Glob. Bio Res., Inc. v. Cantrell*, No. 2:22-CV-68-SWS, 2022 WL 20444747, at *12 (D. Wyo. June 10, 2022) ("A business's potential future loss of reputation and good will can qualify as irreparable injury.") (citing *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1157 (10th Cir. 2001); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004) (noting that courts finding irreparable harm often base those findings on "such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position.").

Evidence in the record establishes that Plaintiff violated the non-solicitation provision in the MVA (section 12) and the OA (section 9.2). Under Connecticut law, "[s]olicitation is defined as "an attempt or effort to gain business." *Avionics Techs., Inc. v. Fakhry*, No. CV-20-5047976-S, 2024 WL 2717658, at *6 (Conn. Super. Ct. May 23, 2024) (quoting Black's Law Dictionary (11th Ed. 2019) (alteration omitted)). "To establish solicitation, the evidence must show that [Optic Tax] sought to persuade the clients to do business with him personally, offered incentives to them if they did so (such as a lower price), or disparaged the plaintiff's services in an effort to obtain the business." *Id.*

In her former position at Cleer, Stranger was in a position that enabled her to maintain and develop relationships with clients and employees. These customers were repeat users of Cleer's services who would likely seek Cleer's services in the future to prepare and file tax returns, but for the competitive efforts of Stranger and other Optic Tax employees/contractors. Pl. Exs. 141, 144. By Stranger's own admission, following her departure from Cleer, she obtained a list of 226 Cleer clients and solicited all of them by blast emails using the Cleer.tax email domain. ECF No. 100, Ex. A (Stranger 1/13/2025 Depo. Tr. 178:18-21; 195:5-7); *see* Pl . Ex. 150 (response to Interrogatory No. 5 stating she possesses a list of 226 bookkeeping clients). She also admitted that, since her resignation, she used the email address crystal@cleer.tax. Pl. Ex. 150 (response to Interrogatory No. 11).

The documents confirm that Stranger and employees of Optic Tax improperly reached out to numerous customers of Cleer since Stranger's resignation and termination of her membership seeking to set up meeting with those customers. *See e.g.,* Pl. Ex. 132 (9/4/2024 email from Melody Cabida, Senior Bookkeeper Optic Tax to a Cleer client, stating in part "I just wanted to let you know that I left Cleer effective immediately. I am now working for OpticTax.com with Crystal

Stranger who used to run Cleer, and is one of the Top International Tax experts."); Pl. Ex. 133 (9/11/2024 text exchange from Antonieta Tungcab to Crystal Stranger stating ("Hi Crystal! I found a partial list of my previous clients from Cleer, as I have checked with our potential client list, some of the names are not there. Is it ok if I send emails to my previous clients? I will just find their emails from linkedin or from their published websites."); Pl. Ex. 136 (9/20/2024 email client solicitation from Stranger to Cleer client Zafar Kanani); Pl. Ex. 139 (9/6/2024 email from a Cleer client, Jose Javier Munoz to Stranger stating "This is in bad faith to Cleer, trying to steal clients while using the name in the mailing. I wouldn't do business [w]ith someone with this bad ethics. Don't contact me again."); Pl. Ex. 156 (9/6/2024 email from Cleer client Philip Kallberg to Nica Agapito at nica@otictax.com stating "It is my impression that your actions have left both us and Cleer Tax in a really bad situation, which is not a good way of doing business. Please stop emailing me."); Pl. Ex. 153 (9/19/2024, email client solicitation from Catherine Meniosa at Cath@cleertax.com to Cleer client Kaisha Fonetiko).

McKeegan's testified about the irreparable harm that Defendants' actions have had on Cleer, McKeegan described the harm in several areas: (1) Stranger's disparaging communications to Cleer's clients that sought to harm the company's reputation (2) Cleer was forced to switch domains significantly impacting the Cleer's online presence and search engine optimization, (3) reputational damage with Cleer's partners and impacting business relationships. Hrg. Tr. 139:16-25. McKeegan further described confusion among clients as to why other people are contacting them, concerns regarding who has access to their data and tax information which degrades Cleer's brand if clients perceive that their information is not secure. Hrg. Tr. 140:9-14; *see* Pl. Ex. 141 ("Crystal-this is all very confusing. I am getting emails from David and you on my inbox for what seems like a public co-founder battle. I just want to candidly know: 1. I paid Cleer for loopback

bookkeeping and our Corporate tax filing due in a few weeks which hasn't been done, so am I an Optic or Cleer client? 2. Where is our data sitting and where are the employees who all supposedly left Cleer?"); Pl. Ex. 144 ("Thanks Crystal, sorry for the confusion I had it in my mind that Optic Tax was a progression of Cleer so I thought you'd have all my old info."); ECF No. 135; ECF 162-2 at 4 (2/8/2025 email from Marcos Sanchez to Cleer employee Danielle stating, in part, "[t]his has created some confusion on my end, and I'd love to clarify how things stand before moving on."); ECF No. 100 (citing Stranger 1/13/2025 Depo. Tr. 178:18-25-179:1-3) (Stranger testifying that her use of the Cleer.tax email domain caused confusion among Cleer's clients).

Furthermore, Defendants gutted Plaintiff's workforce by hiring away Plaintiff's employees/contractors. *See* Pl. Ex. Nos. 160-174, 176-188 (solicitation emails and Facebook Messenger exchanges from Stranger entitled "Tax Work" "Shifting Gears" "Opportunity" "Changes" "New Opportunity" "Touching Base" "Possible Opportunity" "Checking In" or "Lets Talk" to current Cleer employees); Pl. Ex. 174 (text exchange from Anne Tungcab to Stranger stating, in part, "Thank you for the opportunity to be part of Optic and to work with the same team in a happy environment."); Pl. Ex. 150 (response to Interrogatory No. 6 stating that "since her resignation" she communicated with "all of Cleer's employees and contractors."). Plaintiff will be irreparably harmed if Stranger is allowed to continue to violate the non-solicitation and non-compete provisions of the MVA and OA and solicit Cleer's customers and employees.

In light of Stranger's ongoing breaches and flagrant disregard of the OA and MVA, her demonstrated willingness to solicit Cleer's customers and employees, use Plaintiff's confidential information for the benefit of Optic Tax and her ongoing violations of the Court's TRO, the Court finds future breaches of the OA and MVA are likely. Simply put, to the extent that the purpose behind the restrictive covenants is to allow Cleer time to transfer the client relationships previously

maintained by Stranger to other Cleer employees, that benefit is lost by the failure to enforce the Agreements immediately. Indeed, because Stranger acknowledges soliciting and providing competitive services to certain Cleer customers since leaving Cleer, it is clear that Plaintiff faces irreparable harm absent injunctive relief.

### Defendants' Federal Trademark Law Violations Establish Irreparable Harm

Plaintiff argues that in the context of Cleer's domain, irreparable injury is presumed, ECF No. 145 at 19 (citing *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.,* No. CV18814(SJF)(SIL), 2018 WL 2012875, at *6 (E.D.N.Y. Apr. 30, 2018) ("[I]t remains true that irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial, because loss of control over one's reputation is neither calculable nor precisely compensable.") (internal quotation marks and alteration omitted) (citing cases); *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 527 (S.D.N.Y. 2012) ("the mere fact that both Domain Names are spelled *only* with the plaintiff's name weighs quite heavily in favor of the plaintiff here; any time the plaintiff meets a new person, that person—or, for that matter, anyone the plaintiff already knows—will be just clicks away from visiting one of the sites run by the defendant. Even if the defendant never posts damaging material, the Court agrees with the plaintiff that the use of the plaintiff's name in the Domain Names creates a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of those sites.) (emphasis in original, internal quotation marks and alteration omitted).

The evidence shows Cleer.tax domain was acquired by Stranger in the course of her employment and that she was acting on behalf of Cleer when she obtained the Cleer.tax domain, along with several other domain names, during the rebranding of GBS. Hrg. Tr. 110 (McKeegan

testifying that he would not have rebranded to Cleer.tax if he had any doubt that Cleer did not own the domain); Hrg. Tr. 203:2-6 (Stranger testifying that she registered Cleer.tax "for the company.").

As set forth *supra* at 9-17, Plaintiff presented evidence that after leaving Cleer, Stranger and Optic Tax used the Cleer.tax domain to contact Cleer's customers, disparage Cleer and its reputation and solicit business by using Cleer's confidential customer lists and pricing information. *See also* Pl. Ex. 156 (9/6/2024 email from Stranger to Alexandra Agapita at alex@optictax.com, Nica Agapito at nica@optictax.com and Maricon Moronia at mari@optictax.com stating "I am preparing a letter to send the whole bookkeeping client list from email marketing software from the cleer.tax domain explaining what happened."). ECF No. 100, Ex. A (Stranger 1/13/2025 Depo. Tr. 178:18-25-179:1-3 (testifying that her use of the Cleer.tax email domain caused confusion among Cleer's clients). ECF No. 135 (Feb. 8, 2025 email from a Cleer client stating Optic Tax "reached out, offering a significantly different price for handling [the 2024 tax filing] through Optic Tax.").

Having reviewed the uncontroverted testimony and exhibits submitted in support of Plaintiff's motion, the Court finds that Cleer has met its burden of establishing that it will sustain irreparable injury if a preliminary injunction is not issued based on the loss of control of its domain Cleer.tax caused by Stranger's and Optic Tax's continued use of the domain pending a final decision on the merits. Defendants "submitted no argument or evidentiary support as to why such confusion would be unfounded", and the Court determines that plaintiff's arguments are sound. *Bogoni,* 847 F. Supp. 2d at 527 (S.D.N.Y. 2012).

The Court therefore concludes that Plaintiff has met its burden of demonstrating irreparable harm in this case.

### B. *Likelihood of Success on the Merits*

The Court need not address all of Plaintiff's claims when considering the question of likelihood of success. Plaintiff is not required to "show that there is a likelihood of success on the merits of all of [it's] claims for relief. Rather, Plaintiffs must show a likelihood of success on the merits of at least one of [Plaintiff's] claims." *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022) (quoting *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)).

**Breach of the Operating Agreement**

Cleer is likely to succeed on the merits of its claims for breach of the non-disclosure, non-competition and non-solicitation provisions in the OA. Pl. Hrg. Ex.102. As an owner and employee of Cleer, Stranger agreed to confidentiality, customer and employee non-solicitations, and non-competition in the OA and MVA[7] For the reasons that follow, the Court finds that Plaintiff has shown likelihood of success on the merits of its claims for breach of the OA and MVA.

Under Wyoming law, "[t]o be enforceable, a non-compete agreement must be (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in durational and geographical limitations; and (5) not against public policy." *Hassler v. Circle C Res.*, 2022 WY 28, ¶ 15, 505 P.3d 169 (Wyo. 2022) (citing *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 540 (Wyo. 1993)); *see Thorkildsen v. Belden*, 2011 WY 26, ¶ 21, 247 P.3d 60, 65 (Wyo. 2011) (Wyoming Supreme Court recognizing validity of non-compete clauses in operating agreements).

The OA satisfies the criteria for enforceability under Wyoming Law. It is in writing. The OA was entered into ancillary to a membership interest in Cleer that constituted reasonable and

---

[7]    The OA is controlled by Wyoming law. Pl. Hrg. Ex. 102, § 12.5. The MVA is controlled by Michigan law. Pl. Hrg. Ex. 101 § 16.

sufficient consideration. *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.,* 2009 WY 113, ¶ 13, 215 P.3d 1054, 1059 (Wyo. 2009) ("[T]he Wyoming Supreme Court has recognized the rule that a covenant not to compete entered into contemporaneously with the employment itself is enforceable and is supported by sufficient consideration."). The McKeegans also promoted Stranger to Chief Operating Officer ("COO")of Cleer, the same day she signed the OA. ECF No. Hrg. Tr. at 31:16-18. The one-year non-compete restriction is reasonable in terms of duration, and the nationwide geographical scope is reasonable because Cleer provides tax services to a niche group of foreign-owned businesses filing taxes in the United States. *Hopper*, 861 P.2d at 544-45 (upholding one year duration in non-compete agreement). Finally, the non-compete clause in the OA is not against public policy because under Wyoming law, "[e]mployers are entitled to protect their business from the detrimental impact of competition by employees who, but for their employment, would not have had the ability to gain a special influence over clients or customers." *Brown v. Best Home Health & Hospice, LLC,* 2021 WY 83, ¶ 28, 491 P.3d 1021, 1031 (Wyo. 2021) (quoting *Hopper,* 861 P.2d at 542). Here the non-compete non-solicitation covenants apply for one year to "any customer, supplier, licensee, licensor or other business relationship" of Cleer, all of whom Stranger knew as the former COO of Cleer.[8] Pl. Hrg. Tr. 102:10-11.

There is no dispute that Stranger is in breach of the non-compete. She testified that she started using Optic Tax to compete directly with Cleer on September 1, 2024. Hrg. Tr. 208:17-24. Indeed, she used Cleer.tax to reach out to Cleer's customers on the behalf of Optic Tax. Further,

---

[8]     The covenants not to compete and non-solicitation covenants apply "for twelve (12) months following withdrawal for any reason as a Member:" Pl. Hrg. Ex. 102 § 9.1, 9.2. Stranger's membership in Cleer was terminated on August 8, 2024. Thus, the twelve month period expires on August 9, 2025.

as detailed above, Cleer presented competent evidence that Optic Tax continues to contact and solicit Cleer's clients even when ordered by the Court not to do so. ECF No. 34.

There is also no dispute that Stranger is in breach of the non-solicitation provisions. Under the OA and MVA, the term "supplier" refers to foreign-based accountants and bookkeepers as independent contractors who are considered "suppliers" and/or non-W-2 employees working for Cleer. Hrg. Tr. 43:10-16; 50:6-8). Stranger admitted that she solicited Cleer's clients, suppliers, employees, and independent contractors prior to the one year expiration under the OA, and the record reflects that she poached over 20 workers from Cleer and sent blast emails through Optic Tax to at least 5,448 Cleer clients. Hrg. Tr. 227:10-229:19; 234:9-236:14; Pl. Hrg. Ex. 126-127;132; 133; 136-139; 143-144; 146-47;160-189).

There is no dispute that Stranger is in breach of the non-disclosure provisions. Optic Tax has a mailing list that includes 5,448 Cleer current, former, and prospective clients which comprise more than half of Cleer's mailing list. Pl. Hrg. Ex. 123. Stranger testified that she has a separate list of 226 Cleer clients. Hrg. Tr. 227:10-229:19. Stranger also possesses a confidential spreadsheet containing a staffing roster and business partner pricing information belonging to Cleer. Pl. Hrg. Ex. 190, Def. Ex. 515. She also used Cleer's pricing information to develop Optic Tax's pricing and deliberately undercut Cleer. Pl. Hrg. Ex. 142 (9/10/2024 email from Optic Tax Employee Catherine Meniosa seeking clarification and confirmation on tax package pricing and displaying a side-by-side comparison of Optic Tax and Cleer's pricing for reference); ECF No. 135 at 1 (Feb. 8, 2025 email from Cleer client Marcos Sanchez stating "[t]he team that assisted me with the 2023 filing recently reached out, offering a significantly different price for handling it through Optic Tax. This has created some confusion on my end, and I'd love to clarify how things stand before moving forward.").

Accordingly, Plaintiff has demonstrated a likelihood of success on the merits on its breach of the non-compete and non-solicitation covenants in the OA that is enforceable against Stranger at least until August 9, 2025, and she will remain bound by the non-disclosure provisions as provided for in the OA.

### Breach of the MVA

Cleer is likely to succeed on the merits of its claims for breach of the non-disclosure, and non-solicitation provisions in the MVA, which is controlled by Michigan law. For the same reasons stated above, the restrictive covenants are enforceable under Michigan law and designed to protect Cleer's reasonable business interests.

Under Michigan law, a "restrictive covenant must protect an employer's reasonable competitive business interests, but its protection in terms of duration, geographical scope, and the type of employment or line of business must be reasonable. *Coates v. Bastian Bros., Inc.,* 276 Mich. App. 498, 506–07, 741 N.W.2d 539, 545 (2007) (quoting *Thermatool Corp. v. Borzym,* 227 Mich. App. 366, 372, 575 N.W.2d 334 (1998)). The Court finds that the MVA meets the criteria for enforceability under Michigan law. The time period for enforcement of the MVA is reasonable. "Michigan courts have not provided any bright line rules. Rather, they have upheld non-compete agreements covering time periods of six months to three years." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007) (citing cases). "Michigan courts have similarly not imposed any strict limitation on the permissible geographic scope of non-compete agreements." *Id.* Here, the geographic scope mirrors Cleer's nationwide business. Cleer conducts business throughout the United States and Stranger entered into the MVA with a clause agreeing that the geographical limitation is reasonable. Pl. Hrg. Ex. 101 § 11.e; *see Quest Car Care Prods., Inc. v. Titus*, 708 F. Supp. 3d 1338, 1344 (W.D. Mich. 2023).

There is no dispute that Stranger is in breach of the non-solicitation provision of the MVA. As an employee of Cleer, Stranger agreed to not "*contact, solicit, accept business from*, or communicate the fact or circumstance of Employee's resignation from or termination of employment with Company or any of Company's customers or suppliers, or prospective customers or suppliers[.]" Pl. Hrg. Ex. 101 § 12.a.i (emphasis added). She also agreed not to "*contact, solicit or hire any employees of the Company* with whom Employee worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company." Pl. Hrg. Ex. 101 § 12.a.ii (emphasis added).

Stranger's breach of the MVA is clear. During the restrictive periods under both Agreements, she formed and is operating a directly competitive business, Optic Tax, and deliberately solicited Cleer's clients and employees. She further directed employees of Optic Tax to solicit Cleer's customers and offered pricing based on proprietary pricing information belonging to Cleer.

On the record before the Court, the non-compete, non-solicitation, non-disclosure covenants in the OA and MVA are valid, and Plaintiff is likely to succeed on its claims that Stranger breached them.

### Tolling Provision in the MVA

Under the MVA, "the "period of time during which Employee is subject to the Agreement shall be extended for the amount of time Employee is in breach of the Agreement." Pl. Hrg. Ex. 101 §11.h. Connecticut law governs the availability of equitable remedies despite the choice of law provisions in the OA and MVA applying, respectively, the substantive laws of Wyoming and Michigan. *Custard Ins. Adjusters, Inc. v. Nardi*, No. CV980061967S, 2000 WL 562318, at *51 (Conn. Super. Ct. Apr. 20, 2000) ("concerning the enforcement of non-compete agreements, it has

been held that even where a choice of law clause dictates that the law of a foreign state will apply, a court will apply the law of the forum state in determining whether the plaintiff failed to establish that it would suffer irreparable harm without injunctive relief.") (citing cases), *opinion clarified*, No. CV980061967S, 2000 WL 966766 (Conn. Super. Ct. May 5, 2000). Courts in this district and state consistently enforce tolling provisions in restrictive covenant agreements. *Gartner, Inc. v. Hackett Grp., Inc.,* No. 3:23-CV-688 (SRU), 2023 WL 7350329, at *7 (D. Conn. Nov. 7, 2023), *appeal withdrawn,* No. 23-7832, 2024 WL 4866897 (2d Cir. Feb. 15, 2024) (entering injunction for twelve months following the entry of the preliminary injunction order); *Beacon Ins. & Inv. Grp., LLC v. Panzo,* No. CV146044992S, 2016 WL 4507389, at *20 (Conn. Super. Ct. July 25, 2016) ("In ordering a permanent injunction, 'the relief granted must be compatible with the equities of the case.'") (quoting *Castonguay v. Plourde,* 46 Conn. App. 251, 267, 699 A.2d 226, *cert. denied*, 243 Conn. 931, 701 A.2d 660 (1997)); *Roth Staffing Companies, L.P. v. Brown,* 3:13-cv-00216 (JBA)(JGM), ECF No. 71 (D. Conn. Dec. 9, 2013) (entering preliminary injunction as of the date of the Court's Recommended Ruling because defendant continued to breach the employment agreement after the Joint Motion for Stipulation Order Pending Ruling on Motion for Preliminary Injunction was granted.). Here, Plaintiff has provided evidence up to and including February 2025, that Defendants continue to violate the TRO and contact Cleer's customers. Accordingly, the period of time that Stranger is subject to the MVA's restrictive covenants is extended to the amount of time Stranger remains in breach.

### C.  Public Interest

Finally, there is no evidence that the enforcement of these restrictive covenants will harm the public interest. *Gartner, Inc.,* 2023 WL 7350329, at *7 (finding that under Connecticut law, the public interest is served by issuance of the preliminary injunction to enforce post-employment

non-competition agreements) (citing cases); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 551 (6th Cir. 2007) ("No important public policies readily appear to be implicated by the issuance of the preliminary injunction in this case other than the general public interest in the enforcement of voluntarily assumed contract obligations . . . [and] enforcement of this non-compete clause would not run afoul of either federal or Michigan antitrust policy because the injunction appears to be reasonable in purpose, scope, and duration.") (applying Michigan law); *Alarm Funding Assocs., LLC v. Sec. Prods. Co., LLC*, No. 1:14-CV-0128-S, 2015 WL 11090396, at *12 (D. Wyo. Feb. 13, 2015) (finding that entry of an injunction "advances the public interest because it will protect [plaintiff] from unfair competition and continued tortious interference with its valid contractual relationships. To allow [defendant] to improperly take advantage of the information it gained while acting as subcontractor to [plaintiff] to the detriment of [plaintiff], is decidedly against the public interest.") (applying Wyoming law); *A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 301-02 (D. Conn. 2015) ("the only true harm to Naso is being required to fulfill her duties under the Agreement, and the only harm to White Cap is the loss of an employee it should not have hired.").

### *Defendants' Arguments*

Stranger, proceeding *pro se,* argues that the merger clause in the MVA, supersedes the non-compete, non-solicitation and confidentiality provisions in the OA, rendering the OA not enforceable. ECF No. 144 at 3 (citing MVA § 13 ("This Agreement supersedes any prior agreement between the Employee and Company, including, but not limited to, any other agreement relating to salary or any other form of compensation from Company to which Employee may claim an entitlement for any reason.")). She further argues that the non-solicitation provision in the MVA was in effect for a twelve (12) month period commencing on February 1, 2024 and ending on

January 31, 2025. *Id.* The Court disagrees. First, Plaintiff is not seeking enforcement of the non-compete provision in the MVA. *See* ECF No. 145 at ¶¶ 117-124. Second, Plaintiff correctly points out that the "MVA cannot supersede the OA as the two contracts deal with different subject matters; the OA details the duties as between the owners of Cleer and the MVA details the responsibilities of Ms. Stranger in her capacity as an employee of Cleer." ECF 145 at ¶ 105. Here, Stranger resigned her employment as COO of Cleer effective January 31, 2024. She remained a member of Cleer until August 9, 2024, when her membership was terminated. Thus, the MVA and OA addressed a different set of restrictive covenants in Stranger's separate capacities as employee and member of Cleer. "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parole evidence is precluded from altering or interpreting the agreement." *Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 21 (2d Cir. 1997); *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 143 (2d Cir. 2019) ("the concept of a merger clause rests on the rationale that a later written agreement has supplanted prior negotiations[.]") (internal quotation marks and citation omitted). Here, Cleer is not attempting to alter either agreement; rather they are attempting to enforce both agreements exactly as written." ECF No. 145 at ¶ 104. Accordingly, Stranger's argument that the OA is not enforceable because of the merger clause contained in the MVA is without merit.

### *Stranger's Motion for Bond ECF No. 152*

Rule 65(c) provides: "The Court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained . . . ." Fed. R. Civ. P. 65(c). "The Rule 65(c) security requirement is designed to assure the restrained party that it may readily collect damages from the funds posted in the event that it was wrongfully restrained] and that it

may do so without further litigation and without regard to the possible insolvency of the plaintiff." *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.,* 775 F.3d 128, 135 (2d Cir. 2014) (citation and alterations omitted).

Pending is Defendant Stranger's Motion for Bond seeking "$798,196.33, or such higher amount as the Court deems proper, to secure Defendant against damages resulting from the TRO and any subsequent [preliminary injunction]." ECF No. 152.

Plaintiff argues that a bond is unnecessary when there is no evidence that an injunction will cause harm to Defendants. ECF No. 179 at 1. "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm, or where the injunctive order was issued 'to aid and preserve the court's jurisdiction over the subject matter involved.'" *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 136 (2d Cir. 1997) (quoting *Doctor's Assocs., Inc.* v. *Stuart,* 85 F.3d 975, 985 (2d Cir. 1996)). The Court in its discretion finds that no bond is warranted in light of the overwhelming evidence submitted at the hearing in Plaintiff's favor and Stranger's continuing violation of the TRO, for good cause shown pursuant to Fed. R. Civ. P. 65(c).

Accordingly, I recommend that Stranger's Motion for Bond be DENIED. ECF No. 152.

## III.   CONCLUSION[9]

For the reasons stated above, I recommend that Plaintiff's Motion for Preliminary Injunction be **GRANTED**. **ECF No. 12**.

It is HEREBY ORDERED that, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, that Stranger and her employees, contractors, agents, companies (including but not

---

[9]     To the extent not previously addressed, the Court considered the remainder of Defendants' arguments and finds them to be without merit.

limited to Optic Tax), and all persons in active concert or participation with, through, or under her, are enjoined and restrained from:

1. Pursuant to the OA, competing against Cleer until August 9, 2025, including without limitation by offering tax preparation and bookkeeping services;

2. Pursuant to the OA and MVA, for a period of one year from entry of this Recommended Ruling and Order, soliciting, hiring, or otherwise contacting for purposes of discussing employment or contractor opportunities any person who is or was working for Cleer LLC or any of its predecessors in any capacity;

3. Pursuant to the OA and MVA, for a period of one year from entry of this Recommended Ruling and Order: (i) soliciting, (ii) accepting business from, (iii) continuing to provide services for, or (iv) otherwise contacting for purposes of developing business, entering into an agreement, or proposing or making any sale any person who is or was a customer, supplier, or prospective customer or supplier of Cleer LLC. The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and supplier with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two year prior to her termination. Absent conferral and agreement, Stranger may not contact any customers or suppliers or prospective customers or suppliers of Cleer LLC or its predecessors.

4. Using or disclosing or sharing any Confidential Information or trade secret information of Cleer. Defendants are further instructed to confer with counsel for Cleer to ensure the permanent deletion of Cleer's confidential and trade secret information within fourteen (14) days of the Recommended Ruling and Order.

5. Using, operating and maintaining the Domain Name, Cleer.tax;

6. Transferring the domain names to third parties without the Court's consent prior to a permanent resolution of this action on the merits; and

It is further ordered that no bond is required in light of Stranger's continuing violation of the TRO. I recommend that Stranger's Motion for Bond be **DENIED**. **ECF No. 152**.

The parties are encouraged to contact their assigned magistrate judge for a settlement conference.

This is a recommended ruling by a magistrate judge. *See* Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen days of being served with this order. *See* Fed. R. Civ. P. 72(b)(2). Failure to object within fourteen days will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; D. Conn. L. Civ. R. 72.2(a); *Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary

order) (failure to file timely objection to magistrate judge's recommended ruling precluded further appeal to Second Circuit); *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

*/s/ Maria E. Garcia, USMJ*
Hon. Maria E. Garcia
United States Magistrate Judge
