IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | DEFENDANT CRYSTAL STRANGER'S |
| | : | OBJECTION TO MAGISTRATE |
| CRYSTAL STRANGER et al. | : | JUDGE'S RECOMMENDED RULING |
| | : | ON MOTION FOR PRELIMINARY |
| v. | : | INJUNCTION |
| | : | |
| DAVID and CARRIE McKEEGAN | : | |

Defendant Crystal Stranger ("Defendant") respectfully submits this objection to the Magistrate Judge's Recommended Ruling on Plaintiff Cleer, LLC's ("Plaintiff") Motion for Preliminary Injunction [ECF No. 182]. For the reasons set forth below, Defendant requests that the Court reject the Recommendation and deny Plaintiff's Motion for Preliminary Injunction.

## I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(3), a district judge must conduct a de novo review of any portion of a magistrate judge's recommended ruling to which a specific objection is made. The district judge may accept, reject, or modify the recommended disposition. See *United States v. Raddatz,* 447 U.S. 667, 673–74 (1980). This standard requires the Court to "give fresh

consideration to those issues to which specific objection has been made by a party."

*Jeffrey S. by Ernest S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990)

(quoting H.R. 1609, 94th Cong., §2 (1976)).

## II. OBJECTIONS TO THE RECOMMENDED RULING

### A. Plaintiff Has Failed to Demonstrate Irreparable Harm

#### 1. Legal Standard for Irreparable Harm

To obtain a preliminary injunction, a plaintiff must establish "that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Irreparable harm must be "both certain and great," and "actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "Injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time," *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931)" Id. Courts consistently hold that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Here Plaintiff, operating an accounting firm, can easily calculate any financial losses in order to determine monetary damages, but has simply chosen not to do so.

The Second Circuit has emphasized that a plaintiff seeking a preliminary injunction must demonstrate "that he is likely to suffer irreparable injury in the absence of an injunction," not merely that it is possible. *Salinger v. Colting*, 607 F.3d 68, 79-80

(2d Cir. 2010) (emphasis in original) (citing *Winter*, 555 U.S. at 22). Moreover, the harm must be the kind of injury for which an award of money cannot compensate. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). There is no such harm here.

### 2. The Contractual Stipulation of Irreparable Harm Is Not Dispositive

The Magistrate Judge's finding of irreparable harm relies significantly on the stipulation of irreparable harm contained in the MVA. However, this reliance is misplaced. While the Recommendation correctly acknowledges that such provisions are "not dispositive," it nevertheless gives undue weight to this provision.

The Second Circuit has made clear that contractual stipulations of irreparable harm cannot substitute for an actual showing of such harm. *JTH Tax LLC v. Agnant*, 22-1229-cv (2d Cir. 2023), the Court rejected the notion that categorical rules or contractual provisions could replace the required factual demonstration of irreparable harm. This principle has been consistently applied in the Second Circuit. In *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010), the court emphasized that courts "must not adopt a "categorical" or "general" rule or presume that the plaintiff will suffer irreparable harm" but must instead make a factual determination (quoting *eBay*, 547 U.S. at 391, 393-94, 126 S.Ct. 1837)

More specifically, in *Singas Famous Pizza Brands Corp. v. New York Advertising LLC*, 468 F. App'x 43, 46 (2d Cir. 2012), the Second Circuit clarified that courts must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary

injection but ultimately prevails on the merits. A mere contractual stipulation cannot substitute for this analysis.

### 3. The Alleged Communications with Clients Do Not Establish Irreparable Harm

The Magistrate Judge's finding of irreparable harm relies heavily on a series of alleged communications with Cleer clients that mischaracterizes both the nature and impact of these interactions. A closer examination of the evidence reveals several critical flaws in this analysis.

**First,** the Recommendation incorrectly characterizes certain client communications as "solicitations" when they were in fact informational notifications or responses to client-initiated inquiries. In *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 87 (2d Cir. 2010), the Second Circuit appeals court recognized that informational communications that do not actively encourage clients to transfer their business do not constitute improper solicitation.

The evidence cited in the Recommendation fails to establish that Defendant actively solicited Cleer clients. For example, the September 6, 2024 email (Pl. Ex. 139) was merely informational, advising clients of changes and offering free support, without actively encouraging them to transfer their business. This type of communication falls within the permissible category of professional courtesy notifications.

**Second,** the Recommendation fails to acknowledge that the negative client reactions cited (Pl. Ex. 139 and Pl. Ex. 156) represent isolated instances rather than a pattern of client confusion. In *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 212 (S.D.N.Y. 2015), the court held that anecdotal evidence of confusion from a small number of consumers is insufficient to establish the likelihood of irreparable harm. The handful of 226 cited emails among nearly ten thousand Cleer contacts does not establish a pattern of significant confusion.

**Third,** and most critically, the Recommendation fails to establish that any alleged client confusion or dissatisfaction actually resulted in irreparable harm to Plaintiff. In *Salinger*, 607 F.3d at 82, the Second Circuit emphasized that harm must be actual and imminent, not remote or speculative. The evidence does not demonstrate that the cited communications resulted in significant client losses or reputational damage that could not be remedied through monetary damages. Plaintiff has provided no hard evidence in this regard, only testimony about alleged losses without taking any effort to calculate these in detail or show substantiation.

"The party seeking a preliminary injunction must prove that irreparable harm is likely, not merely possible. '[C]onclusory and vague allegations are not sufficient to show entitlement to injunctive relief.'" Rest. Law Ctr. v. United States Dep't of Labor, 1:21-CV-1106-RP, 5 (W.D. Tex. Feb. 22, 2022) (Citing Bush v. Monroe, CIVIL ACTION NO. 6:17cv541 (E.D. Tex. Aug. 5, 2018)).  Additionally, in *Coleman v. Bank of New York Mellon*, 2013 WL 1187158 at *8 (N.D. Tex. Mar. 4, 2013) the court stated that

"unsupported, conclusory statements are insufficient to demonstrate entitlement to the extraordinary relief of a . . . . preliminary injunction." Here, McKeegan's testimony about alleged harm to Cleer's reputation is precisely the type of conclusory assertion that courts have consistently rejected as a basis for finding irreparable harm.

### 4. The Domain Name Issues Do Not Constitute Irreparable Harm

The Magistrate Judge's finding that Plaintiff has demonstrated irreparable harm based on Defendant's use of the Cleer.tax domain is legally and factually erroneous in a number of ways:

A. The Recommendation misapplies trademark law to a domain name ownership dispute. In *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 957 (C.D. Cal. 1997), the court distinguished between domain name ownership disputes and trademark infringement cases, holding that different legal standards apply. The presumption of irreparable harm in trademark cases does not automatically extend to domain name disputes, particularly where the domain registrant has been the legal owner since the domain's creation.

B. The Recommendation ignores Plaintiff's voluntary abandonment of the Cleer.tax domain. As established in the record, McKeegan testified that after Defendant's membership termination, he "realized that Stranger would not give back the domain. So, he switched Cleer.tax to Cleertax.com." (Hrg. Tr. 119:1-3). In *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 937 (9th Cir. 2006), the court held that adopting a new mark and discontinuing use of the old one is

strong evidence of abandonment. Plaintiff's deliberate transition to Cleertax.com constitutes such abandonment.

C. The evidence does not support the conclusion that Defendant's use of the domain caused substantial client confusion leading to irreparable harm. The Recommendation cites isolated instances of unauthenticated client emails expressing confusion, but as noted in *Kadant, Inc. v. Seeley Machine, Inc.*, 244 F. Supp. 2d 19, 38 (N.D.N.Y. 2003), "a showing of irreparable harm may not be based solely on anecdotal evidence," particularly where the evidence consists of "a small number of inquiries from customers." Furthermore, as the domain has not been in use any confusion that did occur was temporary and occurred during a brief transition period in September 2024, over six months ago.

D. Plaintiff has already remedied any potential harm by establishing its online presence at Cleertax.com. In *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985), the court noted that where a party has already taken steps to mitigate potential harm, those steps undercut claims of irreparable injury. Plaintiff's successful transition to Cleertax.com demonstrates that any harm was not irreparable.

**5. The Magistrate Judge's Reliance on the List of 226 Clients Is Factually Erroneous**

The Recommendation states that "By Stranger's own admission, following her departure from Cleer, she obtained a list of 226 Cleer clients and solicited all of them by

blast emails using the Cleer.tax email domain." This characterization is factually incorrect and misrepresents the evidence.

The assertion that Defendant "obtained" a list suggests improper acquisition, yet there is no evidence that Defendant misappropriated any client list in her possession during her tenure at Cleer. In *BEA Sys., Inc. v. WebMethods, Inc.*, 2007 WL 1201099, at *4 (N.D. Cal. Apr. 23, 2007), the court noted that claims of customer list misappropriation require evidence of actual misconduct, not mere assertions. Despite two forensic examinations of Defendant's computers and a subpoena to Plaintiff's email marketing software, Plaintiff produced no evidence that Defendant improperly acquired any client list she had access to.

Furthermore, the evidence shows that independent contractors who left Cleer voluntarily chose to share information about clients they had personally serviced and may well have obtained any contact information provided by using publicly available sources. In *Delaware Express Co. v. Serpico*, 1995 WL 108936, at *7 (E.D. Pa. Mar. 6, 1995), the court recognized that professionals often maintain relationships with clients they personally serviced, and information about such clients is not necessarily confidential, and business contact information can be obtained from publicly available sources. Furthermore. the Recommendation is patently unjust, in that reaching out to 226 former Cleer clients, of whom fewer than 50 ultimately became Optic Tax clients, does not demonstrate irreparable harm that would justify shutting down a business now serving over 500 clients.

**B. Plaintiff Has Not Shown a Likelihood of Success on the Merits**

**1. The Magistrate Judge Misapplied Wyoming Law on Restrictive Covenants**

The Magistrate Judge erroneously concluded that Plaintiff demonstrated a likelihood of success on the merits of its claims for breach of the non-disclosure, non-competition, and non-solicitation provisions in the Operating Agreement ("OA"). This conclusion reflects a fundamental misapplication of Wyoming law governing the enforceability of restrictive covenants.

While the Recommendation correctly identifies the five-factor test from *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 540 (Wyo. 1993), it fails to properly apply these factors to the specific circumstances of this case. Wyoming courts have consistently emphasized that restrictive covenants must be narrowly tailored to protect legitimate business interests and must not be punitive in nature. In *CBM Geosolutions, Inc. v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 38, 215 P.3d 1054, 1064 (Wyo. 2009), the Wyoming Supreme Court emphasized that restrictive covenants are strictly construed against the employer and that they must not exceed the legitimate interests which the employer has a right to protect.

Moreover, the Recommendation misinterprets *Thorkildsen v. Belden*, 2011 WY 26, 247 P.3d 60 (Wyo. 2011), suggesting that it broadly recognizes the validity of non-compete clauses in operating agreements. In fact, *Thorkildsen* simply acknowledged that such provisions can be valid under certain circumstances; it did not establish a

9

blanket rule of enforceability, and the specific non-compete clause at issue in that case was much narrower than the one here. Actually, that specific case referenced was about entitlement of attorney fees when Mr. Thorkildsen was NOT found to have "breached the non-competition provision, intentionally interfered with the LLC's business expectancies or breached his fiduciary duties." *Id.*

The Recommendation also fails to account for Wyoming's strong public policy against restrictive covenants that effectively prevent individuals from earning a livelihood. Covenants that prohibit an employee from competing with his employer are disfavored in Wyoming, especially when the employee brought in with them the knowledge to do their job. In this case the employer is not able to establish a "special business interest subject to protection by the non-compete provision of the Agreement." *Brown v. Best Home Health & Hospice, LLC*, No. S-20-0270, 1 (Wyo. 2021) *see also Preston,* ¶ 15, 277 P.3d at 86 (public policy generally disfavors employee non-compete agreements).

Furthermore, this broad non-compete with global geographic scope and limited competition in the niche is likely to be against public policy. "[S]ound public policy encourages employees to seek better jobs from other employers or to go into business for themselves." *Ridley v. Krout,* 63 Wyo. 252, 180 P.2d 124, 127 (1947) (citations and quotation marks omitted).

The non-compete provision in the OA fails to satisfy Wyoming's requirements for enforceability for several critical reasons:

**First,** the nationwide geographic scope is unreasonable despite Plaintiff's claim that it serves a "niche group." In *Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 544 (Wyo. 1993), the Wyoming Supreme Court emphasized that "[r]easonable geographic restraints are generally limited to the area in which the former employee actually worked or from which clients were drawn. (Citing *Commercial Bankers Life Ins. Co. of America*, 516 N.E.2d at 114-15; *Brewer v. Tracy*, 198 Neb. 503, 253 N.W.2d 319, 322 (1977)." Plaintiff presented no evidence that it actually conducts substantial business operations in all 50 states or that Defendant personally developed relationships with clients throughout the entire country.

While the Wyoming Supreme Court also found that, "[a] broad geographic restriction may be reasonable when it is coupled with a specific activity restriction within an industry or business which has an inherently limited client base." (*Id.* citing *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 427 (Utah 1983)), this was in a case that had omitted geographic restrictions and was prior to the law change that prohibits "blue-pencil" changes to non-competes, as discussed in the Second part of this argument.

Justice Davis of the Wyoming Supreme Court wrote that this "creates an incentive to draft overly broad covenants not to compete in order to instill fear in employees, who can only show that a covenant is overly broad after litigation, the outcome of which is far from certain and can be too costly to pursue. Because an employer can rely on a court or arbitrator to narrow any overly broad restriction, there are no consequences for overreaching in drafting the covenant, which the employee

agrees to at a time when the bargaining positions of the parties are usually unequal."
*Skaf v. Wyo. Cardiopulmonary Servs.*, No. S-20-0266, 24 (Wyo. 2021).

This is exactly the type of case that justice Davis warned about, where an employer has chosen one of the most prominent law firms in the country to bring litigation against the former employee/partner in order to shut down his competition after entering the contract in a time when there was unequal bargaining power.

**Second,** Wyoming has added significant restrictions to the "blue-pencil" doctrine, particularly in the context of contract modification by courts. Under Wyoming law, courts do not have the authority to rewrite or modify contractual terms to make an agreement enforceable. Instead, if a provision is deemed unenforceable, the court may strike it, but it cannot revise or replace it with new terms. This approach ensures that courts uphold the parties' original intent without engaging in judicial contract reformation.

Contracts in Wyoming which are contrary to public policy are not ""'recognized by the court, and the parties to the contract are left as the court finds them.'" *Retz v. Siebrandt*, 2008 WY 44, ¶ 16, 181 P.3d 84, 90 (Wyo. 2008) (quoting *Tate v. Mountain States Tel. & Tel. Co.*, 647 P.2d 58, 61 (Wyo. 1982)). Instead of revising an agreement to make it consistent with public policy, we typically declare it void. See, e.g., *Century Surety Co. v. Jim Hipner, LLC*,2016 WY 81, ¶ 20, 377 P.3d 784, 792 (Wyo. 2016) (insurance contract against public policy was "illegal and void" (citation omitted));" *Hassler v. Circle C Res.*, No. S-21-0132, 6 (Wyo. 2022).

Applying this principle to the Operating Agreement (OA), the Court cannot now modify or alter any of its terms without voiding the agreement. If any provision is found to be unenforceable or against public policy, the Court may strike it, but it cannot substitute new terms or impose conditions not originally agreed upon by the parties. Any attempt to do so would exceed the court's authority and fundamentally alter the contractual relationship, rendering the OA void under Wyoming contract law.

Here the Recommended ruling has done exactly this type of modification, by expanding the OA terms beyond the nationwide restriction to be a total ban on worldwide activities, when even the nationwide restriction is likely void as running contrary to public policy.

**Third,** and most critically, the Recommendation ignores that Wyoming law requires strict compliance with statutory procedures for removing LLC members, as established in Wyo. Stat. §17-29-602. The restrictive covenants in the OA cannot be enforced following an improper removal of Defendant as a member. In *Lieberman v. Wyoming.com LLC*, 11 P.3d 353, 359 (Wyo. 2000), the Wyoming Supreme Court discussed how any kind of removal of an LLC member requires strict compliance with statutory procedures, including expulsion of a member as is the case here. Plaintiff's unilateral removal of Defendant without court approval, as required by Wyoming law, renders the post-termination restrictive covenants unenforceable.

**2. The Non-Compete Provisions Are Overbroad and Unenforceable**

The Magistrate Judge's conclusion that the nationwide geographical scope of the non-compete is reasonable because "Cleer provides tax services to a niche group of foreign-owned businesses filing taxes in the United States" reflects a misunderstanding of Wyoming's requirements for reasonable geographic limitations.

In *Hopper*, the Wyoming Supreme Court upheld a non-compete with a five-mile radius limitation specifically because it was narrowly tailored to the employer's actual service area. The court emphasized that geographic restrictions must be "no greater than required for the protection" of the employer's legitimate business interests. Here, while the geographic scope was discussed in the Recommendation, the actual terms of the restriction do not comply even with the scope within the OA as it simply states, "Pursuant to the OA, competing against Cleer until August 9, 2025, including without limitation by offering tax preparation and bookkeeping services" which would have a global effect as the Defendant lives outside the US, and thus far exceeds the actual scope of the OA, and Wyoming law.

The Recommendation also fails to acknowledge Wyoming's heightened scrutiny of restrictive covenants in specialized professional fields. In *Ridley v. Krout*, 63 Wyo. 252, 180 P.2d 124, 130 (1947), the court noted that professionals have a special interest in being able to practice their profession, and restrictive covenants that unduly limit this ability are particularly disfavored. As a tax professional, Defendant has a

significant interest in being able to continue practicing her profession, and the nationwide restriction effectively precludes her from doing so.

### 3. The Merger Clause in the MVA Precludes Enforcement of the OA's Restrictive Covenants

The Magistrate Judge made further error regarding the critical issue of the merger clause in the MVA, which states: "This Agreement supersedes any prior agreement between the Employee and Company, including, but not limited to, any other agreement relating to salary or any other form of compensation from Company to which Employee may claim an entitlement for any reason."

Under basic principles of contract interpretation, recognized in both Wyoming and Michigan law, this merger clause establishes that the MVA supersedes the OA with respect to the employment relationship and associated restrictions. In *Schuler v. Community First Nat'l Bank*, 2013 WY 34, ¶ 35, 297 P.3d 78, 87 (Wyo. 2013), the Wyoming Supreme Court held that "a merger clause in a commercial contract is a clear indication of the parties' intention to create an integrated agreement" that supersedes all prior agreements on the subject.

Similarly, in *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 418 (Mich. Ct. App. 1998), the Michigan Court of Appeals held that "when a merger clause clearly states that it is the entire agreement, courts must enforce this agreement rather than looking to parol evidence to determine the agreement."

The Recommendation incorrectly treats the OA and MVA as entirely separate agreements governing distinct relationships, when in fact they contain overlapping provisions addressing post-relationship restrictions, and the OA is specifically incorporated by reference into the MVA as a condition precedent and subsequent in Section 6:

**d.** As a condition precedent to the assignment of the above membership interests, Employee agrees that she will execute the attached Amended Operating Agreement.

**e.** As a condition subsequent to the assignment of the above membership interests, Employee shall comply with all terms and conditions of this agreement and the Amended Operating Agreement.

Contrary to the Magistrate Judge's conclusion, the OA and MVA do not "deal with different subject matters" but rather address overlapping aspects of Defendant's relationship with Plaintiff. Both agreements contain restrictive covenants governing Defendant's post-relationship conduct, provisions of non-compete, non-solicit, and relating to trade secrets, creating an inherent conflict that the merger clause resolves in favor of the MVA's provisions.

Where two agreements contain potentially conflicting provisions addressing the same subject matter, the later agreement with a merger clause prevails. See *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 143 (2d Cir. 2019). Therefore, the MVA's provisions regarding post-employment restrictions supersede those in the OA. And, as

the Magistrate Judge acknowledged, the non-compete in the MVA is not enforceable due to Defendant not being terminated for cause.

The Magistrate Judge's conclusion that the merger clause in the MVA does not affect the enforceability of the OA's restrictive covenants misapplies contract interpretation principles under Wyoming law. Wyoming follows the general principle that merger clauses are given their full effect when determining the parties' intent. In *Schuler v. Community First Nat'l Bank*, 2013 WY 34, ¶ 35, 297 P.3d 78, 87 (Wyo. 2013), the Wyoming Supreme Court held that "[a] merger clause in a commercial contract is a clear indication of the parties' intention to create an integrated agreement" that supersedes all prior negotiations and agreements.

The Second Circuit case *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997), cited by the Magistrate Judge, actually supports Defendant's position. The court there recognized that "a merger clause provision indicates that the subject agreement is completely integrated." Where restrictive covenants in both agreements address Defendant's post-relationship conduct, the merger clause in the MVA indicates the parties' intent that its provisions would control over potentially conflicting provisions in the OA.

The Magistrate Judge's assertion that "Cleer is not attempting to alter either agreement; rather they are attempting to enforce both agreements exactly as written" is illogical when both agreements contain potentially conflicting post-relationship

restrictions. The purpose of a merger clause is precisely to resolve such conflicts in favor of the later agreement.

### 4. There Was no Consideration to Support the OA as a Separate Agreement

The Magistrate Judge's recommendation overlooks the fundamental principle that for a contract to be enforceable, it must be supported by adequate consideration. In this case, the Operating Agreement (OA) lacks independent consideration separate from the Membership Vesting Agreement (MVA), necessitating their treatment as a single, integrated contract.

Under Wyoming law, an operating agreement governs the relations among members and between members and the limited liability company (LLC). Wyoming Statute §17-29-111(b) states that a person becoming a member of an LLC is deemed to assent to the operating agreement. However, this presumes that the operating agreement itself is supported by consideration. In instances where membership interest is granted through a separate agreement, such as an MVA, and the OA does not provide additional consideration, the two documents should be interpreted together to reflect the complete agreement between the parties. This approach aligns with the principle that related contracts executed contemporaneously should be construed as a single agreement.

The Magistrate Judge when discussing consideration in the Recommended Ruling incorrectly states, "The McKeegans also promoted Stranger to Chief Operating Officer ("COO") of Cleer, the same day she signed the OA." But this was not factually

accurate, and there was no evidence presented to support this. In fact, the only time this statement was mentioned was in the Opening Argument by the Plaintiff's attorney George Musekamp, who made a number of factual misstatements throughout his remarks, essentially testifying to matters he had no knowledge of. Defendant was promoted to Chief Operating Officer two months before this time, in advance of attending an event at Stripe Headquarters in San Francisco on behalf of Cleer, and there were business cards printed with her new title prior to May of 2022, so if Plaintiff ever provides full discovery, this will be proven to be inaccurate that there was no consideration to support the signing of the OA based on any promotion received, as this is pure fiction stated by Plaintiff's attorney. While hearsay evidence can be utilized in a Preliminary Injunction hearing, basing a ruling on hearsay testimony given by counsel is a real stretch of the imagination that this will be upheld on appeal.

The absence of independent consideration for the OA, apart from the MVA, necessitates that both documents be considered as a single, integrated contract. This interpretation is consistent with contract principles in Wyoming, Michigan, and Connecticut, which recognize that contemporaneously executed documents relating to the same transaction should be read together to ascertain the parties' intent. Accordingly, Defendants respectfully object to the Magistrate Judge's recommendation and request that the Court recognize the OA and MVA as constituting a unified agreement.

**5. The Court Cannot Enforce Restrictive Covenants Where the Agreement Has Been Materially Breached**

The Magistrate Judge failed to consider that Plaintiff's improper removal of Defendant as a member of the LLC constitutes a material breach of the OA that precludes enforcement of the restrictive covenants. Under Wyoming law, a party's material breach of an agreement prevents that party from enforcing the agreement against the non-breaching party. Wyoming courts have frequently concluded that "`the party first committing a substantial breach of contract cannot complain that the other party . . . fails to perform.'" *Winter v. Pleasant*, 222 P.3d 828, 834 (Wyo. 2010) (citing *Baker v. Speaks*, 2008 WY 20, ¶ 14, 177 P.3d 803, 807 (Wyo. 2008) (quoting Williams v. Collins Commc'ns, Inc., 720 P.2d 880, 891 (Wyo. 1986)).

Wyoming statutes, specifically Wyo. Stat. §17-29-602, establish clear procedures for removing a member from an LLC, requiring judicial determination for involuntary dissociation of a member "for cause." Plaintiff's unilateral removal of Defendant without obtaining the required court approval constitutes a material breach of both the OA and Wyoming law.

The Magistrate Judge's Recommendation fails to properly address the fundamental issue of Plaintiff's improper removal of Defendant as a member of the LLC. The Recommendation notes: "Pl. Hrg. Ex. 124. Stranger did not present any evidence or testimony to rebut Cleer's assertion that her membership interest was not 'for cause.' The balance of Stranger's Capital Account, is not due for payment until August 9, 2026.

20

Pl. Ex. 102 § 6.5 ('The purchase price shall be equal to the credit balance in the Member's Capital Account, which shall be paid within twenty-four (24) months of closing'). Hrg. Tr. 114:8-20."

This analysis overlooks critical legal requirements under Wyoming law, where Cleer, LLC is organized. Wyoming statutes, specifically Wyo. Stat. §17-29-602, establish clear procedures for removing a member from an LLC. **The statute requires judicial determination for involuntary dissociation of a member "for cause,"** stating that a member may be expelled "on application by the company or another member, by judicial order" when the member has "engaged in wrongful conduct that adversely and materially affected the company's business" or "willfully or persistently committed a material breach of the operating agreement." In *Lieberman v. Wyoming.com LLC*, 11 P.3d 353, 359 (Wyo. 2000), the court held that expulsion of an LLC member required strict compliance with statutory procedures.

Plaintiff's unilateral removal of Defendant without court approval constitutes a de facto violation of Wyoming law and the Operating Agreement itself. It does not fall upon Defendant's shoulders to prove that a de facto legal violation occurred. This procedural defect substantially undermines Plaintiff's likelihood of success on the merits, as courts consistently refuse to enforce restrictive covenants where the underlying agreement has been breached by the party seeking enforcement. This principle is consistently recognized across jurisdictions. In *Mustang Pipeline v. Driver Pipeline,* 134 S.W.3d 195, 196 (Tex. 2004), the Texas Supreme Court held that "[i]t is a fundamental principle of

contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. (Citing *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994))."

### 6. The Alleged Evidence of Defendant's Breach Is Insufficient to Establish Likelihood of Success

The Magistrate Judge's conclusion that "there is no dispute that Stranger is in breach" of the various restrictive covenants is not supported by the evidence and reflects several critical factual errors.

Regarding the alleged breach of confidentiality provisions, the Recommendation relies on the mere "overlap" of 5,448 contacts between Optic Tax's and Cleer's mailing lists as evidence of misappropriation. This conclusion is unwarranted and ignores alternative explanations for such overlap. In *Del Monte Fresh Produce N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 816 (N.D. Ill. 2009), the court recognized that overlap between customer lists can result from numerous legitimate sources other than misappropriation, including industry directories, public information, and contacts developed through years of experience in the industry. "A list of grocery stores' phone numbers is not "sufficiently secret" to confer trade secret status on Del Monte's contact list. *See, e.g., Carbonic Fire Extinguishers, 190 Ill.App.3d 948* at 953, *138 Ill.Dec. 508*, *547 N.E.2d 675* (customer contact list is not a trade secret where "names, addresses, and telephone numbers of the various customers were readily obtainable from the yellow pages of the telephone directory.")

Along the same lines, the Recommendation incorrectly characterizes the "spreadsheet containing a staffing roster and business partner pricing information" as confidential information belonging to Cleer. No evidence establishes that this information was actually confidential or proprietary rather than general industry knowledge. In *Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007), the court emphasized that "information that is generally known or easily acquired by proper means by others in the industry cannot be protected as a trade secret."

Finally, the Magistrate Judge's conclusion that "Stranger did not present any evidence or testimony" to rebut Plaintiff's assertions fails to acknowledge that Defendant's ability to present evidence was severely compromised due to counsel's documented illness. As noted in Defendant's Motion for Mistrial [Doc. 185], counsel had prepared twenty-five exhibits but was only able to introduce two pieces of evidence at trial due to this illness. The Court's denial of the Motion for Mistrial is currently under appeal. Courts have recognized that failure to consider relevant evidence can constitute an abuse of discretion in preliminary injunction proceedings. *See City of New York v. Henriquez*, Case No. 23-325 (2d Cir. Apr. 16, 2024).

### 7. The Tolling Provision in the MVA Is Unenforceable

The Magistrate Judge's conclusion that the tolling provision in the MVA is enforceable is contrary to established principles of contract interpretation and equity, especially as the Plaintiff has not provided a list to comply with the terms of the MVA, so there has been and is no way to possibly comply, and the error is not due to

noncompliance that would cause a "breach of the agreement". Furthermore, the "evidence" referred to in February of 2025 was already shown to be from a former Cleer client contacting Optic Tax, not the other way around. (See Doc 147, Memorandum in Opposition re 135 Second Motion for Contempt…).

The cases cited by the Magistrate Judge were all uncontested as to the tolling provisions in the contract, thus this is an issue which seems to not have yet been reviewed upon appeal from Connecticut courts. However, tolling provisions that extend restrictive covenants indefinitely are generally disfavored as contrary to public policy.

In Louisiana for example, the court expressed "the starting point for the Court is the text of the statute. Section 23:921 expressly limits a non-compete and non-solicitation provision to two years "from termination of employment." La. Stat. Ann. § 23:921(C). This statute contains no language allowing an extension (through tolling or otherwise) of a non-competition agreement beyond two years from the termination of employment, and courts have interpreted this to mean that no such extension is allowed. Otherwise, a contractual tolling provision would effectively override the express language of the statute and allow a non-compete/non-solicitation agreement to extend beyond the two-year period after termination." *Herff Jones, Inc. v. Girouard*, 966 So. 2d 1127, 1136-37 (La. App. 3 Cir. 10/3/07)

If Connecticut law would apply as stated by the Magistrate Judge, in Connecticut under HB5269(2)(1) non-competes are limited to a "a period of up to one year following the worker's separation from employment" and as such the time period of the validity of

enforcement here would already be exceeded as Defendant's employment ended on January 31st, 2024.

Tolling of contracts is considered against public policy in a growing number of jurisdictions. "The purpose of an injunction is to prevent "future harm," not to penalize a defendant for alleged past unauthorized actions. *Graham v. Hoyl*, 157 Colo. 338, 402 P.2d 604 (1965)." *Atmel Corp. v. Vitesse S. Corp.*, 30 P.3d 789, 796 (Colo. App. 2001)

Furthermore, the Recommendation improperly applies Connecticut law to the enforceability of the tolling provision despite acknowledging that Wyoming and Michigan law govern the substantive provisions of the OA and MVA, respectively. This inconsistent application of law is particularly problematic given that the enforceability of a tolling provision is a substantive contract issue, not merely a procedural matter relating to the availability of equitable remedies.

## 8. The Magistrate Judge's Findings Regarding Cleer.tax Domain Reflect a Misunderstanding of Domain Ownership and Abandonment

The Magistrate Judge's findings regarding the Cleer.tax domain are factually flawed and legally insufficient to support the conclusion that Defendant improperly redirected the domain. McKeegan testified that after Defendant's membership termination, he "realized that Stranger would not give back the domain. So, he switched Cleer.tax to Cleertax.com." (Hrg. Tr. 119:1-3). This testimony is crucial because it establishes that Plaintiff voluntarily abandoned its use of the Cleer.tax domain by transitioning to Cleertax.com—a critical fact that the Magistrate Judge overlooked.

In *Omega S.A. v. Omega Eng'g, Inc.*, 396 F. Supp. 2d 166, 177 (D. Conn. 2005), the court recognized abandonment occurs when use of the mark is discontinued with an intent not to resume its use. Similarly, in *Specht v. Google Inc.*, 747 F.3d 929, 934 (7th Cir. 2014), the court found that creating a new brand name and ceasing to use the previous one is persuasive evidence of intent not to resume use. Plaintiff's decision to "switch" to Cleertax.com constitutes a clear act of abandonment under these principles. Furthermore, the temporary email forwarding setup does not negate abandonment, as courts have held that "minor or token" use is insufficient to preserve rights. See *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000).

Domain name ownership and control are distinct legal concepts. In *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003), the court recognized that domain name registrants have property rights in their domains. Here, Defendant has been the registered owner of the Cleer.tax domain since its creation, a fact that Plaintiff acknowledged and accepted until the dispute arose. Once Plaintiff abandoned the domain by transitioning to Cleertax.com, Defendant, as the lawful owner, was entitled to use the domain for her own business purposes.

### 9. The Magistrate Judge's Findings Regarding Non-Compete and Non-Solicitation Provisions Contain Significant Factual Errors

The Magistrate Judge's findings regarding alleged violations of non-compete and non-solicitation provisions contain several critical factual errors that undermine the conclusion that Defendant violated these provisions.

The Recommendation erroneously characterizes Defendant's recruitment practices. While the Recommendation states that "the only people Stranger reached out to about a job opportunity with Optic Tax, were people who worked for Cleer" (Hrg. Tr. 219:2-5), this misrepresents the actual testimony and facts. Defendant did post job openings via webinars and interviewed candidates outside of Cleer contractors. The testimony cited by the Magistrate Judge was misleading as it specifically asked only about LinkedIn ads, hiring websites, or headhunters—a narrow framing that failed to capture the full scope of Defendant's recruitment efforts.

Courts have recognized that misleading characterizations of testimony constitute grounds for rejecting a Magistrate Judge's recommendation. In *Peretz v. United States*, 501 U.S. 923, 939 (1991), the Supreme Court noted the importance of an accurate factual record for de novo review. The mischaracterization of Defendant's hiring practices is material and warrants correction in the Court's de novo review.

Additionally, the Recommendation improperly conflates knowledge of former contractors' actions with active encouragement. While the Recommendation states that "Stranger knew that these suppliers were soliciting the clients they previously serviced at Cleer...and St[r]anger encouraged them to do so" (Hrg. Tr. 234:9-236:14, Pl. Ex. 132), the evidence does not support this conclusion. Mere knowledge of independent contractors' actions does not constitute "encouragement" or inducement under relevant legal standards. In *Synthes, Inc. v. Emerge Medical, Inc.*, 25 F. Supp. 3d 617, 674 (E.D.

Pa. 2014), the court required evidence of "active inducement" rather than mere knowledge to establish a violation of non-solicitation provisions.

The evidence presented at the hearing does not establish that Defendant actively encouraged or induced former Cleer contractors to solicit clients in violation of their agreements. Instead, these independent contractors made their own business decisions regarding client relationships, which cannot be attributed to Defendant for purposes of establishing a violation of the non-solicitation provisions.

**10. There Also Were Significant Factual Errors Regarding Alleged Client List Misappropriation and Computer Equipment**

The Magistrate Judge's Recommendation contains critical factual errors regarding the alleged misappropriation of client lists and computer equipment that fundamentally undermine Plaintiff's likelihood of success on the merits.

**First,** the Recommendation incorrectly states that "[w]hen leaving Cleer, Stranger took Cleer's laptop and also took with her a portion of Cleer's mailing list." This statement is demonstrably false. Defendant did not "take" any Cleer laptop; rather, Defendant had a computer she had purchased but was paid for by the company, no agreements were signed related to any company computer, and Plaintiff never requested its return until this court action was pending.

**Second,** there is no evidence that Defendant misappropriated any client list. Plaintiff conducted two forensic examinations of Defendant's computers and

subpoenaed Plaintiff's email marketing software, yet produced no evidence that Defendant possessed or misappropriated any Cleer client list. In *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003), the court held that speculative and conclusory allegations of trade secret misappropriation, without concrete evidence, are insufficient to support injunctive relief.

**Third,** the Recommendation states that "Stranger provided no explanation or evidence how 5,448 of Cleer's clients ended up on Optic Tax's email list." This statement ignores the fundamental due process violation that occurred when Defendant was denied the opportunity to address this allegation. Defendant was not present to testify on this issue because she was informed by counsel that he was requesting a continuance due to his illness. The court's denial of Defendant's attorney's request for a continuance and subsequent denial of the Motion for Mistrial [Doc. 185], which is currently under appeal, prevented Defendant from providing this explanation.

In *Doyle v. United States, Postal Serv.*, 771 F.2d 1269, 1272 (9th Cir. 1985), the court found that a Magistrate Judge's findings should be rejected when they are based on procedural errors that denied a party the opportunity to present relevant evidence.

Moreover, the stipulation regarding "overlap" between email lists does not establish misappropriation. In *Delaware Express Co. v. Serpico*, 1995 WL 108936, at *7 (E.D. Pa. Mar. 6, 1995), the court noted that overlap between client lists is common in specialized industries and can result from legitimate business practices, industry

directories, public information, or prior professional relationships. Without evidence of actual misappropriation, such overlap does not support a finding of wrongdoing.

## 11. The Alleged TRO Violations Were Impossible to Comply With Due to Plaintiff's Failure to Provide Required Information

The Magistrate Judge's finding that Defendant violated the Temporary Restraining Order ("TRO") is fundamentally flawed because it fails to recognize that compliance with the TRO was rendered impossible by Plaintiff's own actions. The TRO specifically required that:

"The parties shall confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination."

This provision clearly contemplated that the parties would work together to identify which clients Defendant could permissibly contact. However, Plaintiff failed to fulfill its obligation to engage in this required "good faith effort."

Courts have consistently recognized that impossibility of compliance is a valid defense to alleged violations of court orders. In *United States v. Rylander*, 460 U.S. 752, 757 (1983), the Supreme Court established that "where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."

Plaintiff's approach to the "good faith" obligation was to provide Defendant's former attorney with an unwieldy list of nearly 10,000 email contacts downloaded in December of 2024, nearly a year after Defendant resigned, without any differentiation or tailoring to the specific requirements of the TRO which limited this list to contacts that Defendant had worked with directly or indirectly over a two-year period prior to resigning. This overbroad list of all clients Cleer has worked with over an eight-year period made it impossible for Defendant to determine which contacts had "no direct or indirect contact or solicitation" with Cleer within the specified timeframe. In *FTC v. Kuykendall*, 371 F.3d 745, 756-57 (10th Cir. 2004), the court held that compliance with a court order is impossible where the order's requirements are not sufficiently clear and specific to be implemented.

The specific communications cited in the Recommendation as TRO violations occurred in the context of this impossibility. For example, the October 28, 2024 email was sent to Optic Tax's entire contact list because Defendant had no way of knowing which specific contacts should be excluded as no list had yet been provided by Plaintiff. This situation is analogous to *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993), where the court found that a party could not be held in contempt for failing to comply with a court order when compliance would require information only available from the opposing party.

The alleged February 2025 communication with Siux Studio LLC similarly reflects the impossibility of compliance. Without a properly tailored list identifying which specific

clients had prior contact with Defendant the relevant timeframe, Defendant and related parties had no reasonable way to know whether Siux Studio fell within the prohibited category.

## 12. The Recommended Injunction Violates the First Amendment by Restricting Lawful Speech and Association

The Magistrate Judge's Recommended Ruling violates the First Amendment by imposing an overbroad and vague restriction on speech and association. The First Amendment protects not only core political speech but also commercial speech and the right to freely associate. The restrictions outlined in Paragraph 3 of the Recommended Ruling and Order are unconstitutionally broad and vague, effectively functioning as a speech restriction that extends beyond any legitimate business interest of Cleer LLC.

The order prohibits Defendant from "soliciting, accepting business from, continuing to provide services for, or otherwise contacting" any individual who is or was a "customer, supplier, or prospective customer or supplier of Cleer LLC." This restriction is constitutionally defective for several reasons:

**Overbreadth** – The injunction applies not only to actual clients but also to prospective customers and suppliers, an undefined and limitless category that could encompass an indefinite range of business contacts. The Supreme Court has repeatedly held that restrictions on speech must be narrowly tailored to serve a significant governmental interest. See *Central Hudson Gas & Elec. Corp. v. Public Serv.*

*Comm'n, 447 U.S. 557, 565 (1980)* (holding that restrictions on commercial speech must be narrowly drawn).

**Prior Restraint** – The injunction operates as a prior restraint by prohibiting lawful business communication before any actual harm is shown. Courts have found similar overbroad restrictions on business-related speech unconstitutional. See *Alexander v. United States, 509 U.S. 544, 550 (1993)* (noting that prior restraints are "the most serious and the least tolerable infringement on First Amendment rights").

**Vagueness** – The order provides no clear definition of "prospective customers or suppliers," leaving Defendant-Appellant uncertain as to whom she may lawfully speak. The lack of clarity invites arbitrary enforcement, violating due process principles as articulated in *Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)*.

**Restriction on Freedom of Association** – The injunction prohibits Defendant from engaging in otherwise lawful professional relationships. The Supreme Court has recognized that the right to associate for business and economic purposes is constitutionally protected. See *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 911 (1982)*.

In sum, the Magistrate Judge's Recommended Ruling imposes a sweeping and ambiguous restriction on Defendant-Appellant's ability to communicate and associate with potential clients and business contacts. The First Amendment does not permit such a broad prohibition, particularly when a narrower, more precise restriction could serve any legitimate business interest of Cleer LLC. Courts have consistently held that

injunctive relief must be carefully tailored to avoid infringing on constitutional rights. As drafted, the injunction unjustly prevents lawful speech and economic activity, warranting rejection or significant modification by this Court.

### 13. The Injunction is Not Narrowly Tailored to Serve a Legitimate Interest

Even Even assuming Cleer LLC has a legitimate business interest in protecting its client relationships, the injunction imposed is impermissibly broad. A more narrowly tailored remedy, such as prohibiting direct solicitation of specific existing clients, would suffice without imposing sweeping restrictions on lawful communication and association.

At first glance, the Recommended Ruling appears to aim for such narrow tailoring. However, it requires the parties to "confer in a good faith effort to enable Stranger and other persons working with her to contact customers and suppliers with whom Stranger had no direct or indirect contact or solicitation on behalf of Cleer LLC two years prior to her termination." This mirrors the language in the Temporary Restraining Order (TRO) issued nearly six months ago. Despite this provision, Plaintiff has consistently refused to "confer in good faith" and produce a reasonable list, rendering the requirement ineffective. Consequently, the default provision becomes operative: "Absent conferral and agreement, Stranger may not contact any customers or suppliers or prospective customers or suppliers of Cleer LLC or its predecessors." This results in a total restriction on Defendant's actions, effectively preventing her from contacting anyone who could be a "prospective customer" of Cleer, which could include

any individual or entity worldwide interested in establishing or operating a U.S. business.

Such overbroad restrictions have been deemed unenforceable in various jurisdictions. For instance, in *Wings, LLC v. Capitol Leather, LLC*, Case No. CL-2014-9 (Va. Cir. Ct. Mar. 6, 2014), the court denied a motion for a preliminary injunction, finding the non-compete agreement's geographic and durational scope overly broad and not narrowly tailored to protect the employer's legitimate business interests.

Similarly, in *Medix Staffing Solutions, Inc. v. Dumrauf*, No. 17 C 6648 (N.D. Ill. Apr. 17, 2018), the court found a non-compete agreement unenforceable because it prohibited the former employee from working in any capacity for a competitor within a 50-mile radius for 18 months. The court held that such a broad restriction was unreasonable and declined to modify the agreement to make it enforceable.

Furthermore, in *Union Home Mortgage Corp. v. Cromer*, 31 F.4th 356 (6th Cir. 2022), the Sixth Circuit vacated a non-compete injunction, stating that the order was too vague and broad because it did not specify the prohibited conduct or include a duration, highlighting the necessity for clear and narrowly tailored restrictions.

The injunction in question imposes an excessive burden on Defendant, effectively barring her from a broad range of professional activities without clear justification or limitation. Such a sweeping restriction is inconsistent with established legal standards requiring that any limitation on professional conduct be precisely defined and no more restrictive than necessary to protect legitimate business interests.

## C. Plaintiff's Arguments Regarding the Cleer.tax Domain Are Contradicted by Plaintiff's Own Actions

### 1. Inconsistent Standards Applied to Domain Ownership

Plaintiff argues that Defendant Stranger's ownership of the Cleer.tax domain name was improper, yet Plaintiff's own principal, David McKeegan, admitted under oath that he personally owned the domain GBStax.com when Plaintiff was operating under the name Greenback Business Services (GBS). During his testimony, McKeegan acknowledged that it was common for a business owner to register a domain and allow the company to use it, stating, "I think I did" when asked if he personally owned GBStax.com while GBS was using it. (Tr. 169:21-171:12.)

McKeegan further testified that he and his wife personally registered multiple domains for their business ventures and managed them in a personal account, demonstrating that ownership of a business's domain name by an individual is not unusual or improper. He also admitted that when transitioning from GBStax.com to Cleer, he redirected the domain to Cleer.tax to maintain SEO value before eventually discontinuing its renewal.

Courts have recognized the importance of industry practices when evaluating claims of impropriety. In *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 517 (S.D.N.Y. 2017), the court considered "standard industry practice" when determining whether the defendant's conduct was improper. Here, Plaintiff's own testimony

establishes that individual ownership of business domains is a common practice in the industry.

Given McKeegan's own practice of personally owning and controlling business-related domain names, Plaintiff's argument that Defendant Stranger's ownership of Cleer.tax is wrongful is inconsistent and disingenuous. Courts have long refused to grant equitable relief to parties who seek to hold others to standards they themselves do not follow. See *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244-45 (1933) (holding that a party seeking equity must have acted fairly and without fraud or deceit).

## 2. Plaintiff Abandoned the Cleer.tax Domain by Transitioning to Cleertax.com

The record clearly demonstrates that Plaintiff voluntarily abandoned the Cleer.tax domain by transitioning to Cleertax.com. McKeegan's own testimony establishes that he made a strategic business decision to "switch" from Cleer.tax to Cleertax.com (Hrg. Tr. 119:1-3) rather than pursue any legal recourse regarding the domain. This deliberate transition to a new domain constitutes abandonment under well-established legal principles.

In *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007), the Second Circuit held that abandonment requires non-use of a mark, combined with an intent not to resume use. Plaintiff's conscious decision to transition to a new domain

(Cleertax.com) demonstrates both elements: non-use of the Cleer.tax domain and intent not to resume its use as the primary domain.

Temporary email forwarding from the old domain to the new one does not negate abandonment. In *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989), the court recognized that minor or residual use is insufficient to overcome evidence of abandonment. The temporary forwarding arrangement was merely a transitional measure, not a continuation of the domain's primary business use.

Once Plaintiff abandoned the Cleer.tax domain by transitioning to Cleertax.com, Defendant, as the registered owner, had the legal right to use the domain as she saw fit. In *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 953 (C.D. Cal. 1997), the court recognized that domain registration confers certain property rights to the registrant. Plaintiff cannot now claim impropriety after voluntarily abandoning the domain and transitioning its business to a new online identity.

"Because the property right protected by trademark law is narrower than that protected by copyright law, liability for contributory infringement of a trademark is narrower than liability for contributory infringement of a copyright. *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n. 19, 104 S. Ct. 774, 787 n. 19, 78 L. Ed. 2d 574, (1984). Unlike trademark law, copyright law gives owners a generalized right to prohibit all copying, provided that the owner's rights are valid and the material copied is original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991). Trademark law, on the other hand,

tolerates a broad range of non-infringing uses of words that are identical or similar to trademarks." *Id.* Thus the trademark that Cleer may hold on the name does not extend to the mark cleer.tax which they did not complete registration on and abandoned prior to completing that process as a trademark is not a total ownership right in the way a copyright would be.

## D. The Balance of Hardships and Public Interest Weigh Against an Injunction

### 1. Legal Standard for Balance of Hardships and Public Interest

When considering a preliminary injunction, courts must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. Additionally, courts must determine whether an injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

### 2. Devastating Impact on Defendant's Loss of Livelihood

Granting the injunction would impose catastrophic hardships on Defendant, far outweighing any potential benefit to Plaintiff. Most critically, the preliminary injunction would effectively force Optic Tax to cease operations entirely, resulting in Defendant's complete loss of livelihood. Courts have consistently recognized that the loss of one's business and means of supporting oneself constitutes an extreme hardship and is in itself the type of irreparable harm that Preliminary Injunctions are meant to prevent not to cause. "A restrictive covenant is unenforceable if by its terms the employee is

precluded from pursuing his occupation and thus prevented from supporting himself and his family." *Scott v. Gen. Iron & Welding Co.*, 171 Conn. at 138. Here, the balance of equities strongly favors Defendant, as the injunction would completely eliminate Defendant's ability to conduct business, while Plaintiff's claimed harms remain speculative and compensable through monetary damages.

The timing of this injunction is particularly egregious, coming just days before the April 15th tax filing deadline—the most critical period for tax professionals. In *Empower Energies, Inc. v. SolarBlue, LLC*, 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016), the court denied a preliminary injunction in part because the timing would have caused particularly acute hardship to the defendant and risks to the public. Similarly, here the injunction's timing would maximize damage to Defendant's business and harm many clients reliant on services at the peak of tax season.

Wyoming courts have similarly recognized the importance of this factor in *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 543 (Wyo. 1993), where it stated that "covenants not to compete which prevent the covenanter from earning a living are looked upon with disfavor." This principle is particularly relevant here, where the proposed injunction would severely restrict Defendant's ability to work in her chosen profession, with potentially devastating financial consequences.

### 3. Conflict with Professional and Ethical Obligations

The preliminary injunction places Defendant in an impossible position by creating a direct conflict between compliance with the court order and fulfillment of professional

obligations under IRS Circular 230, which governs tax practitioners' conduct. As an Enrolled Agent, Defendant is bound by Circular 230's ethical requirements, including:

- Section 10.28, which prohibits unnecessary delays and requires the practitioner to promptly return all records of the client necessary for compliance with federal tax obligations;

- Section 10.23, requiring compliance with all federal laws and regulations governing practice before the IRS;

- Section 10.27, concerning fees for services; and

- Section 10.30, regarding rules for solicitation and advertising.

The broad no-contact provision in the preliminary injunction would prevent Defendant from even notifying existing clients about the inability to continue representing them, placing Defendant in direct violation of her duties under Circular 230.

Failure to follow Circular 230 regulations could result in disciplinary action, including loss of Defendant's Enrolled Agent license. A court order that forces an individual to choose between compliance with professional ethical obligations and contempt is a clear due process violation. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (holding that due process is violated when an individual is deprived of a protected interest without adequate procedural safeguards).

Here, the practical effect would be to force Defendant to choose between violating the court order or violating her professional obligations as an Enrolled Agent—an untenable position

### 4. Substantial Public Interest Concerns

The public interest would be significantly harmed by granting the injunction at this critical time in the tax filing season. With the April 15th deadline approaching, many taxpayers who rely on Defendant's services would be left without tax preparation assistance just weeks before their returns are due. Courts have recognized that the public interest is not served when injunctions disrupt important services to the public.

The injunction's broad no-contact provision would prevent Defendant from even notifying clients about her inability to continue serving them, leaving taxpayers in the dark about the status of their tax preparation with a critical deadline approaching. This lack of communication would create significant confusion and potential tax compliance issues for members of the public, a factor that strongly weighs against granting the injunction.

### 5. The Magistrate Judge's Public Interest Analysis Is Fundamentally Flawed

The Magistrate Judge's conclusion that "there is no evidence that the enforcement of these restrictive covenants will harm the public interest" reflects a superficial analysis that fails to consider the significant public interest concerns at issue

in this case. This conclusion is based on a selective reading of case law and ignores the specific factual context that makes this case unique.

**First**, the Recommendation cites *Gartner, Inc. v. Hackett Grp., Inc.*, 2023 WL 7350329 (D. Conn. Nov. 7, 2023), for the proposition that "under Connecticut law, the public interest is served by issuance of the preliminary injunction to enforce post-employment non-competition agreements." However, this overgeneralizes the holding in *Gartner*, which involved very different circumstances. In *Gartner*, the court specifically noted that the public interest analysis turned on the particular facts of the case, including the narrow scope of the restrictions and the absence of harm to third parties. Here, by contrast, the proposed injunction is not narrowly tailored and would have significant adverse effects on third parties—specifically the hundreds of taxpayers who rely on Defendant's services as they approach the critical April 15th tax filing deadline.

**Second**, the Recommendation's reliance on *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007), is misplaced. In *Certified Restoration*, the Sixth Circuit's public interest analysis was premised on the finding that the restrictive covenant at issue was reasonable in purpose, scope, and duration. As extensively argued above, the restrictive covenants here are unreasonable in all three aspects—they exceed legitimate business needs, impose an unrestricted geographic scope without justification, and were triggered by an improper removal process that violated Wyoming law.

**Third**, the Recommendation cites *Alarm Funding Assocs., LLC v. Sec. Prods. Co.*, 2015 WL 11090396 (D. Wyo. Feb. 13, 2015), which focused on protecting a company from unfair competition and tortious interference. However, that case involved actual misappropriation of confidential information, which is not present here. Despite two forensic examinations and a subpoena to Plaintiff's email marketing software, Plaintiff has still produced no evidence that Defendant misappropriated any confidential information, thus this analogy fails.

**Fourth**, the Recommendation ignores more recent and relevant precedent recognizing the significant public interest in protecting worker mobility and client choice, particularly in professional service contexts. In *Flatiron Health, Inc. v. Carson*, 2020 WL 2198366, at *15 (S.D.N.Y. May 6, 2020), the court recognized the public interest in allowing skilled professionals to continue working in their field.

**Fifth**, the Recommendation fails to recognize the changing legal landscape regarding restrictive covenants. The Federal Trade Commission's (FTC) proposed rule to ban non-compete clauses (Notice of Proposed Rulemaking, "Non-Compete Clause Rule," 88 Fed. Reg. 3482, January 19, 2023), which even though not in effect federally, has subsequently been adopted in many states including Wyoming recently where it will be effective July 1st, 2025. This trend reflects growing recognition that non-competes often harm competition and innovation without adequate justification. This signals a significant public policy shift against overbroad restrictive covenants that courts should consider in their public interest analysis.

**6. The Public Interest in Enforcement of Reasonable Contracts Does Not Extend to Unreasonable Restrictions**

While the Magistrate Judge correctly notes the general public interest in enforcing contractual obligations, this interest extends only to reasonable and lawfully formed contracts. Courts have consistently held that the public interest is not served by enforcing unreasonable or overbroad restrictive covenants.

In *Veramark Technologies, Inc. v. Bouk*, 10 F. Supp. 3d 395, 410 (W.D.N.Y. 2014), the court held that the public interest is not served by enforcing an unreasonably broad restrictive covenant that unduly limits competition and worker mobility.

As extensively argued above, the restrictive covenants at issue here are unreasonable in scope and context and were triggered by an improper removal process that violated Wyoming statutory requirements. The public interest in contract enforcement does not justify enforcing such problematic provisions, particularly when doing so would harm innocent third parties and undermine other important public interests.

**E. The Magistrate Judge's Denial of Security Bond Violates Rule 65(c) and Due Process Principles**

**1. Rule 65(c) Mandates Security to Protect Against Wrongful Injunction**

The Magistrate Judge's recommendation to deny Defendant's Motion for Bond [ECF No. 152] constitutes clear legal error and an abuse of discretion. Federal Rule of

Civil Procedure 65(c) provides that a court "may issue a preliminary injunction... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added). This language is mandatory, not discretionary.

The Second Circuit has emphasized the critical importance of the bond requirement. In *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011), the court explained that Rule 65(c)'s security requirement is designed to assure that the enjoined party may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff. Similarly, in *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004), the court stressed that "the district court was required to make this determination before it entered the preliminary injunction."

In *Soldiers', Sailors', Marines' and Airmen's Club, Inc. v. Carlton Regency Corp. 95 A.D.3d 687 (N.Y. App. Div. 2012)*, the New York Appellate Division held that granting an injunction without requiring any security was an abuse of discretion. The court remanded the case for the trial court to determine the appropriate amount of the bond to protect the enjoined party.

The Magistrate Judge's complete waiver of the bond requirement undermines these essential purposes, leaving Defendant without financial protection against the substantial damages that would result from a wrongful injunction.

**2. The Discretion to Set Bond Amount Does Not Include Authority to Eliminate Requirement**

While the Magistrate Judge correctly notes that Rule 65(c) grants courts "wide discretion to set the amount of a bond," this discretion is not unlimited. The recommendation cites *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997), for the proposition that courts may dispense with the bond requirement in certain circumstances. However, this interpretation misapplies *Distajo* and contradicts more recent Second Circuit precedent.

In *Corning Inc.*, 365 F.3d at 158, the Second Circuit clarified that a district court should not dispense with the filing of a bond without making specific findings supporting such a decision. The court emphasized that while a district court has discretion to set the bond amount, the court may not dispense with the filing of a bond unless there has been a specific finding that the circumstances are such that the posting of security is unnecessary. The Magistrate Judge made no such specific findings.

Furthermore, *Distajo* itself involved very different circumstances. There, the court was merely preserving its jurisdiction during arbitration proceedings. By contrast, the preliminary injunction sought here would effectively shut down Defendant's entire business operations during the critical tax season.

More recent Second Circuit cases have further clarified the limited exceptions to the bond requirement. In *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 139 (2d Cir. 2014), the court identified only three narrow exceptions: (1) cases

brought by the United States or its agencies; (2) cases where there has been no proof of likelihood of harm to the party enjoined; and (3) cases where requiring security would effectively deny access to judicial review for indigent plaintiffs.

None of these three exceptions apply here as this case is not brought by the government, Defendant provided proof of likely harm in the Motion for Bond filing, and Plaintiff is not an indigent plaintiff.

### 3. The Record Does Not Support a Finding of "No Likelihood of Harm"

The Magistrate Judge's assertion that "no bond is warranted in light of the overwhelming evidence submitted at the hearing in Plaintiff's favor" fundamentally misunderstands the purpose of the bond requirement. The security is not tied to the relative strength of the plaintiff's case but to the potential harm the defendant would suffer if wrongfully enjoined.

Here, there is substantial evidence in the record of the severe harm Defendant would suffer from the injunction. The preliminary injunction would effectively force Optic Tax, Inc. to cease operations entirely, resulting in Defendant's complete loss of livelihood and current income, as documented in Defendant's Motion for Bond [ECF No. 152]. This is precisely the type of quantifiable harm that security bonds are designed to protect against.

Courts have consistently required substantial bonds in cases where the injunction would significantly impact the defendant's business operations. In *Applied*

*Energetics, Inc. v. Farley 239 A.3d 409 (Del. Ch. 2020)*, the Delaware Court of Chancery addressed the determination of bond amounts for injunctive relief. The court emphasized that, due to the uncertainty of actual damages and the enjoined party's limited recourse, it should err on the high side when setting the bond. In that case, the court required the plaintiff to post a bond of $582,377.26.

### 4. Procedural Defects in the Bond Determination Process

The Magistrate Judge's recommendation suffers from significant procedural defects that violate Defendant's due process rights further. Most notably, the recommendation was issued on March 20, 2025, just six days after Plaintiff filed its Opposition to Defendant's Motion for Bond on March 14, 2025. This timing denied Defendant a reasonable opportunity to reply to Plaintiff's opposition before the Recommendation was issued.

Due process fundamentally requires that parties be given notice and a meaningful opportunity to be heard before adverse judicial actions are taken against them. In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court emphasized that due process requires an opportunity to present reasons, either in person or in writing, why proposed action should not be taken before an individual is deprived of a significant property interest, such as business ownership or employment. It is essential that the Court grant a fair opportunity to respond before adverse decisions are finalized, which was not what occurred here.

In the context of the current case, the Magistrate Judge's swift issuance of a recommendation, without affording Defendant the opportunity to reply to Plaintiff's opposition, constitutes a procedural deficiency that violates Defendant's due process rights. Fundamental fairness necessitates that all parties have a reasonable opportunity to present their arguments and evidence before judicial recommendations or decisions are made. Therefore, the recommendation should be reconsidered to allow Defendant the opportunity to file a reply, ensuring adherence to due process principles.

### 5. Defendant's Financial Exposure Requires Protection Through Security

The preliminary injunction would impose substantial financial hardship on Defendant, necessitating protection through a security bond. The complete cessation of business operations and total prohibition on her providing tax and bookkeeping services would eliminate her income stream entirely, potentially leading to bankruptcy and irreparable financial harm.

Courts have consistently recognized that when an injunction poses a risk to a defendant's financial viability, a substantial bond is warranted. In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Supreme Court upheld the requirement of posting a bond when a preliminary injunction is issued. Although the bond amount in that case was $50,000, the Court acknowledged the necessity of security to cover potential damages if the injunction was later found to be wrongful.

The complete denial of a bond leaves Defendant exposed to catastrophic financial harm without any security to recover damages if the injunction is later determined to have been wrongfully issued. This outcome directly contradicts the protective purpose of Rule 65(c)'s security requirement.

## III. CONCLUSION

For the foregoing reasons, Defendant respectfully objects to the Magistrate Judge's Recommended Ruling on Plaintiff's Motion for Preliminary Injunction and requests that the Court reject the Recommendation and deny the Motion for Preliminary Injunction. Alternatively, if the Court is inclined to grant a preliminary injunction, Defendant requests that the Court require Plaintiff to post a security bond in the amount of $798,196.33, as requested in Defendant's Motion for Bond [ECF No. 152], to protect Defendant against damages resulting from a wrongful injunction.

Respectfully submitted,

*/s/ Crystal Stranger*

Crystal Stranger

Pro Se Litigant

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 2nd, 2025, the foregoing was filed using the Court's electronic filing system which will provide notice to all counsel of record.

*/s/ Crystal Stranger*