## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLEER LLC,<br><br>  *Plaintiff*,<br><br>  v.<br><br>CRYSTAL STRANGER AND OPTIC TAX, INC.,<br><br>  *Defendants*. | No. 3:24cv1496(MPS) |

## MEMORANDUM OF DECISION

Cleer LLC, a tax preparation and bookkeeping company, filed this action against its former Chief Operating Officer, Crystal Stranger, and her company, Optic Tax, seeking damages and injunctive relief. Cleer alleges, *inter alia*, that Stranger violated noncompetition, nonsolicitation, and confidentiality agreements and improperly retained and used Cleer's domain name, Cleer.tax. I issued a temporary restraining order enjoining Stranger from soliciting Cleer's customers and employees, enjoining both parties from using the domain Cleer.tax,[1] and ordering Stranger to return a company laptop. ECF No. 34. I referred the motion for preliminary injunction to Magistrate Judge Garcia, who held an evidentiary hearing on January 29 and 30, 2025. Judge Garcia issued a thorough and well-reasoned Recommended Ruling recommending that Cleer's motion for preliminary injunction be granted. ECF No. 182. Stranger, now proceeding pro se[2], has filed an objection to the Recommended Ruling. ECF No. 195. I have

---

[1] In the TRO, the Court enjoined both parties from using the 'Cleer.tax' domain name - meaning both Ms. Stranger and Cleer - because, at the time, the Court had not determined who owned the domain name. ECF No. 34 at 5. In this ruling, the Court does make that determination: As discussed below, Cleer owns the domain name. Therefore, this ruling enjoins Stranger only from using that name and requires her to transfer that name to Cleer, which may, of course, use the name going forward.

[2] From the onset of the litigation through the evidentiary hearing, Stranger was represented by Attorney Alan Harrison. See ECF No. 126. After the hearing, Attorney Harrison moved to withdraw as counsel to Stranger and Stranger filed a pro se appearance. ECF No. 137. On February 11, 2025, Judge Garcia granted Attorney Harrison's motion to withdraw from his representation of Stranger. ECF No. 142. On February 18, 2025, Attorney Harrison

carefully reviewed Stranger's objection, the transcript of the hearing (ECF Nos. 126, 127), the exhibits, and the parties' post-hearing submissions (ECF Nos. 144, 145). For the reasons that follow, I accept and adopt the Recommended Ruling as modified herein.

## I.    BACKGROUND

I assume familiarity of the facts and incorporate by reference the Recommended Ruling. I cite only those portions of the record and the legal standards necessary to explain this ruling.

This case concerns Stranger's contractual obligations set forth in two agreements between the parties: (1) an "Operating Agreement" ("OA") signed May 26, 2022, and (2) a "Membership Vesting Agreement" signed June 2, 2022. The OA agreement, governed by Wyoming law, contains a noncompete provision (section 9.1), a nonsolicitation provision (section 9.2), and a confidentiality provision (section 9.4). ECF No. 55-3. It also contains a provision that states that any "technical developments" belong to the company (section 9.3).

The Membership Vesting Agreement ("MVA"), governed by Michigan law, contains a nonsolicitation provision (section 12) as well as a confidentiality and trade secret restriction (section 8). ECF No. 55-4. It also contains a provision requiring Stranger to return to Cleer "any and all equipment, files, software programs, and other personal property belonging to the Company" after her employment ends (section 8(f)).

Cleer alleges that in breach of these covenants, Stranger formed and operated a directly competitive business and intentionally contacted and solicited Cleer's clients and the contractors who worked for Cleer. Cleer further alleges that Stranger failed to return a company laptop that had customer information on it and improperly retained and utilized the domain Cleer.tax to solicit Cleer's customers. Cleer asserts, among other claims, breach of contract as to the OA and

---

moved to withdraw as counsel to Optic Tax. ECF No 149. On February 26, 2025, Judge Garcia granted the motion and ordered that "successor counsel to Optic Tax has until March 14, 2025 to file an appearance." ECF No. 155. Optic Tax remains unrepresented.

MVA (counts 1, 2) and false designation of origin and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (count 7).

**Recommended Ruling on Motion for Preliminary Injunction[3]**

Judge Garcia found that Cleer had demonstrated that Stranger's violation of the restrictive covenants and her improper retention and use of the Cleer.tax domain caused, and would continue to cause, Cleer irreparable harm.  ECF No. 182 at 17-24.  Judge Garcia next found that Cleer was likely to succeed on its breach of contract claims.  Specifically, Judge Garcia found that the restrictive covenants in the OA were valid and enforceable under Wyoming law, and that Cleer had demonstrated a likelihood of success on the merits on its claims alleging breach of the OA's noncompete (9.1), nonsolicitation (9.2), and confidentiality (9.4) provisions. *Id.* at 25-28.  Judge Garcia further found that the restrictive covenants in the MVA were enforceable under Michigan law and that Cleer was likely to succeed on the merits of its claims alleging breach of the MVA's confidentiality (section 8), and nonsolicitation (section 12) provisions.  *Id.* at 28.  As relief, Judge Garcia determined that Cleer was entitled to an injunction enjoining Stranger from violating the restrictive covenants and retaining and/or using the domain.  Finally, Judge Garcia determined that Cleer was not required to post a bond under Fed. R. Civ. P. 65(c).  ECF No. 182 at 34.

## II.    STANDARD OF REVIEW

A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When a party

---

[3] A party seeking a preliminary injunction must establish "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *Hercules Pharms., Inc. v. Cherne,* 2025 WL 1099431, at *1 (2d Cir. Apr. 14, 2025).  "The irreparable harm requirement is the single most important prerequisite for the issuance of a preliminary injunction and must therefore be satisfied before the other requirements for an injunction can be considered." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.,* 131 F.4th 102, 106 (2d Cir. 2025) (internal quotation marks omitted).

makes specific objections, the Court reviews *de novo* the portions of the recommended ruling to which objection is made. *Id*.; Fed. R. Civ. P. 72(b)(3).

## III.    DISCUSSION

Stranger objects to the Recommended Ruling on the grounds that Cleer has not demonstrated irreparable harm and has not shown a likelihood of success on the merits because (1) the OA is not enforceable; (2) she did not breach the restrictive covenants; and (3) she (and not Cleer) owns the domain name "Cleer.tax." ECF No. 195.  She also objects to: Judge Garcia's finding that a preliminary injunction is in the public interest, the proposed injunction, and the decision not to require a bond.[4]

## A.    Irreparable Harm

Stranger first objects to Judge Garcia's finding that Cleer demonstrated irreparable harm. ECF No. 195 at 2.

To establish irreparable harm, the moving party must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec*., 969 F.3d 42, 86 (2d Cir. 2020) (internal quotation marks and citation omitted).

Stranger first argues that Judge Garcia gave "undue weight" to the stipulation of irreparable harm contained in the MVA.  ECF No. 195 at 3.

The MVA provides in relevant part:

> Employee agrees that breach of this Agreement will cause irreparable injury to Company, such that monetary damages would not provide an adequate or complete remedy. Accordingly, in the event of Employee's actual or threatened breach of the provisions of this Agreement, the Company, in addition to all other rights, shall be entitled to an injunction restraining Employee from an actual or

---

[4] Stranger's submission significantly exceeds the page limit requirements set forth in Local Rule 7.  The docket does not indicate that she requested leave to file an oversize brief.  In this instance, however, I will not strike the excess pages.

> threatened breach of this Agreement, and to recover from Employee its reasonable
> attorneys' fees and costs incurred in obtaining such remedies, including temporary
> or permanent injunctive relief.

ECF No. 55-4 § 11g.[5]

Judge Garcia did not find the contractual provision dispositive of the issue of irreparable harm. ECF No 182 at 18. Rather, she considered the stipulation as a factor in determining whether Cleer had shown a likelihood of irreparable injury. *Id.* This was not error. *See Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999)(finding that such a provision "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision"); *Hercules Pharms., Inc.,* 2025 WL 1099431, at *1 (finding irreparable harm where defendant disclosed plaintiff's pricing and solicited its clients in breach of contract and observing in addition that he stipulated that plaintiff would suffer irreparable harm in the event of a breach); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 348 (S.D.N.Y. 2018) ("In the Second Circuit, such contractual provisions, while not dispositive, support a finding of irreparable harm.")

Judge Garcia went on to consider the actual injury Cleer would suffer if denied injunctive relief. ECF No. 182 at 18-24. Stranger objects to those findings as well. Specifically, Stranger argues that "the Recommendation fails to establish that any alleged client confusion or dissatisfaction actually resulted in irreparable harm to Plaintiff." ECF No. 195 at 5. According to Stranger, Judge Garcia erred in concluding that Stranger's emails to Cleer's clients caused confusion and contends that the "reactions cited represent isolated instances." ECF No. 195 at 5. I disagree. The evidence shows that Stranger pirated Cleer's domain name and redirected the Cleer.tax website and emails to her company, Optic Tax. See, e.g., Pl's Ex. 36 (in an email to

---

[5] The OA contains a similar stipulation as to irreparable harm in the event of a breach of the restrictive covenants. OA 9.5(b)(i).

Cleer, a client stated, "I initially emailed Seth on his Cleer.tax email address and received am email back from Crystal Stranger who said she owned the domain and no longer works with you.")[6]  As set forth in the Recommended Ruling, Stranger, who had been "the face of Cleer," ECF No. 126 at 176, reached out to Cleer clients using Cleer.tax, offering to assist them in moving their business to Optic Tax, which resulted in client confusion, and Cleer's loss of some clients, evidence of which was adduced at the hearing. See ECF No. 182 at 13-16, 20-22; ECF No. 126 at 140 (McKeegan, Cleer's CEO, testified "that there's been a lot of confusion among clients as to why other people are contacting them. Who has access to their data? Where is their tax information, did that get hacked as well? Questions like that coming in to us, which again degrades us as a brand if people think it's not secure.")  As Judge Garcia correctly observed, courts have recognized that loss of client relationships and customer goodwill as a result of alleged breaches of restrictive covenants constitutes irreparable harm. *See, e.g., Ticor Title Ins. Co.*, 173 F.3d at 69; *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc*., 2025 WL 304500, at *7 (S.D.N.Y. Jan. 27, 2025) ("It is well established in the Second Circuit that a loss of client relationships and customer goodwill that results from the breach of a restrictive covenant generally constitutes irreparable harm."); *Americus Dental Labs, Inc. v. Pincheira*, 2006 WL 8445430, at *9 (D. Conn. Mar. 3, 2006) (finding plaintiff demonstrated irreparable harm where defendant solicited plaintiff's customers in violation of a restrictive covenant, resulting in loss of clients and goodwill).

**B.**    **Objections regarding Enforceability**

    **1.**    **OA is unenforceable because of the Merger Clause in the MVA**

---

[6] Stranger argues that the recommended ruling cites "unauthenticated client emails." ECF No. 195 at 7.  But the documents were admitted during the hearing absent objection.

Stranger argues that the merger clause in the MVA "precludes enforcement" of the restrictive covenants in the earlier signed OA and objects to Judge Garcia's rejection of that argument.  ECF No. 195 at 15; ECF No. 182 at 31-32.  Section 13 of the MVA states:

> This Agreement supersedes any prior agreement between the Employee and Company, including, but not limited to, any other agreement relating to salary or any other form of compensation from Company to which Employee may claim an entitlement for any reason.

ECF No. 55-4.

A merger clause in a contract is a provision that declares the written document to be the complete and final agreement between the parties, superseding any prior oral or written agreements on the same subject.  *See Matthews-Hargreaves Chevrolet, Co. v. DeSantis*, No. 365052, 2024 WL 2499110, at *6 (Mich. App. May 23, 2024) (an integration clause nullifies all antecedent agreements "when two agreements cover the same subject matter and include inconsistent terms"); 17A C.J.S. Contracts § 583 ("If a written contract contains a merger clause, the written contract becomes the exclusive medium for determining the understanding of the parties, and prior agreements covering the same subject matter are unenforceable.")

As Judge Garcia found, although each contains some restrictive covenants, the contracts address different subject matter.  ECF No. 182 at 32.  The OA outlines how the LLC will be managed and operated and sets forth the responsibilities of its members.  It was entered into by the members of Cleer.  The MVA governs Stranger's responsibilities as an employee and addresses the vesting of her membership interests.  The MVA, notwithstanding the integration clause, does not supersede the OA.  The objection is overruled.

### 2.    OA is unenforceable because of Cleer's breach

Stranger objects that Judge Garcia failed to consider Cleer's material breach, which occurred before any of Stranger's alleged conduct.  ECF No. 195 at 20.  Specifically, Stranger

maintains that Cleer's August 2024 removal of her under the OA as a member of the LLC violated a Wyoming statute, Wyo. Stat. § 17-29-602, which, she claims, requires a "judicial determination for involuntary dissociation of a member 'for cause.'" ECF No. 195 at 20. According to Stranger, Cleer's removal of her "without obtaining the required court approval constituted a material breach of both the OA and Wyoming law" and renders the restrictive covenants in the OA unenforceable. *Id.*

Wyo. Stat. § 17-29-602 provides in pertinent part:

Events causing dissociation

(a) A person is dissociated as a member from a limited liability company when:
...
(iii) The person is expelled as a member pursuant to the operating agreement; [or]
...
(v) On application by the company, the person is expelled as a member by judicial order because the person:

> (A) Has engaged, or is engaging, in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the company's activities;
> (B) Has willfully or persistently committed, or is willfully and persistently committing, a material breach of the operating agreement or the person's duties or obligations under W.S. 17-29-409; or
> (C) Has engaged in, or is engaging in, conduct relating to the company's activities which makes it not reasonably practicable to carry on the activities with the person as a member.

The statute provides that a company may seek a judicial order expelling a member. But the statute also provides that a limited liability company can act to dissociate a member without a judicial adjudication. Under § 17-29-602(a)(iii), a member may be expelled "pursuant to the operating agreement." That is what occurred here.

The OA provides that the company may dissociate a member by vote of the members. Specifically, section 6.5 of the OA provides:

Termination For Cause. The Company (by vote of the Members owning greater th[a]n fifty percent (50%) of the Units (exclusive of the Member under

consideration) shall have the right and option to buy a Member's Units for Cause. The term "Cause" shall mean: ... (ii) upon violation by a Member of any first level offense; first level offenses shall mean the following: [1] intentional misappropriation of the Company funds or any of its affiliated entities funds for personal use; or [2] flagrant dishonesty or intentional act detrimental to the conduct of the Company's business or the business of any affiliated entity; or [3] a violation by a Member of the terms of this Agreement, or any of its affiliated entities Operating Agreement(s).

Cleer invoked this section to terminate Stranger's membership for cause, stating in a letter to her:

Pursuant to Section 6.5(ii)[2] and [3] of Cleer LLC's Operating agreement – through a member vote, as prescribed in the Operating Agreement – the Company has voted to repurchase your 12 Units in the Company "for Cause" due to, e.g. (a) your "flagrant dishonesty" (6.5(ii)[2]); (b) your "intentional acts detrimental to the conduct of the Company's business" (6.5(ii)[2]); and (c) your multiple and continuing violations of the Company's Operating Agreement (6.5(ii)[3]).

Specifically, since you resigned from the Company earlier this year, we have tried to solve this situation with you amicably on multiple occasions, but your continued insistence on acting in bad faith, stealing/withholding company property, and continuing to impermissibly hold the company's domain name website in an attempt to force the company to sell to a third party have prevented any mutually beneficial outcome.

Pl's Ex 24. The record evidence indicates that after she resigned, Stranger retained Cleer's property – a computer laptop and the Cleer.tax domain – conduct which formed the basis of the letter's citation of sections 2 and 3 of section 6.5(ii). ECF No. 126 at 113-14, 150. Stranger's objection on the grounds that the OA is unenforceable due to Cleer's prior breach is overruled.

### 3.     OA is unenforceable because there was "no consideration"

Stranger objects to Judge Garcia's finding that the OA was supported by consideration. ECF No. 195 at 18. But Stranger did not raise any argument that the OA lacked consideration before the magistrate judge. See ECF Nos. 20, 125, 126, 144. Accordingly, I need not address it. "It is well settled that parties may not raise new arguments in objections that were not raised before the Magistrate Judge." *Fossil Grp. Inc. v. Angel Seller, LLC*, 2021 WL 4520030, at *2 (E.D.N.Y. Oct. 4, 2021) (citing cases); *see also Frank Brunkhorst Co., LLC v. Castellini*, 2018

WL 1377302, at *3 (E.D.N.Y. Mar. 19, 2018) (citing cases). Even if I were to address it, I would overrule the objection because Stranger fails to point to any evidence in the record to support her argument. ECF No. 195 at 19.

### 4.    Tolling Provision in the MVA is unenforceable

Stranger objects to Judge Garcia's conclusion that the tolling provision of the MVA is enforceable. ECF No. 195 at 23. She argues that Judge Garcia erred in applying Connecticut law and that such provisions are disfavored.

The nonsolicitation provision of the MVA is effective "for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary)[.]" MVA, § 12(a). Stranger resigned her employment January 31, 2024, ECF No. 126 at 99, and therefore, by its terms, the nonsolicitation provision in the MVA ended January 31, 2025. The MVA provides, however, that the "period of time during which Employee is subject to the Agreement shall be extended for the amount of time Employee is in breach of the Agreement." MVA, § 11(h).

Judge Garcia concluded that section 11(h) was enforceable and determined, as a result, that the period of time that Stranger is subject to the MVA's restrictive covenants should be "extended to the amount of time Stranger remains in breach." ECF No. 182 at 30. Judge Garcia concluded that in light of the evidence of Stranger's breach, she should be enjoined from violating the nonsolicitation clause for "one year from entry of this Recommended Ruling and Order."[7] ECF No. 182 at 34.

Agreements to extend the duration of a restrictive covenant because of a breach are enforceable under Connecticut law, as Judge Garcia found, and under Michigan law, which governs the MVA. *See Thermatool Corp. v. Borzym,* 575 N.W.2d 334, 338 (Mich. App. 1998)

---

[7] The Recommended Ruling was filed March 20, 2025.

("in appropriate circumstances, the term of a noncompetition agreement may be extended beyond its stated expiration date"); *Best Team Ever, Inc. v. Prentice*, 2015 WL 3874477, at *4 (Mich. App. June 23, 2015) (finding reasonable a provision that extends the duration of a restrictive covenant where there is a breach). Stranger's objection as to the enforceability of section 11(h) is overruled.

### 5. The Noncompete in the OA is overbroad

Stranger objects to Judge Garcia's conclusion that the noncompete in the OA (section 9.1) is enforceable. Specifically, she argues that the nationwide scope of the noncompete is unreasonable. ECF No. 195 at 14.

Section 9.1 of the OA provides in pertinent part:

> The Members agree that while a Member of the Company and for twelve (12) months following the withdrawal for any reason as a Member, he shall not, directly or indirectly, either for himself or for any other individual own any interest in, manage, control, consult with, render services for or participate in (whether as an officer, director, employee, partner, agent, representative, or otherwise) or in any other manner engage anywhere in the Protected Areas in any business competitive with business of the Company or any affiliated entity (the "Protected Business"). The term "Protected Territories" shall mean the entirety of the United States of America. The Members agree that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Company's business or any affiliated entity.[8]

Judge Garcia found that "the nationwide geographical scope is reasonable because Cleer provides tax services to a niche group of foreign-owned businesses filing taxes in the United States." ECF No. 182 at 26.

Under Wyoming law, which governs the OA, "a noncompete agreement must be (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in duration and geographical limitations; and (5) not against public policy." *Hassler*

---

[8] The noncompete is set to expire August 9, 2025, twelve months from the date of the termination of her membership.

*v. Circle C Res.*, 505 P.3d 169, 174 (Wyo. 2022). "The reasonableness of a covenant not to compete is assessed based upon the facts of the particular case and a review of all of the circumstances." *Oliver v. Quynn*, 303 P.3d 1119, 1123 (Wyo. 2013). "Contracts which hinder employees' freedom to work are strictly construed and rigidly scanned and are declared void unless necessary for the reasonable protection of the employer." *Malave v. W. Wyoming Beverages, Inc.*, 503 P.3d 36, 39-40 (Wyo. 2022) (internal quotation marks omitted). "The burden is on the employer to overcome the presumption that the noncompete is invalid by proving that there existed some special circumstances which rendered it reasonably necessary for the protection of the [employer's] business." *Id.* at 40 ("[T]his court has reversed orders enforcing noncompete agreements because the decision-maker below failed to impose the burden on the employer to establish the restraint of trade was reasonable."). A "'restraint [on trade] is reasonable only if it (1) is no greater than is required for the protection of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.'" *Brown v. Best Home Health & Hospice, LLC*, 491 P.3d 1021, 1030 (Wyo. 2021). *See Preston v. Marathon Oil Co.*, 277 P.3d 81, 86 (Wyo. 2012) ("[P]ublic policy ... generally disfavors [noncompete] agreements" and "we closely scrutinize covenants not to compete, employing a rule of reason analysis, to ensure there is a proper balance between the competing interests of the employer and employee."). "Although an employer may use a noncompete agreement to protect itself from improper and unfair competition by a former employee, it is not entitled to protection from ordinary competition." *Hassler v. Circle C Res.*, 505 P.3d 169, 174 (Wyo. 2022) (internal quotations omitted). As to geographic scope,

> [r]easonable geographic restraints are generally limited to the area in which the former employee actually worked or from which clients were drawn.... When the business serves a limited geographic area, as opposed to statewide or nationwide, courts have upheld geographic limits which are coextensive with the area in

> which the employer conducts business.... A broad geographic restriction may be reasonable when it is coupled with a specific activity restriction within an industry or business which has an inherently limited client base.[9]

*Hopper v. All Pet Animal Clinic, Inc*., 861 P.2d 531, 544 (Wyo. 1993), overruled on other grounds by *Hassler*, 505 P.3d at 169.  *See J.C. Energy, LLC v. Hall*, 2015 WL 5698419, at *7 (D. Wyo. Sept. 28, 2015) (finding reasonable a 100 mile geographic limit where "evidence in the record shows that [plaintiff] does business within this 100 mile radius").

McKeegan testified that Cleer "is a tax and bookkeeping company. It focuses mainly on start-ups and with a specific niche in companies with non-U.S. founders."  ECF No. 126 at 26. He said that Cleer's clients "tend to be tech startups, oftentimes with non-U.S. founders."  *Id.* at 156.  *See also* ECF No. 55 ¶ 22 ("Cleer is a global provider of tax preparing, bookkeeping, and provided consultation services to more than 5,000 startup, small, and growing domestic and international businesses seeking individualized solutions for compliance with the United States tax system.")

On this record, I cannot find that Cleer has discharged its burden of demonstrating that the nationwide geographic scope of the noncompete - unaccompanied by any specific activity restriction, *Hopper*, 861 P.2d at 544 - is reasonable.  Because there is no specific evidentiary showing as to the location of its customers, Cleer has not shown, as it must, that this geographic restraint is "no greater than is required for [its] protection," *Brown*, 491 P.3d at 1030. I am therefore constrained to reject that portion of the Recommended Ruling finding the noncompete reasonable.[10]

## C.    Objections as to Stranger's Breach of Confidentiality

---

[9] Although the OA contains a provision that permits the court to "revise" covenants, § 9.5, Wyoming law does not permit the court to modify a noncompete to render it reasonable.  *Hassler v. Circle C Res.*, 505 P.3d 169, 174 (Wyo. 2022).

[10] Stranger's objection to the injunction proposed in the recommended ruling as overbroad because it has no geographic limitation, see ECF No. 182 at 34, is overruled as moot in light of my finding that the noncompete is unreasonable and consequent revision of the requested injunction.

Stranger objects to Judge Garcia's finding that Cleer demonstrated a likelihood of success on its breach of confidentiality claims.[11]  ECF No. 195 at 22.  Judge Garcia found that

> When leaving Cleer, Stranger took Cleer's laptop and also took with her a portion of Cleer's mailing list containing current, former, and prospective clients, suppliers[[12]], and contacts, which she merged into Optic Tax's email list. The parties stipulated that there is an overlap between Optic Tax's list and Cleer's list of 5,448 clients. Hrg. Tr. 138:2-13; Pl. Ex. 123, 159. Stranger provided no explanation or evidence how 5,448 of Cleer's clients ended up on Optic Tax's email list. Id.
>
> * * *
>
> By Stranger's own admission, following her departure from Cleer, she obtained a list of 226 Cleer clients and solicited all of them by blast emails using the Cleer.tax email domain.

---

[11] Both the OA and MVA contain confidentiality provisions.  Section 8 of the MVA provides in pertinent part Confidentiality and Trade Secrets**.**

a. Employee will not reveal or otherwise disclose, without prior written approval, to anyone Confidential Information, which will include, without limitation, any of Company' confidential, proprietary or trade secret information that is disclosed to Employee or Employee otherwise learns in the course of employment such as, but not limited to, business plans, designs, marketing interests, products, financial information, including cost and pricing, vendor lists , and sales processes and procedures. Confidential Information will not include any information which: (i) is or becomes publicly available through no act of Employee; (ii) is rightfully received by Employee from a third party without restrictions; or (iii) is independently developed by Employee....

d. Employee understands and agrees that he or she will be exposed to Company's trade secrets, including but not limited to information that derives independent economic value from its secret nature. Trade Secrets (hereinafter "Trade Secrets") will include (a) any and all proprietary software solutions used by Company; (b) technical information concerning company salaries, strengths, weaknesses, and skills; (c) information concerning Company's finances, including sales information, profits, accounting information, unpublished financial information, and marketing expenditures; (d) information concerning the company's suppliers or customers, including customer lists, customer information, supplier lists, and supplier information; (e) information concerning business strategies, including marketing plans, business plans, research projects, and product development; (f) and any other information not generally known to the public which, if disclosed, could reasonably be expected to adversely affect Company's business. Employee agrees that he will not reveal or otherwise disclose, without prior written approval, to anyone the Trade Secrets of Company.

Section 9.4 of the OA provides:

Confidential Information. The Members agree to retain all information relating to the business of the Company or any affiliated entity in strict confidence and shall not, at any time, except as authorized in writing by an authorized officer of Company and for the benefit of Company, directly or indirectly, divulge or disclose to any person, firm, association or corporation, or use for his own benefit, gain or otherwise, any information, plans, processes, products, client, report data, results of tests and data, client lists, price lists or any other trade secrets or confidential materials or client information or data regarding the business of Company or any affiliated entity, which is disclosed to or acquired by Member directly or indirectly in the course of Member's employment

[12] McKeegan testified that "suppliers" referred to Cleer's independent contractors.  ECF No. 126 at 50.

* * * *

There is no dispute that Stranger is in breach of the non-disclosure provisions. Optic Tax has a mailing list that includes 5,448 Cleer current, former, and prospective clients which comprise more than half of Cleer's mailing list. Pl. Hrg. Ex. 123. Stranger testified that she has a separate list of 226 Cleer clients. Hrg. Tr. 227:10-229:19. Stranger also possesses a confidential spreadsheet containing a staffing roster and business partner pricing information belonging to Cleer. Pl. Hrg. Ex. 190, Def. Ex. 515. She also used Cleer's pricing information to develop Optic Tax's pricing and deliberately undercut Cleer. Pl. Hrg. Ex. 142 (9/10/2024 email from Optic Tax Employee Catherine Meniosa seeking clarification and confirmation on tax package pricing and displaying a side-by-side comparison of Optic Tax and Cleer's pricing for reference); ECF No. 135 at 1 (Feb. 8, 2025, email from Cleer client Marcos Sanchez stating "[t]he team that assisted me with the 2023 filing recently reached out, offering a significantly different price for handling it through Optic Tax. This has created some confusion on my end, and I'd love to clarify how things stand before moving forward.").

ECF No. 182 at 16, 27.

### 1.    The Client List

Stranger claims that the "overlap" between the client lists is not "evidence of misappropriation" and objects that Judge Garcia "ignores alternative explanations for such overlap." ECF No. 195 at 22. But Stranger does not point to any place in the record where she advanced such explanations. She does not cite any evidence to support an alternate explanation nor does my independent review of the record reveal any. The objection is overruled.

Stranger also takes issue with Judge Garcia's statement that Stranger "obtained" a list of 226 clients because, she argues, the term "obtained" "suggests improper acquisition." ECF No. 195 at 7. But as Judge Garcia found, Stranger testified that former Cleer bookkeepers (who went to work for Optic Tax) provided her with a list of 226 Cleer clients, which she then uploaded to Optic Tax's mailing list and contacted. ECF No. 126 at 209-10. Under the circumstances, Judge Garcia's use of the term "obtained" was not misleading and the objection is overruled.

### 2.    Spreadsheet

Stranger next objects to Judge Garcia's characterization of Cleer's "'spreadsheet

containing a staffing roster and business partner pricing information' as confidential information

belonging to Cleer." ECF No. 195 at 23. But that finding was grounded in the evidence adduced

at the hearing. McKeegan testified that Cleer considered its "client list, the business partnership

list, pricing information, marketing strategies" as confidential and protected online by "different

levels of password protection." ECF No. 126 at 39. He further testified that "[e]veryone who

worked for Cleer signed an NDA and a contract agreement with restrictive covenants in it." *Id.*

at 41. The objection is overruled.

### 3. Company computer

Stranger objects to Judge Garcia's finding that Stranger took Cleer's laptop. ECF No.

195 at 28. She states that she "had a computer she had purchased but was paid for by the

company." *Id.* She further claims that there were "no agreements" as to "any computer." *Id.*

Section 8(f) of the MVA provides:

> [W]hen Employee's employment with Company ends, Employee will promptly
> return all originals and copies of all documents, records, software programs,
> media, and other materials concerning Confidential Information, as well as any
> and all equipment, files, software programs, and other personal property
> belonging to the Company.

Cleer's data was on the computer, which was used for Cleer business. ECF No. 126 at

150 (McKeegan testified that Stranger "kept her company computer," which has client emails on

it). Judge Garcia's statement is supported by record and the objection is overruled.

### 4. Inability to Present Evidence

Stranger argues that Judge Garcia erred in failing to find that Stranger's ability to

introduce evidence was undermined by her attorney's illness. ECF No. 195 at 23, 29. Contrary

to her argument, Stranger was not "denied the opportunity" to present evidence. ECF No. 195 at

29. Her attorney was present both days of the hearing, unlike Stranger, as set forth in Judge

Garcia's denial of Stranger's motion for a new hearing.  See ECF No. 185.  This objection is overruled.

### D.    Objections as to Stranger's Breach of Nonsolicitation Agreement

Stranger objects to Judge Garcia's characterization of "communications with Cleer clients" as solicitations.  ECF No. 195 at 4.  She claims that the evidence cited in the recommended ruling does not establish that she solicited Cleer's clients.  *Id.*  In support, Stranger points to a September 6, 2024 blast email she sent to Cleer's clients and argues that the email was "merely informational" and "falls within the permissible category of professional courtesy notifications."  *Id.*

> The email states in relevant part:
>
> [I]t all just deteriorated there so fast.
>
> When the team wanted to leave, they all reached out to me with concerns about who would help the clients if they left.  While they told me they felt abused and couldn't handle even one day more, they were loyal to you as being wonderful clients and were worried who would help you.... So at their request, I expanded Optic Tax to provide tax and bookkeeping services, to give the team a safe place to do their excellent work.
>
> Team members may have reached out to you, as we want to offer you assistance in this transition time, as seamlessly as possible, so there is no disruption to your business.... I am making myself personally available if you have any questions[.]

Pl's Ex. 139.  It was signed by Stranger who identified herself as the "Founder & CEO" of Optic Tax.  Stranger's argument is unpersuasive.  The communications, as Judge Garcia found, were a solicitation of Cleer's clients to move their business from Cleer to OpticTax.  The objection is overruled**.**

Stranger also objects to Judge Garcia's statement that "the only people Stranger reached out to about a job opportunity with Optic Tax were people who worked for Cleer."  ECF No. 195 at 27.  This is a mischaracterization, Stranger argues, because she "did post openings" and

"interviewed candidates outside of Cleer contractors." ECF No. 195 at 27. Stranger points to no evidence in support of her argument. And in any event, her quibble does not change the fact that she solicited and hired individuals who worked for Cleer to come and work for Optic Tax. ECF No. 126 at 212 ("Q. Is the entire team of Optic Tax former Cleer employees or independent contractors? [Stranger]: In general, yes."); See Pl's Exs. 160-162 (Stranger's emails to individuals who worked for Cleer asking, inter alia, if they want to "chat about an opportunity").

Stranger objects to Judge Garcia's finding that Stranger knew that the independent contractors who used to work for Cleer and now worked for her "were soliciting the clients they previously serviced at Cleer ... and [that] Stranger encouraged them to do so." ECF No. 195 at 27. The record clearly supports Judge Garcia's conclusion. ECF No. 126 at 227, 234-237; Pl's Exs. 32, 33. The objection is overruled.

Stranger also argues that "mere knowledge" that the independent contractors were soliciting Cleer's clients does not rise to "active inducement." ECF No. 195 at 27-28. It does not have to, however, because indirect solicitation through others is enough.

The nonsolicitation provision in the OA provides:

9.2     Further, so long as a Member owns Membership Interest in the Company and for a period equal to twelve (12) months following withdrawal for any reason as a Member, the Member shall not directly, or indirectly through another person or entity ... (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relationship of the Company or any affiliated entity.

The nonsolicitation provision in the MVA provides:

12. Non-solicit.

a.     During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:

> i.     directly or indirectly contact, solicit, accept business from, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to employee's termination, for the purpose of selling or soliciting products or services of Company . . . .

As stated, the record evidence demonstrates that Stranger knew that the independent contractors working for Optic Tax were contacting and soliciting Cleer's clients and countenanced such conduct. Such conduct falls within the ambit of the restrictive covenants' prohibition of "indirect" contact and solicitation. The objection is overruled.

### 6. Impossibility

Stranger objects to Judge Garcia's finding that Stranger violated the TRO's nonsolicitation prohibition by sending out blast emails to Optic Tax's contacts, which included the 5448 "overlap" clients. ECF No. 182 at 16. She maintains that it is "impossible" to comply with the TRO's nonsolicitation provision because Cleer never provided her with a list of contacts that she "had worked with directly or indirectly over a two-year period prior to resigning." ECF No. 195 at 31. While a list might have been helpful to Stranger, Cleer is not required to provide such and she has not demonstrated that the absence of a list made it impossible for her to comply.

### E. Objections regarding the Cleer.tax Domain

### 1. Domain Ownership

Stranger objects to Judge Garcia's finding that the domain name belongs to Cleer. ECF No. 195 at 36. She argues that she owns the domain name and that it is "common practice" for an individual to own a domain and let a business use it. *Id.* But the record evidence compellingly demonstrates that Stranger bought the domain name for Cleer in her role as a Cleer employee, as part of the company rebranding, for the benefit of Cleer, and that it belongs to

Cleer.  ECF Nos. 126 at 32, 61, 64, 183, 188, 202-203; Pl's Exs. 5, 8.  In fact, she points to no

evidence that she registered the domain for her personal use.  The objection is overruled.

>   **2.    Abandonment**

Stranger objects to Judge Garcia's finding that Stranger improperly retained the domain

name and redirected it.  ECF No. 195 at 25.  She points to McKeegan's testimony that once he

realized that Stranger would not give back the domain, he switched to Cleertax.com.  From this,

Stranger argues that Cleer "voluntarily abandoned its use of the Cleer.tax domain" and cites

caselaw for the proposition that abandonment occurs when use of the mark is discontinued with

an intent not to resume its use.  ECF No 195 at 25.  This argument, however, was not raised

before Judge Garcia and is therefore waived.  In any event, Stranger's argument is belied by any

record evidence that Cleer lacked the intent to resume use of the domain once it was able to

regain it.  To the contrary, as set forth in the recommended ruling, Cleer pressed for the return of

the mark.  ECF No. 182 at 10-11.

**F.    Balance of hardships and public interest**

Stranger argues that the balance of hardships "strongly favors [her] as the injunction

would completely eliminate [her] ability to conduct business."  ECF No. 195 at 40.  The

recommended ruling concluded - and I agree - that Cleer is likely to succeed on the merits of its

claim that Stranger breached the nonsolicitation and confidentiality covenants.  As a result, I

need not consider the balance of hardships because that factor is "required when a court finds

only that there are serious questions going to the merits of the claims at issue."  *Hercules*

*Pharms., Inc. v. Cherne*, 2025 WL 1099431, at *2 n.1 (2d Cir. Apr. 14, 2025). *See Fleet Nat.*

*Bank v. Trans World Airlines, Inc*., 767 F. Supp. 510, 517 (S.D.N.Y. 1991) ("Since we conclude

that Fleet is likely to succeed on the merits of this litigation, our analysis need only focus on this question and we need not consider the balance of hardships.")[13]

Stranger objects to Judge Garcia's finding that enforcement of the restrictive covenants would not harm the public interest.  ECF No. 195 at 42.  She argues that the "public interest would be significantly harmed by granting the injunction" because the covenants are unreasonable.  *Id.* at 42-43.  For the reasons already discussed, however, I disagree.  And I concur with Judge Garcia that "the public interest here is served by the enforcement of the parties' lawful agreement." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015).  The objection is overruled.

## G.    Objections to the Recommended Injunctive Relief

### 1.    Overbreadth

Stranger objects that the proposed injunctive relief is "impermissibly broad" because it "prevent[s] her from contacting anyone who could be a 'prospective customer' of Cleer." ECF NO. 195 at 34.  But she admits that the contractual provision at issue "clearly states that the restriction is limited to clients I was in direct or indirect contact with for two years prior to leaving the company."  ECF No. 152 at 6.  Many courts have concluded that such a "restriction fits comfortably within [plaintiff's] legitimate business interest in preventing competitive use, for a time, of [client] information or relationships which ... the employee acquired in the course of the employment."  *Marsh & McLennan Agency, LLC*, 2025 WL 304500, at *7.  To the extent that the proposed language is unclear, I shall modify it to track the contractual provision it is intended to enforce.

### 2.    Professional Obligations

---

[13] In any event, the prohibition against soliciting Cleer's clients and employees and refraining from using its domain name can hardly be said to thwart Stranger's ability to conduct business.

Stranger argues that the injunction's enforcement of the nonsolicitation provision would cause her to violate her professional obligations.  She argues that the injunction "would prevent [her] from even notifying existing clients about the inability to continue representing them, placing [her] in direct violation of her duties under [IRS] Circular 230."  ECF No. 195 at 41.  Stranger did not raise this argument before the Magistrate Judge and, in any event, provides no authority in support of her argument.

### 3.    Constitutional Concerns

Stranger argues that enforcing the restrictive covenants in the OA and MVA would violate her First Amendment rights of speech and association.  ECF No. 195 at 32.

The First Amendment applies only to state actions. *Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972) ("The First and Fourteenth Amendments are limitations on state action, not on [private] action ... for private purposes.").  "[N]othing in the First Amendment prohibits private parties from agreeing to refrain from engaging in certain types of speech or association pursuant to a ... contract between themselves."  *Democratic Nat. Comm. v. Republican Nat. Comm.*, 671 F. Supp. 2d 575, 596 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).  And "[i]t does not violate the First Amendment for a court to enforce the parties' contractual agreement that limits speech." *Plaquemines Holdings, L.L.C. v. CHS, Inc*., 597 F. App'x 763, 771 n.3 (5th Cir. 2015).  *See IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) ("Private parties may freely bargain with each other to restrict their own speech, and those agreements may be enforced, without implicating the First Amendment."); *Medtronic, Inc. v. Benda*, 689 F.2d 645, 658 (7th Cir. 1982) (agreements that restrict "certain commercial speech for which the parties themselves had contracted" do not violate the First Amendment nor does a court order enforcing such an agreement).  The objection is overruled.

## H.    BOND

Stranger objects to the Magistrate Judge's decision recommending that Cleer not be required to post a bond. ECF No. 195 at 45. Stranger had requested that the Court "set a bond in the amount of $798,196.33, or such higher amount as the Court deems proper, to secure Defendant against financial losses resulting from the TRO and PI." ECF No. 152.

Fed. R. Civ. P. 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "Courts have the discretion, however, to require no security at all depending on the specific circumstances." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 86 (2d Cir. 2024). I do not find that waiving the bond requirement is entirely appropriate in this case. Stranger will likely be harmed if a bond is not posted, since if she wins on the merits, she will have been prevented from soliciting or servicing clients that she is entitled to service and therefore from garnering business and goodwill. Although Stranger offers a variety of calculations, none of them capture her alleged loss from turning over the Cleer.tax domain and enforcing the nonsolicitation and confidentiality covenants. I find reasonable a bond of $150,000.

## IV.    CONCLUSION

For the foregoing reasons, I adopt the recommended ruling as modified herein. Cleer's motion for a preliminary injunction is GRANTED in part and DENIED in part as follows:

Stranger[14] and her employees, contractors, agents, companies (including but not limited to Optic Tax) and all persons in active concert or participation with, through, or under her, are enjoined and restrained from

> (1) for a period of one year from March 20, 2025, directly or indirectly contacting, soliciting, accepting business from, or communicating the fact or circumstances of her resignation from or termination of employment with Cleer to any of Cleer's customers or prospective customers, with whom Stranger had direct or indirect contact or solicited on behalf of Cleer in the two (2) years prior to her termination under section 12 of the MVA;

> (2) for a period of one year from March 20, 2025, soliciting, hiring, or otherwise contacting for purposes of discussing employment or contractor opportunities any person who is or was working for Cleer LLC or any of its predecessors in any capacity or as independent contractors or suppliers;

> (3) using, revealing or disclosing, without prior written approval, any of Cleer's confidential, proprietary or trade secret information including but not limited to, business plans, designs, marketing interests, products, financial information, including cost and pricing, vendor lists, and sales processes and procedures under section 8 of the MVA; and

> (4) using the symbol, mark, or designation Cleer.tax.

It is further ordered that within 48 hours of this Order, Stranger shall take all actions required to return to Cleer the domain Cleer.tax.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              June 17, 2025

---

[14] The motion for preliminary injunction seeks such relief only against Stranger, and so the injunction applies to her. Nonetheless, consistent with Rule 65, the Court also enjoins her agents and companies, among others, which would include Optic Tax.