## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CLEER LLC | : |
| | : |
| v. | :   3:24-cv-1496-MPS |
| | : |
| CRYSTAL STRANGER et al. | :   DEFENDANT CRYSTAL STRANGER'S |
| | :   OPPOSITION TO PLAINTIFF'S |
| v. | :   MOTION FOR COERCIVE SANCTIONS |
| | :   (ECF 287) AND CROSS-MOTION FOR |
| DAVID and CARRIE McKEEGAN | :   SANCTIONS AGAINST PLAINTIFF |
| | :   AND PLAINTIFF'S COUNSEL |

### I. INTRODUCTION

This case is a judicial extension of *Kelo v. New London, 545 U.S. 469 (2005)* — except worse. In *Kelo,* property was taken by the state under eminent domain and transferred to private developers. Here, by contrast, the Court itself has ordered the transfer of a unique digital property to Plaintiff, mid-litigation, without even starting full discovery, without trial on the merits, and without compensation, in defiance of constitutional safeguards. This is not equitable; it is expropriation by judicial fiat.

Plaintiff's latest motion builds on that error by mischaracterizing the record and making factual assertions flatly contradicted by the docket. Contrary to Plaintiff's claim, Defendant did not ignore this Court's August 4, 2025 Order (ECF 243). On August 11, 2025, Defendant filed a Status Notice (ECF 258), a Motion for Leave to File Unsworn Declaration or, in the Alternative, to Extend Deadline (ECF 258-2), and a sworn Declaration under 28 U.S.C. § 1746 (ECF 258-3).

These filings demonstrate good-faith compliance with the Court's directive while simultaneously preserving Defendant's appellate rights and protecting constitutional due process.

Moreover, the Second Circuit has since granted rehearing en banc on Defendant's motion for stay (Case No. 25-1575, Dkt. 52.1, Sept. 16, 2025), in an unprecedented use of the local rules over FRCP 40, that normally would prevent en banc review other than for a final judgement. This alone shows the important weight this case holds for the appellate courts. Sanctions at this juncture would interfere with the appellate court's jurisdiction, risk mooting the pending appeal, and impose irreparable harm on Defendant in violation of due process.

As Noam Chomsky observed, "The smart way to keep people passive and obedient is to strictly limit the spectrum of acceptable opinion, but allow very lively debate within that spectrum." *Manufacturing Consent* (1988). When a court chooses to only issue opinions that favor one side, and stay silent on ones that would benefit the other, it erodes the rule of law.

That is what has happened here. Defendant has repeatedly placed these issues before this Court through timely motions and sworn declarations. Yet those filings have been met not with substantive engagement, but with dismissal, delay, or silence. Plaintiff now seeks to convert that judicial silence into a weapon. The Constitution does not permit a litigant's good-faith efforts to preserve her rights to be disregarded and then punished through coercive sanctions. That type of judicial advocacy is what has led to the erosion of trust in the courts we are seeing today.

## II. BACKGROUND

The procedural history of this case is critical to evaluating Plaintiff's motion. From the outset, Defendant diligently pursued stays in both this Court, the Court of Appeals, and even the Supreme Court, to preserve appellate rights and prevent irreparable harm from premature

2

enforcement that would violate Defendant's Constitutional rights. Yet the record reflects a troubling pattern: the Court withheld ruling on Defendant's first stay motion until it was moot, repeatedly denied later motions without explanation, and then used the absence of a stay as the basis for contempt. What follows is a timeline of those events, showing how Defendant consistently sought judicial relief and how the Court's handling of those requests created the very circumstances Plaintiff now invokes to demand coercive sanctions.

**A. Initial District Court Motions to Stay Preliminary Injunction Orders**

- **March 20, 2025 (ECF 182):** Magistrate Judge Garcia entered a Recommended Ruling on the Preliminary Injunction
- **March 21, 2025 (ECF 188):** Defendant filed an Emergency Motion to Stay enforcement of the preliminary injunction, raising due process and First Amendment concerns.
- **June 17, 2025 (ECF 208):** Judge Shea entered a Preliminary Injunction ordering, for the first time, transfer of the Cleer.tax domain within 48 hours. **This requirement was not part of Magistrate Judge Garcia's recommended ruling** (ECF 182).
- **July 3, 2025 (ECF 217):** Plaintiff filed their Motion for Contempt seeking sanctions to enforce the transfer of the Domain cleer.tax
- **July 8, 2025 (ECF 221):** District Court denied motion to Stay, on the grounds it was moot because of the subsequent PI order.

**B. Appellate Proceedings Begin**

- **June 19, 2025 (ECF 212):** Defendant filed Notice of Appeal (Case No. 25-1575).

- **June 20, 2025 (2d Cir. 25-663):** Defendant filed an Emergency Motion for Partial Stay, emphasizing due process violations and risk of mooting appellate rights.

- **June 27, 2025 (2d Cir. 25-1575):** Defendant filed an Emergency Motion for Partial Stay, emphasizing due process violations and risk of mooting appellate rights.

## C. District Court Enforcement

- **August 4, 2025 (ECF 243):** This Court held Defendant in contempt and ordered return of the domain by August 12, with a sworn statement of compliance to be filed. The Order warned that failure would result in coercive sanctions.

## D. Defendant's Compliance Filings

- **August 11, 2025:** Filed Declaration under 28 U.S.C. § 1746 (ECF 258-3), detailing steps taken to comply, including requesting transfer instructions from Plaintiff's counsel and pursuing appellate relief.

- **August 14, 2025:** Defendant filed renewed stay motion in District Court citing Supreme Court filing.

- **August 18, 2025:** District Court denied motion to Stay, without any reasoning.

## E. Appellate Activity Continues

- **August 12, 2025:** Second Circuit issued temporary administrative stay.

- **August 13, 2025:** Second Circuit panel denied stay, without any reasoning.

- **August 18, 2025:** Defendant filed renewed stay motion in the Second Circit.

- **August 28, 2025:** Second Circuit denied renewed motion, without any reasoning.

- **September 16, 2025 (25-1575, Dkt. 52.1):** Second Circuit granted Defendant's motion to file a petition for rehearing en banc on the stay issue, confirming the substantial grounds for appellate review.

## F. Supreme Court of the United States Filings

- **August 14, 2025:** Defendant filed emergency motion for stay with justice Sotamayor.

- **August 25, 2025**: Justice Sotamayor denied the application, without any reasoning.

- **September 5, 2025:** Defendant filed emergency motion for stay with justice Kavanaugh.

- **September 10, 2025:** Defendant filed Writ of Certiorari with the Supreme Court of the United States.

## III. ARGUMENT

**1. The Court's Handling of Stay Motions Deprived Defendant of Due Process and Cannot Justify Coercive Sanctions.**

The linchpin of Plaintiff's motion for coercive sanctions, and this Court's August 4 contempt ruling, is the assertion that Defendant defied the Preliminary Injunction because "there is no stay." (ECF No. 243)

While it is true that absent a stay, parties are generally required to comply with judicial orders even while appellate review is pending, that principle presumes the stay process is available and functioning. See *Maness v. Meyers*, 419 U.S. 449, 458 (1975). Here, the opposite occurred: this Court itself withheld a ruling on Defendant's initial stay motion for nearly four months, only to dismiss it as moot, nearly a month after the subsequent ruling was issued, and then invoked the absence of a stay to find contempt. That sequence deprived Defendant of due process and cannot be the foundation for coercive sanctions.

**A. The Court's Delay Nullified Defendant's First Stay Motion.**

On March 21, 2025, immediately after Magistrate Judge Garcia issued her recommended ruling, Defendant filed an Emergency Motion to Stay (ECF 188). That motion squarely raised due process and First Amendment concerns and sought to preserve appellate rights before

enforcement of any injunction. Yet this Court did not rule on the motion until July 8, 2025 (ECF 221), nearly four months later.

Stay motions are by definition time-sensitive. Their purpose is to prevent irreparable harm while litigation proceeds. To defer ruling until after the harm is imposed, and then deny the motion as moot, deprives the movant of meaningful relief. *See, e.g., In re A.H. Robins Co., Inc.*, 862 F.2d 1092, 1096 (4th Cir. 1988) (courts recognize that stay motions are time-sensitive.)

The timeline where the Court then dismissed the stay motion as moot, nearly a month after entering the new Preliminary Injunction (ECF 208) directly led to a situation where Defendant, the appellate court, and any reasonable third-party observer could not discern whether the stay request applied to the final or recommended Preliminary Injunction. The result was a muddled record: Plaintiff pressed forward with contempt proceedings on July 3, 2025 (ECF 217), stating there was no stay motion, while a stay motion was still pending, and the Court later compounded the confusion by asserting Defendant had not sought a stay at all.

This sequence deprived Defendant of the statutory protection afforded by a timely ruling on a stay motion, obscured the status of appellate rights, and created ambiguity that directly fueled Plaintiff's premature contempt motion.

**B. The Contempt Ruling Relied on the Absence of a Stay That the Court Itself Withheld.**

In its August 4 contempt order, this Court held that Defendant "need not comply because she has appealed it … But that is not the law. As noted, there is no stay." (ECF No. 243)

That reasoning overlooks the procedural reality: Defendant had, in fact, diligently sought a stay in this Court (ECF 188), and later in the Second Circuit (Cases 25-663 and 25-1575). The

absence of a stay was not due to neglect by Defendant, but to this Court's delay and dismissal of her initial motion, followed by summary denials in the appellate courts without reasoning.

It is circular and fundamentally unfair to deny a stay motion as moot, then punish Defendant for lacking a stay. The effect is to manufacture contempt liability out of judicial inaction. Due process does not tolerate such "Catch-22" reasoning. *See Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (due process requires "an opportunity … granted at a meaningful time and in a meaningful manner").

**C. Coercive Sanctions Cannot Be Grounded in This Procedural Irregularity.**

Plaintiff now seeks coercive sanctions premised on the same logic: that absent a stay, Defendant must be compelled by daily fines to transfer her domain. But when the absence of a stay is attributable to the Court's own handling of Defendant's motions, coercive sanctions are not an equitable remedy, they are a miscarriage of justice.

Sanctions cannot be used to punish a party for diligently pursuing lawful avenues of relief, particularly where judicial delay rendered those avenues ineffective. If anything, the record demonstrates that Defendant consistently sought to comply with the law by requesting stays in the proper forums. The Court's own procedural handling deprived her of timely protection. That deficiency cannot now serve as the justification for monetary coercion.

**2. If This Court Issues Coercive Sanctions, It Would Surpass Even the Injustice of *Kelo*.**

The Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005), remains one of the most controversial takings rulings of the modern era. There, the Court held that transferring homes from one private owner to another for purposes of economic development could qualify as a "public use." The majority reasoned:

"Promoting economic development is a traditional and long accepted function of government. Clearly, there is no basis for exempting economic development from our traditionally broad understanding of public purpose." *Id.* at 484.

But even in *Kelo*, the transfer was carried out under statutory eminent domain authority, after judicial review, and with compensation to the property owners. Those safeguards, however inadequate in practice, preserved the basic constitutional framework of process and compensation, all of which are lacking here.

Furthermore Justice O'Connor, dissenting, warned that the Court's rationale risked obliterating constitutional limits:

"Under the banner of economic development, all private property is now vulnerable to being taken and transferred to another private owner, so long as it might be upgraded … The beneficiaries are likely to be those citizens with disproportionate influence and power in the political process." *Id.* at 505 (O'Connor, J., dissenting).

Her warning is realized here. If this Court issues coercive sanctions to compel transfer of Cleer.tax, the result will exceed even *Kelo's* broadest logic:

A. **No Statutory Authority.** Unlike *Kelo*, there is no eminent domain statute authorizing the Court to strip property from one private owner and give it to another. The only "authority" is judicial fiat.

B. **No Compensation.** Unlike *Kelo*, no compensation is offered for the permanent loss of Defendant's property. The Fifth Amendment's guarantee of "just compensation" is disregarded entirely.

C. **No Public Purpose.** Unlike *Kelo*, the transfer here benefits no community, infrastructure project, or taxpayers. It is a compelled transfer for the sole benefit of a private corporate litigant.

D. **No Final Judgment.** Unlike *Kelo*, where judicial review occurred prior to condemnation, this Court would be forcing permanent transfer before a full trial on the merits, before judgment, and before appellate review has run its course.

If coercive sanctions are imposed, this case will mark a constitutional nadir: an uncompensated, mid-litigation judicial transfer of property serving only private interests. What was feared in *Kelo* as the worst-case scenario, that courts would enable property to be taken from one private citizen and handed to another, would become reality.

**3. Judicial Takings Are No Less Offensive than Legislative or Executive Takings.**

The Takings Clause does not discriminate between branches of government. It provides in absolute terms: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Traditionally, most takings cases involve the legislative or executive branches. But the Supreme Court has recognized that judicial action may also effect a taking.

In *Stop the Beach Renourishment v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702 (2010), a four-Justice plurality squarely addressed the concept of "judicial takings." Justice Scalia, writing for the plurality, explained:

"If a legislature or a court declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation." *Id.* at 715.

Justice Scalia emphasized that it "would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat." *Id.*

That is precisely the danger here. Defendant has an established property right in the Cleer.tax domain name, a unique digital asset with commercial value. By ordering permanent transfer of that domain, without compensation, this Court has already extinguished Defendant's property right. But to now impose coercive sanctions to compel the transfer would be to double down on that deprivation: the sanctions themselves would function as the mechanism by which the Court strips Defendant of her property interest.

In other words, the sanctions motion is not ancillary or procedural, it is the very vehicle through which an uncompensated judicial taking would be carried out. Unlike traditional civil contempt, which is meant to coerce compliance with lawful orders, sanctions here would coerce compliance with an order that itself effects a taking. The Constitution does not permit courts to enforce unconstitutional deprivations through the threat of punishment.

Thus, granting Plaintiff's motion would transform this case into the exact scenario Justice Scalia warned against: a judicial taking cloaked as equitable enforcement.

**4. If this Court Issues Coercive Sanctions, it Contradicts Judge Shea's Commitments Made at Confirmation**

When nominated to the federal bench, Judge Michael P. Shea addressed the very concerns that animate this case. In written responses to the Senate Judiciary Committee following the Supreme Court's decision in *Kelo v. City of New London*, Judge Shea stated:

"If confirmed as a district court judge, my role in any eminent domain case would, of course, not be to advocate a client's position but to follow the law, including the Supreme Court's decision in *Kelo*, any other applicable precedents of the Supreme Court or Second Circuit, and any applicable statutes that might restrict the exercise of eminent domain powers."

He further assured the Committee:

"A judge should not allow any personal views on eminent domain he or she might hold to interfere with his or her application of the law to the particular facts of the case."

These assurances reflected the central expectation of Article III judges: that they will apply precedent faithfully and safeguard constitutional limits on governmental power.

If this Court orders coercive sanctions it will depart not only from precedent but from Judge Shea's own sworn commitments at confirmation. The Supreme Court has made clear that due process is violated whenever judicial conduct creates a "serious risk of actual bias — based on objective and reasonable perceptions." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883–84 (2009).

The order already entered in this case, compelling permanent transfer of a private domain name without compensation, before trial on the merits where Defendant could speak in her

defense, in contrast to the recommendations of the Magistrate Judge, foreclosing the objection period in violation of 28 U.S.C. §636(b)(1)(C), and was issued without statutory authorization, stretches *Kelo* beyond recognition. If this Court now imposes coercive sanctions to force compliance with that order, it would deepen the departure from both the constitutional framework and the assurances made at confirmation.

Furthermore, the Court has made personal threats to Defendant in Order 280, showing bias, by stating: "the undersigned suggests that the Defendant would do well to devote her time to complying with the undersigned's orders (lest she face further contempt motions and sanctions) — and ultimately resolving this case — instead of driving the case down dead-end side trails." Such language goes beyond neutral adjudication. It communicates a personal judgment about Defendant's litigation strategy, disparages the exercise of appellate rights as "dead-end side trails," and conveys that continued defense will be punished. These remarks demonstrate the kind of antagonism that the Supreme Court has recognized as inconsistent with impartial justice. See *Liteky v. United States*, 510 U.S. 540, 555 (1994).

The transfer here serves only a private litigant's commercial interests. To enforce it through coercive sanctions would contradict Judge Shea's own promise not to allow personal views or extensions of *Kelo* to override the law. The Senate was assured that *Kelo* would not be extended by judicial fiat. The imposition of sanctions here, compelling uncompensated transfer of private property under threat of punishment, would do exactly that, undermining both constitutional protections and the public's confidence in judicial neutrality.

12

**5. Plaintiff's Motion Knowingly Advances Assertions That are Flatly Contradicted by the Record**

Plaintiff's Motion (ECF 287) asserts that Defendant "has not submitted a statement under oath making clear the steps she has taken to comply with the Court's Order." That statement is demonstrably false, as is apparent by looking at the Docket.

On August 11, 2025, Defendant filed a sworn declaration pursuant to 28 U.S.C. § 1746 (ECF 258-3). That declaration expressly stated it was made "under penalty of perjury," described in detail the steps Defendant had taken to comply with the Court's August 4 Order, and attached corroborating exhibits. Defendant also filed a Status Notice (ECF 258), a supporting medical letter (ECF 258-1), and a Motion for Leave to accept the §1746 declaration or extend the deadline (ECF 258-2), none of which the court has ruled on.

Federal law is clear that an unsworn declaration under §1746 is the functional equivalent of a sworn affidavit. *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985) ("An unsworn statement signed under penalty of perjury satisfies the requirements of an affidavit."); *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) (same). Courts routinely accept such declarations in lieu of notarized affidavits.

Accordingly, Plaintiff's assertion that no sworn statement was filed is not a mistake or a reasonable inference, it is an **intentional misrepresentation flatly contradicted by the docket itself.** Ethical rules forbid such conduct. Including Rule 3.3(a)(1), Model Rules of Professional Conduct ("A lawyer shall not knowingly make a false statement of fact or law to a tribunal") and Rule 11(b)(3), Fed. R. Civ. P. (Representations to the court must have evidentiary support).

Here, Plaintiff's counsel certified a filing that told the Court the opposite of what the docket shows. **This is not zealous advocacy; it is a breach of duty of candor.**

Defendant has already been forced to expend substantial time and resources countering false accusations of "non-compliance" that are disproved by the record, time and again. The Court should not allow Plaintiff's counsel to weaponize misstatements of fact as a litigation tactic.

For these reasons, Defendant respectfully requests that the Court deny Plaintiff's Motion in its entirety and impose sanctions against Plaintiff's counsel, for knowingly misrepresenting the record.

## 6. Plaintiff Attempts to Use Incorrectly Recalled, Unsworn, and Inadmissible Conference Statements as Evidence

Plaintiff's motion further asserts that "Ms. Stranger has affirmatively stated that she does not intend to return the domain to Cleer while her appeals are pending." (ECF 287 at 2). This is false. Plaintiff cannot cite to any filing, declaration, or transcript in which Defendant made such a statement, because none exists.

The only time this issue was discussed was during the parties 'unrecorded Rule 26(f) conference. Defendant made no such affirmative statement, and Plaintiff's counsel expressly refused to permit the conference to be recorded. Plaintiff now seeks to transform unsworn, off-the-record discussion into an "admission" to support a sanctions motion. That is improper as a matter of both procedure and evidence.

Courts consistently hold that statements made during settlement discussions, conferences, or informal meet-and-confers are not admissible to prove liability or support sanctions. *See Fed. R. Evid. 408(a)* (evidence of statements made during compromise negotiations is inadmissible to prove validity of a claim); *Pierce v. F.R. Tripler & Co., 955 F.2d 820, 827–28 (2d Cir. 1992)* (Rule 408 bars use of settlement discussions to prove liability); *Ciolli v. Iravani*, 651 F. Supp. 2d 356, 379 (E.D. Pa. 2009) (informal settlement discussions are inadmissible and cannot form the basis of a factual finding).

Similarly, Rule 26(f) requires parties to meet and confer to plan discovery, but it does not authorize those discussions to be treated as evidence. Courts have recognized that allegations about what was said at such conferences are not a substitute for record evidence. *See, e.g., EEOC v. CRST Van Expedited, Inc.*, 257 F.R.D. 513, 520 (N.D. Iowa 2009) (Rule 26(f) meet-and-confer is for planning, not evidence); *Alexander v. FBI*, 186 F.R.D. 154, 164 (D.D.C. 1999) ("informal meet-and-confer discussions are not evidence and cannot substitute for sworn testimony").

By asserting as fact something allegedly said in an unrecorded 26(f) call, Plaintiff's counsel not only attempts to introduce inadmissible matter, but also mischaracterizes the exchange. Even if such a statement had been made—and it was not—it would be inadmissible under Rule 408 and could not support sanctions. Counsel's reliance on this alleged conversation underscores a disregard for both evidentiary standards and the duty of candor to the Court. See *Model Rule of Professional Conduct 3.3(a)(1)*; *Fed. R. Civ. P. 11(b)(3)*.

For these reasons, Plaintiff's reliance on unsworn, inadmissible conference discussions further discredits its motion. Defendant respectfully requests that the Court deny Plaintiff's Motion in its entirety and impose sanctions against Plaintiff's counsel, for knowingly falsifying the record.

### 7. Plaintiff's Motion Confirms Its Lack of Good Faith in Settlement

This motion also exposes Plaintiff's lack of good faith participation in the Court-ordered settlement process. Plaintiff appeared at the September 18, 2025, settlement conference, without a meaningful offer of compromise, and without any intent to negotiate in good faith. Just three hours after the conference concluded, Plaintiff filed the present motion for coercive sanctions.

That timing speaks volumes. If Plaintiff had been serious about resolution, it would have allowed discussions to proceed before resorting to motion practice. Instead, the record of filing shows that Plaintiff had already prepared this motion in advance, treating the settlement conference as a procedural formality rather than a genuine opportunity to resolve the dispute. Notably, only one of Plaintiff's three counsel of record appeared, further reflecting the limited seriousness with which Plaintiff approached the conference.

Plaintiff may contend that the filing was brief, only one page, and thus could have been drafted after the conference. But, based on billing records (See ECF 247-1), even short filings require research, drafting, internal review, and approval by multiple counsel. This motion bears the signatures of three separate attorneys in two different offices, making it implausible that it was conceived, drafted, circulated for review, and filed in the narrow three-and-a-half-hour window between the close of the settlement conference and its appearance on the docket. The

more reasonable inference is that it was prepared in advance, confirming that Plaintiff had no intent to meaningfully participate in settlement discussions.

Had Plaintiff devoted the same effort to exploring avenues of compromise as it did to preparing this filing, the Court might not be required to address the issue now. The result is that the settlement conference became a waste of judicial and party resources, an outcome directly attributable to Plaintiff's lack of good faith participation.

This is precisely the harm Rule 16 is designed to prevent. The rule empowers courts to require settlement discussions so as to "facilitate settlement" and "conserve judicial resources." Fed. R. Civ. P. 16(a)(5). By arriving without a meaningful offer and immediately pivoting to sanctions litigation, Plaintiff frustrated that purpose and multiplied proceedings instead of narrowing them.

Courts have recognized that a party acts in bad faith when it engages in settlement discussions while simultaneously pursuing aggressive litigation tactics without pause. See *Fisher v. SmithKline Beecham Corp.*, 2008 WL 4501862, at *3 (E.D. Pa. Oct. 7, 2008).*

Here, Plaintiff's decision to file this motion mere hours after the settlement conference reveals that it had no genuine intent to negotiate at all. Rather, Plaintiff treated the settlement process as just another procedural hurdle, turning it into another a waste of judicial and party resources, explaining why this case has more than 280 docket entries one year into litigation. This conduct further shows why Plaintiff's request for sanctions should be denied, and why the Court should instead scrutinize Plaintiff's own litigation behavior, and issue sanctions accordingly.

17

## IV. CROSS-MOTION FOR SANCTIONS AGAINST PLAINTIFF'S COUNSEL

In addition to opposing Plaintiff's Motion, Defendant respectfully moves this Court to impose sanctions against Plaintiff's counsel pursuant to Fed. R. Civ. P. 11, the Court's inherent authority, and Rule 3.3 of the Model Rules of Professional Conduct.

Courts have not hesitated to impose sanctions where counsel misrepresents facts in the record. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) ("[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (recognizing inherent power to sanction counsel for bad-faith misrepresentations). The Second Circuit likewise upholds sanctions where filings lack evidentiary support or are advanced in bad faith. *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).

Here, Plaintiff's one-page motion manages to commit **three separate violations**:

1. **False statement about sworn filings:** Plaintiff asserts that Defendant "has not submitted a statement under oath." (ECF 287 at 2). That is flatly contradicted by ECF 258-3, Defendant's sworn declaration under 28 U.S.C. § 1746. Such a misstatement of the docket violates Fed. R. Civ. P. 11(b)(3) and Model Rule 3.3(a)(1).

2. **Improper reliance on unsworn, inadmissible conference discussions:** Plaintiff next claims that "Ms. Stranger has affirmatively stated that she does not intend to return the domain to Cleer while her appeals are pending." (Id.). No such statement appears in any filing, declaration, or transcript. The only time the issue was even discussed was during an

unrecorded Rule 26(f) call, which Plaintiff refused to allow Defendant to record. Federal law prohibits the use of such unsworn, off-the-record discussions as evidence.

3. **Filing in bad faith, timed to undermine the Court-ordered settlement conference:** Plaintiff filed its sanctions motion only hours after the September 18, 2025, settlement conference, a motion that, by its substance and review signatures, was clearly prepared in advance. Such conduct demonstrates Plaintiff never intended to negotiate in good faith but instead treated the conference as a procedural hurdle.

Taken together, these violations show a deliberate pattern: misstating the docket, misusing inadmissible conversations, and abusing the settlement process. By certifying and filing such a motion, Plaintiff's ounsel breached Rule 11(b), Rule 3.3, and their duties to the Court.

This Court has been presented with multiple opportunities to address Plaintiff's false statements and bad-faith tactics. By declining to act, it has emboldened further misconduct—culminating in the present motion, which rests primarily on demonstrable falsehoods. To overlook such conduct once more would not only invite repetition but would constitute a lapse of the Court's duty to safeguard the integrity of its own process.

Defendant therefore respectfully requests that this Court issue sanctions against both Plaintiff and Plaintiff's undersigned counsel, George B. Musekamp, Evan Cohn, and Michael S. O'Malley, under the Court's inherent authority, in an amount and form the Court deems just and proper, and sufficient to deter further misrepresentations and abuse of the judicial process.

## V. CONCLUSION

This Court has gone where even the majority in Kelo refused to go. By ordering permanent transfer of a disputed domain to a private litigant before trial, it has converted the federal bench into an engine of private expropriation. The Fifth Amendment forbids it. Conscience forbids it. The Court is now asked to punish Defendant for asserting rights that the Constitution guarantees and the Court of Appeals is actively reviewing. This is exactly the type of case law that has undermined the rule of law and led to the civil unrest that the United States is seeing in current events.

The Court's role is to safeguard constitutional rights against the excesses of private power. Yet here, instead of protecting due process and property rights, the Court has compelled their surrender — not after trial, not after judgment, but before appellate review can occur. This is not equity; it is abdication. Like Pontius Pilate, if the Court issues coercive sanctions here it will have washed its hands while delivering Defendant to crucifixion at the behest of her adversaries. The Constitution does not permit judges to help strip property away to appease the crowd. Judicial robes are not meant to be the garments of Pilate. They are meant to be the safeguard of justice.

For these reasons, Plaintiff's Motion for Coercive Sanctions (ECF 287) must be denied, and sanctions should be issued against Plaintiff and Plaintiff's Counsel for filing knowingly false and misleading filings, and not participating in the settlement conference in good faith.

Respectfully submitted,
Crystal Stranger
Pro Se Litigant

20

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 19, 2025 the foregoing was filed using the Court's electronic filing system which will provide notice to all parties.

*/s/ Crystal Stranger*