# EXHIBIT A

Affidavit of Crystal Stranger in Support of Motion for Venue Change

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CLEER LLC | : | 3:24-cv-1496-MPS |
| | : | |
| v. | : | DECLARATION OF CRYSTAL STRANGER |
| | : | IN SUPPORT OF MOTION TO TRANSFER |
| CRYSTAL STRANGER et al. | : | VENUE |
| | : | |

I, Crystal Stranger, declare under penalty of perjury that the following is true and correct:

1. Although I currently reside abroad, I have longstanding ties to New Mexico. My younger daughter was born in New Mexico during the period in which we resided in Las Cruces.

2. My husband owns a home in Las Cruces, and we continue to maintain strong family, financial, and logistical connections to the area.

3. Plaintiff hired and onboarded me while I resided in New Mexico. My employment, payroll, and tax records all reflect that address. Plaintiff was therefore fully aware that New Mexico was my place of residence and work.

4. My father, Simeon Stern, is an elderly and medically fragile non-party witness who resides in Las Cruces, New Mexico. Due to his health conditions, including a heart condition and a neurological disorder that impairs his motor coordination, he would face significant difficulty traveling to Connecticut or participating in remote proceedings. He is unable to operate a

1



computer for video conferencing, and his hand tremors interfere with using a smartphone to join remote calls.

5. Many relevant documents, including historical business and tax records, are stored electronically or physically linked to addresses in New Mexico. None are located in Connecticut.

6. My prior business, 1st Tax, was a New Mexico-registered entity, and I operated it there before merging my practice into GBS/Cleer. I paid business taxes in New Mexico during that time, and many of the processes, templates, and service offerings now used by Cleer originated from my work at 1st Tax.

7. Relevant records pertaining to my prior business, 1st Tax, including financial data, client files, and proprietary operational materials that were integrated into Cleer, are physically stored in New Mexico.

8. At all times, my intention in joining Greenback Business Services ("GBS") was to become a business partner, not a traditional employee. In discussions beginning in 2020, Plaintiff represented that I would receive equity in exchange for demonstrating my value to the company through my client base, tax expertise, and operational contributions.

9. I brought extensive professional materials, systems, and client relationships developed independently through my prior firm, 1st Tax, and was instrumental in building Cleer from its inception. I did not negotiate the terms of the MVA as a free-standing employment agreement, but accepted it under pressure as a means of formalizing long-promised equity.

10. The MVA containing the Connecticut forum clause was presented during peak tax season, with little time for review, and without opportunity to obtain counsel. It was a take-it-or-leave-it condition of continued work and partnership interest. I did not knowingly or voluntarily bargain for Connecticut as a forum.

11. A revised version of the MVA was then presented to me on or about April 14, 2022, immediately before the April 15 U.S. federal tax deadline, a period of intense professional obligation. I gave the document only a brief review under time pressure while prioritizing client compliance deadlines, and I was not represented by legal counsel.

12. Although I was not asked to execute the agreement until June 2, 2022, no further discussions or revisions were offered in the interim. The equity described in the MVA had been promised to me for over two years, and the agreement was presented as a take-it-or-leave-it finalization of that promise.

13. I did not notice when signing the MVA that the extraordinarily long and complex forum selection clause designated Connecticut as the exclusive forum, a jurisdiction I never resided in, rarely visited, and would not have knowingly agreed to for any disputes.

14. I signed the MVA while physically present in Ashland, Oregon. At the time, I was on a brief leave from work to assist my mother, who suffers from dementia and was experiencing significant health challenges. The contract was presented to me without legal counsel, and I signed it while dealing with family caregiving responsibilities. I did not review the contract

again or fully appreciate that the forum had been set in Connecticut, a jurisdiction with which I have no meaningful connection and was wholly unrelated to my work duties.

15. I have never resided in the State of Connecticut. In fact, I have only been physically present in Connecticut on four occasions in my life: once to attend a friend's wedding, once to return a leased vehicle after driving cross-country to New York, once to visit a friend's family, and once to attend trial proceedings in this matter in New Haven.

16. During my tenure at Cleer LLC, including as Chief Operating Officer, I never became aware of any operations, offices, clients, or employees based in the State of Connecticut. The company's leadership was primarily located in Costa Rica and Indonesia, while its staff and contractors were fully remote and geographically dispersed.

17. No part of Cleer's marketing, sales, or delivery strategy was focused on Connecticut or its residents. I am not aware of any clients located in Connecticut, and I do not recall the company ever conducting any business activity specific to that state.

18. At no point during my employment or contractual relationship with Plaintiff did I work in Connecticut or engage in conduct tied to the state. All relevant work was performed remotely or in jurisdictions outside Connecticut.

19. I am currently self-represented after being forced to relinquish legal counsel due to the financial burden of defending this case in a distant forum. Continuing to litigate in Connecticut imposes a significant and unnecessary financial and logistical hardship.

4

20. I reside in South Africa with my family. In order to attend the prior court proceedings in New Haven, I had to travel internationally at great expense. Airfare from Cape Town to Newark alone cost $3,402. A rental car for travel within Connecticut cost $748, and I incurred an additional $182 in tolls.

21. Because New Haven is not within practical driving distance of my in-laws' home in Poughkeepsie, New York, I also had to secure hotel accommodations near the courthouse. The Member Value Agreement containing the Connecticut forum clause was presented during peak tax season, with little time for review, and without opportunity to obtain counsel. It was a take-it-or-leave-it condition of continued work. I did not knowingly or voluntarily bargain for Connecticut as a forum. The cheapest available lodging I could find was $127.26 per night. Meals in New Haven were also costly, with even basic breakfast options near the courthouse costing $20 per person, and average meals running between $50 and $100 per person.

22. As a result of the Preliminary Injunction entered in this case, I was forced to close my business, Optic Tax.

23. The restrictions imposed by the Temporary Restraining Order, particularly the prohibition on email communications, caused substantial disruptions to a separate venture, Xenitha, which my husband and I had acquired after I left Cleer, and we are now in the process of winding up.

24. The ongoing restrictions in the Preliminary Injunction have made it impossible for me to pursue new employment. I am unable to explain the circumstances surrounding my departure

from Cleer LLC, which any prospective employer in the tax or fintech space would reasonably inquire about.

25. My only current source of income is from the occasional webinars I deliver to professional tax organizations, which are not sufficient to meet my basic financial needs. The continuation of this case in an inconvenient and burdensome forum compounds this harm and places me at a severe and ongoing disadvantage.

26. Based on my personal interactions with David and Carrie McKeegan over the course of several years as both a co-founder and COO of Cleer LLC, I am aware that they have not resided in Connecticut at any time relevant to this dispute.

27. Mr. McKeegan frequently referenced their family home in Nosara, Costa Rica, including logistical issues like crossing rivers in a Polaris ATV during rainy season to pick up their children from school.

28. I personally visited the McKeegan family residence in Sanur, Bali, Indonesia, following the company off-site held in the Philippines in 2022.

29. On multiple occasions, Mr. McKeegan explicitly stated to me that he had no intention of ever residing in the United States again and that he structured his finances to "not pay U.S. tax."

30. To my knowledge, neither David nor Carrie McKeegan has resided in Connecticut for over 20 years, nor have they operated any personal or business activities tied to that state.

6

31. Plaintiff's lead trial counsel, George Musekamp, is based in Ohio and is not admitted to practice in Connecticut. To the best of my knowledge, he appeared pro hac vice for the trial.

32. Based on my knowledge of the facts and circumstances outlined above, venue in Connecticut bears no meaningful relationship to the events, parties, or witnesses involved in this dispute. Transferring this matter to the District of New Mexico would serve the interests of justice, provide a fairer forum, and avoid the burdens of litigating in a state with no genuine connection to the controversy.

33. The facts stated herein are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2025, in Cape Town, South Africa.

..................................................
Crystal Stranger

Fish hoek   2025-09-22   09 00

KOMMISSARIS VAN EDE
COMMISSIONER OF OATHS

Jason Bartley
VOORNAME EN VAN IN DRUKSKRIF
FIRST NAMES AND SURNAME IN BLOCK LETTERS

SA Police  APDCM

BESIGHEIDSADRES (STRAATADRES)
BUSINESS ADDRESS (STREET ADDRESS)

Fish hoek

Warrant official.   SA POLICE

SUID-AFRIKAANSE POLISIEDIENS
COMMUNITY SERVICE CENTRE
2 2 SEP 2025
GEMEENSKAPDIENSSENTRUM
VISHOEK / FISH HOEK, K.P. / C.P.
SOUTH AFRICAN POLICE SERVICE