# EXHIBIT G

Membership Vesting Agreement

## MEMBERSHIP VESTING AGREEMENT

THIS AGREEMENT, made and entered into on this 27 day of May, 2022 by and among Greenback Business Services LLC, a limited liability company organized under the laws of the State of Wyoming ("Company"), David McKeegan, an owner of said LLC, Carrie McKeegan, and owner of said LLC, and Crystal Stranger, an employee of said LLC (hereinafter referred to as "Employee").

## **RECITALS**

Company has hired Employee to aid in the operation of the Company, including, but not limited to, by managing its operations;

Employee has certain experience, knowledge, and unique abilities that Company wishes to utilize in developing its business, marketing, and service considerations, including strategic planning;

Employee is already providing services to Company and this Agreement conveys membership interest to Employee but does not change Employee's employment status, except as stated in the terms and conditions set forth herein;

David McKeegan and Carrie McKeegan (together referred to as "McKeegans") own a combined one hundred percent (100%) of the outstanding membership interests in Company (such membership interest hereinafter referred to as the "McKeegan Membership Interest"); and

For Employee's continuing efforts to operate and ensure the success of the Company, McKeegans desires to transfer up to a maximum of twenty percent (20%) of the McKeegan Membership Interest to Employee, upon the terms and conditions below; NOW THEREFORE, in consideration of the mutual promises made herein and the benefits to be derived from this Agreement, the parties hereby represent, warrant, covenant and agree as follows:

1. **Employment Position.** Company has hired Employee in the capacity of International Tax Director / General Manager.

2. **Duties**. Employee will have the following duties and responsibilities:

    a. Employee's primary duties for her role as the International Tax Director / General Manger, will include, without limitation:
        i. Overseeing the tax, bookkeeping and CSA team.
        ii. Steering tax policy and general guidance.
        iii. Providing tax strategy consultations for clients.  iv. Giving webinars and media interviews.
        v. Coordinating the development of technology and tools.
    b. Employee will be provided with Performance Goals that, as a condition of employment under this Agreement, must be met by Employee;

    c. Company will provide Employee with an annual performance review;
    d. Employee will observe the same employment polices and procedures as other Company employees as described by and outlined in the Company's employee manual, if the Company holds one, which the Company may adapt from time to time and that is hereinafter incorporated by reference;
    e. Employee will attend and participate in team meetings as they are scheduled;
    f. Company may provide Employee with tools or other equipment intended to aid Employee in performing the duties of his position. These items and other business essentials will remain the property of Company;
    g. Employee will perform other duties typical of the position held by an employee with Employee's job description and such other duties or projects as may be assigned by Company.
    h. Employee's duties may be reasonably modified at Company's discretion from time to time.

3. **Employee Time.** Employee will devote full, productive time, attention, and energies to the business of Company during designated working hours and will perform all duties in a professional, ethical, and businesslike manner. Employee will work full time hours, which generally will operate from Monday through Friday of each week, except holidays, for hours each day beginning at 8 a.m. and ending on 5 p.m. These hours are not concrete, and Employee's time spent may vary. Employee will perform such duties as are commonly required by her professional education, work experience, and prior instruction, as well as to perform creative tasks, such as the use of invention, imagination, originality, and talent.

4. **Compensation.** Company will pay Employee as follows:

    a. Employee will be paid their annual salary as has already been established by the Company and Employee. This Agreement does not absolve the Company of any obligation to pay Employee their salary; nor does this Agreement alter Employee's current salary with Company.

5. **Expenses.** Company will reimburse Employee for all reasonable and necessary travel, including mileage, lodging, food and entertainment expenses incurred by Employee in performance of his duties and responsibilities under this Agreement provided Employee provides an itemized account of his or her expenditures. Company will not be responsible for any expense incurred by Employee that is not consistent with Company's policies and procedures or that is not approved by Company in advance. Employee understands that Company may provide Employee with equipment to aid Employee in performing his or her employment duties for Company Employee hereby explicitly agrees that, in the event Employee fails to return the equipment at the end of Employee's employment

relationship with Company, Employee may deduct the cost of the equipment from any compensation owed to Employee.

6. **Vesting of Membership Interests.**
    a. As additional consideration during the term of her employment, McKeegans will provide Employee with membership interests in the Company consistent with the following schedule:
        **i.** As of the date of execution of this Agreement (the "Effective Date"), McKeegans will grant Employee six percent (6%) of the McKeegan Membership Interests in the Company, making Employee's total membership interests in the Company six percent (6%). **ii.** Upon the one (1) year anniversary of the Effective Date of this Agreement, McKeegans will grant Employee six percent (6%) of the McKeegan Membership Interests in the Company, making Employee's total membership interests in the Company twelve percent (12%). **iii.** Upon the second (2) year anniversary of the Effective Date of this Agreement, McKeegans will grant Employee eight percent (8%) of the McKeegan Membership Interests in the Company, making Employee's total membership interests in the Company twenty percent (20%). At the third anniversary of the Effective Date of this Agreement, Employee should hold twenty percent (20%) of total membership interest in the Company.
    b. Membership interests vested to Employee shall be equally split between the McKeegans. Specifically, in the first year and second year of this Agreement, David McKeegan and Carrie McKeegan shall each grant Employee three percent (3%) of their individual interest; in the third year of this Agreement, David McKeegan and Carrie McKeegan shall each grant Employee three percent (4%) of their individual interest. After the third year this Agreement, David McKeegan and Carrie McKeegan should have forty percent (40%) each, with Employee holding the remaining twenty percent (20%).
    c. In the event a sale of the Company is made, Employee's interest shall be considered fully vested regardless of the time of the sale. In the event of a sale of the Company, Employee shall have rights to twenty (20%) percent of the overall interest, even if the sale of the Company occurs prior to the second (2) year anniversary of the Effective Date of this Agreement. In other words, if Company is sold in the first or second year of this Agreement, Employee shall automatically be granted the fully vested twenty (20%) Employee is due.
    d. As a condition precedent to the assignment of the above membership interests, Employee agrees that she will execute the attached Amended Operating Agreement.
    e. As a condition subsequent to the assignment of the above membership interests, Employee shall comply with all terms and conditions of this agreement and the Amended Operating Agreement.

7. **Non-Disparagement.**  Employee agrees that, during the term of this Agreement and thereafter, that it will not make statements or representations, or otherwise communicate, directly or indirectly, in writing, orally, or otherwise, to take any action which may, directly or indirectly, disparage Company, its clients, or any subsidiary or affiliate or their respective officers, directors, employees, advisors, businesses or reputations. Notwithstanding the foregoing, nothing in this Agreement will preclude either the Employee or Company from making truthful statements or disclosures that are required by applicable law, regulation or legal process.

8. **Confidentiality and Trade Secrets.**

    a.  Employee will not reveal or otherwise disclose, without prior written approval, to anyone Confidential Information, which will include, without limitation, any of Company' confidential, proprietary or trade secret information that is disclosed to Employee or Employee otherwise learns in the course of employment such as, but not limited to, business plans, designs, marketing interests, products, financial information, including cost and pricing, vendor lists, and sales processes and procedures. Confidential Information will not include any information which: (i) is or becomes publicly available through no act of Employee; (ii) is rightfully received by Employee from a third party without restrictions; or (iii) is independently developed by Employee.

    b.  Should Employee reveal or threaten to reveal this Confidential Information, Company will be entitled to an injunction restraining the Employee from disclosing the same, or from rendering any services to any entity to whom said Confidential Information has been or is threatened to be disclosed.  The right to secure an injunction is not exclusive, and Company may pursue any other remedies it has against the Employee for a breach or threatened breach of this condition, including the recovery of damages from the Employee.

    c.  Employee agrees to act as a trustee of this information and of any Confidential Information learned in connection with the Employee's association with Company when Employee's employment with Company ends, Employee will promptly return all originals and copies of all documents, records, software programs, media, and other materials concerning any Confidential Information, as well as any and all equipment, files, software programs, and other personal property belonging to Company

d.  Employee understands and agrees that he or she will be exposed to Company's trade secrets, including but not limited to information that derives independent economic value from its secret nature. Trade Secrets (hereinafter "Trade Secrets") will include (a) any and all proprietary software solutions used by Company; (b) technical information concerning company salaries, strengths, weaknesses, and skills; (c) information concerning Company's finances, including sales information, profits, accounting information, unpublished financial information, and marketing expenditures; (d) information concerning the company's suppliers or customers, including customer lists, customer information, supplier lists, and supplier information; (e) information concerning business strategies, including marketing plans, business plans, research projects, and product development; (f) and any other information not generally known to the public which, if disclosed, could reasonably be expected to adversely affect Company's business. Employee agrees that he will not reveal or otherwise disclose, without prior written approval, to anyone the Trade Secrets of Company.

e.  Should Employee reveal or threaten to reveal the Trade Secrets of Company, Company will be entitled to an injunction restraining the Employee from disclosing the same, or from rendering any services to any entity to whom said Trade Secrets has been or is threatened to be disclosed. The right to secure an injunction is not exclusive, and Company may pursue any other remedies it has against the Employee for a breach or threatened breach of this condition, including the recovery of damages from the Employee.

f.  Employee agrees to act as a trustee of this information and of any Trade Secrets learned in connection with the Employee's association with Company when Employee's employment with Company ends, Employee will promptly return all originals and copies of all documents, records, software programs, media, and other materials concerning any Trade Secrets, as well as any and all equipment, files, software programs, and other property belonging to Company.

g.  Employee agrees that he will not disclose to Company, use in Company' business, or cause Company to use, any information or material that is the trade secret of another. Employee warrants that his or her performance of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Employee prior to his or her employment with Company.

h.  Employee understands and agrees that his or her obligation to maintain Company' Confidential Information and Trade Secrets will remain in

  effect even after his or her employment with Company ends and will continue for so long as the information remains either Confidential Information or a Trade Secret.

 **i.** Employee understands and agrees that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

9. **Ownership of Intellectual Property.**

 **a.** Employee understands and agrees that he may be asked to create or contribute to the creation of copyrightable works. Employee understands and agrees that copyrightable works that are made within the scope of Employee's employment with Company will be considered "works made for hire" under the Copyright Act and Company will own all copyright rights in such works. Employee warrants and agrees that Employee will not seek and has not sought moral rights in any of the works Employee has created or will create within the scope of Employee's employment.  IF ANY OF THE WORKS CREATED WITHIN THE SCOPE OF EMPLOYEE'S EMPLOYMENT CANNOT CONSTITUTE A WORK MADE FOR HIRE UNDER THE COPYRIGHT ACT, EMPLOYEE EXPRESSLY ASSIGNS ALL COPYRIGHT RIGHTS IN THOSE WORKS TO COMPANY.

 **b.** Employee understands and agrees that Employee will promptly inform Company of the full conception of and details of any and all inventions, discoveries, improvements, innovations, and ideas, whether or not patentable or protectable, that Employee conceives of, completes, or reduces to practice that (a) relate to the Company's present or prospective business; (b) result from work done by Employee using Company's equipment, facilities, materials, trade secrets, or personnel; or (c) result from or are suggested by any work that Employee has or may do for Company Employee hereby agrees to assign to Company his entire right,

    title, and interest in and to all developments, patent applications, or issued patents, including those applied for or issued in foreign countries, to Company that are made or conceived of, whether alone or with others, while Employee is employed by Company.

    c. Employee agrees to aid in and execute any and all documents necessary to prepare any papers that Company may consider necessary or helpful to obtain or maintain any patents, copyrights, trademarks, or other proprietary rights and will do so at no charge to Company

10. **Termination.**

    a. Employee's continued employment with Company and the performance of this Agreement will start on the date this Agreement is fully executed and will continue until terminated. Employee understands and agrees that Employee is an at-will employee and may be terminated at any time and for any reason. On termination of this Agreement, regardless of how termination is affected, or whenever requested by Company, the Employee will immediately return to Company all of Company' property used by the Employee in rendering services or otherwise, that is in the Employee's possession or under Employee's control. Termination will not terminate Employee's non-compete and non-solicitation obligations pursuant to Sections 11 and 12 below, and Employee's non-compete and nonsolicitation obligations will survive termination for the applicable periods specified. Termination of this Agreement and Employee's employment with the Company will also terminate Employee's right to vest in or receive any membership interests from McKeegans or the Company not yet vested or assigned at the time of termination.

    b. Upon termination of Employee, Company, David McKeegan, or Carrie McKeegan shall have the right to buy back all membership interests held by Employee at the time of termination ("Repurchasing Membership Interest"). The value of Employee's membership interest at the time of Repurchasing Membership Interest shall be determined by a third-party individual or entity that specializes in valuation of company's interest, in the good faith discretion of the Company.

11. **Non-Compete.**

    a. Employee will devote her full productive time, attention, and energies to the business of Company during the hours scheduled for work and will perform all duties in a professional, ethical, and businesslike manner.

    b. Employee agrees and acknowledges that Company has invested substantial time, money, and resources in the development, protection, and retention

of its Confidential Information, intellectual property, customers, accounts, business partners, trade names, trademarks, trade dress, existing and prospective customer relationships, goodwill, and specialized employee training (collectively, "Legitimate Business Interests"). Employee specifically acknowledges that as a result of this Agreement, Employee has had and/or will have access to the Company's Legitimate Business Interests and/or Confidential Information, including introduction to existing and prospective Company customers, accounts, and business partners. Employee further acknowledges and agrees that any and all goodwill associated with any customers or prospective customers, accounts, or business partners belongs exclusively to the Company, including, but not limited to, any goodwill created as a result of direct or indirect contacts or relationships between the Employee and any customers or prospective customers, accounts, or business partners.

Employee further specifically agrees and acknowledges that the Company's Confidential Information is not generally known or available to the public and gives the Company a significant competitive economic advantage in its field of business. Additionally, Employee acknowledges and agrees that Employee possesses proprietary knowledge and skills that are special, unique, or extraordinary and that the value of the Company depends upon his use of such skills on its behalf.

c. In order to protect Company's Legitimate Business Interests, Employee agrees that in the event of a for-cause termination by Company against Employee, during this Agreement and for a period of twelve (12) months following the termination of this Agreement:

   i. Employee will not, directly or indirectly own, operate, or control, or participate in the ownership, operation, or control of, any "Restricted Companies" (defined below).

   ii. Employee will not accept employment with, consult for, or perform any services for any "Restricted Companies" (defined below) anywhere in the United States if such employment or engagement:

   1. requires Employee to serve in a position or perform services that are similar to the position Employee held or duties Employee performed for Company, or

   2. might cause Employee to access, use, or disclose Confidential Information, unless Employee first obtains the written consent of a duly-authorized officer of Company

      iii. The term "Restricted Companies" refers to company or its parent, subsidiary, affiliated company, or divisions of the company in the business of book keeping, tax services, corporate tax services, certified public accountant work, general consultation of tax related ventures, among other related industries.
 1.
      iv. The term "for-cause" is defined as gross negligence or conduct contrary to the wellbeing of the Company. Actions that constitute for-cause conditions included, but are not limited to, the following actions by Employee:

1. Violation of the Company code of conduct or ethics policy;
2. Failure to follow Company policy;
3. Breach of this Agreement;
4. Violence or threatened violence;
5. Threats or threatening behavior to a colleague or customer;
6. Stealing Company money or property;
7. Lying to Company;
8. Falsifying records;
9. Extreme insubordination;
10. Harassment; or
11. A conviction for felony crimes;

d. In the event that Employee and Company terminate this Agreement or Employee's employee status for any reason, other than termination defined as for-cause, as defined in Section 11(c)(iv), then Employee shall not be bound by this non-compete section.

e. By signing this Agreement, Employee acknowledges that the Company's business is done throughout the United States and that the geographic and temporal limitations set forth above are therefore reasonable.

f. Nothing in this Section and its subparts shall be deemed to prohibit any conduct as to which Employee obtains the express prior written consent from an authorized person of Company

g. Employee agrees that breach of this Agreement will cause irreparable injury to Company, such that monetary damages would not provide an adequate or complete remedy. Accordingly, in the event of Employee's actual or threatened breach of the provisions of this Agreement, the Company, in addition to all other rights, shall be entitled to an injunction

      restraining Employee from an actual or threatened breach of this Agreement, and to recover from Employee its reasonable attorneys' fees and costs incurred in obtaining such remedies, including temporary or permanent injunctive relief.

    h. The period of time during which Employee is subject to the Agreement shall be extended for that amount of time Employee is in breach of the Agreement.

12. **Non-Solicit.**

    a. During the time that Employee is employed with the Company, and for a period of twelve (12) months following the termination of Employee's employment for any reason (whether such termination is voluntary or involuntary), Employee agrees that, in the absence of prior written approval by a duly-authorized officer of Company, Employee will not:

        i. directly or indirectly contact, solicit, accept business from, or communicate the fact or circumstances of Employee's resignation from or termination of employment with Company to any of Company's customers or suppliers, or prospective customers or suppliers, with whom Employee had direct or indirect contact or solicited on behalf of Company in the two (2) years prior to Employee's termination, for the purpose of selling or soliciting products or services that are in competition with the products or services of Company; and

        ii. directly or indirectly contact, solicit, recruit or hire any employees of the Company with whom Employee worked or had contact for the purpose of causing, inviting, or encouraging any such employee to alter or terminate his or her employment or business relationship with Company

13. **Final Agreement**.  This Agreement supersedes any prior agreement between the Employee and Company, including, but not limited to, any other agreement relating to salary or any other form of compensation from Company to which Employee may claim an entitlement for any reason.

14. **Severability.**  If, for any reason, any provision of this agreement is held invalid, all other provisions of this agreement will remain in effect.

15. **Amendment.** This Agreement may be modified only by a further writing that is duly executed by both parties.

16. **Choice of Law, Jurisdiction, and Venue**. Company and Employee agree that any dispute, claim, or controversy arising out of or in relation to Employee's employment relationship with Company, this Agreement, or the applicability, breach, termination, validity, enforcement, or interpretation of this Agreement, will be settled by final binding, confidential, and individual arbitration. Except as where otherwise stated herein, this Agreement to arbitrate includes, but is not limited to, any claim that could be asserted in court or before an administrative agency or claims for which the employee has an alleged cause of action, including without limitation claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, discrimination based on sex, pregnancy, race, national or ethnic origin, age, religion, creed, marital status, sexual orientation, mental or physical disability or medical condition or other characteristics protected by statute); claims for wrongful discharge; violations of the Family and Medical Leave Act (FMLA); violations of confidentiality or breaches of trade secrets; and/or claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance, and whether based on statute or common law; and all of the foregoing claims whether made against Company, any of its subsidiary or affiliated entities, or its individual officers or directors (in an official or personal capacity). This Agreement to arbitrate does not cover or include: a claim for workers' compensation benefits; a claim for unemployment compensation benefits; a claim under the National Labor Relations Act (NLRA), as amended; a claim by Company for injunctive or other equitable relief, including, without limitation, claims for unfair competition and the use or unauthorized disclosure of trade secrets or confidential information, for which Company may seek and obtain relief from a court of competent jurisdiction; and a claim based on Company's current (successor or future) employee benefits and/or welfare plans that contain an appeal procedure or other procedure for the resolution of disputes under the plan.

    If there is a dispute about whether this arbitration clause can be enforced or applies to the dispute between Employee and Company, Employee and Company agree that the arbitrator will decide that issue. Notwithstanding the foregoing, Employee and Company each agree that any claim related to actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights will not be subject to this arbitration clause or arbitration.

    Employee and Company agree that the Federal Arbitration Act will govern the interpretation and enforcement of this arbitration provision. The arbitration will be administered under American Arbitration Association's most recent

Employment Arbitration Rules then in effect except where as modified herein. The arbitration will be conducted in Fairfield County, Connecticut and will be decided by a single arbitrator randomly selected from a list of neutral arbitrators maintained by the American Arbitration Association. Judgment on any award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator will be provided with the right to award costs and attorneys' fees to the prevailing party. This arbitration will be held in Fairfield County, Connecticut and both Parties agree that they will be required to be present in Fairfield County, Connecticut for arbitration under the terms of this Agreement and hereby submit to exclusive personal jurisdiction in Fairfield County, Connecticut. The arbitrator will apply the laws of the State of Connecticut and the federal laws of the United States in deciding any controversy or claim pursuant to this arbitration clause.

Company and Employee acknowledge and agree that each are waiving the right to a trial by jury as to all arbitrable disputes.

Employee agrees that, to the extent any disputes, claims, or controversies arising out of or in relation to Employee's employment relationship with Company or this Agreement are not subject to arbitration as outlined above, any and all claims arising out of or related to Employee's employment with Company shall be exclusively brought in the district or circuit courts located in Fairfield County, Connectic or, for federal claims, the United States District Court for the District of Connecticut. Employee specifically agrees to exclusive jurisdiction in district or circuit courts located in Fairfield County, Connecticut, or, for federal claims, the United States District Court for the District of Connecticut. This Agreement is to be governed exclusively by Michigan law. No other forum or choice of law is acceptable.

17. **No-Retaliation/Employment At-Will.** Under no circumstances will a Company employee be retaliated against in any way for invoking arbitration or any other remedy under the terms of this Agreement in good faith to seek the resolution of a dispute. Company employees who engage in such retaliation will be subject to discipline under the appropriate disciplinary procedures. The arbitration clause outlined above does not in any way alter the at-will employment status of Company employees. Company and its employees are always free to terminate the employment relationship at any time for any lawful reason and employment is not for any specific or definite duration.

18. **No Assignment**.  Neither this Agreement nor any interest in this Agreement may be assigned by Employee without the prior express written approval of Company, which may be withheld by Company at Company's sole and absolute discretion.

The undersigned represent that they have the authority to enter into this Agreement, have read and understand its terms, and are agreeing to be bound by the Agreement.

**Employee:**

_____   Date:
Crystal Stranger (Jun 2, 2022 15:48 PDT)
Crystal Stranger

**Company:**

_____   Date: June 2, 2022
David McKeegan
David McKeegan, as Member of Greenback Business Services LLC

_____   Date: June 2, 2022
Carrie McKeegan (Jun 2, 2022 16:51 MDT)
Carrie McKeegan, as Member of Greenback Business Services LLC

**David McKeegan:**

_____   Date: June 2, 2022
David McKeegan
David McKeegan, Member

**Carrie McKeegan:**

_____   Date: June 2 2022
Carrie McKeegan (Jun 2, 2022 16:51 MDT)
Carrie McKeegan, Member